**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
E-mail: jpafiti@pomlaw.com

*Attorney for Plaintiff*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER VATAJ, Individually and On Behalf of All Others Similarly Situated, | ) ) ) ) ) |
| Plaintiff, | Case No. |
| v. | ) CLASS ACTION ) |
| WILLIAM D. JOHNSON, JOHN R. SIMON, GEISHA WILLIAMS, and JASON P. WELLS, | ) COMPLAINT FOR VIOLATIONS OF THE ) FEDERAL SECURITIES LAWS ) ) DEMAND FOR JURY TRIAL |
| Defendants. | ) ) ) |

Plaintiff Christopher Vataj ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding PG&E Corporation ("PG&E" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired PG&E securities between December 11, 2018, and October 11, 2019, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     PG&E Corporation was incorporated in 1905 and is based in San Francisco, California.  The Company, through its subsidiary, Pacific Gas and Electric Company ("Pacific Gas"), engages in the sale and delivery of electricity and natural gas to residential, commercial, industrial, and agricultural customers in northern and central California of the United States.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

3. PG&E's electricity distribution network consists of approximately 107,000 circuit miles of distribution lines, fifty transmission switching substations, and 769 distribution substations. The Company's electricity transmission network comprises approximately 18,000 circuit miles of interconnected transmission lines and eighty-four electric transmission substations. The Company's natural gas system consists of approximately 43,100 miles of distribution pipelines, approximately 6,400 miles of backbone and local transmission pipelines, and various storage facilities. Additionally, the Company also owns and operates nuclear, hydroelectric, fossil fuel-fired, and solar electricity generation facilities.

4. On January 29, 2019, PG&E filed a voluntary petition for reorganization under Chapter 11 in the U.S. Bankruptcy Court for the Northern District of California. The Chapter 11 petition followed in the wake of multiple high-profile lawsuits against PG&E related to widely publicized and catastrophic wildfire incidents that occurred in California in 2015, 2017, and 2018. The incidents were faulted to PG&E, whose alleged misconduct apparently caused the Company's equipment to ignite the wildfires. PG&E is facing $30 billion in liabilities in connection with the wildfires.

5. Following the wildfire incidents, PG&E began periodically initiating rolling power outages across its customers' facilities and service areas. The blackouts were intended to reduce the risk of future wildfire events and scheduled for times when dangerous weather conditions exacerbated chances of further wildfires occurring.

6. Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) PG&E's purportedly enhanced wildfire prevention and safety protocols and procedures were inadequate to meet the challenges for which they were ostensibly designed; (ii) as a result, PG&E was

unprepared for the rolling power cuts the Company implemented to minimize wildfire risk; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

7.     On October 12, 2019, the *New York Times* published an article reporting on PG&E's efforts to deal with the rolling power cuts it had implemented in California aimed at minimizing wildfire risk.   The article reported, among other issues, that "PG&E's communications and computer systems faltered, and its website went down as customers tried to find out whether they would be cut off or spared."  According to the article, "[a]s the company struggled to tell people what areas would be affected and when, chaos and confusion unspooled outside.  Roads and businesses went dark without warning, nursing homes and other critical services scrambled to find backup power and even government agencies calling the company were put on hold for hours."

8.     On this news, PG&E's stock price fell $0.35 per share, or 4.36%, to close at $7.67 per share on October 14, 2019, the following trading day.

9.     On October 23, 2019, it was reported that as a last resort to prevent additional wildfires PG&E began shutting off power to 179,000 homes and businesses in 17 northern and central California counties.

10.     Following this news, PG&E's stock price fell $1.00 per share, or 12.2%, to close at $7.20 on October 24, 2019.

11.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

14.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  PG&E is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' activities took place within this Judicial District.

15.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

16.     Plaintiff, as set forth in the attached Certification, acquired PG&E securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

17.     Defendant William "Bill" D. Johnson ("Johnson") has served as PG&E's Chief Executive Officer ("CEO") and President since May 2, 2019.

18.     Defendant John R. Simon ("Simon") was named as PG&E's Interim CEO on January 13, 2019.  Simon served in this role since January 13, 2019, following the resignation of Defendant Geisha Williams ("Williams"), and while the Company was searching for a new CEO.  Simon stepped down from the role of Interim CEO following the Company's decision to

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

name Defendant Johnson as CEO.  Simon currently serves as PG&E's Executive Vice President, Law, Strategy and Policy.

19.     Defendant Williams served as PG&E's CEO from before the start of the Class Period until January 13, 2019, when she stepped down from her role as CEO and resigned from the Boards of both PG&E and Pacific Gas.

20.     Defendant Jason P. Wells ("Wells") has served as PG&E's Chief Financial Officer at all relevant times.

21.     Defendants Johnson, Simon, Williams, and Wells are sometimes referred to herein as the "Individual Defendants."

22.     The Individual Defendants possessed the power and authority to control the contents of PG&E's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of PG&E's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with PG&E, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

23.     PG&E is a California-registered corporation with its principal executive offices located at 77 Beale Street, P.O. Box 770000, San Francisco, California 94177.  PG&E's

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

securities trade in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "PCG."

24.     PG&E Corporation was incorporated in 1905 and is based in San Francisco, California.  The Company, through its subsidiary, Pacific Gas, engages in the sale and delivery of electricity and natural gas to residential, commercial, industrial, and agricultural customers in northern and central California of the United States.

25.     PG&E's electricity distribution network consists of approximately 107,000 circuit miles of distribution lines, fifty transmission switching substations, and 769 distribution substations.  The Company's electricity transmission network comprises approximately 18,000 circuit miles of interconnected transmission lines and eighty-four electric transmission substations.  The Company's natural gas system consists of approximately 43,100 miles of distribution pipelines, approximately 6,400 miles of backbone and local transmission pipelines, and various storage facilities.  Additionally, the Company also owns and operates nuclear, hydroelectric, fossil fuel-fired, and solar electricity generation facilities.

26.     On January 29, 2019, PG&E filed a voluntary petition for reorganization under Chapter 11 in the U.S. Bankruptcy Court for the Northern District of California.  The Chapter 11 petition followed in the wake of multiple high-profile lawsuits against PG&E related to widely publicized and catastrophic wildfire incidents that occurred in California in 2015, 2017, and 2018.  The incidents were faulted to PG&E, whose alleged misconduct apparently caused the Company's equipment to ignite the wildfires.  PG&E is facing $30 billion in liabilities in connection with the wildfires.

27.     Following the wildfire incidents, PG&E began periodically initiating rolling power outages across its customers' facilities and service areas.  The blackouts were intended to

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

reduce the risk of future wildfire events and scheduled for times when dangerous weather conditions exacerbated chances of further wildfires occurring.

### Materially False and Misleading Statements Issued During the Class Period

28.     The Class Period begins on December 11, 2018.  On December 10, 2018, during after-market hours, PG&E issued a press release announcing its enhanced wildfire prevention and safety efforts (the "December 10, 2018 Press Release").  The December 10, 2018 Press Release touted that PG&E would "be implementing a series of additional precautionary measures intended to further decrease wildfire threats in communities that are at higher risk of wildfires," including, in relevant part:

- Implementing a series of additional safety measures, including expanded inspections and other safety precautions intended to further reduce wildfire threats throughout its service area[.]

* * *

- Detailed and Enhanced Inspections of Electric Infrastructure: Conducting detailed safety inspections of more than 5,500 miles of transmission lines (consisting of approximately 50,000 transmission poles and towers in high fire-threat areas), in addition to routine inspections and maintenance . . . . If any issues are identified as a potential risk to public safety, PG&E will take action to address them right away. PG&E also plans to begin similar inspections of its distribution lines in high fire-threat areas in early 2019.

* * *

- More Real-Time Monitoring and Intelligence: As shared in early November and a part of the company's 2020 General Rate Case, expanding PG&E's weather station network to enhance weather forecasting and modeling. By 2022, PG&E will add approximately 1,300 new weather stations, a density of one station roughly every 20 miles in the high fire-risk areas. In addition, PG&E plans to install nearly 600 new, high definition cameras in high fire-threat areas by 2022, increasing coverage across high fire-risk areas to more than 90 percent.

29.     Additionally, the December 10, 2018 Press Release touted that "PG&E will be expanding and enhancing its system-wide Community Wildfire Safety Program (CWSP), which

8

was implemented following the 2017 wildfires as an additional set of precautionary measures intended to further reduce wildfire threats," and that "[t]hese new safety and operational actions and enhancements are designed to enhance current safety measures, as well as further inspect and harden the electric system."

30.     The December 10, 2018 Press Release also quoted the Company's then-CEO, Defendant Williams, who assured investors that PG&E was taking the necessary steps and "acting decisively" to address wildfire-related threats, and was committed to working with regulators, state leaders, and customers to make the communities the Company served safer. Specifically, as quoted in the December 10, 2018 Press Release, Defendant Williams stated, in relevant part:

> As Californians, we are all faced with the devastating realities of extreme weather and the growing wildfire threat. In recent years, we've made significant changes and additions to our business to combat these weather events, but the climate is changing faster. All of us at PG&E are determined to enact additional safety measures and initiatives that will help further reduce the risk of wildfires and keep customers and communities safe . . . . We are acting decisively now to address these real and growing threats, and we are committed to working together with our regulators, state leaders and customers to consider what additional wildfire safety efforts we can all take to make our communities safer.

31.     A few days later, on December 13, 2018, PG&E issued another press release announcing the Company's proposed critical investments to enhance wildfire safety and help reduce wildfire risk (the "December 13, 2018 Press Release").  According to the December 13, 2018 Press Release, and as "[r]eflecting the company's commitment to address the growing threat of wildfires, PG&E . . . propos[ed] a series of important additional safety investments as part of its 2020 General Rate Case" (the "GRC"), which the Company submitted to the CPUC [California Public Utility Commission] on the same date, "to help further protect the 16 million people it serves."  Further, Defendants touted that the GRC "include[d] additional precautionary measures implemented after the 2017 and 2018 wildfires to help further reduce wildfire threats,"

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

and that *"[s]uch measures will help bolster wildfire prevention, risk monitoring and emergency response; add new and enhanced safety measures; increase vegetation management; and harden PG&E's electric system to help further reduce wildfire risk*." (Emphasis added).[1]

32.    Additionally, the December 13, 2018 Press Release quoted Steve Malnight, PG&E's Senior Vice President of Energy Supply and Policy, who assured investors "[w]e understand and embrace our responsibility to safely provide electricity and gas to the communities we have the privilege to serve," and that "[a]s California experiences more frequent and intense wildfires and other extreme weather events, we must take necessary, bold and urgent steps to protect our customers. The prudent investments we are proposing will help build a safer and more resilient energy system for the future[.]"

33.    On January 4, 2019, PG&E released yet another press release espousing promises of expanded safety efforts—this time on behalf of the Company's Board of Directors (the "Board")—highlighting at the top of that press release that a "**Board Refreshment Process [was] Underway**," the "**Board [was] Reviewing Structural Options for PG&E**," and that "**Independent Experts [were] to Advise [the] Board on Additional Wildfire Safety Best Practices**" (the "January 2019 Press Release").

34.    The January 2019 Press Release touted that "[t]he Board . . . is making changes to reinforce the company's commitment to safety and improvement," which included, "[i]n addition to prior actions taken to confront the growing wildfire threat, . . . *actively assessing PG&E's operations*, finances, *management, structure, and governance*" (emphases added), while "remain[ing] focused on improving safety and operational effectiveness." According to the January 2019 Press Release, specific actions the Board would take included, in relevant part:

---

[1] All other emphases are as they appear in the original statements, unless specified otherwise.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- [C]onducting a Board refreshment process that includes searching for new directors at both the holding company and its utility subsidiary Pacific Gas . . . . The Board is looking to add fresh perspectives to augment its existing expertise in safety, operations, and other critical areas. The Board is working with a leading search firm to identify new directors and is currently interviewing several candidates[; and]

- [R]eviewing structural options to best position PG&E to implement necessary changes while meeting customer and operational needs.

In this respect, the January 2019 Press Release also assured investors that the Board had already "formed a special Board committee that is engaging independent experts to advise on best practices in wildfire safety. The committee is also assessing the additional operational changes proposed by management to enhance safety as PG&E prepares for the 2019 wildfire season."

35.     The January 2019 Press Release also contained a quoted statement from the Board, which assured investors, in relevant part:

> The members of the Board fully understand PG&E's responsibility to its customers, the communities it serves, and all of its stakeholders to drive safety and operational excellence. That is why we are redoubling our ongoing wildfire safety efforts *and are looking at every possible action PG&E can take to improve*. We want to tap fresh perspectives and additional expertise to help address the changing nature of PG&E's business and the challenges it faces now and in the future. We are committed to working closely with the California Public Utilities Commission, policymakers, and other stakeholders to provide PG&E customers the safe, reliable, and affordable natural gas and electric services they expect and need.

(Emphasis added.)

36.     On February 6, 2019, PG&E issued a press release announcing the Company's "2019 Wildfire Safety Plan," which included yet additional safety precautions (the "February 6, 2019 Press Release"). According to the February 6, 2019 Press Release, these "additional and enhanced safety precautions include[ed] the expansion of PG&E's Public Safety Power Shutoff" ("PSPS") "program to include all electric lines that pass through high fire-threat areas – both transmission and distribution," and that "[w]hile customers in high fire-threat areas are more likely to be affected, any of PG&E's more than 5 million electric customers could have their

power shut off for safety only as a last resort when forecasted fire danger conditions warrant."

Further, the February 6, 2019 Press Release specifically assured investors that "[t]he expanded

program includes *timely notification to customers* of potential PSPS events" (emphasis added),

"reflects the unique size and geography of PG&E's 70,000-square-mile service area of which

more than half is located in extreme or elevated fire-threat areas," and "addresses an array of

wildfire risk factors through new and ongoing measures."

       37.     Additionally, the February 6, 2019 Press Release touted that PG&E's 2019

Wildfire Safety Plan "builds on PG&E's comprehensive Community Wildfire Safety Program,

launched in March 2018," and that "PG&E has completed or is implementing these important

safety enhancements and investments to help keep our customers and communities safe."

According to Defendants, these actions included, in relevant part, the following:

- Established a new 24/7 Wildfire Safety Operations Center to monitor wildfire risks in real-time and coordinate prevention and response efforts;

- Expanded its network of PG&E weather stations to enhance weather forecasting and modeling and better predict where wildfire danger could occur, with more than 200 new weather stations installed to date;

- Installed new high-definition cameras in high fire-threat areas in Napa, Marin and Sonoma counties to improve real-time monitoring across high fire-risk areas;

\* \* \*

- Developed a new program to proactively turn off power for safety, only as a last resort, when extreme fire danger conditions are forecasted (Public Safety Power Shutoff), and coordinated efforts with public safety authorities and other community partners;

\* \* \*

- Initiated construction on a pilot resilience zone project in Angwin (Napa County), which includes infrastructure upgrades that enables the company to provide electricity to central community resources if power lines need to be turned off for safety due to high wildfire threats; and

- Held over 450 meetings with state and local community leaders and emergency response partners around wildfire safety and preparedness.

38.     The February 6, 2019 Press Release also quoted Michael Lewis ("Lewis"), PG&E's Electric Operations Senior Vice President, who assured investors that "[w]e know how much our customers rely on electric service," and that the Company understood that "[p]roactively turning off power is a highly complex issue with significant public safety risks on both sides – all of which need to be carefully considered and addressed."

39.     The February 6, 2019 Press Release additionally quoted Sumeet Singh ("Singh"), PG&E's Vice President of the Community Wildfire Safety Program, who assured investors that "an extended and more dangerous wildfire season . . . demands urgent action and coordination," and that "[t]he wildfire safety actions and programs described in [PG&E's] 2019 plan address the company's unique and diverse service area and provide our regulators, customers and communities with transparency of our unwavering efforts to help further reduce the risk of wildfire and improve public safety."

40.     On February 11, 2019, PG&E issued a press release providing an update on the Company's Board refreshment process (the "February 11, 2019 Press Release"). The February 11, 2019 Press Release touted that "[t]he Board is working with a leading search firm and has identified strong candidates who would add fresh perspectives and augment the Board's expertise in safety, operations and other critical areas."

41.     The February 11, 2019 Press Release also contained a statement from the Board, which assured investors that the Company understood its prior safety deficiencies and was making every effort to enlist management and those with expertise to rectify these deficiencies. Specifically, as quoted in February 11, 2019 Press Release, the Board stated, in relevant part:

> We fully understand that PG&E must re-earn trust and credibility with its customers, regulators, the communities it serves and all of its stakeholders, and we are continuing to make changes that reinforce PG&E's commitment to safety

13

and improvement. We recognize the importance of adding fresh perspectives to the Board to help address the serious challenges the business faces now and in the future. That is why we are committed to significant Board refreshment with the current expectation that no more than five current directors will stand for election and the intention that a majority of the Board will be new independent directors. We have been working diligently to identify respected professionals with relevant experience in safety, operations and other critical areas, and we have identified a number of strong candidates. Throughout this process of identifying and evaluating candidates, we intend to remain engaged with our shareholders and other stakeholders on potential new director nominees to ensure we are aligned and are evaluating the most qualified candidates who can help PG&E deliver safe and reliable service to our customers in the years ahead.

42.     On February 28, 2019, PG&E filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2018 (the "2018 10-K"). The 2018 10-K touted PG&E's 2019 Wildfire Safety Plan, stating, in relevant part:

The 2019 Wildfire Safety Plan . . . describes forecasted work and investments in 2019 that are designed to help further reduce the potential for wildfire ignitions associated with the Utility's electrical equipment in high fire-threat areas. The 2019 Wildfire Safety Plan specifically addresses wildfire risk factors that occur most frequently and have potential to start or spread a fire. The new and ongoing safety measures being pursued include:

- Installing nearly 600 new, high-definition cameras, made available to Cal Fire and local fire officials, in high fire-threat areas by 2022, increasing coverage across high fire-threat areas to more than 90%;

- Adding approximately 1,300 additional new weather stations by 2022, at a density of one station roughly every 20 circuit miles in high fire-threat areas; [and]

\* \* \*

- Partnering with additional communities in high fire-threat areas to create new resilience zones that can power central community resources during a Public Safety Power Shutoff.

43.     Appended as an exhibit to the 2018 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 wherein Defendants Simon and Wells certified that "the [2018] 10-K fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange

Act of 1934" and that "the information contained in the [2018] 10-K fairly presents, in all material respects, the financial condition and results of operations of PG&E Corporation."

44.     On April 3, 2019, PG&E issued a press release announcing the appointment of a new CEO and a refreshed Board focused on enhancing safety culture and operational excellence (the "April 3, 2019 Press Release").  The April 3, 2019 Press Release touted that "[s]afety at PG&E is the central-most mission of both the management team and the Board," and that, "[t]o that end, PG&E made a commitment to enacting leadership changes, including selecting a new CEO and undertaking a significant Board refreshment process."  Further, the April 3, 2019 Press Release touted that the "refreshed Board . . . includes 13 highly accomplished individuals committed to further enhancing PG&E's safety culture, understanding and properly responding to customer concerns and fairly treating wildfire victims, employees, retirees and other interested parties."

45.     The Board, as quoted in the April 3, 2019 Press Release, assured investors that "[w]e have heard the calls for change and have taken action today to ensure that PG&E has the right leadership to bring about real and dynamic change that reinforces our commitment to safety, continuous improvement and operational excellence."  The Board also stated that they "believe [the] new CEO and the newly constituted Board will help PG&E address California's evolving energy challenges and deliver what our customers expect from their energy company."

46.     With respect to the new Board's credentials, the April 3, 2019 Press Release stated, in relevant part:

> PG&E believes that a diverse Board with a mix of operational, safety, risk management, regulatory, restructuring, financial, audit and business experience will be critical in continuing improvements to safety, driving operational excellence and navigating the restructuring process. The new directors include individuals who have lived and worked in California, received degrees from universities in California, and who have California-related regulatory experience. The newly comprised Board will include:

- Industry leaders who have dedicated their careers to delivering safe and reliable utility service to millions of customers;

- Leaders with fresh perspectives on safety and risk management; and

- Leaders with over 125 years of collective experience in financial and operational restructurings, which often involved making fundamental changes to corporate culture. This experience will not only help guide PG&E through Chapter 11, but will also enable cultural change at PG&E.

47. On April 11, 2019, PG&E issued another press release announcing yet further Board actions to enhance safety operations at the Company (the "April 11, 2019 Press Release"). According to the April 11, 2019 Press Release, these further actions included:

- **Appointing former state and federal regulator Nora Mead Brownell to serve as Chair of the Board of PG&E Corporation.** Ms. Brownell has an expansive career in the energy sector and has served as a Commissioner of the Federal Energy Regulatory Commission (FERC), a member of the Pennsylvania Public Utility Commission and President of the National Association of Regulatory Utility Commissioners.

- **Appointing former U.S. Ambassador Jeffrey Bleich to serve as Chair of the Board of Pacific Gas and Electric Company.** Mr. Bleich is a longtime California resident and former Partner at the global law firm Dentons and a leader of its global diplomatic consulting group. He has previously served as the U.S. Ambassador to Australia, Special Counsel to President Obama, Chair of the California State University Board of Trustees, President of the California State Bar, a member of the Governor's International Trade and Investment Council and President of the Bar Association of San Francisco.

- **Appointing Bill Johnson as Chief Executive Officer and President, effective May 1, 2019.** Mr. Johnson recently concluded a more than six-year tenure as President and CEO of the Tennessee Valley Authority (TVA), where he was responsible for leading the nation's largest publicly owned utility in its mission of providing energy, environmental stewardship and economic development across a seven-state region. Mr. Johnson has almost 30 years of experience in the electric utility industry, where he has collaborated closely with elected officials and other community leaders to deliver safe and reliable electricity to millions of customers.

48. With respect to these new appointments, the Board, as quoted in the April 11, 2019 Press Release, stated that it was "focused on taking additional actions to bring about real and dynamic change that reinforces our commitment to safety and continuous improvement,"

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

and that "[t]he appointments of Nora Mead Brownell and Jeffrey Bleich, two respected leaders with a deep understanding of the California and federal regulatory environments, underscore our commitment to engage with our stakeholders to address the state's evolving energy challenges."

49.     On May 6, 2019, PG&E issued a press release announcing the Company's "coordinated wildfire safety and awareness campaign" with two of California's largest energy companies to prepare Californians for anticipated PSPS events (the "May 2019 Press Release"). In describing what Californians should expect during a PSPS event, the May 2019 Press Release assured investors and customers that the Company would utilize various communications methods to keep affected areas, persons, and entities apprised of needed information before, during, and after a PSPS event.  In this regard, the May 2019 Press Release stated, in relevant part:

> Energy companies will aim to send early warning notifications via phone calls, text alerts, emails and other means before turning off power. SDG&E, SCE and PG&E are all working with customers to ensure they have updated contact information on file and are able to reach customers before, during and after a Public Safety Power Shutoff event. Energy companies will also use websites and social media channels to share information and provide regular updates to local news and radio outlets.

50.     On August 2, 2019, PG&E issued a press release announcing new upgrades to PG&E's "Wildfire Safety Operations Center" (the "August 2019 Press Release").  The August 2019 Press Release touted that the Wildfire Safety Operations Center "serves as PG&E's ***24/7 hub for*** monitoring wildfire risks and ***coordinating prevention and response efforts*** across Northern and Central California" (emphases added).

51.     Additionally, the August 2019 Press Release quoted PG&E's Vice President of the Community Wildfire Safety Program, Singh, who stated that "[t]he newly completed upgrades to [PG&E's] Wildfire Safety Operations Center provide additional critical tools to enable our team of experts to monitor wildfire risks across our service territory," and that "[t]he

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Wildfire Safety Operations Center played a vital role as [the Company] considered and then subsequently initiated two Public Safety Power Shutoffs in June."

52.     On October 8, 2019, PG&E issued a press release announcing that a PSPS event could occur in the near future, impacting more than 600,000 customers across Northern and Central California (the "October 8, 2019 Press Release").  Specifically, the October 9, 2019 Press Release stated that the Company "anticipates that it may begin implementing a Public Safety Power Shutoff (PSPS) to more than 600,000 customers across portions of nearly 30 northern, central, coastal and Bay Area counties," and that "[t]his would be a precautionary measure to reduce the risk of wildfire in these communities."

53.     With respect to communication efforts, the October 9, 2019 Press Release stated that "[c]ustomers are encouraged to visit pge.com/pspsupdates for the most up-to-date Public Safety Power Shutoff information, including addresses for the Community Resource Centers as they open and a link to an address look-up tool where customers can search their address for potential impacts."   In this regard, Defendants also represented that "[a]s part of PSPS preparedness efforts," customer should update their contact information because "PG&E will use this information to alert customers through automated calls, texts, and emails, when possible, prior to, and during, a Public Safety Power Shutoff."

54.     The October 8, 2019 Press Release also quoted PG&E's Electric Operations Senior Vice President, Lewis, who assured investors and customers that PG&E was "working directly with state and local agencies to help prepare [its] customers and the public for this safety event."   That same day, PG&E issued another press release amending the number of affected customers to 800,000.

55.     On October 9, 2019, PG&E issued a press release confirming that the Company had "implemented the first phase of a Public Safety Power Shutoff (PSPS) across significant

18

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

portions of its service area in response to a widespread, severe wind event" (the "October 9, 2019 Press Release").  The October 9, 2019 Press Release also assured investors and customers that "PG&E will use [updated contact] information to alert customers through automated calls, texts, and emails, when possible, prior to, and during, a PSPS," and quoted Lewis, who reaffirmed that Defendants would "do what is necessary to keep our communities safe."

56.     On October 10, 2019, PG&E issued a press release regarding what was considered the second phase of the PSPS event, purportedly "sharing important updates related to the Public Safety Power Shutoff (PSPS) that has been implemented across portions of its service area as a precautionary measure to reduce the risk of wildfire during a widespread, severe wind event impacting its service area" (the "October 10, 2019 Press Release").  The October 10, 2019 Press Release quoted Singh, who assured investors that the Company's "meteorological and operations teams are actively monitoring the weather and this evolving situation, and [Defendants] are working directly with state and local agencies to help our customers and communities through this event safely."  The October 10, 2019 Press Release mentioned nothing regarding any perceived issues with PG&E's facility to communicate with or respond to inquiries from affected customers.

57.     That same day, PG&E issued two more updates regarding the second phase of its precautionary PSPS event, which equally failed to mention anything regarding any perceived issues with PG&E's facility to communicate with or respond to inquiries from affected customers.  One of those two announcements again quoted Singh, who continued to assert that the Company's "meteorological and operations teams are actively monitoring the weather and this evolving situation, and [Defendants] are working directly with state and local agencies to help our customers and communities through this event safely."

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

58.     On October 11, 2019, PG&E issued a press release providing updates on what was considered the third phase of its PSPS precautionary event (the "October 11, 2019 Press Release").  The October 11, 2019 Press Release, as with prior PSPS event updates, mentioned nothing regarding any perceived issues with PG&E's facility to communicate with or respond to inquiries from affected customers.  Two more press releases issued on the same day, providing updates on the number of customers still affected by the PSPS event, also failed to disclose PG&E's failure to adequately communicate with and provide warnings to customers during the first, second, or third phases of the event.

59.     The statements referenced in ¶¶ 28-58 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) PG&E's purportedly enhanced wildfire prevention and safety protocols and procedures were inadequate to meet the challenges for which they were ostensibly designed; (ii) as a result, PG&E was unprepared for the rolling power cuts the Company implemented to minimize wildfire risk; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Begins to Emerge

60.     On October 12, 2019, the *New York Times* published an article reporting on PG&E's efforts to deal with the rolling power cuts it had implemented in California aimed at minimizing wildfire risk.   The article reported, among other issues, that "PG&E's communications and computer systems faltered, and its website went down as customers tried to find out whether they would be cut off or spared."  According to the article, "[a]s the company struggled to tell people what areas would be affected and when, chaos and confusion unspooled

outside.  Roads and businesses went dark without warning, nursing homes and other critical services scrambled to find backup power and even government agencies calling the company were put on hold for hours."

61.     The *New York Times* article also described how Elizaveta Malashenko ("Malashenko"), Deputy Executive Director for Safety and Enforcement at the California Public Utilities Commission, "arrived at 9 a.m. on Tuesday for the first of her two 12-hour shifts at PG&E's operations center," that "said she was stunned by what she saw," namely, that "PG&E's website crashed just ahead of the first rounds of power shut-offs that would leave thousands in the dark,"  and that "[t]he situation got so bad at one point that Ms. Malashenko called in information technology specialists from the state to help restore PG&E's systems."  Malashenko also reportedly stated that "[i]t never got to the point where it worked well."

62.     Additionally, the *New York Times* article reported that Defendant Johnson later admitted that "the systems the company uses to alert residents and businesses that they would lose power didn't work as they were supposed to."  He was also reported in that article as stating "[w]e did not deliver on this commitment this time," and "[w]e were not prepared to manage the operational event."

63.     On this news, PG&E's stock price fell $0.35 per share, or 4.36%, to close at $7.67 per share on October 14, 2019, the following trading day.

64.     On October 23, 2019, it was reported that as a last resort to prevent additional wildfires PG&E began shutting off power to 179,000 homes and businesses in 17 northern and central California counties.

65.     Following this news, PG&E's stock price fell $1.00 per share, or 12.2%, to close at $7.20 on October 24, 2019.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

66.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

67.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired PG&E securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.   Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

68.     The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, PG&E securities were actively traded on the NYSE.   While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by PG&E or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

69.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

70.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

71.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of PG&E;

- whether the Individual Defendants caused PG&E to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of PG&E securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

72.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

73.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- PG&E securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold PG&E securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

74. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

75. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder)**

76. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

77. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

78.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of PG&E securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire PG&E securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

79.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for PG&E securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about PG&E's finances and business prospects.

80.     By virtue of their positions at PG&E, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose

such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

81.  Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of PG&E, the Individual Defendants had knowledge of the details of PG&E's internal affairs.

82.  The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of PG&E.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to PG&E's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of PG&E securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning PG&E's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired PG&E securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

83.  During the Class Period, PG&E securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of PG&E securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of PG&E securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of PG&E securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

84.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

85.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act)

86.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

87.     During the Class Period, the Individual Defendants participated in the operation and management of PG&E, and conducted and participated, directly and indirectly, in the conduct of PG&E's business affairs.  Because of their senior positions, they knew the adverse

non-public information about PG&E's misstatement of income and expenses and false financial statements.

88.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to PG&E's financial condition and results of operations, and to correct promptly any public statements issued by PG&E which had become materially false or misleading.

89.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which PG&E disseminated in the marketplace during the Class Period concerning PG&E's results of operations.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause PG&E to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of PG&E within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of PG&E securities.

90.     Each of the Individual Defendants, therefore, acted as a controlling person of PG&E.  By reason of their senior management positions and/or being directors of PG&E, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, PG&E to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of PG&E and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

91.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by PG&E.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated:  October 25, 2019

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jennifer Pafiti*

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
E-mail: jpafiti@pomlaw.com

**POMERANTZ LLP**
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email: jalieberman@pomlaw.com
Email: ahood@pomlaw.com

29

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1

2   **POMERANTZ LLP**
    Patrick V. Dahlstrom
3   (*pro hac vice* application forthcoming)
    10 South La Salle Street, Suite 3505
4   Chicago, Illinois 60603
    Telephone: (312) 377-1181
5   Facsimile: (312) 377-1184
    Email: pdahlstrom@pomlaw.com
6
7   ***Attorneys for Plaintiff***

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.  I, _Christopher Vataj_, make this declaration pursuant to

Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the

Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation

Reform Act of 1995.

2. I have reviewed a Complaint against PG&E Corporation ("PG&E" or the "Company") and

authorize the filing of a comparable complaint on my behalf.

3. I did not purchase or acquire PG&E securities at the direction of plaintiffs' counsel or in

order to participate in any private action arising under the Securities Act or Exchange Act.

4.   I am willing to serve as a representative party on behalf of a Class of investors who

purchased or acquired PG&E securities during the class period, including providing testimony at

deposition and trial, if necessary.  I understand that the Court has the authority to select the most

adequate lead plaintiff in this action.

5.  To the best of my current knowledge, the attached sheet lists all of my transactions in

PG&E securities during the Class Period as specified in the Complaint.

6.  During the three-year period preceding the date on which this Certification is signed, I

have not sought to serve as a representative party on behalf of a class under the federal securities

laws.

7.   I agree not to accept any payment for serving as a representative party on behalf of the

class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable

costs and expenses directly relating to the representation of the class as ordered or approved by the

Court.

8. I declare under penalty of perjury that the foregoing is true and correct.

Executed _____10/21/19_____
          **(Date)**

_____
          **(Signature)**

_____
          **(Type or Print Name)**

**PG&E Corporation (PCG)**                                               **Vataj, Christopher**

### List of Purchases and Sales

| Date | Purchase or Sale | Number of Shares/Unit | Price Per Share/Unit |
|------|------------------|-----------------------|----------------------|
| 8/29/2019 | Purchase | 2,500 | $10.7100 |
| 8/29/2019 | Purchase | 1,000 | $10.5950 |
| 9/18/2019 | Purchase | 1,500 | $11.5400 |
| 9/18/2019 | Purchase | 1,500 | $11.9139 |
| 9/18/2019 | Purchase | 900 | $11.8294 |
| 9/11/2019 | Sale | (1) | $10.7900 |
| 9/11/2019 | Sale | (1) | $10.7900 |
| 9/11/2019 | Sale | (10) | $10.7900 |
| 9/11/2019 | Sale | (10) | $10.7900 |
| 9/11/2019 | Sale | (1) | $10.7900 |
| 9/11/2019 | Sale | (977) | $10.7900 |
| 9/11/2019 | Sale | (200) | $10.7900 |
| 9/18/2019 | Sale | (2,300) | $11.6500 |
| 9/19/2019 | Sale | (1,500) | $12.2900 |