1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER VATAJ, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br><br>WILLIAM D. JOHNSON, JOHN R. SIMON, GEISHA WILLIAMS, and JASON P. WELLS,<br><br>Defendants. | Case No. 4:19-cv-06996-HSG<br><br>Hon. Haywood S. Gilliam, Jr.<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

I.    NATURE OF THE ACTION ................................................................................................1

II.   JURISDICTION AND VENUE .........................................................................................5

III.  PARTIES ..............................................................................................................................5

IV.   BACKGROUND ...................................................................................................................6

   *A.*   *PG&E and Pacific Gas* ...................................................................................................6

   *B.*   *Relevant Statutory and Regulatory Provisions* ..........................................................8

   *C.*   *PG&E Incurs Wildfire-Related Liabilities* ..................................................................9

   *D.*   *PG&E Boasts That It Is a New Company* ...................................................................11

   *E.*   *PG&E Needs Support From California's Government* ...............................................13

V.    THE MATERIAL MISREPRESENTATIONS .............................................................15

   *A.*   *Defendants' Materially Misleading Statements About Conducting De-Energizations* ...............15

      1.   False Statements About Cooperation With Local Governments ....................17

      2.   False Statements About Communications with Critical Facilities and Public Safety Partners .22

      3.   False Statements About Customers with Medical Needs ...............................23

      4.   False Statements About PG&E's Website ......................................................25

   *B.*   *Defendants' False Statements About the Ability to Target De-Energizations* ...........................25

      1.   False Statements About SCADA ....................................................................26

      2.   False Statements About Remote Monitoring Stations and Fire Modelling ....................26

      3.   False Statements About Modeling ..................................................................27

   *C.*   *Defendants' False Statements About Vegetation Management* ................................32

   *D.*   *Defendants' False Statements About Equipment Inspection* ...................................34

VI.   REASONS DEFENDANTS' DE-ENERGIZATION STATEMENTS WERE FALSE .........36

   *A.*   *False Statements About Conducting De-Energizations* .............................................42

      1.   Failure To Work With Local Government ......................................................42

      2.   Failure to Identify and Notify Critical Facilities and Public Safety Partners ...........................49

      3.   Failure to Identify and Contact Customers with Medical Needs ...................52

      4.   Failure to Operate A Working Website ..........................................................55

      5.   Refusal to Listen to Complaints ....................................................................56

      6.   Other Failures ................................................................................................58

   *B.*   *Micro-Targeting De-Energizations* .............................................................................59

VII.  REASONS STATEMENTS ABOUT VEGETATION MANAGEMENT WERE FALSE ....61

VIII. REASONS STATEMENTS ABOUT TOWER INSPECTIONS WERE FALSE ...............65

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IX.      LOSS CAUSATION ................................................................................................ 68

X.    CLASS ACTION ALLEGATIONS ...................................................................... 78

FIRST CLAIM ................................................................................................................ 81

SECOND CLAIM ........................................................................................................... 84

PRAYER FOR RELIEF ................................................................................................. 86

DEMAND FOR TRIAL BY JURY ............................................................................... 86

Co-Lead Plaintiffs Robert Allustiarti, Iron Workers Local 580 Joint Funds, and Ironworkers Locals 40, 361 & 417 Union Security Funds ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning themselves, which are alleged upon personal knowledge.

## I.       NATURE OF THE ACTION

1.      This is a securities class action brought on behalf of all persons and entities who purchased the common stock of PG&E Corp. on the NYSE between December 13, 2018, and October 28, 2019, both dates inclusive ("Class Period"), seeking remedies under Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934.[1]

2.      Between 2015 and 2018, PG&E's equipment caused several wildfires. The most devastating of these, the Camp Fire, levelled the town of Paradise and left 85 dead. These wildfires pushed PG&E into bankruptcy. Needing Californians' goodwill to exit bankruptcy and retain its operating license, beginning in December 2018, PG&E strove to convince the market that it had transformed itself and was now entirely focused on safety. PG&E explained in exacting detail what it was doing to address the risk of wildfires, including well-organized micro-targeted de-energizations (power shutoffs) when weather conditions created risks that PG&E's equipment might set wildfires. But unbeknownst to investors, PG&E was not actually implementing the measures it claimed. As a result, it cut power to California five times in October 2019, to a total of almost five million residents. These de-energizations were disorganized messes, endangering Californian residents' property and lives. Further, PG&E's vegetation management – tree

---

[1] The Class Period as to Defendant PG&E is limited to the period of January 30, 2019 through October 28, 2019, both dates inclusive.

trimming near its power lines – missed tens of thousands of dangerous trees, each of which could set a fire, while its inspections repeatedly missed the very deficiency that had caused the Camp Fire. When these facts were disclosed, the last through a devastating fire that forced 200,000 residents to evacuate, PG&E's stock price fell, damaging investors.

3.      As a utility, PG&E operates pursuant to a license issued and revocable by the State of California. The State also sets the rates PG&E can charge ratepayers, and therefore its revenues and profits.

4.      The wildfires PG&E set, most notably the Camp Fire in 2018, left its reputation in tatters, and further created liabilities that impaired its very existence.

5.      To resolve its liabilities, PG&E filed for bankruptcy. To exit bankruptcy, PG&E needed state subsidies. Further, its state regulator, the California Public Utilities Commission ("CPUC") had to approve the bankruptcy plan.[2]

6.      Put simply, PG&E needed to convince the State of California that it could operate safely and effectively, and thereby should be allowed to continue to exist as an investor-owned utility.

7.      To that end, PG&E publicly stated that it was entirely different from the old PG&E that had caused the Camp Fire. PG&E's campaign began in December 2018, when it told the market that the new PG&E's priority was operating safely. To reinforce the point, in January 2019, PG&E fired its CEO, the head of its electric business, and 80% of its Board. The terminations' stated purpose was to refocus on safety.

---

[2] The CPUC regulates services and utilities, protects consumers, safeguards the environment, and assures Californians' access to safe and reliable utility infrastructure and services. The CPUC's is PG&E's state regulator.

8.      In early February 2019, PG&E publicly filed a detailed wildfire mitigation plan ("Mitigation Plan") with the CPUC. The Mitigation Plan boasted that PG&E was conducting unprecedented vegetation management and using sophisticated analysis to identify common ways its equipment broke and started wildfires, and then spending millions of hours to fix both.

9.      PG&E also claimed that it had prepared a sophisticated plan to cut off power when conditions were apt to create wildfires ("de-energization", or "PSPS").[3] Under this latter program, PG&E stated that it had sectionalized its grid to obviate the need for indiscriminate power outages, while working closely with local governments and others to limit the damage its de-energization would cause.

10.      Unbeknownst to investors, PG&E had not and was not implementing the measures set out in the Mitigation Plan.

11.      On August 14, 2019, after the close of trading, a report from PG&E's court-ordered monitor was publicly filed, revealing systematic deficiencies in PG&E's inspections. In one case, the monitor discovered deficiencies so dangerous that the monitor's team decided to stay on the scene until PG&E fixed it. As a result of this adverse news, on August 15, PG&E's stock price fell, damaging investors.

12.      PG&E claimed that it had enacted sophisticated techniques to inspect its equipment to identify and address the leading causes of equipment failures that led to wildfires. Yet PG&E's vaunted inspections were nothing of the sort. In fact, after these inspections, an expert who was investigating the Camp Fire examined a tower next to it only to find ***the exact deficiency which***

---

[3] In its communications to the public, PG&E describes these voluntary blackouts as "Public Safety Power Shutoffs," which it abbreviates as "PSPSs."

1    *had caused the Camp Fire*. A third tower with the exact same deficiency caused a fire in late

2    October 2019 which required the evacuation of 200,000 residents (the "Kincade Fire").

3        13.    In 2019, PG&E conducted seven of these de-energizations. The de-energizations

4    were precisely the types of indiscriminate power outages that PG&E had expressly claimed it

5    would not undertake. In total, more than five million California residents lost power. Further, most

6    of the de-energizations' impact fell on areas that were not at risk of wildfires and did not experience

7    the powerful winds that formed the entire rationale for de-energization. Accordingly, Defendants'

8    statements about targeting de-energizations were false.

9        14.    And as to PG&E's actual conduct of de-energizations, before the de-energizations,

10   Defendant Johnson, PG&E's CEO, testified as follows:

11       But we have spent a great deal of time preparing for [de-energization] and working
         with local governments, local EMS, so that people will know where to go. [] We
12       are working with local governments to say "can we set up a shelter in this
         gymnasium?" We're identifying medical need patients. So I think we're doing all
13       the right things here. There's still a little coordination to go but I think we
         certainly understand the issue and I think we're doing all the right things to make
14       sure we're ready.

15       15.    After the de-energizations, he testified as follows:

16       I think we thought the big event was turning off the power because for us this is an
         unnatural act. You know, in utility business your job is to keep the power on 24/7
17       and I think we focused on that as the main event instead of the impact of that, right,
         on the, on the people it affected.

18       16.    PG&E's reckless conduct of de-energizations and resulting investigations and

19   legislation, coupled with the Kincade Fire, caused its stock price to fall, damaging investors.

20       17.    In sum, Defendants made detailed representations to the market about everything

21   PG&E was supposedly doing and had done to operate safely. These representations were false.

22   Investors never would have bought PG&E shares had they known that PG&E's statements that it

23   could operate safely and effectively were false.

## II.     JURISDICTION AND VENUE

18.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 ( "Exchange Act"), 15 U.S.C. §§ 78j(b), 78b-1 and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

19.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

20.     Venue is proper in this District under Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). Defendants maintain their principal executive offices in this District and many of the acts, practices and transactions complained of herein occurred in substantial part in this District.

21.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III.     PARTIES

22.     Co-Lead Plaintiffs Robert Allustiarti, Iron Workers Local 580 Joint Funds, and Ironworkers Locals 40, 361 & 417 Union Security Funds, as set forth in their previously-filed PSLRA certifications, purchased PG&E common stock at artificially inflated prices and were damaged upon the disclosures and materializations of the risks of Defendants' material misstatements and omissions.

23.     Defendant PG&E is a holding company which operates through Pacific Gas & Electric Co. ("Pacific Gas"), a utility.

24.     Defendant Geisha Williams joined PG&E in 2007 and was appointed its CEO in March 2017. She held the position until her termination in January 2019.

1   25.   Defendant Sumeet Singh, P.E., joined PG&E in 2009. Defendant Singh has served

2   as Vice President, Community Wildfire Safety Program since at least September 2018. According

3   to the Mitigation Plan, Defendant Singh's role is "Head of Wildfire Risk Management efforts" and

4   his responsibilities are "oversight and direction of wildfire risk management efforts."

5   26.   Defendant William Johnson was appointed as PG&E's CEO on April 3, 2019, and

6   currently continues in that capacity.. Upon being hired, Johnson's $2.5 million annual base salary

7   was more than double that of his predecessor, Defendant Williams. The majority of Defendant

8   Johnson's total reported $18.5 million compensation at PG&E came through $11.1 million in stock

9   options. Defendant Johnson therefore had incentives to keep PG&E's stock price high.

**IV.    BACKGROUND**

   ***A.    PG&E and Pacific Gas***

   27.   PG&E was incorporated in 1905 and is based in San Francisco, California. The

Company, through its subsidiary Pacific Gas, sells and delivers electricity and natural gas to

residential, commercial, industrial, and agricultural customers in northern and central California.

   28.   Pacific Gas is a privately-owned public utility. It enjoys a state-protected monopoly

or quasi-monopoly, derived from its exclusive franchise provided by the State of California.

Pacific Gas's monopoly is guaranteed and safeguarded by the CPUC which can refuse to issue

certificates of public convenience and necessity, a license, to permit potential competition to enter

the market. In the case of particularly egregious misconduct, the state can also take away Pacific

Gas's license. Thus, Pacific Gas is more akin to a governmental entity than a purely private entity

and runs its utility affairs like a governmental entity.

   29.   In California, the legal doctrine of inverse condemnation makes utilities liable for

wildfires caused by their equipment regardless of fault. The utility can then recover all or a portion

of the costs by increasing its rates if it acted as a reasonable and prudent manager of its distribution systems.

30.     The CPUC approves the amount that each electric utility – including PG&E and its Pacific Gas subsidiary – can collect from its customers. This is called a utility's "revenue requirement." It is based on the cost of operating, maintaining, and financing the infrastructure used to run the utility, the cost of its procured fuel and power, and provides the utility with a rate of return. The revenue requirement forms the basis for how electric rates get determined for each customer class.

31.     Once a utility's revenue requirement has been determined, the utility must propose what rate will be charged to customers in order to recover the revenue requirement. Rates are set in formal CPUC proceedings called ratemaking proceedings. General Rate Cases (or "GRCs") are proceedings used to address the costs of operating and maintaining the utility system and the allocation of those costs among customer classes. [4]

32.     For PG&E and California's other two large, investor-owned utilities, GRCs are divided into two phases. Phase I of a GRC determines the total amount the utility is authorized to collect, while Phase II determines the share of the cost each customer class is responsible to pay and the rate schedules for each class.  Each large electric utility files a GRC application every three years.  For smaller utilities, authorized costs and allocation of costs are done in just one phase.

33.     Because the rates PG&E can charge ratepayers depends on regulatory approval, and because PG&E's profits are directly related to its ability to charge higher rates, state regulators have substantial control over PG&E's ability to increase its profits.

---

[4] *See* http://www.cpuc.ca.gov/General.aspx?id=10431.  GRCs are categorized according to "test year," or the actual historical period of time for which financial and operating data will be required.  Therefore, the actual GRC proceedings themselves will typically predate the test year.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**B.      *Relevant Statutory and Regulatory Provisions***

34.      PG&E must exercise an increased level of care in line with the increased risk of associated danger.

35.      Public Utilities Code § 451 mandates that "[e]very public utility shall furnish and maintain such adequate, efficient, just, and reasonable service, instrumentalities, equipment, and facilities ... as are necessary to promote the safety, health, comfort, and convenience of its patrons, employees, and the public."

36.      More recently, California Senate Bill (SB) 901 (passed and signed into law in 2018) provides that electric utilities must "construct, maintain, and operate [their] electrical lines and equipment in a manner that will minimize the risk of catastrophic wildfire posed by those electrical lines and equipment."

37.      In particular, Public Resources Code § 4293 mandates that PG&E maintain clearances of four to ten feet for all of its power lines, depending on their voltage. In addition, "[d]ead trees, old decadent or rotten trees, trees weakened by decay or disease and trees or portions thereof that are leaning toward the line which may contact the line from the side or may fall on the line shall be felled, cut, or trimmed so as to remove such hazard."

38.      Public Utilities Code §§ 451 and 399.2(a) allows electric utilities to shut off electric power in order to protect public safety.  This authority includes shutting off power to prevent fires caused by strong winds.

39.      In March 2018, following widespread criticism about its role in causing the 2017 Northern California fires, PG&E announced it would develop a program to de-energize power lines as a fire prevention measure.

40. On July 12, 2018, the CPUC adopted Resolution ESRB-8, which ordered utilities to engage local communities in developing de-energization programs. ESRB-8 further required that utilities submit a report within ten days after each de-energization event, and after high-fire-threat events where the utility provided notifications to local governments, agencies, and customers of possible de-energization, even where no de-energization occurred.

41. PG&E did not actually de-energize until October 14, 2018, when it "proactively turned off the power in extreme fire-risk areas of Lake, Napa, and Sonoma Counties impacting approximately 17,500 customers" as well as "extreme fire-risk areas of the Sierra Foothills in Amador, El Dorado and Calaveras counties, impacting approximately 42,000 customers."[5]

### C.    PG&E Incurs Wildfire-Related Liabilities

42. The frequency of western U.S. wildfires has increased by 400% since 1970, with California among the states that have experienced the worst damage.

43. In November 2018, PG&E caused the Camp Fire. The Camp Fire is the deadliest and most destructive wildfire in modern California history. It is also the deadliest in the United States since 1918.

44. The Camp Fire started just before sunrise on November 8, 2018 near the town of Pulga, California. After the fire moved rapidly to the west, the towns of Paradise and Concow were almost completely destroyed, each losing about 95% of structures in town. By the time the Camp Fire was under control, it had engulfed more than 150,000 acres across parts of Butte and Plumas Counties, destroyed more than 18,000 structures (including nearly 14,000 homes), killed at least eight-five residents, and displaced thousands of residents. The smoke from the fire – which was

---

[5] *See* https://www.pge.com/en_US/safety/emergency-preparedness/natural-disaster/wildfires/public-safety-event.page

visible from space – resulted in widespread air pollution throughout the Bay Area and the Central Valley, prompting school closures.

45.     On the same day the Camp Fire began, PG&E filed an Electric Incident Report with the CPUC acknowledging that just before Camp Fire began, PG&E had experienced a problem on the Caribou-Palermo 115 kilovolt (kV) transmission line, a high-voltage transmission line at the Poe Dam site. It further acknowledged that an aerial patrol later that day showed "damage" to that same transmission tower.

46.     Six months later, after the start of the Class Period, the California Department of Forestry and Fire Prevention ("Cal Fire") confirmed "after a very meticulous and thorough investigation [] that the Camp Fire was caused by electrical transmission lines owned and operated by Pacific Gas and Electricity (PG&E) located in the Pulga area."[6] Cal Fire identified two ignition points, both of which were sparked by PG&E power lines.  These included the Caribou-Palermo high-voltage transmission line.

47.     Moreover, PG&E regulators concluded that had proper inspections been carried out, the equipment causing the fire would have been spotted and the fire likely prevented.

48.     PG&E pled guilty to 84 counts of involuntary manslaughter.

49.     Ultimately, PG&E agreed to pay $13.5 billion to resolve legal claims brought by victims of the Camp Fire as well as other fires it caused dating back to 2015. between 2015 and the Camp Fire.

50.     On January 14, 2019, PG&E announced that it intended to file for Chapter 11 bankruptcy in the wake of its collective, wildfire-related liability.

---

[6] Transmission lines are electric lines which convey power to local areas for distribution. Distribution lines then distribute the power to individual customers.

#### D.       PG&E Boasts That It Is a New Company

51.      With its reputation in tatters after the Camp Fire, Defendants strove to convince the public and investors that PG&E had completely changed its ways.

52.      In a December 13, 2018 GRC filing, Defendants acknowledged that "publicly-owned utilities play a critical role in mitigating the risk of wildfires" and argued that "the additional capital we plan to invest in our infrastructure to harden our system against wildfire is imperative and unavoidable."[7]

53.      As reported on December 14, 2018, more than half of PG&E's $1 billion-plus rate increase application for 2020 was earmarked for wildfire prevention.[8]

54.      On January 4, 2019, PG&E issued a press release stating in relevant part:

The Board of Directors of PG&E Corporation (NYSE: PCG) today announced it is making changes to reinforce the company's commitment to safety and improvement. In addition to prior actions taken to confront the growing wildfire threat, the Board is actively assessing PG&E's operations, finances, management, structure, and governance -- and remains focused on improving safety and operational effectiveness. Among other things, the Board:

                    *        *        *        *        *

- Is reviewing structural options to best position PG&E to implement necessary changes while meeting customer and operational needs.

- Has formed a special Board committee that is engaging independent experts to advise on best practices in wildfire safety. The committee is also assessing the additional operational changes proposed by management to enhance safety as PG&E prepares for the 2019 wildfire season.

---

[7] https://www.pge.com/pge_global/common/pdfs/about-pge/company-information/regulation/2020-General-Rate-Case-Summary.pdf at 1-1, 1-2.

[8] *See* https://www.spglobal.com/marketintelligence/en/news-insights/trending/Vw33XgX27CO2DjQaMcFNXw2

55.     The press release also announced that PG&E was searching for new directors to replace a portion of its current board. After some deliberations, PG&E replaced 80% of its board in April 2019.

56.     In mid-January 2019, PG&E abruptly fired Defendant Williams.

57.     PG&E claimed that following these personnel changes, it was a fundamentally different company. In a February 28, 2019 press release to announce that its equipment likely caused the Camp Fire, PG&E claimed:

> "We recognize that more must be done to adapt to and address the increasing threat of wildfires and extreme weather in order to keep our customers and communities safe," said John Simon, Interim Chief Executive Officer of PG&E Corporation. "We are taking action now on important safety and maintenance measures identified through our accelerated and enhanced safety inspections and will continue to keep our regulators, customers and investors informed of our efforts."

*     *     *     *     *

> "All 24,000 PG&E employees are public safety officers in the communities we have the privilege to serve. We have heard the calls for change and are committed to taking action by focusing our resources on reducing risk and improving safety throughout our system," said Simon.

58.     The April 3, 2019 Press Release announcing Defendant Johnson's hiring quoted the PG&E Board that:

> "We have heard the calls for change and have taken action today to ensure that PG&E has the right leadership to bring about real and dynamic change that reinforces our commitment to safety, continuous improvement and operational excellence. We believe our new CEO and the newly constituted Board will help PG&E address California's evolving energy challenges and deliver what our customers expect from their energy company."

59.     In a May 2019 filing in a CPUC proceeding investigating PG&E's safety culture ("Safety Investigation"),[9] PG&E told the CPUC:

> Since this past April, PG&E's Boards of Directors have taken the unprecedented step of turning over more than 80% of their members. This is part and parcel of

---

[9] Investigation 15-08-019.

PG&E's commitment to vast changes in its business to improve its safety operations and safety culture substantially. That commitment starts with the directors, who joined PG&E fully understanding the critical nature of this mission and with complete dedication to it.

60.     On May 15, 2019, at a hearing before the California Assembly Utilities & Energy Committee, Defendant Johnson testified:

> On the issue of trust, you know, how do you build trust? There's a couple of ways you do this. The first thing is say what you're going to do and do it. Right? I mean, my dad had a saying which I have adhered to: "just tell the truth as fast as you can." And so that's part of trust, tell the truth. If something bad happens, own it, don't cover it up. Conduct your business in a way that you can be proud of. And we've had some instances of things that nobody can be proud of and I think it's that simple. I mean, I think we tend to overcomplicate things, but things like trust; are you gonna do what you said you're gonna do? Did you make sense when you said it? Did you socialize the idea and then, did you do it?
>
> So, if I tell you I'm going to do the best I can to prevent a fire again, you can count on that being true. Now, whether I will succeed or not is a different question. But I think that's how we rebuild trust and I know it's going to take a while, but we've already started this. This is about a set of behaviors and a set of commitments we make every day. Here's how we're going to do our business and if we get out of line, we're going to fix it. There will be plenty of challenges. I'll tell you what I'm focused on. I'm focused in the short term at the moment.

**E.     PG&E Needs Support From California's Government**

61.     In California, utilities are strictly liable for damages caused by their equipment under the doctrine of inverse condemnation. In 2019, the State of California enacted legislation creating a wildfire fund which would directly pay eligible claims from certain wildfires. *See* Senate Bill 1054.

62.     The $21 billion wildfire fund will be funded by payments from the utilities. One half would be paid by shareholders themselves. But the other half would be paid by bonds issued ***in the name*** of the utilities but secured by, and paid by, a dedicated charge on ratepayers' utility bills. Thus, the wildfire fund creates an enormous potential benefit for PG&E.

...

63. But to access the wildfire funds, PG&E must exit bankruptcy by June 30, 2020. *See* Public Utilities Code Section 3292(b)(1).

64. Prior to submitting the plan to the bankruptcy court, the CPUC must approve PG&E's bankruptcy plan. The Governor's office appoints the members of the CPUC's commission and the CPUC places great weight on the Governor's views. Accordingly, as a practical matter, it may be impossible for PG&E to exit bankruptcy without the Governor's approval of its plan.

65. During the Class Period, Defendants claimed that PG&E had taken specific, concrete steps to prepare itself and the communities it served for de-energizations. These concrete steps gave investors the false impression that when PG&E conducted de-energizations, the impact on communities would be as small as possible, thus creating some goodwill with Californians.

66. PG&E badly needed that goodwill. First, PG&E needs the Governor's appointed CPUC's approval to exit bankruptcy. Second, PG&E needs the California legislature not to revoke enormous subsidies that PG&E would receive should it exit bankruptcy by June 30, 2020, and not to take over or municipalize PG&E. Third, the directors of the CPUC decide what rates PG&E will be allowed to charge, and therefore how much it could profit.

67. The CPUC, moreover, also is the body that licenses utilities to operate in California. After seeing how PG&E conducted de-energizations in 2019, the CPUC threatened to take away PG&E's license if it did not improve.

68. The failure to conduct de-energizations properly, therefore, was an existential threat to PG&E.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

V.     **THE MATERIAL MISREPRESENTATIONS**

*A.     Defendants' Materially Misleading Statements About Conducting De-Energizations*

69.     On May 15, 2019, Defendant Johnson testified before the California Assembly Utilities and Energy Committee Hearing ("May Hearing"), stating in relevant part:

> Q: […] And so, we need some information about how [de-energization is] going to work. There's a lot of folks out there that are fearful that need power. Obviously, we want to minimize our risk but what does that look like, I guess, going into the future as far as our constituents who are – many of them – on life support system, dialysis systems, medically, heat, those things, what does that look like? I mean, I've heard some commercials that have been out there trying to start the process of educating, but there's literally, you know, millions of people out there who don't. We need some way to communicate directly with them to let them know what the process is going to be.

> **Defendant Johnson:** […] We weren't well prepared last year – that was obvious. We're better prepared this year, much better prepared. Much better diagnostic ability and I can't give you the periodicity with which we will do this, *but we have spent a great deal of time preparing for this and working with local governments, local EMS, so that people will know where to go.* We are intent on giving a lot of advance notice. We'd like to give 48 hours if we can, repeat it at 24 and then immediately before the event. *We are working with local governments to say "can we set up a shelter in this gymnasium?" We're identifying medical need patients. So I think we're doing all the right things here. There's still a little coordination to go but I think we certainly understand the issue and I think we're doing all the right things to make sure we're ready.*

70.     PG&E's actual conduct of de-energizations in 2019 showed Defendant Johnson's statements were materially misleading. As he admitted in a November 18, 2019, California Senate's Energy, Utilities and Communications Committee to discuss PG&E's failure to take the very steps it told the world it had already taken:

> *I think we thought the big event was turning off the power because for us this is an unnatural act. You know, in utility business your job is to keep the power on 24/7 and I think we focused on that as the main event instead of the impact of that, right, on the, on the people it affected.*

71.     As Marybel Batjer, CPUC's President since July 2019, summed up at a separate October 18, 2019 CPUC hearing convened to address PG&E's failure in its de-energization to do what it had claimed it had already completed:

> PRESIDENT BATJER: It seems extraordinary to me, extraordinary, that we're two or three PSPSs in and other [Investor Owned Utilities] too and that you're just now realizing that you really ought to have a liaison designated to each one of your impacted counties and that you're just realizing that maybe you should have done some preplanning to have your Community Resource Centers already sited and that you don't have your liaisons SEMS trained, that we're -- I'm hearing, "We're gonna." "We're planning."· "We're gonna have a playbook by the end of the year." ***This isn't hard. This is not hard.*** You've been in the business 41 years. You gave a very nice speech or a few words about anticipation, but I can tell ***you guys failed on so many levels on pretty simple stuff: Creating liaisons, setting up CRCs, understanding that your website needed to scale.***

72.     Defendants made additional false statements which fell into several categories:

   a.  False statements about PG&E's purported work with local governments, including representations that PG&E:

      i.   Jointly created with local governments and EMS workers plans to ensure that individual PG&E, local government, and EMS employees had planned out a coordinated response to de-energization;

      ii.  Jointly identified with local governments where PG&E would site small powered shelters called Community Resource Centers ("CRCs") to let residents charge batteries and avoid unbearable heat during de-energization;

      iii. Engaged in tabletop exercises with local governments and other affected entities to plan de-energization responses; and

    iv.   Created the infrastructure necessary to share geographic information system ("GIS") files with local governments in case of de-energization.

  b.  False statements that PG&E:

    i.   Had spoken directly with *critical facilities*, a defined term which includes hospitals, EMS providers, water utilities, entities that buy power from PG&E but manage their own distribution, and the like, to ensure PG&E had adequate contact information to provide them with legally mandated advance notice; and

    ii.  Developed de-energization procedures that included providing adequate and legally mandated notice to *critical facilities* and *public safety partners*, a defined term which includes critical facilities as well as others necessary to maintain safety and life like telecommunications providers.

  c.  Identified customers who needed continuous power for medical reasons; and

  d.  Created the infrastructure necessary for its website to provide necessary information in case of de-energization;

    *1.*    *False Statements About Cooperation With Local Governments*

73.   A California law enacted after PG&E's disastrous 2017 wildfires[10] required that utilities annually develop and obtain the CPUC's approval of a plan to mitigate wildfires.

---

[10] Senate Bill 901.

74.     The mitigation plan is a serious requirement. In a rulemaking proceeding created for the purpose ("Mitigation Rulemaking"),[11] the CPUC established detailed guidelines requesting community input on each plan and allowing intervenors to be compensated for such input. The CPUC also gave intervenors a right to reply.

75.     Moreover, PG&E's mitigation plan was more important still as the Honorable William Alsup, in his capacity as PG&E's probation judge, ordered PG&E's compliance with its 2019 mitigation plan as a condition of its probation.

76.     On February 6, 2019, PG&E filed its 2019 Wildfire Mitigation Plan ("Mitigation Plan").

77.     Six cities/counties provided detailed comments to PG&E's plan, as did the CPUC's Office of Consumer Advocate and its Public Advocates Office, numerous advocacy groups, trade associations, telecommunications companies, solar companies, municipal aggregators, non-profit organizations, and individuals.

78.     PG&E's Mitigation Plan also garnered media attention. PG&E issued a press release announcing the filing. In the few days following its filing, Reuters and AP both reported on the plan's provisions, as did the Santa Rosa Press Democrat. Utilities experts like Michael Wara, a Senior Research Scholar at Stanford's Woods Institute for the Environment and the Director of its Climate and Energy Policy Program, also commented on the plan.

79.     After an immaterial February 14 amendment, on April 25, 2019, Defendants filed a Second Amended Mitigation Plan ("Amended Mitigation Plan"), which purportedly addressed all the difficulties PG&E had encountered in enacting the Mitigation Plan. The Amended

---

[11] Proceeding R.18-10-007.

Mitigation Plan did not correct any of the misstatements alleged in this complaint. Instead, Defendants repeated the same false statements contained in the original Mitigation Plan.

80.     After submitting a proposed decision approving PG&E's plan for comments in April 2019, and following extensive comments, the CPUC approved PG&E's plan on May 30, 2019.

81.     Defendants claimed in every version of the Mitigation Plan that:

> PG&E is committed to providing notice to government agencies and providers of critical services when extreme fire danger is forecasted, as well as continuing to refine its PSPS program to reduce the scope and severity of impact on customers. ***PG&E will notify its primary government and agency contacts that PG&E is monitoring conditions and that extreme fire danger conditions may cause power outages or require PG&E to shut off power for safety in the coming days.***

82.     Defendants also claimed that PG&E was conducting "[o]ngoing briefings with city and county leaders, community leaders, first responders, local offices of emergency services and other public safety authorities ***to discuss our wildfire safety efforts and how PG&E can coordinate[.]***"

83.     Similarly, to provide reassurances that PG&E's de-energizations would not endanger safety, Defendants claimed they had emulated San Diego Gas & Electric ("SDG&E")'s notification program. SDG&E is all-but-universally acknowledged as the leader in de-energization for its pinpoint targeting, crystal clear communications, and superlative execution. In particular, Defendants stated that—

> In developing the PSPS program, ***PG&E performed extensive benchmarking with SDG&E (the domestic utility with the longest history in pro-actively shutting power off to avoid wildfire events) in a variety of areas, including meteorology, operational processes, emergency response, restoration, communications and customer support.***

> Particularly, PG&E ***emulated SDG&E's*** [] early stakeholder communication strategy (including with customers).

84.     The CPUC's approval process requires that utilities participate in public workshops in which they make presentations and answer questions about the mitigation plan.

85.     At a February 13, 2019 workshop ("February Workshop") for the Mitigation Plan, Defendant Singh stated:

> Q:  So how many local agencies do you coordinate with in terms of providing warnings of your public safety power shutoff? I mean, given to you 50% of the transmission and distribution grid that's in the high hazard zones, is it, 458 cities, 230 cities and 29 counties. I mean, how many different agencies do you coordinate your warning systems with?

> Defendant Singh: *So, as part of our expanded effort this year, that's exactly what we are currently in the process of doing: is reaching out to each of those respective cities, communities, to discuss the plans, the implications of proactive unitization, the lessons learned from last year. And really the focus is twofold; one is engaging in communications. And we are also putting forward some tabletop exercises that we're going to be looking to engage in with our respective county and community partners this year within the notification and communication aspects of PSPS.* So, one dimension is the engagement before we get into the time period where we see a higher likelihood of exercising PSPS. And then as we get into the course of forecasting a potential event, that varies event by event in terms of how large the impact could be based on the Northeast type of winds, the wind conditions, the different weather conditions that drive a potential de-energization. And in that regard you know, we activate our emergency center and are following the joint letter that was issued by Cal OES, CPUC, Cal Fire last year. So that's part of the effort.

86.     In December 2018, the CPUC initiated a rulemaking specifically to address utilities' de-energization plans ("De-Energization Rulemaking").[12] PG&E represented in a March 25, 2019 filing in the De-Energization Rulemaking ("March 25 De-Energization Filing") that:

> *PG&E already provides notifications during an Emergency Operations Center ("EOC") activation for a potential PSPS event to state and local responders.* PG&E's EOC Incident Commander also provides update calls to Cal OES [the California Governor's Office of Emergency Services], CAL FIRE, and other local and state government officials twice a day throughout the duration of the EOC activation. *Additionally, PG&E representatives provide multiple local update calls daily during a PSPS activation for local County OES operational area partners*. PG&E is currently working with Cal OES and the other utilities on

---

[12] Rulemaking R.18-12-005.

potential standardization of notification timelines and cadence of updates to state and local first responders.

***Where possible, PG&E agrees that utilities should prioritize alerts, warnings, and notifications to critical service providers such as hospitals, water agencies (including wastewater services), telecommunications providers, first responders, and cities and counties in advance of residential customers.***

PG&E agrees with SED's proposal that the following information should be conveyed: ***total customer outages within a jurisdiction's boundaries***, total number of impacted Medical Baseline customers within a jurisdiction's boundaries, the event triggering the de-energization, and the estimated length of the de-energization event.

87.     The above emphasized statements were misleading because, as further set out below, PG&E had not worked with, was not working with, and would not work with EMS workers and local governments to plan for de-energization.

88.     Defendant Johnson specifically cited as an example of PG&E's cooperation with local governments that "***[w]e are working with local governments to say 'can we set up a shelter in this gymnasium?'***"

89.     Johnson's statement was false because, as further set out below, instead of working with local governments to site CRCs, PG&E either did not identify in advance locations for CRCs or did not share such locations with local governments.

90.     Defendants also cited as examples of cooperation with local governments that they would jointly conduct tabletop exercises to plan for de-energizations. At the February Workshop, Defendant Singh stated:

***And we are also putting forward some tabletop exercises that we're going to be looking to engage in with our respective county and community partners this year.***

91.     The statement was misleading because, as further set out below, PG&E excluded all local governments from its tabletop exercises.

92.     Finally, PG&E boasted that it was providing GIS data (in this case, data presented by overlaying on maps) to state and local officials. These data would inform officials of (a) the exact area covered by de-energization, and (b) the number of customers affected. Thus informed, local officials would know which buildings to evacuate, which areas to prioritize for EMS, where to send police officers and maintenance employees, what information to communicate to residents, and all other aspects of reacting to the dramatic event that is a complete loss of power.

93.     For example, Defendants stated in the March 2015 De-Energization Filing that:

*PG&E supports increased transparency and is already working with state and local officials to share de-energization-related GIS data.*

*This effort includes near-term sharing of GIS files with public safety agencies and the addition of a GIS REST service in the second half of 2019.*

94.     The statement was false because, as further set out below, PG&E planned to, and did, provide GIS maps that deliberately overstated the de-energization's geographic boundary.

2.      *False Statements About Communications with Critical Facilities and Public Safety Partners*

95.     Defendants claimed in the Mitigation Plan that the tasks PG&E had already completed included:

*Proactively identify[ing] PSPS impacts to critical customers and services that support emergency response and preparedness. Ensur[ing] sufficient mapping, planning and communication protocols are developed prior to potential PSPS initiation.*

96.     Defendants claimed that PG&E had already:

*Conducted direct outreach to customers who provide critical services such as hospitals, fire stations, water agencies and telecommunications providers that could be affected by a PSPS event.*

97.     Defendants also claimed that in case of de-energization, PG&E prioritized communications with critical service providers:

*PG&E is committed to providing as much advance notice (as possible) so that our critical service providers customers can be prepared to implement their emergency operational plans should a power shut down be necessary.*

98.     Finally, Defendants claimed that PG&E prioritized communications with those of its customers who purchased power in bulk from PG&E and distributed it to customers (such as municipal utilities) who were formally included as *public safety partners*:

> Coordination With Third-Party Commodity Suppliers: As more customers in PG&E territory purchase their gas or electric commodity from a supplier other than PG&E, we recognize the importance of providing Community Choice Aggregation (CCA) programs [i.e., municipal electricity distributors] [] providers in our territory timely and relevant updates relating to PSPS events and Wildfire Relief efforts. ***Prior to PSPS events PG&E notifies CCA [] providers of the potential PSPS event and the timing of prospective event. As the event gets closer, PG&E continues to provide updates to our CCA [] partners that may impact our joint customers, including potential impacted customer lists, talking points and any timing changes that may occur.***

99.     The emphasized statements were false because PG&E, as further set out below, was not capable of providing legally mandated notice to critical customers like telecommunications providers, first responders, and cities and counties, and utterly failed to do so, in part because it had identified only a small fraction of critical facilities.

### 3.     *False Statements About Customers with Medical Needs*

100.     Defendants represented in the Mitigation Plan that PG&E was, at the very least, identifying a portion of customers who need access to continuous power for medical reasons – medical baseline customers. These are customers who filed applications under a California law providing for discounted electricity rates for customers who need continuous power to survive and whose applications were granted. Defendants represented that PG&E would also ensure that these customers received notice. Further, Defendants claimed in the Mitigation Plan that PG&E would try to identify additional customers who might qualify under the program and urge them to apply:

PG&E will do additional outreach to Medical Baseline and Medical Baseline-eligible customers so that PG&E has their contact information and they know how to prepare. If general notifications (IVR, text and email) are unsuccessful, ***PG&E will deploy personnel for an in-person notification***

101.    PG&E further represented in the March 25 De-Energization Filing that:

PG&E supports SED's recommendation that Medical Baseline customers should be used by [Investor-owned utilities] to identify vulnerable populations for the purposes of de-energization for the 2019 fire season. PG&E also agrees with SED's proposal that the IOUs should continue engaging with organizations such as independent living centers, regional centers, and other resource providers that support the elderly and disabled community to create awareness of the PSPS program and potential implications of de-energization. ***Through this engagement, PG&E will encourage those communities to enroll in the Medical Baseline Program in order to ensure that those individuals will be included in the definition of "vulnerable population" for the purposes of de-energization.***

102.    Defendants also stated in the Mitigation Plan that PG&E was:

***Partnering with organizations who support our most vulnerable customers to explore opportunities to provide additional information and services[.]***

103.    Finally, in his May 15 testimony, Defendant Johnson represented that PG&E was ***"identifying medical needs patients."***

104.    The emphasized statements were false and misleading because, as further set out below: (a) PG&E did not attempt to identify persons eligible for the medical baseline program, including at a minimum obtaining information from customers like senior apartments which are likely to have patients with medical needs but which do not themselves qualify for medical baseline rates; (b) PG&E had not and would not establish a program to notify medical baseline customers as Defendants claimed in the Mitigation Plan; and (c) PG&E refused to disclose lists of medical baseline customers to municipalities.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 4.   False Statements About PG&E's Website

105.   Defendants boasted that PG&E would provide notice to customers of impending de-energizations, keep them informed throughout the de-energization process, and inform them of impending re-energization. A key part of the notification plan was PG&E's website.

106.   Defendants stated in the Mitigation Plan:

24/7 Information and Updates: PG&E's website provides customers with convenience and flexibility by allowing them to educate themselves on a variety of topics associated with wildfire preparedness. While *customers can quickly identify areas impacted by weather or emergency events on the PG&E website*, PG&E will also work closely with external media outlets to provide broader awareness, critical insight and capture crowdsourced feedback—all of which promotes more effective communication. In 2018, 2,380,153 customers visited pages related to outages and wildfire safety and preparedness.

107.   The statement was false because, as further set out below, Defendants had decided not to scale up PG&E's website to accommodate additional traffic. As a result, PG&E's website crashed within minutes of PG&E announcing its first massive de-energization taking place on October 9 and had to be rescued by the State of California.

### B.   Defendants' False Statements About the Ability to Target De-Energizations

108.   PG&E also made reassuring statements that it could target PSPSs to limited areas rather than cutting power across the grid.

109.   PG&E's system purportedly included: (a) supervisory control and data acquisition systems, universally referred to as "SCADA"; (b) remote weather monitoring stations; and (c) historical models. Using these technologies, PG&E purportedly could limit de-energizations to only those circuits whose operations actually were dangerous.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*1.     False Statements About SCADA*

110.    In an emergency, there is not always enough time or personnel to travel to each circuit to deactivate them. But devices equipped with SCADA can be deactivated remotely from an operations center rather than in person.

111.    Defendants boasted that all of PG&E's reclosers (devices that automatically power circuits back up if deactivated) in high fire risk areas were SCADA-enabled. As PG&E boasted in its February 6 Mitigation Plan:

> PG&E is working to SCADA-enable all line reclosers in Tier 2 and Tier 3 HFTD areas by June 1, 2019. In addition, devices located on nearly 400 transmission lines with voltages of 115 kV and below were included in the 2018 program. Over 95 percent of the transmission line devices are SCADA-enabled and can be disabled remotely, and similar to the distribution devices that are not SCADA-enabled, PG&E will manually disable the remaining devices for the duration of wildfire season.

112.    Thus, using SCADA-enabled devices, PG&E could remotely shut off power to any circuits.

*2.     False Statements About Remote Monitoring Stations and Fire Modelling*

113.    On December 10, 2018, PG&E issued a press release which provided in relevant part:

> <u>More Real-Time Monitoring and Intelligence</u>**:** As shared in early November and a part of the company's 2020 General Rate Case**,** expanding PG&E's weather station network to enhance weather forecasting and modeling. By 2022, PG&E will add approximately 1,300 new weather stations, a density of one station roughly every 20 miles in the high fire-risk areas. In addition, PG&E plans to install nearly 600 new, high definition cameras in high fire-threat areas by 2022, increasing coverage across high fire-risk areas to more than 90 percent.

114.    Defendants claimed in the Mitigation Plan that PG&E would already have achieved nearly half its goal by the 2019 fire season:

> PG&E operates more than 200 weather stations within its service area to obtain local weather data in real-time and these data are publicly available through the NWS. This data is utilized to assess current fire danger conditions to facilitate

AMENDED COMPLAINT -- Case No. 4:19-cv-06996-HSG

26

operational decision making and support safe operation of facilities. ***PG&E plans to deploy an additional 400 weather stations by September 1, 2019[.]***

115.   Defendants claimed in the Mitigation Plan that remote weather monitoring stations allowed PG&E to learn weather conditions throughout its range:

> Data from weather stations installed in PG&E's service area will be used to help forecast and monitor for high fire-risk weather conditions to help inform implementation of additional measures such as PSPS.

116.   Defendant Singh represented at the February Workshop that PG&E's remote weather monitoring stations and fire modelling would ensure surgical precision when PG&E de-energized at the February Workshop:

> **Defendant Singh:** Yeah, I mean we've really leveraged the same playbook. One of the elements that's needed, from my perspective, to be able to get to that level of granularity is the installation of the weather stations itself. ***So, with what we've proposed in regards to the 1300 stations and we're looking to get to one weather station on average for every distribution circuit, so we can be able to really get that understanding in terms of the microclimate capabilities. And that's one of the primary reasons to your point of trying to get there faster and sooner is the reason we've doubled the weather station program for this year and we're looking to do more if we can. And then on the back end we're leveraging and just engaged with the same entity that San Diego [Gas & Electric] has partnered with to help develop the fire potential index capabilities, the capabilities as it pertains to fire ignition and fire spread modelling. So, we're looking to continue the weather station implementation, pull that in,*** so, we are positioned in a similar fashion sooner than later and we'd love to be able to get there this year, but I'm not sure if that's going to be achievable. You know, given the infrastructure investment that's needed.

### 3.   *False Statements About Modeling*

117.   Defendants boasted in the Mitigation Plan that PG&E could identify local climates down to a resolution of 3 kilometers:

> The POMMS [PG&E's weather model] is a high-resolution weather forecasting model ***that forecasts important fire weather parameters including wind speed, temperature, relative humidity, and precipitation down to 3-km resolution.***

> PG&E utilizes state-of-the-art weather forecast model data and information from several public and propriety sources (e.g., the NWS, European Center for Medium Range Forecasting, Global Forecasting System) and from PG&E's proprietary in-

house mesoscale forecast model, POMMS, to generate short and medium-term fire danger forecasts across the service area.

118.    Defendants boasted in the Mitigation Plan PG&E used state-of-the-art models, called Fire Potential Index, to determine the risk that particular distribution circuits would cause wildfires:

> *PG&E also leverages a [Fire Potential Index] modeled similarly to that of SDG&E, to identify higher-risk lines in correlation with applicable conditions*

119.    Defendants also claimed in the Mitigation Plan that PG&E had emulated SDG&E's approach to targeting de-energizations:

> *To further follow with SDG&E's decision factors, PG&E is implementing several key enhancements in 2019, including increased density of weather stations, improved base meteorological modeling, and an enhanced [Fire Potential Index]. PG&E is also engaging with the same company that developed an advanced fire ignition spread model for SDG&E to develop a fire ignition spread model tailored to PG&E's service area to help focus PSPS on the areas of highest risk.*

120.    Defendants claimed that by combining the Fire Potential Index and its network of local weather stations, PG&E could micro-target de-energizations:

> In late 2017, it became evident a more granular and real-time fire danger rating system would be needed for understanding and awareness of extreme events. PG&E's Meteorology team, with guidance from fire experts from SDG&E, and [San Jose State University]'s Fire Weather Research Lab, developed an enhanced version of the [Fire Protection Index] to function as a realtime tool leveraging weather station observations. Several benchmarking sessions with SDG&E were conducted during [Fire Protection Index] development. PG&E's Meteorology team plans to utilize a newly completed 30-year model reanalysis (climatology) across the entire PG&E territory along with historical fire occurrence to calibrate and scale this enhanced [Fire Protection Index] as well as utilize it in forecast model.

> *       *       *       *       *

> Generally, the first trigger for a potential PSPS event is a forecast of fire danger and high wind conditions by PG&E's Meteorology team. With the enhanced situational awareness from increased weather stations, and *advanced modelling, PG&E's Meteorology team predicts conditions specific to local geographic areas.*

\*       \*       \*       \*       \*

As PG&E expands PSPS to higher voltage lines within [high fire risk areas], it is developing a risk-based process, or Operability Assessments (OA), to assess the wildfire risk of individual transmission lines and structures. Through these OA, initially applied to transmission lines, PG&E will apply a risk-informed methodology to evaluate the potential risks of the line and impacts from de-energization. ***This risk-informed methodology will guide PSPS decisions, allowing PG&E to de-energize specific, targeted transmission lines to reduce wildfire risk and avoid indiscriminate de-energization of transmission lines.***

121.    Likewise, PG&E could avoid widespread de-energization of distribution lines:

PG&E will continue upgrading devices with SCADA capability in targeted portions of the [high fire risk] areas to help minimize the impact of PSPS events on customers in low-risk areas adjacent to the [high fire risk] areas. These upgrades will include adding or replacing existing manually operated fuses and switches at strategic locations with new SCADA-enabled Fusesavers™, switches, or reclosers. ***By isolating the lines closer to the border of the HFTD, fewer customers will be impacted and fewer lines will be deenergized.*** These improvements will also expedite restoration by reducing the amount of lines requiring a patrol.

122.    When asked in the February Workshop whether PG&E would be able to sectionalize high fire risk areas, Defendant Singh claimed it was "part of what we've included in terms of what we call the distribution sectionalisation plan":

**Q** - I am counsel for Mendocino, Napa and Sonoma Counties. And I had a question about the segmentation of PG&E circuits as it relates to potential de-energization. [] ***Is it correct that PG&E current proposal in its plan is to essentially ring fence the high fire-threat districts with technology that will allow segmentation of the circuits at that border***?

**Defendant Singh** - ***That's currently part of what we've included in terms of what we call the distribution sectionalisation plan***. And we're also evaluating – hard to know exactly – the border, there's a map for that, it's not perfect. So, we're also using the ignition spread modelling, right? So, for example, if there is an ignition that may take place in an adjacent tier-one area and could spread into an elevated or extreme fire risk area we would actually expand where we install that sectionalisation device. So, we're looking at you know, a risk evaluation at the buffer or the boundary, if you want to call it.

**Q -** And is PG&E looking at more granular segmentation of the circuits within the – say – at the county level or at a geographical regional level as well?

**Defendant Singh -** Our first focus has been to minimize the potential impact. That's something that's going to be part of the program as we continue to build and evolve it. ***But in terms of the current priority of what we have proposed in the 2019 plan, it's really focused on the boundary condition.***

123.    Later, on June 3, 2019, Defendants issued a press release further touting that PG&E's weather stations would permit it micro-target de-energizations:

Building on the 200 weather stations it installed in 2018, PG&E has added an additional 200 weather stations in 2019 to capture localized, real-time data related to temperature, wind speeds and humidity levels. Approximately 400 new weather stations are scheduled to be installed in 2019, prioritized in areas at elevated and extreme risk for wildfires, based on the California Public Utilities Commission (CPUC) High Fire-Threat District Map.

To help protect customers and communities during extreme weather events, electric power may be shut off for public safety in an effort to prevent a wildfire. This is called a Public Safety Power Shutoff (PSPS). PG&E's meteorologists will feed data from these new stations to the company's Wildfire Safety Operations Center team, where it can be utilized to help inform actions such as PSPS.

Before any PSPS, PG&E will carefully review a combination of criteria including predictions of strong winds and very low humidity levels; additional weather stations will assist PG&E's Meteorology team to better predict conditions specific to local geographic areas. Data collected by the weather stations is available to state and local agencies and the public through online sources such as the National Weather Service and MesoWest.

***"These new weather stations help us monitor conditions around the clock, improving our ability to understand when and where it is necessary to take this precautionary action in the interest of public safety*****,"** said Aaron Johnson, PG&E vice president of Electric Operations.

124.    Defendants' emphasized statements in this section were false because, as further set out below, (a) PG&E was either unable or unwilling to target de-energizations, thus ensuring that they would in fact be "indiscriminate"; and (b) PG&E's approach in no way resembled SDG&E's micro-targeting.

125.     At the May Hearing, Defendants also assured investors that PG&E would dramatically reduce the duration of PSPS events:

> **Q:** So, last year, they actually shut the power off before we had the events, and I know Dr. Woods in my district, but it was four days before it came back on. So nobody was expecting – the wind event was over, the heat was gone, and it was four days later that farmers were trying to figure out how they're gonna water their fields. I mean, I was getting calls like crazy of people like, 'When is it actually gonna come back on?' So I guess, for me, I want to be able to be safe and I want to avoid those risky times, but those times are short windows that we need to actually shut the power down and we need to be able to figure out how we're gonna assess – because I actually called PG&E myself and said, "When am I gonna get power back on in my district?" And they said, "As soon as we survey every single line."
>
> As you just stated in your opening comments, there are tens of thousands of miles of lines out there. And I know that you're talking about just areas that are shut down, but we have to have some sort of a system in that's not going to be four days every time. Because the next event – pretty soon you could be eight days without power and that's not acceptable either. Because we have to have a system in place that allows us to be able to shut the power off during those events where we know there's high risk and then be able to get it back on in a fashion where people aren't totally impacted as well at the same time.
>
> **Defendant Johnson:** *So, when I heard that the restoration time was two and a half to four days, I have to say my jaw dropped. But – and this is not an excuse, but this is a fact – the transmission system was built to remain in service.* The focus has always been how do you keep it working 99.999% of the time, and turning it off is not something we have had experience with. You know, we turned it back in when there's a failure. So, that's part of the problem figuring out how to do this. And I would say the physics – I don't want to get too far into physics – but the physics of re-energizing a transmission system is not as simple as throwing a switch. There's some complexity to this.
>
> *None of that goes to the point of four days is ridiculous, I got that. I agree with that. I think we're in better shape.* Over time, there are equipment you can install on the line that's in the plan that makes this lot easier. *I won't bore you with those details, but we will do better this year.*

126.     Defendants' emphasized statements were false because, as further alleged below, PG&E's CEO Defendant Johnson testified after the 2019 de-energizations that PG&E's internal

benchmark was to restore power within *five* days of the end of the weather event requiring de-energization, so PG&E internally acknowledged that it would do *worse*, not better, than it had in 2018.

### C. *Defendants' False Statements About Vegetation Management*

127.    In 2015 through 2017, 49% of the fires PG&E's caused resulted from vegetation. There are many ways vegetation might cause PG&E's equipment to cause wildfires. For example, trees may fall directly on towers or electrical equipment. They may also fall on and sever power lines. Or tree leaves may touch uninsulated electric equipment. In any of these cases, it is possible that a spark will start a wildfire.

128.    For this reason, clearing trees that are close to the power lines, or where trees or individual limbs are dead, dying, weak, or otherwise at risk of falling over power lines, is one of the most important aspects of wildfire safety.

129.    In PG&E's 2019 Mitigation Plan, Defendants made detailed false statements about PG&E's vegetation management inspections. According to Defendants, the inspection process had three steps – pre-inspection, removal, and post-work inspection – and PG&E's statements about the thoroughness of and skill employed at each step were misleading.

130.    First, Defendants represented in the Mitigation Plan that PG&E's purportedly well-trained and well-supervised contractors conducted a pre-inspection on miles of its transmission lines to identify all issues needing remediation:

> Pre-inspection is the first step in the vegetation management process. Correctly assessing tree characteristics including species, health, growth rate, and likely failure patterns is critical to prescribing the appropriate vegetation management actions to reduce the wildfire risk from tree-line interactions. The pre-inspectors performing this work are qualified and trained, with many holding industry certifications. PG&E contracts with a limited number of well-established, large-scale vendors to perform this work. Throughout their training and once deployed

pre-inspectors follow an established set of procedures for consistency in how the work is performed and findings/prescriptions recorded.

Beyond the training that the contractors provide to their pre-inspector staffs, PG&E also provides two full days per year of training to all pre-inspectors to align on safety practices, and relevant procedures.

131.    Then, as a second step, "PG&E's line clearance-qualified tree work contractors then trim or remove trees as necessary to create adequate clearance and abate any hazard trees."

132.    As a third step, Defendants boasted that PG&E conducted post-work inspection for 100% of the miles of trees in which it removed trees. As Defendant Singh stated at the February Workshop:

[] vegetation management really is a three-step process. And the first step is where we send a pre-inspector out on the line to look at and identify what are the trees that may be encroaching within the minimum radio clearance. And then these individuals have the certifications from an arborist, from a forester perspective, they do a defect assessment on the various trees. And they're also doing an assessment: if a tree is trimmed does that – especially if it's an old Oak tree and if we do end up removing a limb – does that make the tree and accelerate its tree mortality? So that assessment is done as part of the first step in the process of pre-inspection. Or the qualified individual makes a determination: is that a removal or is that a trim? And a trim, that can lead to a potential removal. Behind that individual comes the tree crew that's actually doing the work in terms of the trim or the removal, and behind them is a crew that actually does the debris or the wood management of the trees that are removed.

The other dimension that we've added as part of this is not just about the numbers, to your point on the targets, which is one of the reasons why we've made quality a key aspect of this work. To not just do the work, but to ensure we do it right the first time around. ***So, as part of our enhanced vegetation management program, we're sending another individual post-work to be able to do a hundred percent review of the work to ensure no tree was missed or tree was mischaracterized, and was the work that was prescribed by the pre-inspector actually executed by the tree crew themselves***.

133.    PG&E boasted in the Mitigation Plan that it had a fourth and final step, quality assurance:

The final step in the vegetation management process is the QA Program to assess the quality work performed in the field. This is accomplished through the physical inspection of a sample of the PG&E system. The objective of the sampling exercise

is to estimate the work quality rate for all trees in the geographic area covered by an audit. PG&E uses the results of the QA Program to improve future performance. PG&E has reviewed its QA Program and procedures with third-party experts who have validated that the sampling design in use is appropriate for PG&E's objectives[.]

134.   Defendants claimed in the Mitigation Plan that quality assurance would ensure that PG&E was properly conducting vegetation management:

In addition, as explained below, PG&E's [vegetation management] QA effort is designed to validate that the entire process, starting with pre-inspectors, is creating the desired outcomes and identifies areas where expectations are not being met such that further action, including retraining or re-assigning staff, can be taken. PG&E's vegetation management program incorporates changing environmental conditions, lessons learned, and new regulations. In the wake of the 2015 Butte Fire, PG&E adapted several practices to address risks identified in that incident. Among other measures, PG&E initiated additional validation of contractor training programs for pre-inspectors.

135.   PG&E's statements were false because, as more fully set out below: (a) on average, PG&E's pre-inspection work missed 61 dangerous trees per mile, or more than one every hundred feet; (b) PG&E's post-work inspections did not find improper work merely occasionally, but instead gave a failing grade to about 40% of the work PG&E completed; and (c) PG&E's post-work inspections also missed numerous dangerous trees.

### D.   *Defendants' False Statements About Equipment Inspection*

136.   Defendants claimed that a particular focus of PG&E's 2019 wildfire safety program was inspecting all of its transmission and distribution line assets. On December 10, 2018, Defendants published a press release which provided in relevant part:

Detailed and Enhanced Inspections of Electric Infrastructure**:** Conducting detailed safety inspections of more than 5,500 miles of transmission lines (consisting of approximately 50,000 transmission poles and towers in high fire-threat areas), in addition to routine inspections and maintenance. PG&E has already inspected approximately 350 miles of transmission lines in the past several weeks. This includes ground and climbing inspections, as well as aerial imagery captured by drones and in some cases, helicopter, to further complement and enhance visual inspections. If any issues are identified as a potential risk to public safety, PG&E

will take action to address them right away. PG&E also plans to begin similar inspections of its distribution lines in high fire-threat areas in early 2019.

137.     Defendants further claimed in the Mitigation Plan that PG&E was revamping and expanding its inspections of its distribution and transmission circuits.

138.     Specifically, in the Mitigation Plan, Defendants claimed PG&E would henceforth follow a risk-based approach to inspections. The approach's first step, which had already been completed, was examining in detail the most common ways in which PG&E's equipment would cause wildfires and developing methods of inspection that would identify and address these ways:

> To develop the [Inspection Plan], PG&E used a risk-based approach including conducting a Failure Modes and Effects Analysis[].The focus of the [analysis] was to identify single points of failure of electric system components that could lead to fire ignition and then aid in the development of inspection methods that can most appropriately identify the condition of these respective components.

139.     PG&E's lines of business purportedly had already completed a detailed and extensive analysis of these factors. Defendants boasted of the thoroughness of PG&E's examination:

> Each line of business performed the [analysis] using the following methodology:
>
> 1. Establishing a cross-functional team of external professionals and PG&E [experts] with experience in field operations, engineering, and asset management.
>
> 2. Reviewing a list of asset components to identify potential single point failure ignition risks for categorization in an asset group.
>
> 3. Where available, developing an independent list of failure modes and frequencies from multiple internal and external sources using published reports, internal reports and [expert] interviews.
>
> 4. Mapping components to the final list of failure modes and relevant inspection methods.
>
> 5. In some cases, the failure mode does not have a readily observable issue that can be identified via a visual inspection. In those cases, non-destructive and destructive examination methods may be considered.

140.    PG&E used the results of this analysis to purportedly conduct an inspection of all of its transmission poles and towers in or adjacent to high fire threat areas:

> Beginning in December 2018, and continuing into 2019, using this risk-based approach, PG&E is performing inspections of transmission structures (poles and towers) in [high fire risk] areas, as well as nearby structures outside the HFTD in close proximity and with high risk of fire spread into adjacent [high fire risk] areas (approximately 5,700 miles of transmission line with more than 50,000 structures). These enhanced inspections focus on the failure mechanisms identified from the [analysis] based on PG&E and industry information that identified components with a fire ignition risk.

141.    According to the 2019 Mitigation Plan, 56% of the inspections had been completed by January 31, 2019.

142.    These statements were misleading because, as further alleged below, PG&E's risk-based analysis and subsequent inspections did not target the cause of the most dangerous PG&E wildfires: severed or fallen transmission tower jumper cables.

## VI.    REASONS DEFENDANTS' DE-ENERGIZATION STATEMENTS WERE FALSE

143.    In 2019, PG&E de-energized power seven times:

| Date | Customers (residents) affected[13] |
|---|---|
| June 8-9 | 22,000 (55,000) |
| September 23-26 | 50,000 (125,000) |
| October 5-6 | 12,000 (30,000) |
| October 9-12 | 735,000 (1,837,500) |
| October 23-25 | 179,000 (447,500) |
| October 26-November 1 | 985,000 (2,465,000) |

[13] As-amended numbers taken from PG&E's February 18, 2020 presentation to the CPUC. Residents affected calculated by multiplying customers by 2.5, an industry rule of thumb. In PG&E's case, the resident count understates the total number of residents affected because many of PG&E's customers are municipal utilities that purchase power from PG&E's transmission lines and run their own distribution circuits.

| November 20-21 | 49,000 (122,500) |
|---|---|

144.    The October 26 and October 9 de-energizations were, respectively, the first and second largest voluntary de-energizations ever conducted in the U.S.

145.    PG&E's de-energizations had catastrophic consequences.

146.    An October 9 San Francisco Chronicle quoted Michael Wara, director of the climate and energy policy program at Stanford University's Woods Institute for the Environment, as estimating that damages for the October 8 PSPS could reach $2.5 billion. Later, a January 2020 Moody's Analytic report estimated that the impact of the October 2019 de-energizations **on Sonoma County alone** was $105 million.

147.    The costs went far beyond the financial. According to Cal OES, over 400 schools sent 135,000 students home to their parents with little warning, even though schools were required to get advance warning of de-energization because they were critical facilities.[14]

148.    Advocacy groups condemned PG&E's de-energizations. An October 11 L.A. Times article quoted Mark Toney, executive director of The Utility Reform Network, as saying that "[t]heir shut-off strategy, hitting 800,000 customers, is not surgical by any stretch." Toney added that "[i]t's like, they'll do whatever they feel like." Similarly, an October 25 NY Times article quoted Eric Kennedy, assistant professor of emergency management at York University, as saying that while "there is [] a dimension that is absolutely about the power companies and their employees earnestly not wanting to kill people, and not wanting to hurt communities," there is also "a dimension that is absolutely about the power companies wanting to reduce their own liability."

---

[14] *"I'm Out": PG&E Blackouts Stagger Californians*, WSJ, available at https://www.wsj.com/articles/im-out-blackouts-stagger-californians-11571010514.

149.    California lawmakers questioned the legitimacy of the de-energization. An October 9 San Francisco Chronicle article noted that State Senator Scott Wiener questioned whether the PSPS was justified, noting that "[t]he Wild West doesn't work", while State Senator Jerry Hill noted that it was "by no means surgical." A later October 13 San Francisco Chronicle article quoted Senator Wiener as saying that "PG&E has a strong financial incentive to go broad with planned blackouts because of financial liability."

150.    Governor Newsom was especially appalled. On October 10, Governor Newsom held a press conference to discuss, among other things, the October 9 de-energization. Newsom stated that "[w]hat has happened in the last 48 hours is unacceptable", adding that "it's happened because of neglect." On October 12, he stated that residents should be "outraged" and "infuriated" by the de-energization.

151.    On October 14, Governor Newsom commented that:

> [PG&E's] lack of preparation and poor performance is particularly alarming given that, prior to the event, PG&E responded to the scrutiny and questioning of multiple state and local agencies by asserting that it could handle a PSPS event without the need for additional assistance.

152.    On October 23, Governor Newsom sent Johnson an open letter demanding that PG&E rectify issues that had arisen with its October 9 blackout. In it, Newsom noted that the "scope and duration" of that blackout was "unacceptable." Newsom also noted that "PG&E's communications with local and tribal governments lacked even the most basic elements of emergency management organization."

153.    On October 24, Governor Newsom published an open letter to PG&E's executives. In an accompanying press conference, he announced that he "will not forgive" it for failing to invest in safety. He also announced that its blackouts were "infuriating beyond words." Summing

up, Governor Newsom rejected the false pieties Defendants had been issuing to customers, regulators, and investors:

> For close to a year now, we've been meeting on a consistent basis every damn week with these guys laying out protocols and they're not meeting those protocols. I don't think they get it. They'd better step things up. This is simply unacceptable.

154. PG&E's de-energizations made it less likely that it could emerge from bankruptcy. As Governor Newsom explained in a December 13, 2019 letter to PG&E rejecting its confirmation plan:

> PG&E's recent management of the [de-energization] did not restore public confidence. Instead, PG&E caused extreme uncertainty and harm to Californians who rely on power for their health care and for their livelihoods. For too long, PG&E has been mismanaged, failed to make adequate investments in fire safety and fire prevention, and neglected critical infrastructure. PG&E has simply violated the public trust.

155. Likewise, PG&E's conduct of de-energizations appalled the CPUC, especially in light of PG&E's earlier reassurances that it had de-energization fully in hand.

156. A representative of the CPUC was quoted in an October 12, 2019 NY Times article that "it's pretty much safe in saying this did not go well."

157. After Governor Newsom requested an investigation, on October 14, 2019, the CPUC issued a press release and published an open letter from its President to PG&E announcing that it would investigate PG&E for its conduct of the October 8 de-energization. The Press Release stated in relevant part:

> "Failures in execution, combined with the magnitude of this PSPS event, created an unacceptable situation that should never be repeated," said [CPUC] President Batjer. PG&E's decision to shut off power during the week of October 7, 2019, affected more than 700,000 customers and impacted an estimated 2 million people. "The scope, scale, complexity, and overall impact to people's lives, businesses, and the economy of this action cannot be understated," she said.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

158.   The open letter to Defendant Johnson observed that "PG&E assured the State that it was prepared for PSPS event execution [but] the event that took place the week of October 7, 2019, left Californians scrambling for information." The letter then continued for 7 pages in which it alternated between excoriating PG&E for its conduct of the de-energization and proposing new requirements on it in light of its failures. The letter ordered PG&E to file an after-action report by October 17 and appear at an emergency CPUC hearing on October 18. Governor Newsom praised the investigation in a letter that same day charging that PG&E had conducted the blackout "with astounding neglect and lack of preparation"

159.   Then, at an October 18 CPUC meeting, President Batjer stated that "The situation frankly has been unacceptable. The impacts to individual communities, to individual people, to the commerce of our state, to the safety of our people, has been less than exemplary. This cannot be the new normal. We can't accept it as the new normal. And we won't."

160.   PG&E plainly knew of the problems. A December 20, 2020 AP article, citing correspondence obtained through public records request, cited  Elizaveta Malashenko, the CPUC's Deputy Executive Director, as saying that state officials also pushed PG&E to improve in other areas of conducting de-energizations]. According to the article, starting in April, the CPUC met at least weekly with PG&E, "pointing out needed improvements and stressing that aspects of the utility's preparation was inadequate."

161.   But instead of addressing the problems, PG&E simply conducted check-the-box compliance, as noted by an IT Manager who worked for PG&E for about twenty years until his retirement in November 2019. The IT Manager's last position at PG&E was IT and Infrastructure Field Support Manager. The IT Manager reported to Senior Director of IT Michael Savage. The

IT Manager was in charge of the team that provided IT to PG&E's de-energization emergency response center and teams.

162.     The IT Manager oversaw the team that was responsible for setting up "base camps" and "mini camps" during de-energizations. The IT Manager's responsibilities were substantial; base camps would include between 500 and 2,000 PG&E employees. The IT Manager's team also supported PG&E's Wildfire Safety Operations Center, the central operations hub in charge of all wildfire safety. The Wildfire Safety Operations Center's hub during the 2019 de-energizations was the San Ramon Learning Center.

163.     According to the IT Manager, his and his team's training was utterly irrelevant to their jobs. Their training was limited to "us understanding what criteria would be used to cause a [de-energization] event." Their training did not touch on their responsibilities, IT, give them any guidance on how to set up IT for PG&E's emergency response teams, or otherwise how to do their jobs if PG&E conducted a de-energization. As a result, the IT Manager explained, "we felt we were under-prepared."

164.     Further, much of the damage resulted from PG&E's reckless conduct of the de-energization. PG&E gave no advance notice of the scope of de-energizations to local governments, forcing governments to waste critically needed resources preparing for the de-energization of areas that had never been expected to lose power. PG&E gave no notice to many industrial producers, whose complex processes came to an abrupt and unsafe halt.

165.     PG&E's customers reported harrowing stories. Some customers were unable to charge the batteries of the ventilators they needed to survive, risking death. In one case, a community of seniors in a low-income apartment complex in Novato was trapped in the dark for days.

166.     Ultimately, Governor Newsom – whose consent PG&E needed to exit bankruptcy – declared that he "will not forgive" PG&E and that its conduct was "infuriating beyond words".

*A.     False Statements About Conducting De-Energizations*

*1.     Failure To Work With Local Government*

a.     Failure to Provide Advance Information To Local Governments

167.     After PG&E failed to provide notice of its de-energizations to affected parties, the CPUC initiated a new investigation by way of Order to Show Cause Why PG&E Should Not Be Sanctioned ("Sanctions Investigation").[15] The CPUC invited comments from interested parties.

168.     The Counties of Kern, Marin, Mendocino, Napa, Sonoma, Nevada, San Luis Obispo, Santa Barbara, and the City of Santa Rosa, represented by their counsel Goodin, MacBride, Squeri & Day LLP ("GMSD Governments"), were among the parties that filed comments in the Sanctions Investigation. The GMSD Governments noted that they, among other local governments, had sought to be involved in PG&E's process of developing protocols PG&E would follow in a de-energization to share information with local governments. But PG&E flatly refused.[16]

169.     PG&E's refusal endangered residents. AS the GMSD Governments explained, local government's responsibilities include providing information to constituents.[17] Once PG&E informs the public of an impending de-energization, the public floods local governments with phone calls and emails. Because PG&E did not provide advance notice and information to local

---

[15] Investigation I.19-11-013.

[16] Response of the Joint Local Governments To the Order Instituting Investigation, filed on January 10, 2020 in the 19-11-013 proceeding, ("Joint Local Governments Response"), at p. 54-55., available at:
<http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M324/K940/324940633.PDF>.

[17] Joint Local Governments' Comments on PG&E Post-PSPS Event Report for September 25, 2019, filed in the De-Energization Rulemaking Proceeding, filed on January 3, 2020, at p. 2, available at <http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M324/K457/324457828.PDF

1   governments before it informed the public, the local governments had no way to prepare

2   themselves to answer their constituents' questions.

3       170.    Further, as the GMSD Governments explained, local governments have important

4   obligations for the safety and welfare of their residents. To meet these responsibilities, local

5   governments need more information than the public. For example, local governments need fire-

6   threat modeling information, detailed GIS maps, circuit information, and likely outage scenarios,

7   to plan their own response and to answer residents' questions about the likely duration of a de-

8   energization and which areas would not lose power.[18] Local governments, at least the GMSD

9   Governments, requested but never received the information in the course of PG&E's de-

10  energizations.[19]

11      171.    Moreover, PG&E regularly failed to provide even elementary information. As the

12  GMSD Governments explained in the De-Energization Proceeding, the only advance notice PG&E

13  provided of the September 25 de-energization was a phone call that PG&E was increasing the

14  estimated risk of de-energization to "elevated". Local governments were not told whether there

15  definitely would be a de-energization and were not provided with outage maps, which are critical

16  to answering constituents' most frequent question: will I lose power?

17      172.    Before the October 9 de-energization, many local governments, including the

18  GMSD Governments, had asked that PG&E provide them with a separate source of information

19  about de-energization. PG&E had refused to provide the governments with a separate source of

20  information, instead directing them to PG&E's public website. Yet the public website failed in the

---

[18] Response filed by the GMSD Governments in the PSPS Rulemaking Proceeding, filed on
October 15, 2019, available at:
<http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M317/K610/317610533.PDF>.
[19] Joint Local Governments Response, at 15-16.

first massive de-energization on October 9. Thus, local governments did not know and had no way to determine which areas had lost power.

173.    PG&E's failures continued throughout the season. For example, on October 23, PG&E warned the City of Santa Rosa that it would lose power 60 minutes *after* it was de-energized.[20]

174.    Even when PG&E provided advanced notice, the advanced notice only specified that PG&E *would* de-energize an area.[21] Further, the notifications were haphazard, going out to seemingly randomly-selected employees of the local governments, with several counties unable to determine even after the fact to whom PG&E provided notification. [22]

175.    Indeed, the California Community Choice Association, an association of entities that purchase power from PG&E transmission lines and operate local distribution networks ("Transmission Customers Association") surveyed affected municipalities. The municipalities reported that communications problems were general even as late as the October 29 de-energization.[23] The problems they reported included, for example:

> a.   A municipality that received no warning whatsoever;

---

[20] Joint Local Governments' Comments on PGE Post-PSPS Event Report for October 23, 2019, in the De-Energization Rulemaking Proceeding, filed on January 3, 2020, at p. 2, available at <http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M324/K290/324290756.PDF>.

[21] City of San José's Response to Order Instituting Investigation (OII) and Response to Pacific Gas & Electric Company's Response to OII, at filed January 10, 2020 ("San José's Response to OII"), at p. 5-6., available at <http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M324/K963/324963002.PDF>.

[22] San José's Response to OII, at p. 6.

[23] Comments of the California Community Choice Association on Pacific Gas and Electric Company's Public Safety Power Shutoff Reports for the October 23, 2019 and October 26 and 29, 2019 consolidated events, filed in the De-Energization Rulemaking Proceeding, at p. 15-16, available at <http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M324/K290/324290771.PDF>.

b.  A city that was warned that the entire city would lose power and thus warned all its residents to plan to not have power, only to later find out that only a small portion of the city had been slated to lose power;

c.  A jurisdiction whose outage maps were so vague and inaccurate that it had to send out staff to determine outage boundaries.

176.  Similarly, the California State Association of Counties concluded that "[i]ndividual local governments are constantly left out of communications, left without outage maps or impacted customer information, and left with single points of contact who are unable to extract the necessary information from PG&E's EOC."

b.  Failure To Advise Local Governments of the Existence and Location of CRCs

177.  To allay the impact of the de-energizations, PG&E claimed that it would establish CRCs, small power shelters where electricity and outlets are available.

178.  AS the GMSD Governments stated, CRCs are necessary. For example, residents who depend on battery-powered respirators must have a way to charge their batteries, or they may die. They can plug in at CRC and recharge batteries. Others can charge phones which they need to get updates on the de-energization or contact authorities in case of emergency.

179.  Because CRCs are necessary, if PG&E does not set up CRCs, then local governments must. Further, local governments are obviously better prepared than PG&E to select locations for CRCs. Local governments know their community; PG&E does not.

180.  Thus, local governments, including the GMSD Governments, repeatedly asked PG&E to explain where it would site CRCs.

181.    Yet according to the GMSD Governments, PG&E flatly refused to do so.[24]

182.    Many local governments offered to provide PG&E with locations to set up CRCs. Having local governments select CRC locations helps constituents because local governments know better than PG&E where to locate CRCs to be maximally helpful. Yet PG&E ignored local governments' request. For example, Napa County offered a centrally located site for de-energization, free of charge. Yet instead, at its own expense, PG&E placed a CRC in Vallejo - *15 miles* from the City of Napa. The CRC was completely inaccessible to any residents who did not have access to a car.[25]

183.    Further, the California State Association of Counties noted that some of its members, such as Merced County, did not receive any CRCs *at all* and had to create their own.[26]

c.    Failure to Engage in Tabletop Exercise

184.    In the February Workshop, Defendants claimed that PG&E was conducting several tabletop exercises with local governments. Such tabletop exercises would let PG&E and local governments jointly plan out their response to de-energization, address any issues, and ensure that

---

[24] Response filed by the GMSD Governments in the PSPS Rulemaking Proceeding, filed on October 15, 2019, at p. 6, available at:
<http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M317/K610/317610533.PDF>.; See also Joint Local Governments' Comments on PG&E Post-PSPS Event Report for September 25, 2019, filed on January 3, 2020, at p. 3 (noting that PG&E had not provided advance notice of CRCs in the September 25 PSPS, either), available at
<http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M324/K457/324457828.PDF>.
[25] Response filed by the GMSD Governments in the PSPS Rulemaking Proceeding, filed on October 15, 2019, p. 6-7, available at:
<http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M317/K610/317610533.PDF>.
[26] Response of California State Association of Counties to Order Instituting Investigation, filed in the Sanctions Investigation Proceeding, filed January 10, 2020,
<http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M324/K884/324884502.PDF>.

1
2
both PG&E and local government employees (including EMS personnel) know exactly what to do in a de-energization.

3
4
5
6
185.    Yet shortly after the February Workshop, PG&E cancelled all scheduled tabletop exercises with local governments, including two scheduled with Sonoma and Napa Counties, without any discussion with the local governments.[27]

7
8
9
186.    Throughout the spring and summer of 2019, the GMSD Governments sought to have PG&E conduct table-top exercises with them. Yet PG&E never rescheduled the tabletop exercises. [28]

10
11
12
187.    Accordingly, when the PSPSs came, PG&E was not prepared for the local governments' needs.[29]

13
14
d.    Failure To Provide Working Maps and Provision of Deliberately Inaccurate Maps

15
16
17
18
188.    Maps let customers plan for outages. Not only do they show customers whether they will be affected, they can also point customers to friends or family who will not lose power, allowing the customer to arrange to stay with them. Outage maps let local governments know which critical facilities they will have to supply with power or close.

19
20
189.    At first, PG&E did not timely produce outage maps.

21
22
23
24
25
[27] Reply Comments of Mendocino, Napa, and Sonoma Counties and the City of Santa Rosa in the De-Energization Rulemaking Proceeding, filed May 21, 2019, at p. 3-4, available at <http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M292/K711/292711567.PDF>.

26
27
[28] Reply Comments of Mendocino, Napa, and Sonoma Counties, and the City of Santa Rosa in the De-Energization Rulemaking Proceeding, filed December 13, 2018, at p. 15-16, available at <http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M324/K940/324940633.PDF>.

28
[29] Joint Local Governments Response, at p. 15-16.

1

2

190.    For the June 8 de-energization, PG&E did not provide outage maps until the evening of June 7.[30] And for the September 23 de-energization, PG&E did not provide outage maps until after it had announced the de-energization.

191.    In October, PG&E provided deliberately misleading maps. While responding to the de-energizations, many of the GMSD Governments were surprised to discover that many areas PG&E had claimed were going to lose power in fact did not. The GMSD Governments learned the reason when a PG&E liaison for the October 9 de-energization explained that PG&E created a 20% buffer on the outage area in the maps it provided. This was not because PG&E did not have accurate outage maps, as it provided accurate maps to its personnel. [31]

192.    PG&E had not disclosed that it was imposing a buffer. The buffer forced governments to waste resources and risk harms unnecessarily evacuating buildings which fell within the buffer zone. For example, Napa nearly evacuated its County jail before it learned that the jail was not in the planned outage area but instead in a PG&E buffer.[32]

193.    The 20% buffer continued in the October 23 PSPS[33] as well as the October 26 and 29 PSPSs.[34] PG&E again did not disclose the buffer.

---

[30] Joint Local Governments' Comments on PG&E Post-PSPS Event Report for June 8, 2019, filed in the De-Energization Rulemaking Proceeding, filed on January 3, 2020, at p. 2, available at <http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M324/K367/324367408.PDF>.

[31] Letter from Megan Somogyi to Elizaveta Malashenko titled Joint Local Governments' Response to PG&E After-Action Report for October 9, 2019 PSPS Event, at p.2.

[32] Response filed by the GMSD Governments in the PSPS Rulemaking Proceeding, filed on October 15, 2019, p. 7-8, available at:
<http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M317/K610/317610533.PDF>.

[33] Joint Local Governments' Comments on PGE Post-PSPS Event Report for October 23, 2019, in the De-Energization Rulemaking Proceeding, filed on January 3, 2020, at p. 2, available at <http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M324/K290/324290756.PDF>.

[34] Joint Local Governments' Comments on PG&E Post-PSPS Event Report for October 26 and 29, 2019., filed in the De-Energization Rulemaking Proceeding, filed on January 3, 2020, at p. 5, available at <http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M324/K456/324456192.PDF>.

194. The City of San José complained that "PG&E's communication with customers during the 2019 PSPS events was untimely, incomplete, and at times even confusing."  For example, PG&E provided unusable blackout maps; San Jose had to create its own maps as well as software to interpret them.[35] It appeared to San José that PG&E was not able to understand how the de-energization would affect its own grid.[36]

### 2. Failure to Identify and Notify Critical Facilities and Public Safety Partners

195. Local governments are not the only parties who need advance notification. Industrial customers need advance notice so they can shut down manufacturing processes without damaging equipment or harming workers. Transmission customers need advance notification so they can prepare their own grid. Hospitals need advance notification so that they can ensure their generators work and have sufficient fuel, among other things. Schools need advance notification to know whether they can hold classes.

196. PG&E's own plan and the CPUC's orders mandated that PG&E identify critical facilities, such as first responders, medical facilities, emergency operations centers, schools, utility facilities vital to maintaining or restoring normal services, and drinking water and wastewater treatment plants.[37]

197. The rules and plans required PG&E to provide early notice to all such critical facilities that would be affected by a de-energization. PG&E must also provide outreach to those facilities throughout the de-energization.

---

[35] San José's Response to OII, at p. 9-10, 17-18.
[36] San José's Response to OII, at p. 9.
[37] Opening Comments on Phase 1 Issues, filed by Pacific Gas and Electric Company, filed in the De-Energization Rulemaking Proceeding, filed March 25, 2019,  at p. 13-14, available at <http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M275/K024/275024563.PDF>.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

198.    In addition to its own efforts, PG&E purportedly began a campaign in July 2019 to ask all cities and counties to confirm and verify critical facilities and infrastructure within their jurisdiction, and identify additional facilities and infrastructure they deem to be critical and ought to be included in PG&E's critical facilities and infrastructure list.[38]

199.    PG&E did not attempt to obtain or incorporate information from the cities and counties into its critical facilities list. For example, for the October 9 de-energization, San José listed ten critical facilities, while PG&E had only identified three.[39] San José identified nine critical facilities for the October 26 de-energization, and PG&E only three.[40] Between the October 9 and 26 de-energizations, San José provided a list of critical facilities to PG&E, but several of the names it provided were not on PG&E's list of critical facilities for October 26.

200.    Likewise, San Francisco asked PG&E whether two of its critical facilities located in Contra Costa County would be affected by the October 26 de-energization. PG&E wrongly told San Francisco that they would not. San Francisco thereby wasted resources in an emergency and still lost tens of thousands of gallons of water.[41]

201.    Further, it is plain that PG&E did not provide notice to schools, as they sent 135,000 students home on short notice

202.    Nor did PG&E provide information to municipal electric agencies.

---

[38] Pacific Gas and Electric Company Progress Report on Implementation of De-Energization Guidelines, dated September 4, 2019, at p. 8-9, available at https://www.pge.com/pge_global/common/pdfs/safety/emergency-preparedness/natural-disaster/wildfires/PSPS-Report-Letter-09.04.19.pdf
[39] San José's Response to OII, at p. 4
[40] Id. at 4-5.
[41] Response of the City and County of San Francisco, filed in the Sanctions Investigation Proceeding, filed on January 10, 2020, at p. 2-3, available at <http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M324/K944/324944660.PDF>.

1  203.    The Northern California Power Agency ("NCPA") is a not-for-profit entity that

2  makes investments in energy resources for its members, which are entities that purchase power

3  from PG&E in bulk and then distribute it to their customer through their own grid.[42] The

4  prototypical NCPA member is a municipal utility.

5  204.    The NCPA's members are *critical facilities* within CPUC rules and are therefore

6  entitled to advance notice of any de-energization. NCPA members need advance notice of power

7  shutoffs. They need to make arrangements like setting up CRCs and ensuring that first responders

8  can still operate. Further, they must notify their own customers that a de-energization is looming.

9  Moreover, NCPA's members are sophisticated electricity providers and not without resources. If

10 provided with advance information, NCPA's members might even be able to keep power on in

11 some of their territory.

12 205.    PG&E told the NCPA that they would receive information about any PSPS directly

13 from a particular PG&E employee. They were not told about the October 9 PSPS by PG&E.

14 Instead, the NCPA was told by ***Cal OES*** that 12-20 transmission line customers would lose power.

15 And even then, the NCPA was not told who these 12-20 customers would be. Instead, the NCPA

16 was told to call 12 individual PG&E employees, each of whom was responsible for a discrete

17 geographical area, to determine whether its members were among the transmission line customers

18 who were going to lose power.

---

Northern California Power Agency Comments on PG&E Public Safety Power Shutoff Report for
October 9-12 PSPS Event, filed in the De-Energization Rulemaking Proceeding, filed on
December 31, 2019, available at
<http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M324/K375/324375650.PDF>.

206.   In its report on the October 26/29 de-energizations, the NCPA noted that PG&E's communications had in no way improved. [43] As just one example, the NCPA noted the travails of the City of Healdsburg. Healdsburg was not included in the initial or updated list of transmission customers who would lose power in the October 26-29 de-energization. It was told on a Cal OES call that PG&E would cut power to 36 transmission customers, but the PG&E representative on the call did not know which ones would lose power. It was still trying to figure out whether its power would be cut on the morning of the 26th. At 11:00 AM Healdsburg received notice that it was among the transmission customers who would lose power, more specifically at 2:00 PM that day. It was difficult for Healdsburg to do anything about it, because Healdsburg had been ordered to evacuate 30 minutes earlier to escape the Kincade Fire.

207.   Likewise, the California Large Energy Consumers Association explained that its members needed advance warning to power down industrial processes. That association's members, however, received incorrect information from PG&E about which factories would lose power. In some cases, factories lost power with no advance notice. One member repeatedly contacted PG&E before October 2019 to ensure it had the member's correct contact information. But PG&E never took note of the contact information, and the customer received no notice of the de-energization.

3.   *Failure to Identify and Contact Customers with Medical Needs*

208.   A de-energization is particularly harmful to customers who depend on power to meet their access and functional needs ("AFN").

---

[43] Northern California Power Agency Comments on PG&E Public Safety Power Shutoff Report for October 9-12 PSPS Event, filed in the De-Energization Rulemaking Proceeding, filed on December 31, 2019, available at <http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M324/K375/324375650.PDF>.

209.    California's medical baseline program provides preferential rates to ratepayers who depend on power for life-sustaining medical devices. The program is not self-enforcing; rather, ratepayers must themselves apply (and their applications must be granted). Medical baseline customers are one segment, albeit a particularly acute segment, of AFN individuals.

210.    PG&E represented that it would provide advance notice of de-energization to at least medical baseline customers. PG&E would start with text requesting a response. If customers did not respond, PG&E would call them and seek to get a person on the line, then escalate to home visits.

211.    According to PG&E's After-Action report for the September 25 PSPS, PG&E began calling medical baseline customers *after the power was shut off*. Setting aside the uselessness of warning customers that they would lose power after they already had, many forms of communications do not work without power, like VoIP and copper wire service using a cordless handset.[44]   Similarly, in the October 9 de-energization, PG&E did not provide notice to 500 medical baseline customers. Any one could have been caught by surprise and died.

212.    Further, the De-Energization Guidelines require utilities to "make a diligent effort to identify" customers with Access and Functional Needs.  PG&E did not try to identify customers who, while not medical baseline customers themselves, housed residents who were. As a result, many residents who would qualify for medical baseline rates if they were customers never received

---

[44] Center for Accessible Technology Comments on Pacific Gas & Electric Post-PSPS Event Report for September 23, 2019 and September 25, 2019, filed in the De-Energization Rulemaking Proceeding ("CAT September 25 PSPS Response"), at p. 2, available at <http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M324/K386/324386707.PDF>; Comments on Amended PG&E's Post-PSPS Event Report for October 9-12, 2019 filed by AT&T Corp., et al., filed in the Rulemaking Proceeding ("AT&T's Early October Event Post-PSPS Comments"), at p. 4, available at <http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M324/K386/324386716.PDF>.

any notice at all. Nor did PG&E attempt to identify customers who qualified for the medical baseline program but had not applied.

213.    Nor did PG&E attempt to identify customers who, while not qualifying for medical baseline rates, would suffer horrifying conditions without power. For example, in its comments in the Sanctions Proceeding, an organization advocating for disability rights told of a community of seniors in a low-income apartment complex in Novato was trapped in the dark for days.

214.    Moreover, PG&E's last-minute notifications did not help medical baseline customers. According to the disability rights organization, PG&E's advice to medical baseline customers who had no way to charge their devices was to call 911 and request an ambulance, at ruinous cost both to the health system and the customers. [45] In Nevada County, six ER beds were occupied during the October 9 de-energization by patients whose only medical need was charging their medical device. *Id.* Nor did PG&E's CRC hours of 8 AM to 8 PM take into account that it takes 6-8 hours to charge an oxygen concentrator's batteries. [46]

215.    Further, after deciding not to help medical baseline customers, PG&E put obstacles into the path of first responders who would.  PG&E refused to provide information to first responders unless they signed a broad, sweeping non-disclosure agreement ("NDA") that PG&E sprung on the first responders at the last minute. The first responders, who are subject to public records laws, had no time to analyze the NDA to see if it was consistent with their obligations. Further, PG&E had already been told that it should provide the information without an NDA. On October 8, after PG&E again Malashenko emailed the three investor-owned utilities, stating:

> There seems to be ongoing confusion regarding sharing medical baseline customer
> information with counties during a PSPS event. ***This issue has been discussed***

---

[45] Joint Local Governments Response, at p. 87.
[46] Joint Local Governments Response, at 74

*many times over the last several months and the CPUC staff understanding is as follows:*

- Once a utility has initiated PSPS protocol, it will share medical baseline customer information with impacted County's Emergency Response team *even if there is no NDA in place*

(second emphasis in original)

216.    An internal October 8 email from Malashenko noted that the question "has been discussed many times over the last several months" yet "has once again become an issue with PG&E." On October 9, the CPUC issued a blanket order compelling PG&E to provide its list of medical baseline customers and their addresses without an NDA, but PG&E continued to insist on NDAs in the October 26-29 de-energization.

### 4.    Failure to Operate A Working Website

217.    PG&E did not operate a working website ready for de-energizations until mid-October.

218.    In the September 25 PSPS, the English-language portion of PG&E's website lagged behind other methods, including Twitter, and the other-language portion was simply not updated until several requests from disability rights organization. The only update provided was to instruct non-English language customers to call PG&E for information.[47]

219.    PG&E used on premises computer resources to power its website. Because it did not have access to the massive resources provided by a service such as Amazon Web Services, PG&E was sharply limited in how much it could scale up its response.

220.    PG&E was unprepared for the October 9 de-energization, when its website went down entirely, and stayed down for substantially all of that de-energization. PG&E provided

___
[47] CAT September 25 PSPS Response, at p. 2.

updates by tweet, though many California residents are not on twitter and those who are would not

necessarily know to check PG&E's twitter account for updates, as that is normally not the principal

means large companies use to transmit necessary safety updates.

221.    The information on the website was also deficient, As the GMSD Governments

explained:

> That website, and PG&E's additional webpage for local public safety partners and
> critical facilities, were developed and launched without any input from the local
> public safety partners they were intended to benefit. The terminology in PG&E's
> weather awareness website lacks clarity, the information about PSPS potential has
> never been correlated to operational actions or notification procedures that involve
> local public safety partners, and the fact that it is public means that local
> governments will have no opportunity to respond to the PSPS forecast or obtain
> necessary follow-up information before being flooded with emails and phone calls
> from concerned residents. [48]

### 5.    Refusal to Listen to Complaints

222.    Troublingly, PG&E was unable to incorporate customer feedback into its

operations. Thus, PG&E persisted in engaging in bizarre destructive behavior even after customers

brought the behavior to its attention.

223.    PG&E claimed it read FCC regulations protecting customers to prohibit it from

providing advance notice (rather than notice that a de-energization is imminent) after hours. The

rules obviously are not meant to protect large companies like AT&T, which in fact operates after

hours every day. Indeed, AT&T provided PG&E with an after-hours contact number before any

de-energizations. Yet as AT&T explained in a July 8 letter to the CPUC copying PG&E, PG&E

still did not provide it with the requisite notice:

> Despite its obligation to identify "24-hour" contacts with Public Safety Partners
> like AT&T, PG&E apparently decided not to provide certain notifications to AT&T
> due to a concern regarding Federal Communications Commission ("FCC")
> "curfew" rules. PG&E's Report indicates that although PG&E provided initial
> notice around 24 hours in advance, it did not provide notice within the required one

---

[48] Joint Local Governments Response, at p. 54

to four window before de-energization in Location 1,[] where de-energization occurred around 6:00 am on June 8. PG&E's rationale for not providing notification of imminent de-energization was a concern that it would be out of compliance with the FCC curfew guideline and time restrictions.[] AT&T assures PG&E that in the case of an impending de-energization, AT&T should be contacted at any time, and in fact AT&T has provided PG&E with a contact number at an AT&T after-hours operational center to ensure emergency notices can be received 24 hours a day. Concerns about FCC curfew rules are not an adequate justification to skip notifications to AT&T.[49]

224.    Incredibly, in the October 9-12 and October 26-November 1 de-energizations, PG&E again failed to provide PG&E the requisite notice, again citing FCC curfew regulations, prompting AT&T to re-issue the same paragraph virtually unchanged in commenting on each de-energization.[50]

225.    When Sonoma County sought to embed a representative in PG&E's EOC in the September 25 de-energization, PG&E placed the representative in a separate room outside the EOC.

226.    After that de-energization, PG&E acknowledged to Sonoma County that the isolation was "not an acceptable plan," but when a Sonoma county representative appeared for the October 9 blackout, they were again placed in isolation. PG&E also forbade a San José representative from entering the EOC in the October 9 PSPS.[51] Sonoma County and San José tried again in the October 26 de-energization, with the same result.

---

[49] Comments on PG&E's Post-PSPS Event Report for June 7 to June 9, 2019., filed by AT&T Corp., et al., filed in the De-Energization Rulemaking Proceeding, filed on January 7, 2020, available at <http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M324/K367/324367429.PDF>.
[50] AT&T's Early October Event Post-PSPS Comments; Comments on PG&E's Post-PSPS Event Report for October 26 to November 1, 2019 filed by AT&T Corp., et al., filed in the De-Energization Rulemaking Proceeding, filed on January 7, 2020, ("AT&T's Late October Event Post-PSPS Comments") available at <http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M324/K456/324456210.PDF>
[51] Comments on PGE's Post-PSPS Event Report for October 9-12, 2019, filed by the City of San José, filed in the De-Energization Rulemaking Proceeding, filed on January 7, 2020, at p. 3, available at http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M324/K457/324457864.PDF>.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 6.    *Other Failures*

227.    All told, as the GMSD Governments commented in the Sanctions Proceeding, PG&E narrowly averted creating a disaster:

> Towards the end of the outage, nursing homes, assisted living facilities, and other facilities that provide care to vulnerable individuals were nearing the limits of their backup power. As the PSPS wore on into the early hours of October 10 in the North Bay, with signs that the cellular networks, VoIP, and broadband internet were quickly degrading, veteran fire fighters and emergency managers feared that if a fire broke out, their best tool for warning and evacuating the public – Wireless Emergency Alert – would be significantly hampered or even useless.

228.    The GMSD Governments concluded that "[h]ad the outage lasted another 24 hours, in the Joint Local Governments' emergency managers' estimation, PG&E could have seen as many customer deaths as in the 2017 and 2018 wildfires."

229.    Other commentators made substantially the same point. As the disability rights organization stated:

> The risks to the public go far beyond simply being inconvenienced because their lights went out. In addition to the partial list of harms set out above, the events of 2019 made clear that public safety is harmed when the power goes out in multiple additional ways. Roadways become unsafe when streetlights and traffic lights cannot operate. Customers lose perishable food because they cannot power their refrigerators; this can have a long-term effect on their health as well as the immediate risk of hunger. People earning hourly wages lose income if their place of work is closed due to a lack of power. This creates a risk that they will be unable to pay for essential services such as food or housing. Small businesses lose revenue and risk closure (with accompanying job losses). Even if someone's place of work has power, parents whose children's schools have closed due to a lack of power must choose between missing work and leaving their children alone in the dark. Children with special needs who receive services through their schools lose access to these services, and families that depend on school lunch programs to feed their children may risk hunger.[52]

---

[52] Response of the Center for Accessible Technology to Order Instituting Investigation on the Commission's Own Motion on the Late 2019 Public Safety Power Shutoff Events, filed in the Sanctions Investigation Proceeding, at p. 6-7, available at <http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M324/K940/324940634.PDF>.

230.    The County of Santa Clara claimed that its own costs from the October 2019 de-energizations (excluding the much larger costs borne by residents) were $5.3 million.

231.    Entities whose interest in PG&E was merely financial also commented. PG&E's Ad Hoc Committee of Senior Unsecured Noteholders likewise criticized PG&E's conduct of the de-energization in January 10, 2020 responses. That Committee noted that "PG&E continues to struggle to provide adequate customer notification and public safety partner engagement." The Committee noted that:

> PG&E has not identified in any of its PSPS reports how it plans to resolve these customer-to-equipment errors. An accurate understanding of how customers and system equipment relate is paramount for any utility, particularly those tasked with the difficult task of weighing the potential safety impacts of de-energization against the risk of potential wildfires.

### B.    Micro-Targeting De-Energizations

232.    In October 2019, PG&E de-energized power four times. SDG&E also de-energized two times. Yet PG&E's de-energizations affected almost two orders of magnitude more residents than SDG&E's:

| Date | Utility | Number of customers affected |
|---|---|---|
| October 5-6 | PG&E | 12,000 (30,000) |
| October 9-12 | PG&E | 735,000 (1,837,500) |
| October 23-25 | PG&E | 179,000 (447,500) |
| October 26-November 1 | PG&E | 985,000 (2,465,000) |
| October 24 | SDG&E | 19,500 |
| October 29 | SDG&E | 24,600 |

233.    In total, almost 5 million California residents lost power in PG&E's de-energizations.

234.    On October 10, 2019, Governor Newsom highlighted the sharp contrast between PG&E and SDG&E:

> One final point. We also anticipated, and we stated this on multiple occasions, including here in this room, that this idea of de-energization is not novel. It occurs as an industry best practice. San Diego has been doing it for years and years and years. They learned their lesson in 2007. PG&E didn't learn that lesson even after some of the mismanagement of San Bruno. But San Diego Gas and Electric is arguably one of the nation's most effective and efficient IOUs, but specifically as relates to their predictive analysis, their weather station. I had a chance to visit it a few months ago, it's exceptional. It's at another level.

235.    The mere fact that in one month there were three de-energizations affecting more than five million residents in total shows that PG&E could not sectionalize the de-energizations, contrary to its false statements.

236.    But, further, it is apparent that many of the areas de-energized were at no risk of creating any wildfire. Of the circuits shut off in the October 9-12 de-energization, only 9% had been sectionalized. Further, 89% of the distribution circuits and 74% of the transmission lines shut off during that PSPS were entirely or partially outside of a high fire risk area, belying PG&E's claim that it could ring-fence the high fire risk areas. Moreover, the National Weather Service weather conditions for 113 of 131 weather stations in which PG&E shut off power did not meet PG&E's own criteria at any time during the de-energization.[53] These areas include Marin County and the San Francisco Bay Peninsula.

237.    PG&E fared no better in the October 26-November 1 de-energization. There, PG&E only used sectionalizing devices on 28% of the circuits affected, and 92% of the distribution

---

[53] Id. at 8-9.

circuits shut off were located outside High Fire Threat District areas.[54] Further, the National Weather Service weather conditions for 101 of 131 weather stations in which PG&E shut off power for which there was complete data did not meet PG&E's own criteria at any time during the 6-day shutoff.[55] These areas include Marin County and much of the San Francisco Bay Peninsula.

238.     Nor did the length of the de-energizations comport with PG&E's representations. Defendant Johnson testified that PG&E would do "much better" than 4 days. But as Defendant Johnson admitted at the October 18, 2019 Emergency CPUC meeting, PG&E's internal benchmarks during the 2019 fire season were again to return power within 5 days after the end of the weather event prompting de-energization:

> We did everything realtime except turn the power off in preparation for the worst-case scenario.· As I mentioned in·my opening comments, ***this number was the actual benchmark, five days.· Okay.· So --·and that was where, in my view, there needs to be improvement because if the benchmark was two days I would have asked for mutual assistance earlier.***

239.     Between the October 23 and 29 PSPSs, some customers lost power for a week. [56]

## VII.    REASONS STATEMENTS ABOUT VEGETATION MANAGEMENT WERE FALSE

240.     Judge Alsup charged PG&E's probation monitor with producing letter reports on PG&E's compliance with its own vegetation management program.

---

[54] Letter from Jeffrey Mondon to Elizaveta Malashenko dated December 13, 2019 providing AT&T comments to PG&E's report on its October 26-November 1 PSPS, filed in Rulemaking 18-12-005 on January 7, 2020. AT&T's Late October Event Post-PSPS Comments.

[55] Id. at p. 8-9.

[56] Letter from Beth Vaughan to Elizaveta Malashenko titled Comments of the California Community Choice Association on Pacific Gas and Electric Company's Public Safety Power Shutoff Reports for the October 23, 2019 and October 26 and 29, 2019 consolidated events, atfiled in the De-Energization Rulemaking Proceeding, at p. 6, filed in the 18-12-005 proceeding.available at <http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M324/K290/324290771.PDF>.

241.    The monitor provided one such report on July 26, 2019, whose conclusions the monitor had shared with senior PG&E management (including Defendant Singh) on July 17, 2019.

242.    The monitor's report concluded that "not only is PG&E falling short of its EVM [Enhanced Vegetation Management] goals for the year [miles inspected], but the quality of the completed work is questionable [and] PG&E's systems for recording, tracking, and assigning EVM work are not reliable or consistent and are likely contributing to the identified quality issues."

243.    The monitor's principal audit tool was reviewing PG&E's work at various stages: after the pre-inspection, after work is completed, and after the post-work inspection marked the project completed. The monitor then tallied the number of dangerous trees which PG&E's processes had missed in violation of PG&E's Mitigation Plan or California legislations or regulations.

244.    In total, the monitor audited 53.5 miles of distribution lines. It found that PG&E had missed 3,280 dangerous trees. On average, PG&E's crews missed 61.3 dangerous trees per mile, or more than one every 100 feet.

245.    The missed trees the monitor identified included rotting trees, branches directly overhanging power lines, and trees belonging to species known to fall and set fires.

246.    The monitor also discovered that PG&E's pre-inspection work was so shoddy that its post-work verification served not as an assurance but as a sort of second pre-inspection. According to PG&E's own internal data, post-work verification gave failing grades to pre-inspection work at a rate of 46% in Q1 2019 and 34% in Q2 2019.

247.    Further, even post-work verification missed numerous trees. PG&E considered the post-work inspection process completed when a project was coded by inspectors as either

"Complete" or, if the project initially failed, "Corrective Action Complete." The monitor found 127 dangerous trees that PG&E missed even after post-work verification.

248.    The monitor highlighted three dangerous trees, two of which related to projects that PG&E had marked complete:

[O]n June 27, 2019, the Monitor team informed PG&E of a tree that was **within one foot of the primary conductor**, despite being marked as "tree work complete."

*        *        *        *        *

[O]n July 12, 2019, the Monitor team informed PG&E of a tree that was within inches of the primary conductor, and had been contacting the conductor during wind gust. [**L**]*eaves of the tree had been burned from ongoing contact with the primary conductor.* PG&E informed the Monitor team that this particular tree was identified for ***routine*** compliance work in November 2018 and a tree work company reported to PG&E that it completed the work ***in February 2019***, even though it was not actually completed (that is, the tree work company provided a false certification). On April 16, 2019, a different pre-inspector inspected the area under the EVM scope, prescribed the tree for work, but failed to note the urgency.

249.    In another case, the danger was so dire that the monitor's team felt compelled to stay on the scene until PG&E fixed it:

[O]n July 11, 2019, the Monitor team informed PG&E of a tree that was ***in contact with a primary conductor*** near the driveway of a private residence []. ***The Monitor team stayed in the area until a PG&E dispatched pre-inspector arrived.***

250.    Further, PG&E's paperwork violated recordkeeping requirements to such an extent as to endanger public safety. The monitor found numerous instances of incomplete or false records of such gravity that they could not have been missed by a proper QA or QC procedure.

251.    The monitor found other dangerous systematic failures in recordkeeping. PG&E uses software, Arc Collector, to coordinate all its vegetation management work. Pre-inspectors record the location of trees to remove in Arc Collector, while also marking them with paint. The work crews then use the records saved in Arc Collector and the marked trees themselves to identify

which trees to remove. The post-work inspectors then use Arc Collector to ensure that the trees identified by the pre-inspectors have been removed.

252.    The monitor found that chiefly because of Arc Collector PG&E's contractors consistently failed to record work that needed to be done:

a.  ***Inconsistent use of Arc Collector to record work***: The monitor team found that some pre-inspectors were not entering any data into Arc Collector. Others did not physically mark trees. This creates a risk that crews will not remove even trees that have been identified for removal.

b.  ***Inaccurate conductor lines***: Arc Collector data misplaced many conductors, which pre-inspectors sometimes did not manually correct.

c.  ***Idiosyncratic physical markings***: Pre-inspectors used multiple paint colors and different flagging methods to indicate that work is needed, sometimes on the same tree. Because vegetation management work is subject to customer negotiation, the use of multiple paint colors and idiosyncratic flagging will confuse removal crews. Further, pre-inspectors sometimes marked fences or the like near the trees rather than the tree itself, and sometimes the markings themselves were undetectable. As a result, the removal work sometimes fell short even of the pre-inspection.

d.  ***Post-work verification***: Most concerning, the monitor team found that re-inspection after post-work verification was not recorded consistently, with instances where inspectors physically marked trees that needed to be remediated but added none or only some those trees into Arc Collector.

253.    Yet as Defendants admitted in a September 3, 2019 filing before Judge Alsup, the monitor's findings did not come as a surprise. PG&E's own inspections were uncovering, but failing to rectify, the same failings: "PG&E's own findings as part of its post-work verification have been similar to those set forth in the Monitor's Letter."

254.    In addition, CPUC's Electric Safety and Reliability Branch conducts regular "electric audits" of PG&E districts during which commission employees review PG&E records and field inspections of PG&E facilities.

255.    CPUC's PG&E-related audits conducted during 2018 found poles and other PG&E equipment in contact with or obstructed by vegetation, and at least one situation in which vegetation threatened to bring down PG&E electrical facilities.[57]

## VIII.   REASONS STATEMENTS ABOUT TOWER INSPECTIONS WERE FALSE

256.    In 2018, a visibly corroded insulator string supporting a jumper hook on a PG&E transmission tower broke, letting a jumper cable fall. The fallen jumper cable released an insulator. With the insulator released, the fallen jumper cable came into direct contact with the steel tower. The fallen jumper cable and steel cable then created an electric arc. The electric arc started a fire. That fire – the Camp Fire – killed 85 people and caused tens of billions of dollars in property damage. PG&E would later plead guilty to 84 counts of manslaughter based on its conduct. The Camp Fire was the deadliest wildfire in the U.S. since 1918.

---

[57] *See ,e.g.,*
https://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Safety/Electric_Safety_ and_Reliability/Reports_and_Audits/Electric_Facilities/EA2018_800_Sonoma.pdf at 5, 6;
https://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Safety/Electric_Safety_ and_Reliability/Reports_and_Audits/Electric_Facilities/EA2018_801_Humboldt.pdf at 6-7.

257.    In October 24, 2019, a PG&E transmission line near Kincade Road in Sonoma County set a fire which led to an evacuation of 200,000 Californians and created billions of dollars in damages.

258.    In response to questions posed by Judge Alsup, PG&E admitted that the cause of the Kincade Fire was, again, a detached PG&E jumper cable on a PG&E transmission tower.

259.    Thus, falling jumper cables on transmission towers caused the most destructive fires in both 2018 (Camp Fire) and 2019 (Kincade Fire).

260.    Yet as PG&E admitted in a November 29, 2019 memorandum to Judge Alsup, PG&E waited until after the Kincade Fire to investigate whether there were systematic issues with its jumper cables on transmission towers.

261.    In fact, PG&E admitted that it had inspected the specific tower on which the cable broke three times during 2019. Each inspection was fatally deficient.

      a.    In February 2019, PG&E conducted a climbing inspection, but the ladder the crew used only allowed them to get to 20 feet from the jumper cable, at best.

      b.    In May 2019, PG&E conducted a drone inspection. The inspectors used the wrong form and, when prompted to answer whether the jumper cables were in good shape, reported "N/A".

      c.    In July 2019, PG&E conducted a ground inspection. About the inspection, PG&E could only say that the inspector "might" have had binoculars.

262.    PG&E's failed inspection led an appalled Judge Alsup to ask "What good are inspections that don't find problems?"

263.    The two fires were hardly the only instances of PG&E missing the very problem that led to damaging fires. Several groups of victims of the Camp Fire sued PG&E in state court. In December 2018, one of the groups' expert was examining the tower that caused the Camp Fire. Dkt. # 1185 ¶3 a. Because that tower had been disassembled, he took pictures of the jumper cables on a tower a few hundred feet away ("Nearby Tower") of a similar vintage to show the plaintiffs' lawyers what the tower would have looked like at the time of the Camp Fire.

264.    The expert did not review several different towers, or select the Nearby Tower for any reason other than that it was close. But the pictures he took of the Nearby Tower showed that the hooks that held up the jumper cables had deteriorated significantly.

265.    PG&E inspected the Nearby Tower twice in 2019. Both inspections, in January and July, missed the erosion entirely. No work order was generated to replace the hooks on the Nearby Tower.

266.    The plaintiffs' expert returned to the Nearby Tower in December 2019. He took more pictures of that tower's jumper cables, which showed that PG&E had still not fixed the hook.

267.    At that point, the plaintiffs' counsel notified both Judge Alsup and PG&E. Judge Alsup ordered a hearing. At the hearing, PG&E admitted that it was its practice to allow up to a year to elapse before replacing hooks *unless they had eroded more than 50%*.

268.    As Judge Alsup noted:

You [PG&E] always fall back on: We do inspections, we do inspections. But the inspections aren't working. They're not catching these problems. Then the Kincade Fire starts or the Butte County Fire starts as a result of not having done an adequate inspection."

269.    PG&E agreed to immediately fix the hook, further inspect the tower, take pictures, and provide the pictures to the plaintiffs' expert. The pictures are attached as Exhibit A to this Complaint and are incorporated herein.

270.    In fact, in that inspection, PG&E's own engineers estimated that the hook and the plate it was attached to had eroded by, respectively, 33% and 50%, a fact which all the previous inspections had missed.  Dkt. # 1184, at 3.

271.    The plaintiffs' expert pointed out that several other hooks on the tower had eroded by similar or higher percentages. Dkt. # 1185 ¶3 d.

272.    PG&E's statements concerning its enhanced inspections misleadingly suggested that it was actually addressing the leading problems with its infrastructure. In truth, PG&E's inspections were so superficial that on two separate occasions they failed to detect the identical deficiencies in PG&E's equipment that had caused the deadliest fire in the U.S. in a century just the previous year.

## IX.    LOSS CAUSATION

273.    On August 14, 2019, after close of trading, the Clerk of the Court of the United States District Court for the Northern District of California publicly filed the Monitor's July report, revealing that PG&E's vegetation management was of "questionable" value.

274.    The monitor's report was major news. Within minutes of its issuance, Bloomberg sent out several emergency alerts describing the monitor's conclusions.  Bloomberg News, the San Francisco Chronicle, and the WSJ each published more detailed news stories on August 14 or early August 15, as did several industry publications.

275.    As a result, on August 15, the price of PG&E's stock fell from $15.93 to close at $14.39, down 9.6%, damaging investors.

276.    On September 23, 2014, PG&E announced that it was turning off power to 21,000 customers in three counties in Northern California, Butte, Nevada, and Yuba.

277.    Even as it was returning power to customers affected by the first de-energization, announced that it was considering another power de-energization. The new de-energization would begin on September 24 and affect 48,200 customers in seven counties in Northern California.

278.    These initial de-energizations paled in comparison to those PG&E would impose on customers later in the season. Yet at this early point, the frequency of the de-energizations – two shutoffs in as many days – alarmed customers, regulators, and investors.

279.    As a result of these shutoffs, on September 24, 2019, PG&E's stock price fell from $11.54 to $10.93, down $0.61 (5.3%), on heavy volume, damaging investors.

280.    The September de-energizations had serious consequences. The shutoffs occurred during a heatwave. A front-page September 26 Mercury News article reported on the harms PG&E's customers suffered. Some low-income customers lost all the food in their refrigerator. Others with medical necessities, were placed in dangerous conditions, like a customer who relied on electric-powered machine for breathing while he sleeps. PG&E employees were sent to warn customers with medical conditions of the impending blackout but had no answers to these customers' questions about what they could do.

281.    As a result, on September 27, 2019, as news trickled out that PG&E had not been ready for the PSPS, PG&E's stock price fell its previous close of $10.70 to close at $10.12, down $0.58 (5.4%), damaging investors.

282.    On October 1, 2019, after close of trading, PG&E admitted in a response to questions from Judge Alsup that its equipment may have contributed to nine fires of 10 acres or more in 2019, including three caused by vegetation or equipment failure. On October 2, Judge Alsup ordered PG&E to provide all pertinent details concerning the fires by October 9. Bloomberg

News reported on PG&E's admission on October 1 and on Judge Alsup's order to provide additional details on October 2.

283.    On October 2, 2019, Governor Newsom issued a press release announcing that he had signed 22 bills to enhance wildfire mitigation. One of these bills, SB 167, required utilities to ensure that low-income customers with medical necessities could have back-up power during de-energizations.

284.    The Senate Report on SB167 singled out PG&E's prior de-energizations for criticism. And on October 3, 2019, the San Francisco Chronicle quoted the bill's author, Bill Dodd, who represents Napa, as suggesting that the bill was meant to ensure that PG&E conducted de-energizations responsibly: "There are a lot of people that can't fend for themselves. We think that PG&E - or any utility for that matter in the state of California - should be taking into account those populations ... during one of their power shutoffs."

285.    Another bill signed October 2, 2019, SB560, required utilities to notify first responders of looming de-energizations. According to an October 2, 2019 press release issued by the California Senate Democrats, SB560 was enacted because "Communities have unfortunately experienced a lack of communication and notification from PG&E, and making it a requirement is the next step in ensuring proper notification is received."

286.    On October 2, 2019, in response to the two legislative rebukes and PG&E's admission that it may have caused nine fires, PG&E's stock price fell 9.5% from its previous close of $9.90 to close at $8.96, on heavy volume, damaging investors.

287.     On October 7, 2019, PG&E announced in a press release that it was monitoring a severe wind event that could affect almost 30 counties across Northern and Central California.[58] In that press release, PG&E announced that it was considering an outage across portions of these counties.

288.     On October 8, 2019, before trading hours, PG&E announced in a press release that it was continuing to consider an outage for the counties. In the press release, PG&E estimated that the outage would affect more than 600,000 customers, or about 1.5 million people.

289.     Later that day, PG&E published another press release announcing that it would turn off power to 800,000 customers (about 2.0 million people) in 34 counties in rolling blackouts. Ultimately, PG&E shut off power to 735,000 customers (1.8 million people) on October 9. A voluntary blackout of this size was literally unprecedented.

290.     PG&E instructed customers to "[c]ontinue to monitor PG&E's new weather forecasting web page at pge.com/weather." PG&E also instructed customers to update their contact information online or by calling a toll-free line. PG&E admitted that the toll-free line would only be open during business hours.

291.     Beginning October 8, and through October 10, news of PG&E's ghastly roll-out began to trickle out.

292.     According to an October 8 Sacramento Bee article, users began noticing that pages on PG&E's website loaded slowly or produced error messages before 10:00 a.m. local time. At 10:11 a.m., PG&E tweeted an apology for the "delay of accessing #PSPS [] related web pages."

---

[58] The counties included Alameda, Alpine, Amador, Butte, Calaveras, Colusa, Contra Costa, El Dorado, Glenn, Lake, Mariposa, Mendocino, Napa, Nevada, Placer, Plumas, San Joaquin, San Mateo, Santa Clara, Santa Cruz, Shasta, Sierra, Solano, Sonoma, Stanislaus, Tehama, Tuolumne, Yolo and Yuba.

With its website down, PG&E's communications strategy deteriorated to posting maps of affected areas on Twitter. Later in the day, PG&E's website functioned only intermittently

293.    According to an October 12, 2019 NY Times article, the website crashed again on the morning of October 9. PG&E was unable to resolve its technical issues. Instead, the article cited a California State representative as saying that the State's own IT specialists restored PG&E's website.

294.    There were other issues with PG&E's communications. PG&E's call center was overwhelmed. According to the October 12, 2019 NY Times article, even government agencies calling PG&E were put on hold for hours.

295.    On October 8, 2019, the price of PG&E's shares fell from $11.41 to $10.90, down $0.51 (5.2%), damaging investors.

296.    At nearly the same time as Governor Newsom's October 10 Press Conference referenced above, PG&E held a press conference to calm residents' fury.

297.    At the October 10 press conference, asked "[w]hat is PG&E going to do to really help the community both financially and just physically?", Johnson falsely responded:

> So as I said, this does create a hardship and we understand the hardship it creates. We also have spent a great deal of time – hundreds of meetings, hundreds of visits – to make sure things like critical care facilities, telecommunication facilities and others have backup generation, have fuel, are prepared for these events. We communicate very clearly with those people, very directly. So, I think we're doing about everything we can to help with those situations.

298.    PG&E also conveyed its tin-eared offer to not bill customers whose power was shut off for the time they didn't have power:

> [F]or customers that have been shut off as a result of our public safety power shut off, they will not be billed for the time that they are out of service. So, we have suppressed billing, we are not doing estimated billing. Those customers will not be charged for the time that they are out of service.

299.    Finally, PG&E offered a mild apology.

First, we commit to communicating with our customers and communities with as much notice as possible, with as much clarity as possible and as frequently as possible. And we did not deliver on that commitment this time. Our website crashed several times. Our maps are inconsistent, perhaps incorrect. Our call centers were overloaded. To put it simply, we were not adequately prepared to support the operational event and this will improve.

300.    As an author on investing website Seeking Alpha would later acidly note, Johnson's admission that PG&E "did not deliver on this commitment" to safely carry out de-energization events and "were not prepared to manage the [] event" was a "profound understatement."

301.    Because, contrary to its many public statements, PG&E was not prepared to safely and properly manage de-energization, on October 10, PG&E's stock price fell from its previous close of $10.98 to close at $7.79, down 29%.

302.    As set out above, on October 14, 2019, the CPUC issued a press release threatening to launch the Sanctions Investigation, while Governor Newsom castigated PG&E in yet stronger terms.

303.    As a result of the CPUC's threat to launch the Sanctions Investigation, and the Governor's criticisms of PG&E's inability to safely carry out PSPS in contravention to PG&E's prior public statements claiming that was able to safely manage PSPS, on October 14, PG&E's stock price fell from $8.02 to $7.67, down $0.35 (4.4%), damaging investors.

304.    On October 22, PG&E warned that it was considering another blackout, which would affect 200,000 customers (500,000 residents).

305.    On October 23, PG&E confirmed that it would cut power to 179,000 customers (450,000 residents).

306.    That same day, PG&E warned of a risk that it may have to shut off power on the 27th, though according to PG&E details "remain[ed] unclear."

307.    After close of trading on October 23, PG&E in a press releasing providing an update on the ongoing 450,000 person blackout, PG&E warned that it was monitoring a wind event which would start October 26 and had the "potential to be widespread across PG&E's service area in Northern and Central California." In an after-hours press conference, a PG&E meteorologist emphasized the warning, commenting that there would be a second, stronger wind storm starting on October 26.

308.    At around 9:30 PM on October 24, a wildfire ignited in Sonoma County, the Kincade Fire. The Kincade Fire grew to 5,000 acres in hours, prompting a mandatory evacuation, and to 7,000 acres by early morning the next day. At 9:35 AM on October 24, the San Francisco Chronicle article reported that the Kincade Fire had reached 10,000 acres.

309.    During trading on October 24, the day of Governor Newsom's open letter referenced above, PG&E filed a report with the CPUC acknowledging that one of its transmission towers had malfunctioned near the ignition point. PG&E also noted that a Cal Fire investigator found a broken jumper wire on the tower. The Sacramento Bee quickly published an article calling attention to the report.

310.    As a result, on October 24, PG&E's stock price fell from $8.20 to close at $7.20, down $1.00 (12.2%), on extraordinarily high volume, damaging investors.

311.    PG&E's twin crises worsened overnight. After close of trading on October 24, PG&E held a press conference, wherein PG&E's Chief Meteorologist Scott Strentel announced that PG&E's "confidence is significantly increasing that we will have a second and very strong offshore wind event." Further, Johnson admitted that the PSPS "has a potential to be on the same order as the one on October 9th but over a longer duration."

312. Meanwhile, the Kincade Fire continued to expand. By 11 PM on October 24, the fire had spread to 16,000 acres, only to reach 21,900 by early morning the next day, forcing 2,000 residents to evacuate.

313. On October 25, Governor Newsom declared a state of emergency for Sonoma County because of the Kincade Fire.

314. As a result of the Kincade Fire and the announcement concerning a looming de-energization that would be the largest and longest in history, on October 25, PG&E's stock price fell from its previous close of $7.20 to close at $5.00, down $2.20 (30.6%), damaging investors.

315. After close of trading on October 25, PG&E reported that its October 26 blackout would affect 850,000 customers (2.1 million residents). By the morning of Saturday October 26, PG&E said the blackout was "highly likely." And mid-day on the 26, PG&E announced that it would cut power to 940,000 customers (2.4 million residents), or about one fifth of all of PG&E's customers, starting later that day. PG&E ultimately cut power to 968,000 customers (2.5 million residents). PG&E predicted that Californians would be without power for two days or longer. By the evening of October 28, 880,000 customers remained without power.

316. Meanwhile, the Kincade Fire continued to rage. By morning of October 26, a Saturday, the fire had spread to 26,000 acres, and 50,000 residents were ordered to evacuate, joined by a further 40,000 later that day. The fire grew to 30,000 acres overnight, and another 90,000 residents were ordered to evacuate. By the night of October 27, the blaze had reached 55,000 acres. The Kincade Fire would ultimately burn more than 77,000 acres and displace about 200,000 residents.

317. On October 27, Governor Newsom declared a statewide emergency.

318.    On October 28, before trading began, PG&E warned that it may have to conduct another de-energization beginning Tuesday October 29 which would affect 520,000-640,000 customers (1.1-1.4 million residents).

319.    Then, on October 28, the CPUC launched a formal investigation on PG&E's use of de-energizations. The announcement quoted President Batjer as singling out PG&E for the "poor execution" of its PSPSs.

320.    As a result, on October 28, PG&E's stock price fell from its previous close of $5.00 to close at $3.80, down 24%, damaging investors.

321.    Observers attributed the October 25-28 drops to the de-energization and the Kincade Fire.

a.     On October 25, 2019, the San Francisco Business Times published an article titled *PG&E plunges on rising fears stock will become worthless*, citing the de-energization and Kincade Fire. The article quoted Citi analyst Praful Mehta as saying "shareholders are worried and should be. Kincade increases the probability of a zero share price."

b.     An October 26, 2019 WSJ article reported that "[a]nalysts at New York-based hedge funds invested in PG&E spent recent days poring over NASA satellite maps to track the [Kincade] fire. [] Other analysts were in California monitoring the fire hour-by-hour to forecast the damage."

c.     An October 28 Seeking Alpha note attributed the October 28 drop to both the Kincade Fire and the de-energization.

d.     On October 28, 2019, Morningstar reduced its fair value estimate for PG&E's stock price from $13 to $11, citing both the Kincade Fire and de-energizations.

e.     An October 31, 2019 WSJ report titled *PG&E Investors Lost $4.1 Billion in 4 Days* asserted that "[i]nvestors say the selloff has been driven by concern over the Kincade Fire's spread."

***Unrelated developments in the bankruptcy case cause PG&E's stock price to rebound***

322.   On October 28, 2019, after close of trading, Judge Montali, charged with overseeing PG&E's bankruptcy, appointed a mediator to seek a global resolution of the PG&E bankruptcy.  Judge Montali's short order provided:

> Finally, based upon the current apparent state of things, equity owners are entitled to consideration of their rights under whatever alignment or realignment may follow as part of a chapter 11 plan.

323.   On October 29, PG&E's stock price increased from $3.80 to $5.03.

324.   Commentators attributed the price increase to the mediator's appointment:

a.     On October 29, Bloomberg published an article title PG&E Stock, *Bonds Rally After Judge Orders Debt Mediation*. The article quoted a Bloomberg Intelligence analyst as saying "We found it interesting that the judge's order made a formal statement in support of equity's entitlement to 'consideration of their rights'" adding that "[t]hat modicum of support may be valuable for shareholders in their proceedings with the mediator."

b.     On October 29, *Barrons* published an article titled *PG&E Stock Is Rallying Because a Mediator Is Getting Involved in its Bankruptcy*.

c.     A November 6, 2019 Forbes article titled *Why Did PG&E Stock Rally 75% Over The Last Week?* explained that "last week, a mediator was brought on to facilitate the negotiations between the two competing factions [which] is likely viewed as a positive sign by investors."

325. On November 5, Governor Newsom met with PG&E, unsecured creditors, TCC, and other creditors behind closed doors to push all parties to seek a resolution. Publicly, Newsom stated that he "strongly urged the parties to get a resolution that ensures what we saw over the last month never happens again."

326. On November 5, PG&E's stock price rose from $7.27 to $8.00.

## X. CLASS ACTION ALLEGATIONS

327. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities who purchased or otherwise acquired PG&E securities during the Class Period. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

328. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, PG&E's common shares actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Hundreds of millions of PG&E common shares were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by PG&E or its transfer agent and may be notified of the pendency of this action by mail or email, using the form of notice similar to that customarily used in securities class actions.

329.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

330.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

331.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of PG&E;

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages; and

(d) whether Defendants' false statements were made with scienter.

332.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

## (FRAUD-ON-THE-MARKET DOCTRINE)

333.    The market for PG&E's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and misleading statements and failures to disclose, PG&E's securities traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of PG&E's securities and market information relating to PG&E, and have been damaged thereby.

334.    During the Class Period, Defendants' misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class.  During the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about PG&E's electric operations, prospects, and wildfire safety.  These material misstatements and/or omissions created an unrealistically positive assessment of PG&E and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  PG&E's materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

335.    At all relevant times, the market for PG&E's securities was an efficient market for the following reasons, among others:

(a)    PG&E shares met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, PG&E filed periodic public reports with the SEC and/or the NYSE;

(c)    PG&E regularly communicated with public investors via established market

communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as regulatory filings, public filings, public presentations, filings with the financial press and other similar reporting services; and/or

(d)     PG&E was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

336.     As a result of the foregoing, the market for PG&E's securities promptly digested current information regarding PG&E from all publicly available sources and reflected such information in PG&E's share price. Under these circumstances, all purchasers of PG&E's securities during the Class Period suffered similar injury through their purchase of PG&E's securities at artificially inflated prices and a presumption of reliance applies.

**FIRST CLAIM**
**Violation of Section 10(b) of The Exchange Act**
**and Rule 10b-5 Promulgated Thereunder**
**(Against All Defendants)**

337.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

338.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase PG&E securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

339.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for PG&E's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

340.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about PG&E's wildfire safety programs and prospects, as specified herein.

341.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of PG&E's value and performance and ability to operate safely, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about PG&E and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of PG&E's securities during the Class Period.

342.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and directors at the Company during the Class Period; (ii) each of these Defendants, by virtue of

their responsibilities and activities as senior officers and directors, was privy to and participated in the creation, development and reporting of PG&E's electric operations, plans, projections and reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's electric operations at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

343.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and omissions were done knowingly or recklessly and for the purpose and effect of concealing PG&E's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and misstatements of the Company's electric operations and prospects throughout the Class Period, these Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

344.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of PG&E's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and

misleading statements made by the Defendants, or upon the integrity of the market in which the securities trades, and in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by these defendants during the Class Period, Plaintiffs and the other members of the Class acquired PG&E's securities during the Class Period at artificially high prices and were damaged thereby.

345.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that PG&E was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their PG&E  securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

346.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

347.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of the Exchange Act**

**<u>(Against the Individual Defendants)</u>**

348.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

349.    The Individual Defendants acted as controlling persons of PG&E within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level

positions, and their ownership and contractual rights, participation in and awareness of the Company's operations or intimate knowledge of the documents containing false statements disseminated to investors, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, public statements, regulatory filings, and other statements alleged by Plaintiffs to be misleading prior to and shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

350.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

351.    As set forth above, PG&E and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

Dated: April 17, 2020                    Respectfully submitted,


**THE ROSEN LAW FIRM, P.A.**

/s/Laurence M. Rosen
Laurence M. Rosen (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com


Jonathan Horne (*pro hac vice*)
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: jhorne@rosenlegal.com

**POMERANTZ LLP**

Louis C. Ludwig
(*admitted pro hac vice*)
Jared Schneider
(*admitted pro hac vice*)

Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 229-8811
Email: lcludwig@pomlaw.com
Email: jschneider@pomlaw.com

Jeremy A. Lieberman
(*admitted pro hac vice*)
J. Alexander Hood II
(*admitted pro hac vice*)
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: ahood@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
Email: jpafiti@pomlaw.com

*Co-Counsel for Co-Lead Plaintiffs*

**THE SCHALL LAW FIRM**
Brian Schall
Sherin Mahdavian
Rina Restaino, Esq.
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: (424) 303-1964
Email: brian@schallfirm.com
sherin@schallfirm.com
rina@schallfirm.com

*Additional Counsel for Plaintiff Allustiarti*

**CERTIFICATE OF SERVICE**

I, Laurence M. Rosen hereby declare under penalty of perjury as follows:

I am a partner at The Rosen Law Firm, P.A., LLP. I am over the age of eighteen.

On April 17, 2020, I electronically filed the foregoing AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS using the CM/ECF system which sent notification of such filing to all counsel of record.

Executed on April 17, 2020.

/s/ Laurence M. Rosen
Laurence M. Rosen