McDERMOTT WILL & EMERY LLP
STEVEN S. SCHOLES (admitted *pro hac vice*)
444 West Lake Street
Chicago, IL 60606-0029
Telephone: +1 312 372 2000
Facsimile: +1 312 984 7700

MICHAEL A. PIAZZA (State Bar No. 235881)
GREGORY R. JONES (State Bar No. 229858)
JASON D. STRABO (State Bar No. 246426)
2049 Century Park East, Suite 3200
Los Angeles, CA 90067-3218
Telephone: +1 310 277 4110
Facsimile: +1 310 277 4730
Email: PG&E@mwe.com

Attorneys for Individual Defendants
WILLIAM JOHNSON, GEISHA WILLIAMS,
and SUMEET SINGH

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

CHRISTOPHER VATAJ,

Plaintiff,

v.

WILLIAM D. JOHNSON, JOHN R. SIMON, GEISHA WILLIAMS, and JASON P. WELLS,

Defendants.

CASE NO. 4:19-cv-06996-HSG

**BRIEF IN SUPPORT OF THE INDIVIDUAL DEFENDANTS' MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT**

[NOTICE OF MOTION AND MOTION AND REQUEST FOR JUDICIAL NOTICE FILED CONCURRENTLY HEREWITH]

Hearing:

Date: August 20, 2020
Time: 2:00 p.m.
Location: Courtroom 2 (4th Floor)

**TABLE OF CONTENTS**


I. INTRODUCTION ....1

II. RELEVANT BACKGROUND ....3

A. Legislative And Regulatory Efforts To Mitigate Wildfire Risk ....3

B. The Utility's Public Safety Power Shutoff Program....4

C. The 2018 Camp Fire....4

D. PG&E And The Utility File For Bankruptcy ....4

E. The Utility's PSPS Events In 2019 ....5

F. The October 2019 Kincade Fire....5

III. THE GOVERNING PLEADING STANDARDS ....6

A. Pleading Standard Under Rule 12(b)(6)....6

B. Heightened Pleading Standards Under Rule 9(b) And The PSLRA ....6

IV. THE AC IS A "PUZZLE PLEADING" THAT VIOLATES RULES 8 AND 9(B).7

V. PLAINTIFFS FAIL TO ALLEGE THE ESSENTIAL ELEMENTS OF A RULE 10B-5 CLAIM....9

A. Plaintiffs Have Not Pled With Particularity That Any Individual Defendant Made An Actionable Statement ....10

1. Plaintiffs Have Not Alleged That Defendant Geisha Williams Made An Actionable Statement....11

2. Plaintiffs Have Not Alleged That Defendant William Johnson Made An Actionable Statement ....12

3. Plaintiffs Have Not Alleged That Defendant Sumeet Singh Made An Actionable Statement....14

B. Plaintiffs Have Not Alleged That Each Misstatement Was Made "In Connection With" A Securities Transaction....16

C. Plaintiffs Have Not Pled A Scheme Liability Claim Against The Individual Defendants Under Rule 10b-5(a) And 10b-5(c) ....18


McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

D. Plaintiffs Have Failed To Plead A Strong Inference Of Scienter For Each Of The Individual Defendants ....................................19

E. Plaintiffs Have Failed To Allege Loss Causation ....................................21

VI. PLAINTIFFS' SECTION 20(A) CLAIM ALSO MUST BE DISMISSED ...........23

VII. CONCLUSION ....................................................................................24

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aqua Metals, Inc. Sec. Litig.*,No. 17-cv-07142-HSG, 2019 WL 3817849 (N.D. Cal. Aug. 14, 2019)....8, 9, 16, 18

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)....6

*In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784 (9th Cir. 2017)....12, 13, 15

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)....6

*In re BofI Holding, Inc. Sec. Litig.*, No. 3:15-CV-02324-GPC-KSC, 2017 WL 2257980 (S.D. Cal. May 23, 2017)....20

*Bruce v. Suntech Power Holdings Co.*, No. CV 12-04061 RS, 2013 WL 6843610 (N.D. Cal. Dec. 26, 2013)....10, 11, 12

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045 (N.D. Cal. 2012)....11

*Curry v. Yelp Inc.*, 875 F.3d 1219 (9th Cir. 2017)....19

*Desaigoudar v. Meyercord*, 223 F.3d 1020 (9th Cir. 2000)....7

*Di Donato v. Insys Therapeutics Inc.*, No. CV-16-00302-PHX-NVW, 2017 WL 3268797 (D. Ariz. Aug. 1, 2017)....17

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005)....6, 21

*In re Finisar Corp. Sec. Litig.*, No. 5:11-CV-01252-EJD, 2013 WL 5442356 (N.D. Cal. Sep. 30, 2013), ....11

*Fleming v. Impax Labs., Inc.*, No. 16-cv-06557-HSG, 2018 WL 4616291 (N.D. Cal. Sept. 7, 2018) ....21, 22

*In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049 (9th Cir. 2008)....6

*Glen Holly Entm't, Inc. v. Tektronix Inc.*, 352 F.3d 367 (9th Cir. 2003)....12, 13, 15

*Hefler v. Wells Fargo & Co.*, No. 16-cv-05479-JST, 2018 WL 1070116 (N.D. Cal. Feb. 27, 2018) ....................10

*Iron Workers Local 580 Joint Funds v. Nvidia Corp.*, No. 18-cv-07669-HSG, 2020 WL 1244936 (N.D. Cal. Mar. 16, 2020)....................20, 23

*Irving Firemen's Relief & Ret. Fund v. Uber Techs.*, No. 17-cv-05558-HSG, 2018 WL 4181954 (N.D. Cal. Aug. 31, 2018)....................8

*Janus Capital Grp. v. First Deriv. Traders*, 564 U.S. 135 (2011)....................1, 10

*Loos v. Immersion Corp.*, 762 F.3d 880 (9th Cir. 2014)....................21

*Lu v. Align Tech., Inc.*, 417 F. Supp. 3d 1266 (N.D. Cal. 2019) ....................8

*Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025 (9th Cir. 2008)....................6

*Markette v. Xoma Corp.*, No. 15-cv-03425-HSG, 2017 WL 4310759 (N.D. Cal. Sept. 28, 2017) ....................10, 18, 19, 23

*Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097 (9th Cir. 2008)....................6

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049 (9th Cir. 2008)....................7, 21, 23

*N.Y. Hotel Trades Council & Hotel Ass'n of N.Y.C., Inc. Pension Fund v. Impax Labs. Inc.*, No. 16-cv-06557-HSG, 2019 WL 3779262 (N.D. Cal. Aug. 12, 2019)....................22

*In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046 (9th Cir. 2014)....................20

*In re Oak Tech. Sec. Litig.*, No. 96-20552 SW, 1997 WL 448168 (N.D. Cal. Aug. 1, 1997)....................8

*Oregon Pub. Employees Ret. Fund v. Apollo Grp., Inc.*, 774 F.3d 598 (9th Cir. 2014)....................7, 21

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268 (9th Cir. 2017)....................12, 13, 15

*In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869 (9th Cir. 2012)....................7

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

*SEC v. Rana Research*,
8 F.3d 1358 (9th Cir. 1993)....16, 17, 18

*SEC v. Texas Gulf Sulphur Co.*,
401 F.2d 833 (2nd Cir. 1968)....16, 17

*SEC v. Zandford*,
535 U.S. 813 (2002)....16

*Sgarlata v. PayPal Holdings, Inc.*, No. 17-cv-06956-EMC,
2018 WL 6592771 (N.D. Cal. Dec. 13, 2018)....23, 24

*In re Silicon Graphics, Inc.*,
183 F.3d 970 (9th Cir. 1999)....20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)....19

*Turocy v. El Pollo Loco Holdings, Inc.*, No. SACV 15-1343-DOC,
2017 WL 3328543 (C.D. Cal. Aug. 4, 2017)....10

*United States SEC v. Pirate Inv'r LLC*,
580 F.3d 233 (4th Cir. 2009)....16, 17, 18

*Webb v. SolarCity Corp.*,
884 F.3d 844 (9th Cir. 2018)....19

*Wenger v. Lumisys, Inc.*,
2 F. Supp. 2d 1231 (N.D. Cal. 1998)....7

*WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*,
655 F.3d 1039 (9th Cir. 2011)....18, 19

*Ziolkowski v. Netflix, Inc.*, No. 17-cv-01070-HSG,
2018 WL 4587515 (N.D. Cal. Sept. 25, 2018)....20

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009)....7, 23, 24

**Statutes**

15 U.S.C. § 78u-4(b)(2)(A)....19

Cal. Pub. Util. Code § 1759....5

Cal. Pub. Util. Code § 8386....4, 17

Cal. Pub. Util. Code § 8386.3....4

**Other Authorities**

17 C.F.R. § 240.10b-5(a), (c) .......... 18

17 C.F.R. § 240.10b-5(b) .......... 10

Federal Rule of Civil Procedure 8 .......... 1, 6 7, 8, 9

Federal Rule of Civil Procedure 9(b) .......... 1, 6, 7, 8

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

## I. INTRODUCTION

In the amended complaint ("AC"), plaintiffs drop prior defendants Jason Wells and John Simon, add as new defendants PG&E Corporation ("PG&E") and Sumeet Singh, and continue to assert claims under Sections 10(b) and 20(a) of the Securities Exchange of 1934. The primary focus of the AC remains the widespread power shutoffs conducted by Pacific Gas and Electric Company (the "Utility") during the 2019 fire season to protect public safety and avoid the risk of catastrophic wildfires. These "public safety power shutoffs" ("PSPS") were dictated by fire hazard weather conditions, the first of their kind in scope, and undertaken a little more than a year after California utilities were first required to use such measures to proactively prevent wildfires. Plaintiffs attempt to reverse-engineer a securities fraud claim by cherry-picking stock price declines that followed not the revelation of any fraud, but mere public criticism of the Utility's power shutoffs in early October 2019, the announcement of a regulatory investigation into those events, and the outbreak of the Kincade Fire later that month. Plaintiffs then strain to connect those declines to earlier public statements. The effort fails, and there are six independent reasons why the AC must be dismissed against the three Individual Defendants (William Johnson, Geisha Williams, and Sumeet Singh).

*First*, the AC constitutes a "puzzle pleading" that violates Federal Rules of Civil Procedure 8 and 9(b). Over 351 paragraphs and 86 pages, plaintiffs allege what is approximately 41 misstatements. It is difficult to identify each specific statement that plaintiffs allege is misleading because they quote long blocks of text, do not enumerate each alleged misstatement, and inconsistently use bold and italic emphases. This problem is exacerbated because plaintiffs do not allege why each individual statement was misleading but instead attempt to explain why the statements, as a group, were misleading based on a lengthy recitation of factual allegations. Forcing a party to disentangle alleged misstatements in numerous long block quotations and hunt down contradictory factual allegations is precisely the reason why courts prohibit "puzzle pleading."

*Second*, plaintiffs have not pled with particularity that each Individual Defendant violated Rule 10b-5(b) by "making" actionably false statements. Under Rule 10b-5(b), individuals are only liable if they speak untrue statements or have "ultimate authority" over them. Plaintiffs allege remarkably few statements that the Individual Defendants made personally, and none of these statements is actionable under Rule 10b-5. Indeed, the only misstatements the Individual Defendants are accused of personally making are oral statements that reflect vague, optimistic, and subjective sentiments about the Utility's practices. Nor have plaintiffs alleged any facts establishing that the Individual Defendants had ultimate authority over any statement they did not personally speak.

*Third*, plaintiffs have failed to plead that the alleged misstatements were made "in connection with" the purchase or sale of a security. A claim for securities fraud must be based on a statement that has some nexus to a securities transaction. This requirement is satisfied whenever a statement is reasonably calculated to influence investors. Securities fraud actions are usually based on publicly disseminated statements contained in documents on which investors traditionally rely, such as securities filings, press releases, earnings calls, etc. In the AC, however, only three of the 41 alleged misstatements were publicly disseminated in this manner (press releases). All of the other statements were made in mandatory regulatory filings, testimony at a legislative hearing, and a regulatory "workshop." Plaintiffs have not alleged that these statements were made "in connection with" the purchase or sale of a security, as required by Section 10(b) and Rule 10b-5.

*Fourth*, plaintiffs have not pled scheme liability under Rule 10b-5(a) and 10b-5(c). Scheme liability requires allegations of conduct beyond the any alleged misrepresentations or omissions at issue. Plaintiffs assert no such allegations in the AC.

*Fifth*, plaintiffs have failed to plead a strong inference that the Individual Defendants acted with scienter. Plaintiffs do not allege scienter on either a statement-by-statement or an officer-by-officer basis. Nor is there a dedicated section of the AC devoted to pleading scienter. Also missing are allegations that plaintiffs commonly assert as a basis for pleading

scienter, such as suspicious stock sales, resignations, terminations, and confidential witnesses. Plaintiffs have not even come close to alleging this essential element.

*Sixth*, plaintiffs have failed to plead loss causation. Two of the 10 disclosures that purportedly revealed the "fraud" merely announce investigations into circumstances relating to the power shutoffs. Announcements of investigations do not reveal fraud, and such statements alone are insufficient to allege loss causation as a matter of law. More problematically, plaintiffs have not alleged that any of the 10 stock drops identified in the AC resulted from the market learning about information that rendered false some actionable prior statement. All plaintiffs allege is a mere market reaction to negative news about the Utility, which is a far cry from alleging a market reaction to a revealed fraud.

Plaintiffs' Section 20(a) claim must also be dismissed. Not only have plaintiffs failed to allege a primary violation of Rule 10b-5, but they also have failed to plead control person liability for any of the Individual Defendants.[1]

## II. RELEVANT BACKGROUND

### A. Legislative And Regulatory Efforts To Mitigate Wildfire Risk

On October 8 and 9, 2017, numerous wildfires ignited across nine counties in the North Bay region of California (the "North Bay Fires"). *See* AC ¶ 39. Following the North Bay Fires, the California Public Utilities Commission ("CPUC") adopted a resolution in July 2018 (ESRB-8) that requires utilities to prepare a protocol for de-energizing power lines when extreme fire danger conditions exist. *Id.* ¶ 40. ESRB-8 does not require utilities to de-energize power lines in particular circumstances; instead, it merely requires them to formulate their own protocol and to communicate it to the CPUC and public. RJN, Ex. A, p. 9-10. ESRB-8 also requires utilities to notify customers whenever they decide to de-energize a power line for safety reasons. *Id.*

[1] Although the AC adds PG&E as a defendant and ostensibly asserts a claim against the company under Section 10(b) and Rule 10b-5, plaintiffs appear to have no intention of pursuing this claim as they apparently have not served PG&E, presumably because of the automatic stay imposed by the pending bankruptcy proceeding.

On August 31, 2018, the California Legislature enacted Senate Bill 901 ("SB 901"), which implemented a number of measures designed to minimize the risk of catastrophic wildfires. AC ¶ 36. One such measure requires utilities to prepare annually, and submit for review and approval by the CPUC, a wildfire mitigation plan. Cal. Pub. Util. Code § 8386(b), § 8386.3(a). A utility's wildfire mitigation plan must include protocols for de-energizing its electrical distribution and transmission systems "that consider the associated impacts on public safety" and procedures for notifying customers who may be impacted by the de-energization of power lines. *Id*. § 8386(c)(6), § 8386(c)(7).

**B. <u>The Utility's Public Safety Power Shutoff Program</u>**

Pursuant to SB 901 and ESRB-8, the Utility publicly disclosed its PSPS policies and procedures in September 2018. RJN, Ex. B. The Utility's PSPS protocol states that: "A [PSPS] will only be done as a last resort during the most extreme fire danger conditions. Importantly, no single factor will drive a [PSPS]. PG&E will take a combination of many criteria into consideration, including: [identifying seven specific criteria]." *Id*. at 3. The Utility's PSPS protocol also describes the procedure for notifying impacted customers of an impending PSPS event. *Id*. at 5-6. After issuing its PSPS protocol, in October 2018, the Utility conducted targeted de-energizations on power lines located in high fire threat areas, which impacted approximately 60,000 customers. AC ¶ 41.

**C. <u>The 2018 Camp Fire</u>**

On November 8, 2018, a fire ignited in Butte County that ultimately became the most destructive and deadly in California history (the "Camp Fire"). AC ¶ 43. The Camp Fire tragically burned more than 150,000 acres, destroyed more than 18,000 buildings, and took the lives of 85 people. *Id*. ¶ 44. The Camp Fire ignited when a C-hook located on a cross-arm of an 115,000-volt steel tower on the Caribou-Palermo transmission line broke, causing the power line to fall to the ground and igniting vegetation. *Id*. ¶¶ 45-46, 256.

**D. <u>PG&E And The Utility File For Bankruptcy</u>**

Facing $51.7 billion in potential liabilities arising out of the North Bay and Camp Fires, PG&E and the Utility filed for bankruptcy on January 29, 2019. AC ¶ 5. In July 2019,

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

the California Legislature enacted Senate Bill 1054 ("SB 1054"), which establishes a $21 billion wildfire fund that utilities can use to pay claims for costs and expenses caused by certain utility-ignited wildfires. *Id.* ¶¶ 61-62. To have access to the wildfire fund, PG&E and the Utility must exit bankruptcy by June 30, 2020. *Id.* ¶ 63.

**E. The Utility's PSPS Events In 2019**

During the 2019 fire season, the Utility undertook measures to protect public safety and avoid the risk of catastrophic wildfires by conducting several widespread de-energizations pursuant to its PSPS Program. AC ¶ 143. These PSPS events were dictated by fire hazard weather conditions and the first of their kind in scope. *Compare id.* ¶ 41 (alleging that 2018 PSPS events impacted approximately 60,000 customers), *with id.* ¶ 143 (alleging that 2019 PSPS events impacted more than 1.9 million customers and nearly 5 million residents). Plaintiffs claim that the Utility did not execute the power shutoffs well, alleging that the de-energizations were "disorganized messes, endangering California residents' property and lives" (*id.* ¶ 2) and "had catastrophic consequences" (*id.* ¶ 145). Plaintiffs allege that the Utility's execution of these PSPS events was roundly criticized by the news media, customers, advocacy groups, legislators, the governor, and the CPUC. *Id.* ¶¶ 146-159. On October 28, 2019, the CPUC announced that it was instituting an investigation into the Utility's PSPS events.[2] *Id.* ¶ 319.

**F. The October 2019 Kincade Fire**

On October 24, 2019, a fire ignited underneath a Utility transmission tower in Sonoma County (the "Kincade Fire"). AC ¶¶ 257-258. Although the cause of the Kincade Fire is still under investigation, plaintiffs allege that a jumper cable detached from its connection point on the tower during a windstorm, which caused sparks to contact dry grass below the tower, igniting the fire. *Id.* Although the Kincade Fire burned more than 77,000

[2] The AC is not the first class action seeking to assert claims arising out of the Utility's 2019 PSPS events. In the bankruptcy proceeding, a complaint for negligence was filed by a putative class of individuals who were allegedly harmed by the power shutoffs. RJN, Ex. C, p. 2. The bankruptcy court ultimately dismissed the complaint because it was preempted by California Public Utilities Code § 1759, which vests the CPUC with exclusive regulatory authority over matters relating to a public utility, including PSPS events. *Id.* at 8-12.



McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

acres and caused widespread evacuations, no fatalities occurred. *Id.* ¶ 316. Reacting to news of the Kincade Fire, PG&E's stock price dropped 12.2%, 30.6%, and 24% on three successive trading days. *Id.* ¶¶ 308-310, 314, 320-321.

## III. THE GOVERNING PLEADING STANDARDS

### A. Pleading Standard Under Rule 12(b)(6)

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). However, courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

### B. Heightened Pleading Standards Under Rule 9(b) And The PSLRA

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege six elements: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).

Claims under Section 10(b) and Rule 10b-5 must satisfy the heightened pleading requirements of both Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). *See In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012). Rule 9(b) imposes a heightened pleading requirement for fraud claims, requiring that a party "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Rule 9(b) requires plaintiffs to plead every element of a securities fraud claim with particularity. *See Oregon Pub. Employees Ret. Fund v. Apollo Grp., Inc.*, 774 F.3d 598, 605 (9th Cir. 2014) ("Rule 9(b) applies to all elements of a securities fraud action …."). Additionally, all private securities fraud claims are subject to the "more exacting pleading requirements of the PSLRA," which requires that the complaint plead with particularity both falsity and scienter. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). Together, Rule 9(b) and the PSLRA require securities fraud plaintiffs to plead their cases "with a high degree of meticulousness." *Desaigoudar v. Meyercord*, 223 F.3d 1020, 1022 (9th Cir. 2000).

## IV. THE AC IS A "PUZZLE PLEADING" THAT VIOLATES RULES 8 AND 9(b)

A securities class action complaint that alleges "a litany" of false statements without identifying which portions of the statements are alleged to be misleading, or specifying the reasons why each particular statement is misleading must be dismissed under Rule 12(b)(6). *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008) (affirming dismissal of securities fraud complaint that pled "[a] litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false"). Courts reject a "puzzle pleading" approach to alleging securities fraud whereby a plaintiff pleads a laundry list of false statements and then groups together the purported contradictory factual allegations without correlating them to specific statements. *See Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1244 (N.D. Cal. 1998) (observing that "[i]n the context of securities class action complaints, courts have repeatedly lamented plaintiffs' counsels' tendency to place 'the burden [] on the reader to sort out the statements and match them with the corresponding adverse facts to solve the 'puzzle' of

interpreting Plaintiffs' claims'") (citations omitted); *In re Aqua Metals, Inc. Sec. Litig.*, No. 17-cv-07142-HSG, 2019 WL 3817849, at *7-8 (N.D. Cal. Aug. 14, 2019) (dismissing securities fraud complaint as impermissible "puzzle pleading" under Rule 8 because it failed to allege "in detail exactly *which* statement is misleading and *why* the alleged misstatement is misleading and/or false"); *Irving Firemen's Relief & Ret. Fund v. Uber Techs.*, No. 17-cv-05558-HSG, 2018 WL 4181954, at *6 (N.D. Cal. Aug. 31, 2018) (dismissing complaint as impermissible "puzzle pleading" under Rule 8); *Lu v. Align Tech., Inc.*, 417 F. Supp. 3d 1266, 1274 (N.D. Cal. 2019) (same); *In re Oak Tech. Sec. Litig.*, No. 96-20552 SW, 1997 WL 448168, at *5 (N.D. Cal. Aug. 1, 1997) (same).

The AC is an impermissible "puzzle pleading" that violates Rules 8 and 9(b). Over the course of 73 paragraphs and 21 pages, plaintiffs selectively quote from approximately 41 statements that they allege are materially misleading. AC ¶¶ 69-142. The quoted language is often bolded and italicized – occasionally in large blocks of text (*see id*. ¶¶ 85, 116, 119) – in an apparent attempt to indicate which portions of the statements are allegedly misleading. However, other quoted statements do not contain any such emphasis (*see id*. ¶¶ 111, 113, 115, 130, 131, 133, 134, 136, 138, 139, 140). This forces the Individual Defendants to wade through hundreds of paragraphs in the AC to try to determine what adverse facts might have been pled to demonstrate that these statements are misleading. This is precisely the type of forced exercise that underlies the ban on "puzzle pleading." *See Aqua Metals*, 2019 WL 3817849, at *7-8.

Additionally, plaintiffs fail to allege why each of the approximately 41 statements pled in the AC is false. As this Court has recognized, "merely bolding and italicizing swaths of text does not assist the Court in determining which statements are allegedly misleading and why, in light of the multitude of reasons Plaintiff lists." *Aqua Metals*, 2019 WL 3817849, at *8. Nor is it proper for a complaint to "follow[] each group of allegedly false or misleading statements with broad, general explanations that largely fail to identify the specific statements to which they apply." *Id*. at *7. That is exactly what plaintiffs do in the AC: they allege a laundry list of false statements (*see, e.g.*, AC ¶¶ 69-126 (listing

misleading statements about de-energizations)) and then group together the factual allegations that purportedly demonstrate falsity without tying them back to specific statements (*see, e.g.*, *id.* ¶¶ 143-231 (grouping together reasons why defendants' de-energization statements were misleading)).

The AC does not satisfy the requirement that securities fraud claims must allege falsity on a statement-by-statement basis. *See Aqua Metals*, 2019 WL 3817849, at *7-8. Although some statements and groups of statements are followed by a paragraph purporting to allege contradictory facts, those paragraphs often contain a broad conclusory assertion that is unconnected to any particular misstatement and uniformly direct the reader to some unidentified portion of the AC. For example, plaintiffs allege that the Utility's wildfire mitigation plan states: "PG&E performed extensive benchmarking with SDG&E … in a variety of areas" and "emulated SDG&E's early stakeholder communication strategy (including with customers)." AC ¶ 83 (emphasis removed). Plaintiffs later allege that this statement was misleading "because, *as further set out below*, PG&E had not worked with, was not working with, and would not work with EMS workers and local governments to plan for de-energizations." *Id.* ¶ 87 (emphasis added). Alleging that a statement is false because of some unrelated, non-contradictory fact and then telling the reader to look for further support in some undisclosed portion of the complaint is the very definition of "puzzle pleading." This problem is pervasive throughout the AC. Therefore, the AC does not satisfy Rules 8 or 9(b) and should be dismissed on this ground alone.

## V. PLAINTIFFS FAIL TO ALLEGE THE ESSENTIAL ELEMENTS OF A RULE 10B-5 CLAIM

Plaintiffs have failed to allege several essential elements of a Rule 10b-5 claim. First, plaintiffs have not pled with particularity that each Individual Defendant was the "maker" of a statement that is actionable. Second, plaintiffs have not alleged that each of the alleged misstatements was made "in connection with" the purchase or sale of a security. Third, plaintiffs have not alleged scheme liability under Rule 10b-5(a) and 10b-5(c). Fourth, plaintiffs have failed to plead a strong inference of scienter for each of the Individual

Defendants. Finally, plaintiffs have failed to plead loss causation. Each of these pleading failures independently requires dismissal of the AC.

### A. <u>Plaintiffs Have Not Pled With Particularity That Any Individual Defendant Made An Actionable Statement</u>

Rule 10b-5(b) makes it unlawful to "make an untrue statement of a material fact or to omit a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). Under Rule 10b-5(b), corporate officers are not liable for false or misleading statements they did not "make" personally. *See Janus Capital Grp. v. First Deriv. Traders*, 564 U.S. 135, 142-43 (2011). The "maker" of a statement is the "speaker" as well as any other person with "ultimate authority" over the statement, which means one who has the ability to control its content and dissemination. *Id*. Otherwise, individuals are not liable for making misstatements "spoken" by their colleagues or contained in general corporate statements, such as press releases, reports, and securities filings, that are not specifically attributable to them. *See Markette v. Xoma Corp.*, No. 15-cv-03425-HSG, 2017 WL 4310759, at *13 (N.D. Cal. Sept. 28, 2017) (dismissing Rule 10b-5(b) claim against director based on alleged false statements made by other defendants); *Bruce v. Suntech Power Holdings Co.*, No. CV 12-04061 RS, 2013 WL 6843610, at *4 (N.D. Cal. Dec. 26, 2013) (dismissing Rule 10b-5(b) claim against CFO based on alleged false statements made by other defendants); *Turocy v. El Pollo Loco Holdings, Inc.*, No. SACV 15-1343-DOC, 2017 WL 3328543, at *12-13 (C.D. Cal. Aug. 4, 2017) (dismissing Rule 10b-5(b) claim against CFO and CMO based on oral statement made by CEO).

To allege that a non-speaking defendant had "ultimate authority" over a statement, a plaintiff must plead specific and non-conclusory facts demonstrating the existence of such authority. *See Markette*, 2017 WL 4310759, at *13 (dismissing Rule 10b-5(b) claim against director because plaintiff "failed to make any factual allegations" to support ultimate authority conclusion); *Hefler v. Wells Fargo & Co.*, No. 16-cv-05479-JST, 2018 WL 1070116, at *9-10 (N.D. Cal. Feb. 27, 2018) (dismissing Rule 10b-5(b) claim against

certain officer defendants because plaintiffs did not plead "specific facts indicating that [they] were provided with ultimate authority over various SEC filings, news releases, and other public statements"); *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1070-71 (N.D. Cal. 2012) (same); *In re Finisar Corp. Sec. Litig.*, No. 5:11-CV-01252-EJD, 2013 WL 5442356, at *5 (N.D. Cal. Sep. 30, 2013) (third-party report could not be attributed to CEO because plaintiff did not allege he "had editorial control over the author's use of [the statement] or the preparation of the ultimate report"), *rev'd on other grounds by Finisar Corp. Sec. Litig. v. Finisar Corp.*, 646 F. App'x. 506 (9th Cir. 2016).

As discussed below, plaintiffs have not alleged that each Individual Defendant is liable for making actionable statements under Rule 10b-5(b).

1. Plaintiffs Have Not Alleged That Defendant Geisha Williams Made An Actionable Statement

Defendant Geisha Williams was employed by PG&E for just the first month of the alleged class period (December 13, 2018 to January 13, 2019). AC ¶¶ 1, 56. Plaintiffs plead only two false statements during that timeframe, both of which are contained in the same press release issued on December 10, 2018. *Id.* ¶¶ 113, 136. Plaintiffs do not allege that Williams personally made either statement. *Id.* Nor do they allege any facts demonstrating that Williams had ultimate authority over the December 10, 2018 press release, or that she was even aware of it. Indeed, Williams is mentioned in only three of the 351 paragraphs pled in the AC, and those allegations only generically describe her title and tenure with PG&E. *Id.* ¶¶ 24, 26, 56. Furthermore, as a matter of law, Williams cannot be held liable for any statements that post-date her employment with PG&E. *See Bruce*, 2013 WL 6843610, at *8 (CFO could not be held liable for statements made outside of his employment with the company). Thus, plaintiffs have not alleged that Williams made any misstatements, and the Court should dismiss the Rule 10b-5(b) claim against her.



McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

2. Plaintiffs Have Not Alleged That Defendant William Johnson Made An Actionable Statement

Defendant William Johnson became the CEO of PG&E on April 3, 2019, which post-dates the vast majority of the allegedly misleading statements pled in the AC. AC ¶¶ 26, 81, 83, 85, 86, 93, 95-98, 100-102, 106, 111, 113-119, 122, 130, 131-134, 136, 138, 141. Johnson cannot be held liable for these statements under Rule 10b-5(b). *See Bruce*, 2013 WL 6843610, at *8.

While he was the CEO of PG&E, plaintiffs allege that Johnson only spoke two purportedly misleading statements, both of which were made in testimony during a hearing before the California State Assembly Committee on Utilities and Energy on May 15, 2019. AC ¶¶ 69, 125.[3] As they failed to do for Williams, plaintiffs have not pled any specific facts demonstrating that Johnson had ultimate authority over the other statements alleged in the AC. Therefore, Johnson's potential liability under Rule 10b-5(b) is limited to the two statements he made during the May 2019 legislative hearing. However, neither of those statements is actionable under Rule 10b-5.

An actionable misstatement must "be capable of objective verification." *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017) (internal citation omitted). Securities fraud claims cannot be based on "generalized, vague and unspecific" statements that constitute "puffery" or mere corporate optimism. *Glen Holly Entm't, Inc. v. Tektronix Inc.*, 352 F.3d 367, 379 (9th Cir. 2003) (statement that company placed a "high priority" on product development not actionable). The rationale behind this limiting principle is that "[w]hen valuing corporations, [] investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers." *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 800 (9th Cir. 2017) (quoting *In re Cutera Sec. Litig.*, 610 F.3d 113, 1111 (9th Cir. 2010)).

---

[3] Plaintiffs also identify statements made by Johnson in Paragraphs 88 and 103 of the AC, but those statements are both encompassed within the larger one pled at Paragraph 69.

Both of the statements attributed to Johnson in the AC are inactionably vague or optimistic. Plaintiffs emphasize the following portions of Johnson's legislative testimony about the Utility's de-energization practices in two large block quotes:

> AC ¶ 69 (emphasis removed): but we have spent a great deal of time preparing for this and working with local governments, local EMS, so that people will know where to go…. We are working with local governments to say "can we set up a shelter in this gymnasium?" We're identifying medical need patients. So I think we're doing all the right things here. There's still a little coordination to go but I think we certainly understand the issue and I think we're doing all the right things to make sure we're ready.

> AC ¶ 125 (emphasis removed): So, when I heard that the restoration time was two and a half to four days, I have to say my jaw dropped. But – and this is not an excuse, but this is a fact – the transmission system was built to remain in service…. None of that goes to the point of four days is ridiculous, I got that. I agree with that. I think we're in better shape. Over time, there are equipment you can install on the line that's in the plan that makes this lot easier. I won't bore you with those details, but we will do better this year.

Most of the information conveyed in Johnson's statements is too generalized, vague, or unspecific to be actionable ("great deal of time"; "working with local governments"; "identifying medical need patients"; "a little coordination to go"). Other information represents inactionable optimism ("we're doing all the right things"; "we're in better shape"; "we will do better this year"). The rest is based on Johnson's subjective belief about the underlying circumstances regarding the Utility's PSPS Program ("I think …"; "I think …"; "I think …"; "my jaw dropped"; "four days is ridiculous"; "I agree with that"; "I think …"). None of these statements is actionable under Rule 10b-5(b). *See Retail Wholesale*, 845 F.3d at 1275; *Glen Holly*, 352 F.3d at 379; *Atossa Genetics*, 868 F.3d at 800.

Furthermore, plaintiffs have not adequately alleged that each emphasized item of information in Johnson's two block-quoted statements was false at the time he made them in May 2019. Plaintiffs claim that Johnson's first statement was misleading because, during a subsequent legislative hearing in November 2019, he stated:

> I think we thought the big event was turning off the power because for us this is an unnatural act. You know, in utility business your job is to keep the power on 24/7 and I think we focused on that as the main event instead of the impact of that, right, on the, on the people it affected.

AC ¶ 70 (emphasis removed). Nothing in Johnson's November 2019 statement contradicts anything he said during the May 2019 hearing.

Plaintiffs' falsity allegations as to Johnson's second statement suffer from the same problem. Plaintiffs claim that all of the information conveyed in Johnson's block-quoted statement at Paragraph 125 was false because he "testified" that at some point in 2019 "PG&E's internal benchmark was to restore power within five days of the end of the weather event requiring de-energization." AC ¶ 126 (emphasis removed). Even if both statements address the same subject matter, there is nothing inconsistent between Johnson expressing his personal surprise at how long it takes to restore power once a transmission line is de-energized and the Utility's internal benchmark for doing so. Both can be true, and plaintiffs have not alleged otherwise.

Plaintiffs have not alleged that Johnson made an actionable misrepresentation, and the Court should dismiss the Rule 10b-5(b) claim against him.

3. Plaintiffs Have Not Alleged That Defendant Sumeet Singh Made An Actionable Statement

Plaintiffs allege that defendant Sumeet Singh spoke four purportedly misleading statements. AC ¶¶ 85, 116, 122, 132.[4] These statements were made at a "workshop" held by the CPUC on February 13, 2019 to discuss the Utility's wildfire mitigation plan. *Id.* As with Williams and Johnson, plaintiffs have not pled specific facts demonstrating that Singh had "ultimate authority" over any of the other allegedly false statements pled in the AC. Therefore, at most, Singh could have violated Rule 10b-5(b) only with the four alleged statements he personally made during the February 2019 CPUC workshop. None of these four alleged statements is actionable under Rule 10b-5.

All of the statements attributed to Singh are inactionably vague or optimistic. Plaintiffs emphasize the following portions of Singh's workshop statements about the Utility's de-energization and vegetation management practices in four large block quotes:

[4] Plaintiffs also identify a statement made by Singh in Paragraph 90 of the AC, but this statement is encompassed within the larger one pled at Paragraph 85.

> AC ¶ 85 (emphasis removed): So, as part of our expanded effort this year, that's exactly what we are currently in the process of doing: is reaching out to each of those respective cities, communities, to discuss the plans, the implications of proactive unitization, the lessons learned from last year. And really the focus is twofold; one is engaging in communications. And we are also putting forward some tabletop exercises that we're going to be looking to engage in with our respective county and community partners this year within the notification and communication aspects of PSPS.

> AC ¶ 116 (emphasis removed): So, with what we've proposed in regards to the 1300 stations and we're looking to get to one weather station on average for every distribution circuit, so we can be able to really get that understanding in terms of the microclimate capabilities. And that's one of the primary reasons to your point of trying to get there faster and sooner is the reason we've doubled the weather station program for this year and we're looking to do more if we can. And then on the back end we're leveraging and just engaged with the same entity that San Diego [Gas & Electric] has partnered with to help develop the fire potential index capabilities, the capabilities as it pertains to fire ignition and fire spread modelling. So, we're looking to continue the weather station implementation, pull that in.

> AC ¶ 122 (emphasis removed): That's currently part of what we've included in terms of what we call the distribution sectionalisation plan…. But in terms of the current priority of what we have proposed in the 2019 plan, it's really focused on the boundary condition.

> AC ¶ 132 (emphasis removed): So, as part of our enhanced vegetation management program, we're sending another individual post-work to be able to do a hundred percent review of the work to ensure no tree was missed or tree was mischaracterized, and was the work that was prescribed by the pre-inspector actually executed by the tree crew themselves.

Like Johnson's alleged misstatements, Singh's comments are either too generalized or vague to be actionable ("expanded effort"; "reaching out"; "engaging in communications"; "putting forward"; "going to be looking to engage"; "on the back end"; "we're leveraging"; "really focused") or represent inactionable optimism ("we're looking to get"; "trying to get there faster and sooner"; "looking to do more if we can"; "we're looking to continue"; "current priority"; "we're sending"). None of these statements is actionable under Rule 10b-5(b). *See Retail Wholesale*, 845 F.3d at 1275; *Glen Holly*, 352 F.3d at 379; *Atossa Genetics*, 868 F.3d at 800.

Additionally, plaintiffs have not alleged that each emphasized item of information in Singh's four block-quoted statements was false at the time he made them in February 2019. None of the paragraphs that immediately follow Singh's statements purports to

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

explain why they were misleading. *See* AC ¶¶ 86, 117, 123, 133. Indeed, the difficulty in trying to evaluate the falsity of each portion of Singh's alleged misstatements is a microcosm of plaintiffs' entire "puzzle pleading" approach in this case. Plaintiffs force the reader to disentangle alleged factual misrepresentations looming in long blocks of text and match them to alleged contradictory facts in a 351-paragraph and 86-page complaint. This is improper. *Aqua Metals*, 2019 WL 3817849, at *7-8.

Plaintiffs have not pled that Singh made an actionable statement, and therefore, the Court should dismiss the Rule 10b-5(b) claim against him.

**B. Plaintiffs Have Not Alleged That Each Misstatement Was Made "In Connection With" A Securities Transaction**

The "in connection with" element of a securities fraud claim is satisfied when an untrue statement has "some nexus" with a securities transaction. *SEC v. Rana Research*, 8 F.3d 1358, 1362 (9th Cir. 1993) (citations omitted). The Ninth Circuit has held that the requisite nexus exists "whenever assertions are made … in a manner reasonably calculated to influence the investing public." *Id*. (quoting *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 862 (2nd Cir. 1968) (en banc), *cert. denied sub nom. Coates v. SEC*, 394 U.S. 976 (1969)).

As the Fourth Circuit has explained, the purpose of the *Texas Gulf* standard is about notice to the speaker because "attaching liability under the securities laws for statements made in any medium, no matter how tangentially related to the securities markets, would run the risk of roping in speakers who had no idea that their conduct might implicate Section 10(b)." *United States SEC v. Pirate Inv'r LLC*, 580 F.3d 233, 250-51 (4th Cir. 2009). Further, "by requiring that misstatements be communicated in a medium upon which a *reasonable* investor would rely, the *Texas Gulf* standard protects these unknowing speakers from liability and ensures that there is a sufficient nexus between the misrepresentations and the securities sales that they induce…." *Id.*; *see SEC v. Zandford*, 535 U.S. 813, 820 (2002) (noting that Section 10(b) "must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation of [Rule 10b-5]").

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

Under the *Texas Gulf* standard, the "in connection with" element requires allegations demonstrating both that the untrue statement was publicly disseminated and that there was some reasonable basis for the speaker to believe that it might influence investors. As the Ninth Circuit has recognized, these requirements are generally satisfied for statements contained "in a document such as a press release, annual report, investment prospectus or other such document on which an investor would presumably rely." *Rana Research*, 8 F.3d at 1362; *see also Pirate Investor*, 580 F.3d at 250 (identifying various documents that courts have held satisfy the *Texas Gulf* standard, such as investment research reports, prospectuses, the sales and marketing materials at brokerage houses and other points of sale, SEC filings, and detailed drug advertisements published in sophisticated medical journals). Absent allegations that a statement was publicly disseminated to investors with some reasonable basis to believe that they would rely on it, the statement does not violate Rule 10b-5. *See Di Donato v. Insys Therapeutics Inc.*, No. CV-16-00302-PHX-NVW, 2017 WL 3268797, at *16 (D. Ariz. Aug. 1, 2017) (dismissing Rule 10b-5 claim because quotes attributed to defendant in news article he did not write, produce, or verify did not satisfy the "in connection with" requirement).

Plaintiffs allege that the Individual Defendants are liable under Rule 10b-5(b) for making approximately 41 statements. AC ¶¶ 169-142. The vast majority of the alleged misstatements are taken from regulatory filings submitted by the Utility to fulfill its statutory obligation under California Public Utilities Code § 8386 to prepare a wildfire mitigation plan (*id.* ¶¶ 81, 83, 95-98, 100, 102, 106, 111, 114, 115, 117-119, 130, 131, 133, 134, 138, 141) or in response to an official rulemaking proceeding issued by the CPUC (*id.* ¶¶ 86, 93, 101). Thus, plaintiffs have affirmatively alleged that these statements were made in connection with the fulfillment of the Utility's statutory and regulatory obligations, not "in connection with the purchase or sale of any security," which Section 10(b) and Rule 10b-5 expressly require. Plaintiffs do not allege any facts indicating that these statements were publicly disseminated to investors with some reasonable basis to believe that they would rely on them to make investment decisions.

This problem is especially glaring for the six statements plaintiffs allege that the Individual Defendants personally made. Johnson is alleged to have personally made two misstatements during a hearing before the California State Assembly Committee on Utilities and Energy on May 15, 2019. AC ¶¶ 69, 125. Singh is alleged to have personally made four misstatements at a CPUC workshop to discuss the Utility's wildfire mitigation plan on February 13, 2019. *Id.* ¶¶ 85, 116, 122, 132. Neither is a traditional medium of information on which investors rely to make investment decisions. *See Rana Research*, 8 F.3d at 1362; *Pirate Investor*, 580 F.3d at 250. Nor have plaintiffs alleged any facts suggesting that these oral statements were reasonably calculated to influence investors. Indeed, plaintiffs do not even allege if or how these statements were publicly disseminated to investors. Therefore, plaintiffs have not satisfied the "in connection with" element for every misstatement pled in the AC. For this independent reason, plaintiffs' Rule 10b-5 claim fails and must be dismissed.

### C. <u>Plaintiffs Have Not Pled A Scheme Liability Claim Against The Individual Defendants Under Rule 10b-5(a) And 10b-5(c)</u>

Rule 10b-5(a) and 10b-5(c) make it unlawful to use a "device, scheme, or artifice to defraud" or engage in "any act, practice, or course of business which operates or would operate as a fraud or deceit." 17 C.F.R. § 240.10b-5(a), (c). To plead a violation of these subsections, "a plaintiff must allege the same elements as a Rule 10b-5(b) claim, except that a scheme liability claim cannot be based solely on false or misleading statements, but must instead involve deceptive conduct 'beyond those misrepresentations or omissions'." *Aqua Metals*, 2019 WL 3817849, at *8 (quoting *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011)). The failure to plead "separate" conduct from the alleged violation of Rule 10b-5(b) is grounds for dismissing a scheme liability claim. *Spot Runner*, 655 F.3d at 1057-58 (affirming dismissal of scheme liability claim under Rule 10b-5(a) and 10b-5(c)); *Markette*, 2017 WL 4310759, at *13 (dismissing scheme liability claim under Rule 10b-5(a) and 10b-5(c)).

Plaintiffs have not pled a scheme liability claim. Although the AC does not identify the specific subsections of Rule 10b-5, it alleges that the Individual Defendants "employed devices, schemes, and artifices to defraud" and "engaged in acts, practices, and a course of business which operated as a fraud and deceit," which tracks the operative language of Rule 10b-5(a) and 10b-5(c). AC ¶ 339. Plaintiffs, however, do not allege any facts showing that the Individual Defendants engaged in any conduct "beyond" or "separate from" making untrue statements in violation of Rule 10b-5(b). *Spot Runner*, 655 F.3d at 1057; *Markette*, 2017 WL 4310759, at *13. Therefore, plaintiffs' scheme liability claim must be dismissed.

**D. Plaintiffs Have Failed To Plead A Strong Inference Of Scienter For Each Of The Individual Defendants**

To plead scienter under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). To qualify as "strong," "an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). The ultimate question is: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* at 326.

To allege a strong inference of scienter, a plaintiff must plead facts showing that the defendant made his or her statement with an "intent to deceive, manipulate, or defraud" or "deliberate recklessness." *Webb v. SolarCity Corp.*, 884 F.3d 844, 851 (9th Cir. 2018) (citations omitted). "Deliberate recklessness is an *extreme* departure from the standards of ordinary care[,] which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it." *Id*. (citations omitted) (alteration in original). Courts must determine whether a plaintiff's allegations either individually or holistically support a strong inference of scienter. *See Curry v. Yelp Inc.*, 875 F.3d 1219, 1226 (9th Cir. 2017) (discussing two-part inquiry).

Moreover, as this Court has observed, "[p]laintiffs must provide individualized statement-by-statement allegations of scienter that establish that each Individual Defendant possessed the information that purportedly made the statement knowingly or recklessly false or misleading at the time it was made." *Iron Workers Local 580 Joint Funds v. Nvidia Corp.*, No. 18-cv-07669-HSG, 2020 WL 1244936, at *12 (N.D. Cal. Mar. 16, 2020) (dismissing Rule 10b-5 claim because plaintiffs failed to allege scienter for each individual defendant); *see also In re BofI Holding, Inc. Sec. Litig.*, No. 3:15-CV-02324-GPC-KSC, 2017 WL 2257980, at *12 (S.D. Cal. May 23, 2017) ("Generally speaking, such an inference must be made by pleading scienter as to the individual executive or director who made the misstatement"); *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014) ("the most straightforward way to raise [an inference of scienter] for a corporate defendant will be to plead it for an individual defendant.") (citations omitted).

Plaintiffs have failed to plead a strong inference of scienter for each of the Individual Defendants. The word "scienter" appears only once in the AC. AC ¶ 331(d). Plaintiffs' only scienter allegations merely parrot the conclusory assertion that "Defendants' material misrepresentations and omissions were done knowingly or recklessly." *Id.* ¶ 343. Plaintiffs do not allege any facts in the AC that support an inference of scienter, let alone a strong one, on either a statement-by-statement or officer-by-officer basis. Nor are there *any* factual allegations related to suspicious stock sales, resignations, terminations, or statements from confidential witnesses, much less the "great detail" required to plead scienter. *See In re Silicon Graphics, Inc.*, 183 F.3d 970, 974 (9th Cir. 1999) (observing that securities fraud plaintiffs "must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct").

Plaintiffs' failure to allege scienter is compounded by their failure to plead the falsity of each statement alleged in the AC. *See Ziolkowski v. Netflix, Inc.*, No. 17-cv-01070-HSG, 2018 WL 4587515, at *5 (N.D. Cal. Sept. 25, 2018) (noting that "[a]lthough falsity and scienter are distinct inquiries, Plaintiff's ability to plead facts showing Defendants acted with the requisite scienter is substantially hindered by his inability to plead the existence of

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

a materially false or misleading statement or omission."). Whether evaluated individually or holistically, plaintiffs have failed to allege any facts that create a cogent or compelling inference that any Individual Defendant made a particular statement with scienter, and for this reason alone, the Rule 10b-5 claim should be dismissed.

**E. Plaintiffs Have Failed To Allege Loss Causation**

Loss causation refers to the causal relationship between a misrepresentation and the economic loss suffered by an investor. *See Dura Pharm.*, 544 U.S. at 342. Courts have interpreted this element to require that "a securities fraud plaintiff must prove that the defendant's misrepresentation was a substantial cause of his or her financial loss." *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014) (citations omitted). Where a plaintiff affirmatively pleads a "market revelation of fraud" theory, he or she must allege "that the decline in the defendant's stock price was proximately caused by a revelation of fraudulent activity rather than by changing market conditions, changing investor expectations, or other unrelated factors." *Id.* A plaintiff must allege that the market "learned of and reacted to th[e] fraud, as opposed to merely reacting to reports of the defendant's poor financial health generally." *Metzler*, 540 F.3d at 1063. Loss causation also must be pled with specificity. *See Apollo*, 774 F.3d at 605.

In a section of the AC titled "Loss Causation," plaintiffs allege that over a 6-week period between August 14 and October 28, 2019, there were 10 instances when PG&E's stock price dropped in response to negative news about the Utility, in an effort to allege a "market revelation of fraud" theory of loss causation. AC ¶¶ 273-321. Plaintiffs' loss causation allegations are deficient for several reasons.

First, two of the 10 disclosures are insufficient to support loss causation as a matter of law. Plaintiffs allege that PG&E's stock price dropped on October 14, 2019 and October 28, 2019 in response to news disclosing that the CPUC either was threatening to investigate or had initiated an investigation into the Utility's de-energization practices. AC ¶¶ 302-303, 319-320. As this Court has recognized, "the mere existence of a regulatory investigation is insufficient to show cognizable fraud." *Fleming v. Impax Labs., Inc.*, No.

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

16-cv-06557-HSG, 2018 WL 4616291, at *5 (N.D. Cal. Sept. 7, 2018) (citing *Loos*, 762 F.3d at 890 & n.3 (an investigation "simply puts investors on notice of a potential future disclosure of fraudulent conduct")); *N.Y. Hotel Trades Council & Hotel Ass'n of N.Y.C., Inc. Pension Fund v. Impax Labs. Inc.*, No. 16-cv-06557-HSG, 2019 WL 3779262, at *2 (N.D. Cal. Aug. 12, 2019) (same). Therefore, the allegations of the October 14 and 29 investigation disclosures alone are insufficient to plead loss causation.

Second, plaintiffs have not alleged that any of the 10 stock price drops were caused by the disclosure of information that rendered a prior statement false. For all that appears in the AC, the stock price declines simply reflect the market's reactions to negative news about the Utility unrelated to any prior false statements. For example, plaintiffs allege that PG&E's stock dropped 9.6% in response to a court filing on August 14, 2019 stating "that PG&E's vegetation management was of 'questionable value'." AC ¶¶ 273-275. However, plaintiffs do not explain why that revelation, or any other information contained in the report, exposed a mistruth contained in some prior vegetation management-related statement pled in the AC. Absent such an alleged nexus, there is no allegation of loss causation. *See Fleming*, 2018 WL 4616291, at *5 (rejecting loss causation allegations based on "the lack of any disclosure by Defendants suggesting actual fraud that is causally linked with loss").

Similarly, plaintiffs allege that PG&E's stock price dropped on six occasions following the Utility's announcement of an impending PSPS event or public criticisms about the way the Utility executed certain PSPS events. AC ¶¶ 276-279 (PSPS announcement), ¶¶ 280-281 (PSPS criticism), ¶¶ 284-286 (PSPS criticism), ¶¶ 291-295 (PSPS criticism), ¶¶ 311-314 (PSPS announcement), ¶¶ 318-321 (PSPS announcement). But again, plaintiffs fail to allege that the market's reaction to this PSPS-related news was the result of learning about information that rendered some prior statement about the Utility's de-energization practices false or misleading. *See Fleming*, 2018 WL 4616291, at *5.

Finally, plaintiffs allege that news related to the Utility's potential involvement in the Kincade Fire caused the PG&E's stock price to decline on three occasions. AC ¶¶ 308-310, 312-314, 320-321. Again, plaintiffs do not connect this news to any prior statement. Moreover, PG&E's investors were obviously aware that the Utility's electrical equipment could ignite a significant wildfire given the fact that the companies had filed for bankruptcy based on the billions of dollars in potential financial liabilities caused by the North Bay and Camp Fires. *Id*. ¶¶ 39, 43, 49-50.

As the Ninth Circuit observed in *Metzler*, "[s]o long as there is a drop in a stock's price, a plaintiff will always be able to contend that the market 'understood' a defendant's statement precipitating a loss as a coded message revealing the fraud…. Loss causation requires more." 540 F.3d at 1064. Plaintiffs have failed to plead this something more in the AC. Because plaintiffs have not alleged the loss causation element of their Rule 10b-5 claim, the Court must dismiss it.

## VI. PLAINTIFFS' SECTION 20(a) CLAIM ALSO MUST BE DISMISSED

Section 20(a) of the Exchange Act imposes liability on anyone who "exercised actual power or control" over a person who violates Rule 10b-5. *Zucco Partners*, 552 F.3d at 990 (citations omitted). To plead a viable Section 20(a) claim, a plaintiff must allege a predicate violation of Rule 10b-5. *Id*.; *see Nvidia*, 2020 WL 1244936, at *14 (dismissing Section 20(a) claim where plaintiff did not allege an underlying violation of Rule 10b-5); *Markette*, 2017 WL 4310759, at *13 (same). A plaintiff must also allege specific facts to state a valid Section 20(a) claim. *See Sgarlata v. PayPal Holdings, Inc.*, No. 17-cv-06956-EMC, 2018 WL 6592771, at *8 (N.D. Cal. Dec. 13, 2018) (dismissing Section 20(a) claim because plaintiffs "cannot rely on boilerplate allegations; they must provide some factual support that defendants were in a position to control a primary violator") (citations omitted).

Plaintiffs' Section 20(a) claim must be dismissed for two independent reasons. First, plaintiffs have failed to allege a primary violation of Rule 10b-5. Second, even if they had, plaintiffs have failed to allege specific facts showing that the Individual

Defendants "exercised actual power or control over the primary violator." *Zucco Partners*, 552 F.3d at 990. Plaintiffs fail to identify the primary violator, who controlled the primary violator, how they controlled the primary violator, and when such control existed. AC ¶¶ 348-351. Instead, plaintiffs generically allege that the Individual Defendants each exercised the requisite control based on their "high-level positions," "ownership and contractual rights," "participation in and awareness of [PG&E's] operations or intimate knowledge of the documents containing false statements disseminated to investors," and "unlimited access to copies of [PG&E's] reports, public statements, regulatory filings, and other statements alleged … to be misleading prior to and shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected." *Id.* ¶ 349. Such boilerplate allegations are insufficient to plead a valid Section 20(a) claim. *Sgarlata*, 2018 WL 6592771, at *8. Therefore, plaintiffs' Section 20(a) claim also must be dismissed.

## VII. CONCLUSION

For the foregoing reasons, the Court should dismiss each of the claims asserted against the Individual Defendants in the amended class action complaint.

Dated: May 15, 2020

McDERMOTT WILL & EMERY LLP

By: */s/ Steven S. Scholes*
STEVEN S. SCHOLES
Attorneys for Individual Defendants
WILLIAM JOHNSON, GEISHA WILLIAMS, and SUMEET SINGH