# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| CHRISTOPHER VATAJ, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>WILLIAM D. JOHNSON, JOHN R. SIMON, GEISHA WILLIAMS, and JASON P. WELLS,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 4:19-cv-06996-HSG<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**<br><br>**Date:** August 20, 2020<br>**Time:** 2:00 p.m.<br>Oakland Courthouse<br>**Dept.:** Courtroom 2 (4th Floor)<br>**Judge:** Hon. Haywood S. Gilliam, Jr. |

## TABLE OF CONTENTS

I.    INTRODUCTION.................................................................................................. 1

II.   STATEMENT OF FACTS .................................................................................. 3

III.  ARGUMENT........................................................................................................ 7

   A.   Legal Standard .............................................................................................. 7

   B.   The Complaint Adequately Pleads Falsity................................................... 7

      1.   The Complaint Satisfies Rule 8 ...............................................................7

      2.   Defendants Made the Statements in the Complaint .............................9

      3.   The Complaint Sufficiently Alleges That The Few Statements Defendants
           Challenge Are False or Misleading.........................................................11

      4.   Defendants' False Statements Were Made "In Connection With" The Purchase
           or Sale of Securities ..............................................................................14

   C.   The Complaint Adequately Pleads Scienter ................................................. 16

      1.   Legal Standard.........................................................................................16

      2.   Defendants Made Specific Statements About PG&E's Core Operations ...........16

      3.   The Court Can Impute Singh's Scienter To PG&E ............................19

      4.   Defendants Were Told Their Statements Were False...........................20

      5.   The Complaint Adequately Alleges Motive ...........................................20

   D.   The Complaint Adequately Pleads Loss Causation .................................... 21

   E.   The Complaint Adequately Pleads Control Person Liability................................ 23

IV.   CONCLUSION .................................................................................................... 25

Plaintiffs' Memorandum of Law in Opposition to Motion to Dismiss - Case No. 4:19-cv-06996-HSG

**TABLE OF AUTHORITIES**

**Pages**

Cases

*Aldridge v. A.T. Cross Corp.*,
   284 F.3d 72 (1st Cir. 2002) ................................................................................. 20, 21

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ..................................................................................................... 7

*Atlas v. Accredited Home Lenders Holding Co.*,
   556 F. Supp. 2d 1142 (S.D. Cal. 2008) ..................................................................... 24

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................................................... 19

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008) ............................................................................... 14, 17

*Bielousov v. GoPro, Inc.*,
   No. 16-CV-06654-CW, 2017 WL 3168522 (N.D. Cal. July 26, 2017) ..................... 13

*Bruce v. Suntech Power Holdings Co.*,
   64 F. Supp. 3d 1365 (N.D. Cal. 2014) ................................................................. 10, 11

*City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*,
   875 F. Supp. 2d 359 (S.D.N.Y. 2012) ....................................................................... 18

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
   880 F. Supp. 2d 1045 (N.D. Cal. 2012) ..................................................................... 11

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005) ................................................................................................... 22

*Eminence Capital, LLC v. Aspeon, Inc.*,
   316 F.3d 1048 (9th Cir. 2003) ................................................................................... 25

*Exch. Comm'n v. City of Victorville*,
   No. EDCV1300776JAKDTBX, 2018 WL 3201676 (C.D. Cal. Jan. 24, 2018) ........ 20

*Fecht v. Price Co.*,
   70 F.3d 1078 (9th Cir. 1995) ....................................................................................... 8

*Glen Holly Entm't, Inc. v. Tektronix, Inc.*,
   352 F.3d 367 (9th Cir. 2003) ................................................................................................ 13

*Hefler v. Wells Fargo & Co.*,
   No. 16-CV-05479-JST, 2018 WL 1070116 (N.D. Cal. Feb. 27, 2018).................................... 11

*In re Apple Inc. Sec. Litig.*,
   No. 19-CV-02033-YGR, 2020 WL 2857397 (N.D. Cal. June 2, 2020) ................................... 15

*In re Aqua Metals, Inc. Sec. Litig.*,
   No. 17-CV-07142-HSG, 2019 WL 3817849 (N.D. Cal. Aug. 14, 2019) ............................ 9, 24

*In re Atossa Genetics Inc Sec. Litig.*,
   868 F.3d 784 (9th Cir. 2017) ................................................................................................ 13

*In re BofI Holding, Inc. Sec. Litig.*,
   No. 315CV02324GPCKSC, 2017 WL 2257980 (S.D. Cal. May 23, 2017)............................. 24

*In re Carter-Wallace, Inc. Sec. Litig.*,
   150 F.3d 153 (2d Cir. 1998)................................................................................................... 15

*In re ChinaCast Educ. Corp. Sec. Litig.*,
   809 F.3d 471 (9th Cir. 2015) ................................................................................................ 20

*In re Equifax Inc. Sec. Litig.*,
   357 F. Supp. 3d 1189 (N.D. Ga. 2019) .................................................................................. 15

*In re Facebook, Inc. Sec. Litig.*,
   405 F. Supp. 3d 809 (N.D. Cal. 2019) ................................................................................... 15

*In re Finisar Corp. Sec. Litig.*,
   No. 5:11-CV-01252-EJD, 2013 WL 5442356 (N.D. Cal. Sept. 30, 2013).............................. 12

*In re Gilead Scis. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008) ......................................................................................... 22, 23

*In re Illumina, Inc. Sec. Litig.*,
   No. 3:16-CV-3044-L-KSC, 2018 WL 500990 (S.D. Cal. Jan. 22, 2018)................................ 10

*In re Immune Response Sec. Litig.*,
   375 F. Supp. 2d 983 (S.D. Cal. 2005)..................................................................................... 20

*In re Intuitive Surgical Sec. Litig.*,
   65 F. Supp. 3d 821 (N.D. Cal. 2014) ................................................................................... 8, 9

iii

*In re MannKind Sec. Actions*,
 835 F. Supp. 2d 797 (C.D. Cal. 2011) ................................................................. 20, 24

*In re New Century*,
 588 F. Supp. 2d 1206 (C.D. Cal. 2008) ..................................................................... 9

*In re Oak Tech. Sec. Litig.*, No. 96-20552 SW,
 1997 WL 448168 (N.D. Cal. Aug. 1, 1997) ............................................................... 9

*In re Puda Coal Sec. Inc., Litig.*,
 30 F. Supp. 3d 261 (S.D.N.Y. 2014)........................................................................ 11

*In re Silicon Graphics Inc. Sec. Litig.*,
 183 F.3d 970 (9th Cir. 1999) ................................................................................... 16

*In re Sinclair Broad. Grp., Inc. Sec. Litig.*, No. CV CCB-18-2445,
 2020 WL 571724 (D. Md. Feb. 4, 2020) ................................................................. 15

*In re VeriFone Holdings, Inc. Sec. Litig.*,
 704 F.3d 694 (9th Cir. 2012) ................................................................................... 16

*In re Wells Fargo & Co. S'holder Derivative Litig.*,
 282 F. Supp. 3d 1074 (N.D. Cal. 2017) ................................................................... 13

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
 564 F.3d 242 (3d Cir. 2009)..................................................................................... 17

*Irving Firemen's Relief & Ret. Fund v. Uber Techs.*,
 No. 17-CV-05558-HSG, 2018 WL 4181954 (N.D. Cal. Aug. 31, 2018) .................... 9

*Janus Capital Grp., Inc. v. First Derivative Traders*,
 564 U.S. 135 (2011)........................................................................................... 10, 11

*KB Partners I, L.P. v. Barbier*,
 907 F. Supp. 2d 826 (W.D. Tex. 2012)..................................................................... 18

*Khoja v. Orexigen Therapeutics, Inc.*,
 899 F.3d 988 (9th Cir. 2018) ..................................................................................... 7

*Khoja v. Orexigen Therapeutics, Inc.*,
 No. 15-CV-540 JLS (JLB), 2019 WL 4599882 (S.D. Cal. Sept. 23, 2019) .............. 10

*Kui Zhu v. Taronis Techs. Inc.*, No. CV-19-04529-PHX-G,
 MS, 2020 WL 1703680 (D. Ariz. Apr. 8, 2020)....................................................... 10

Plaintiffs' Memorandum of Law in Opposition to Motion to Dismiss - Case No. 4:19-cv-06996-HSG

*Lloyd v. CVB Fin. Corp.*,
   811 F.3d 1200 (9th Cir. 2016) ..................................................................................... 22

*Markette v. XOMA Corp.*,
   No. 15-CV-03425-HSG, 2017 WL 4310759 (N.D. Cal. Sept. 28, 2017)................................. 11

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011)...................................................................................................... 21

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ................................................................................. 9, 22

*Meyer v. Jinkosolar Holdings Co.*,
   761 F.3d 245 (2d Cir. 2014)......................................................................................... 15

*Mineworkers' Pension Scheme v. First Solar Inc.*,
   881 F.3d 750 (9th Cir. 2018) ................................................................................. 22, 23

*Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc.*,
   774 F.3d 598 (9th Cir. 2014) ....................................................................................... 22

*PQ Labs, Inc. v. Yang Qi*,
   No. C 12-0450 CW, 2012 WL 2061527 (N.D. Cal. June 7, 2012)................................... 12, 14

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014) ............................................................................ 18, 21, 22

*Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*,
   845 F.3d 1268 (9th Cir. 2017) ..................................................................................... 13

*S. Ferry LP #2 v. Killinger*,
   687 F. Supp. 2d 1248 (W.D. Wash. 2009)....................................................................... 17

*S. Ferry LP, No. 2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ....................................................................................... 17

*Schueneman v. Arena Pharm., Inc.*,
   840 F.3d 698 (9th Cir. 2016) ....................................................................................... 20

*Sgarlata v. PayPal Holdings, Inc.*,
   No. 17-CV-06956-EMC, 2018 WL 6592771 (N.D. Cal. Dec. 13, 2018)............................... 25

*Simmons Investments, Inc. v. Conversational Computing Corp.*,
   No. 09-CV-2345-EFM/KMH, 2011 WL 673759 (D. Kan. Feb. 17, 2011) ............................ 18

Plaintiffs' Memorandum of Law in Opposition to Motion to Dismiss - Case No. 4:19-cv-06996-HSG

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007).................................................................................................... 7, 16, 17

*Turocy v. El Pollo Loco Holdings*, Inc.,
   No. SACV 15-1343-DOC, 2017 WL 3328543 (C.D. Cal. Aug. 4, 2017) ................................ 11

*U.S. S.E.C. v. Pirate Inv'r LLC*,
   580 F.3d 233 (4th Cir. 2009) ............................................................................................ 15

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
   No. CIV.A. 13-6731, 2015 WL 3755218 (E.D. Pa. June 16, 2015) ......................................... 18

*Wenger v. Lumisys, Inc.*,
   2 F. Supp. 2d 1231 (N.D. Cal. 1998) ................................................................................... 9

*Xiaojiao Lu v. Align Tech., Inc.*,
   417 F. Supp. 3d 1266 (N.D. Cal. 2019) ................................................................................ 9

*Yanek v. Staar Surgical Co.*,
   388 F. Supp. 2d 1110 (C.D. Cal. 2005) ................................................................................ 7

**Rules**

Fed. R. Civ. P. 9(b) ............................................................................................................ 7, 22

Plaintiffs' Memorandum of Law in Opposition to Motion to Dismiss - Case No. 4:19-cv-06996-HSG

## I.      **INTRODUCTION**[1]

By the beginning of the Class Period, PG&E had sparked wildfires so destructive they left its existence in question. The largest and last of these, the Camp Fire, leveled two towns. PG&E would later plead guilty to 84 counts of manslaughter for sparking it. PG&E needed a clean slate. It filed for bankruptcy to resolve its liabilities.

Yet before it even filed for bankruptcy, PG&E also committed itself to overhauling its operations top to bottom to dramatically reduce the risk that it would ignite wildfires. PG&E aimed to win over the people of California and its political branches to access insurance funds, exit bankruptcy, and otherwise continue to operate. To this end, PG&E fired its CEO and 80% of its Board of Directors.

PG&E's new wildfire prevention plan had three main elements. Wildfires were frequently sparked by vegetation falling on PG&E's distribution lines, the lines that carry power directly to customers. So Defendants represented that PG&E was inspecting all its distribution lines located in high fire risk areas to remove all dangerous overhanging vegetation. Wildfires are also caused by failing PG&E equipment on transmission lines, the high-voltage lines that transmit power to distribution lines. So Defendants represented that PG&E was inspecting all its transmission lines in high fire threat areas to identify and replace equipment with the types of defects that most frequently lead to wildfires. Finally, Defendants announced that PG&E had created infrastructure allowing it to turn off power to targeted areas if the weather created an extreme risk of dangerous wildfires. When they made these statements, Defendants stated all these steps had been taken, were nearly complete, or would be complete before the start of the 2019 wildfire season at the latest.

The statements were false. PG&E's inspections of distribution lines were so shoddy they left one dangerous tree every hundred feet, on average. PG&E's inspections of its transmission lines ignored the very defect that had caused the Camp Fire. That defect went on to cause the most disastrous fire of the 2019 wildfire season. But Defendants' statements about de-energizations were their most

---

[1] Defendants are PG&E and its senior officers and directors Geisha Williams, Sumeet Singh, and William Johnson, of whom the latter three have moved. References to "¶_" are to the Complaint. References to "D.Br." are to Defendants' Brief In Support Of The Individual Defendants' Motion To Dismiss Amended Class Action Complaint (ECF No. 60). PG&E is still in bankruptcy and has not been served. ***Unless otherwise noted, all emphases are added and citations removed.***

1

egregious misrepresentations. Defendants spun a detailed and specific story of the steps PG&E was taking to ensure de-energizations would be short, targeted, and well-organized. Defendant Johnson did not merely claim that PG&E would restore power quickly, but that it would restore power in much fewer than four days – even as an internal PG&E benchmark called for it to restore power in five days. Defendants claimed PG&E had created detailed notification plans, identified all customers who need power for medical reasons, and identified critical facilities like hospitals and emergency services providers. Yet when the de-energizations were implemented, the notifications did not go out, only a small subset of medical needs customers had been identified, and PG&E was missing more than half of critical facilities because it had never asked the cities in which the facilities were located. PG&E manifestly had not, by September, done what Defendants claimed it had completed by May. This created dangerous conditions for the public and substantial liabilities for PG&E.

The Complaint also adequately alleges scienter. Defendants' statements are not vague. If Johnson did not learn that PG&E planned to take five days to restore power when he confidently testified without any hedges that it would take much fewer than four, Johnson's statements were at a minimum reckless. The other statements, equally specific, were likewise made with scienter. Defendants described, at length and in detail, the steps PG&E had and was taking to inspect its distribution and transmission lines – yet failed to disclose the perfunctory inspections were entirely ineffective.

Between August and September 2019, as events revealed that each of these statements was false and as the risks they had concealed materialized, PG&E's stock price fell from over $15.93 to $3.80.

Defendants' arguments to the contrary mischaracterize the Complaint. Defendants claim the Complaint is a so-called "puzzle pleading" because they purportedly cannot match allegedly false or misleading statements with the factual allegations showing their falsity. The Complaint is not a "puzzle pleading" because it sets out all the false and misleading statements, alleges that they are false and misleading, and includes both an abbreviated paragraph and a section of detailed allegations, referenced therein, explaining why the statements are false or misleading.

Defendants also claim that they did not "make" the written statements that the Complaint

2

alleges are false, which were principally made in a press release and a detailed plan to mitigate wildfire risks ("Mitigation Plan"). Yet courts commonly find that CEOs like Defendant Williams "make" statements in press releases issued during their tenure, like here, even when they are not quoted in the press release as Williams was here. And Defendant Singh headed the PG&E division that drafted the Mitigation Plan, was identified in it, and presented it to the public in a workshop a week after its filing. Thus, the facts support a finding that the misrepresentations were theirs.

Defendants argue their statements were not "in connection with" a securities transaction. Yet courts take an expansive reading of that requirement, focusing on the substance of the statements rather than the forum in which a defendant makes them. Recently, in June 2020, a court in this District found the requirement satisfied by statements to Congress. Defendants' statements to PG&E's regulator and to the California Assembly are precisely analogous. And statements concerning efforts to prevent future wildfires could not have been more material to PG&E investors in a Class Period punctuated by PG&E's filing for bankruptcy because of prior wildfires and concerns about the utility's ongoing viability.

On scienter, Defendants argue that Plaintiffs fail to meet a standard that the Ninth Circuit has explicitly rejected. And though Defendants claim the culpable inference the Complaint alleges is not as compelling as a competing nonculpable inference, they do not *proffer* any nonculpable inference. Instead, they advance boilerplate arguments that do not mention the Complaint's allegations, but instead pretend these well-pled allegations do not exist. On loss causation, Defendants ask the Court rely on a restrictive reading of case law that the Ninth Circuit has specifically disavowed and do not raise any specific issue with any disclosures.

Because it alleges that the disclosure or materialization of the risk of Defendants' false statements, made with scienter, caused Plaintiffs' losses, the Complaint states a claim, and the Court should deny the motion to dismiss.

## II.    STATEMENT OF FACTS

In 2018, PG&E's equipment sparked the Camp Fire, leveling the Northern California towns of Paradise and Concow. ¶¶44, 48. PG&E would later plead guilty to 84 counts of manslaughter for setting the fire and faced tens of billions of dollars in liabilities. ¶¶48-49, 51. The following January,

3

dogged by lawsuits, several regulatory investigations into its safety practices, and a judge examining whether to modify the conditions of its probation, PG&E filed for bankruptcy. ¶50.

As a utility, PG&E is utterly dependent on the State of California. The California Public Utilities Commission ("CPUC"), whose members are appointed by the Governor of California, grants it a license to operate, ¶67, determines what it is allowed to earn as revenues and profits, ¶¶28, 30, and must approve its bankruptcy plan. ¶64. Tacitly, PG&E also needed the Governor's approval of its bankruptcy plan. *Id.* PG&E also depends on huge subsidies enacted by the California legislature to insure against the liabilities it might face for creating wildfires. ¶62. By causing death and destruction, PG&E raised doubts about whether the State of California would continue to permit it to have a license.

In response to these existential pressures, Defendants set about convincing the public that PG&E had reformed. Defendants claimed they had "heard" (and heeded) "the calls for change." ¶¶57-58. PG&E fired its CEO, the head of its electric business, and 80% of its Board, purportedly to refocus the company on preventing wildfires safely. ¶¶7, 54-57, 59. The new CEO, Defendant Johnson, testified to a committee of the California Assembly that "if I tell you I'm going to do the best I can to prevent a fire again, you can count on that being true." ¶60. Defendants claimed that PG&E was instituting new programs along with these new leaders. They falsely claimed, beginning in December 2018, to undertake a comprehensive overhaul of PG&E's operations to ensure it could deliver power to its customers without setting wildfires. ¶¶7-8. Defendants emphasized three programs.

First, Defendants claimed PG&E had developed a thorough program to minimize disruption when, faced with high winds and low humidity, it had to shut off power to prevent wildfires (*i.e.*, de-energization). ¶¶69-107. Defendants falsely claimed de-energizations would be short. PG&E had taken four days to restore power after PG&E's sole pre-Class Period de-energization. ¶69. Acknowledging the delay was "jaw dropp[ing]," Defendant Johnson falsely testified that PG&E was doing "much better." *Id.* In truth, PG&E's internal benchmark was to restore power within five days – even worse than it had done before the Class Period. ¶¶126, 238. Defendants also boasted that PG&E's extensive microclimate weather monitoring tools, state-of-the-art modelling, and remote-controlled switches would ensure it could microtarget any de-energizations. ¶¶110-23. In fact, in the 2019 fire season, PG&E resorted to the two largest de-energizations in American history and also shut

off power to areas that were completely unaffected by harsh weather conditions. ¶¶232, 235-37.

Defendants boasted that PG&E had worked extensively with all stakeholders to develop a plan to mitigate the effects of de-energization. ¶¶73-107. Yet after the 2019 de-energizations, PG&E revealed that there had been no plan, Defendant Johnson admitted that "*I think we thought the big event was turning off the power [] instead of the impact of that, right, on the, on the people it affected.*" ¶15. With no way to reasonably limit the scope or duration of the de-energizations and no plan to mitigate the harm, when PG&E turned off the power it threw much of Northern California into chaos. In some cases, neither customers – including those who depended on life-saving powered medical devices – nor local governments, nor even local utilities who purchased power from PG&E wholesale, received any advance notice of de-energization, ¶¶202, 211, though Defendants had earlier specifically claimed they had established a system to provide notice to all such persons. ¶¶81, 86, 95-96, 98, 100-03. PG&E had claimed it maintained a comprehensive list of critical facilities (*e.g.*, first responders, schools, and the like), ¶198, but missed an outright majority of such facilities. ¶¶199-201. Though Defendants boasted during or before May 2019 that PG&E had already worked with local governments to identify locations for emergency powered shelters. ¶88. The 2019 de-energizations revealed that PG&E had not done so even as late as October 2019. ¶¶177-83. These are only a few of the preparations Defendants claimed PG&E had already completed before the 2019 wildfire season *which were not even in place as it ended*.

The political branches whose support PG&E needs and the people of California they represent were outraged. Governor Newsom variously called the de-energizations "unacceptable", "infuriating beyond words," and "outrage[ous]", adding that he "will not forgive" PG&E ¶¶150-54 for its "astounding neglect". ¶158. State legislators excoriated PG&E for its performance, with one calling its approach "[t]he Wild West." ¶149. Claiming the de-energization "created an unacceptable situation that should never be repeated," ¶157, the CPUC formally investigated PG&E's use of de-energization. ¶318. The CPUC's President pronounced PG&E's conduct of the De-Energizations "extraordinary," adding that "[t]his isn't hard. This is not hard." ¶71.

Second, Defendants claimed PG&E inspected 2,450 miles of its distribution lines located in high fire threat areas to remove trees that risked setting wildfires by coming into contact with power

5

lines. ¶¶127-135. *See also* Declaration of Louis C. Ludwig ("Ludwig Dec") Exhibit ("Ex.") 1 at 74. Defendants boasted that at least three sets of professionals conducted each inspection – pre-inspectors who walked the line and identified trees to be removed, tree removers who removed the trees, and post-work inspectors who walked the same line to ensure that neither pre-inspectors nor removers had missed any dangerous trees. ¶¶130-32. Further, Defendants claimed PG&E audited much of the work to ensure that it had been done flawlessly. ¶133. Yet PG&E's probation monitor reported that it had inspected 53.5 miles of PG&E's distribution lines and found that PG&E had missed, on average, more than one dangerous tree every hundred feet inspected, ¶244, including one tree so dangerous that the monitor felt compelled to stay on the scene until a PG&E team arrived to remove it. ¶249. Further, PG&E's teams used inconsistent recordkeeping, ensuring miscommunication between teams and making any audit unreliable. ¶¶251-52.

And third, Defendants claimed PG&E inspected transmission line equipment. ¶¶136-40. Defendants boasted that PG&E had "established [] cross-functional team[s] of external professionals and PG&E [experts]" who "review[ed] a list of asset components" to identify the most frequent fire risks and developed detailed plans to catch all such failures through inspections. ¶139. PG&E then purportedly inspected all its transmission line equipment located in or adjacent to high fire threat areas to replace all eroded equipment. ¶140. 56% of inspections had purportedly been completed by January 2019. ¶141. Yet in truth, the inspections were perfunctory. ¶263. Indeed, PG&E's 2019 inspection of a tower a mere few hundred feet from the tower that had caused the Camp Fire in 2018 failed to detect the same type of defect that sparked the Camp Fire. ¶263. History repeated itself when the same defect on a PG&E transmission line ignited the most destructive fire of the 2019 season, the Kincade Fire. ¶258. PG&E's appalled probation judge asked it "[w]hat good are inspections that don't find problems?" ¶262.

The disclosure of Defendants' misrepresentations and materialization of the risks they concealed caused investor losses. The August 14, 2019 disclosure of PG&E's probation monitor's report caused its stock price to fall 9.6% to close at $14.39 on August 15. ¶274. Between September 23 and the close of the Class Period, a series of corrective disclosures revealed that Defendants' statements about de-energizations and equipment inspections had been false. These disclosures

included announcements of large and frequent de-energizations, ¶¶279, 310, 314, 320-21, news of PG&E's catastrophic conduct of de-energizations, ¶¶281, 295, 301, and resulting investigations into PG&E's misconduct. ¶¶286, 303. The disclosures also included news of the Kincade Fire that ignited on October 23 and quickly grew to burn 77,000 acres and force the evacuation of 200,000 residents, caused by the exact same defect in PG&E's equipment that had caused the Camp Fire. ¶¶308, 312-314, 316-317.

PG&E's stock price had fallen to *$3.80* by October 28, the close of the Class Period. ¶320.

## III.  ARGUMENT

### A.  Legal Standard

On a motion to dismiss, the Court accepts all well-pleaded factual allegations as true, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007), draws all reasonable inferences in Plaintiffs' favor, *Yanek v. Staar Surgical Co.*, 388 F. Supp. 2d 1110, 1120 (C.D. Cal. 2005), and upholds the Complaint if it plausibly states a claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Plaintiffs adequately plead violations of Section 10(b), as relevant to this motion, by alleging that Defendants: (1) made a misstatement or omission of material fact ("falsity") (2) with scienter (3) that caused the plaintiff's losses. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018). Plaintiffs allege falsity by identifying the "who, what, when, where, and how" under Fed. R. Civ. P. 9(b), *id.*, and similarly specifying "[1] each statement alleged to have been misleading, [2] the reason or reasons why the statement is misleading, and, [3] if an allegation regarding the statement or omission is made on information and belief, . . . all facts on which that belief is formed." *Id.* "Whether a public statement is misleading . . . is a mixed question to be decided by the trier of fact" that may be resolved on a motion to dismiss 'only if the adequacy of the disclosure' [] is 'so obvious that reasonable minds could not differ.'" *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995).

### B.  The Complaint Adequately Pleads Falsity

#### 1.  The Complaint Satisfies Rule 8

So-called "puzzle-pleadings" "'abuse the principles of Rule 8 *not* because they are not short' but *because they are not plain*." *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 831 (N.D. Cal. 2014). Complaints are not "puzzle pleadings" if they "detail[] each problematic statement,

allege[] that each statement is false and misleading, and allege[] the reasons as to why each statement [is] false and misleading." *Id.*

The Complaint alleges Defendants' false statements in a section titled "THE MATERIAL MISREPRESENTATIONS." Complaint, p. 15. The Complaint organizes the false statements by topic under subsections with descriptive titles. *E.g.*, "*False Statements About Cooperation With Local Governments*."). *Id.* p. 17. Where it is necessary to set out large block quotations for context, the Complaint emphasizes the portion of statements that are false or misleading. *E.g.*, ¶85. Following each false statement, or group of similar statements, the Complaint explains why the foregoing statements were false or misleading. *E.g.*, ¶87. Later in the Complaint, under a section with a title mirroring the material representations subsection that alleges the false statements, the Complaint alleges at length the reasons why the statements were false when made.

For example, paragraph 87 states that the previous statements were misleading because "PG&E had not worked with, was not working with, and would not work with EMS workers and local governments to plan for de-energization." *Id.* The corresponding subsection, titled "Failure To Work With Local Governments" sets out with particularity the facts showing the statements were false. *E.g.*, ¶172 (PG&E had refused to provide information to local governments); ¶175 (PG&E had failed to notify municipalities of de-energizations); ¶¶181-182 (PG&E had failed to work with governments to identify locations for powered shelters or even notify local governments of whether and where it would place such shelters); ¶185 (PG&E had failed to conduct tabletop exercises); ¶¶189-94 (PG&E had failed to provide accurate or in some cases any maps); ¶¶197-201 (PG&E had failed to identify critical facilities, including EMS locations). These specific, particularized allegations "put[] Defendants on notice of the true substance of the claims against them." *Intuitive Surgical*, 65 F. Supp. 3d at 831. Rule 8 demands nothing more.

Defendants speciously argue that the Complaint is a "puzzle pleading" despite this detailed guidance. D.Br. 7. Defendants argue that the Complaint emphasizes certain false statements but contains quotes with no emphasis. D.Br. 8. They resist the obvious conclusion that the quotes with no emphasis are false or misleading in their entirety. Second, Defendants argue that the Complaint's abbreviated paragraphs reference allegations elsewhere in the Complaint rather than repeating them

each time.  D.Br. 9. As explained above, the titles of the false statement sections precisely mirror the titles of the sections showing in detail why the statements are false.[2] *See* page i. (table of contents).[3]

### 2. Defendants Made the Statements in the Complaint

The Complaint alleges misleading oral *and* written statements. The written statements were made in a December 10, 2018 press release, ¶¶ 113, 136 ("Press Release"); PG&E's February 6, 2019 Wildfire Mitigation Plan ("Mitigation Plan"), ¶76; and a March 25, 2019 CPUC filing ("CPUC Filing"). ¶86. Defendants made the oral misstatements at a February 13, 2019, workshop in which Defendant Singh delivered a presentation about the Mitigation Plan ("Workshop"), ¶85; and in

---

[2] Defendants argue that the Complaint does not allege why statements concerning SDG&E are false or misleading, D.Br. 9, but that is an argument that the particular statements are not false or misleading not a challenge to the Complaint as a whole. *In re New Century*, 588 F. Supp. 2d 1206, 1218 (C.D. Cal. 2008) (because complaint was not a puzzle pleading as a whole, "[t]o the extent that the Complaint fails to identify false and misleading statements, or lacks sufficient particularity when required, the Court will rule accordingly.").

[3] The Complaint in *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008) was not a puzzle pleading, but rather had not alleged the reasons why the statements they identified were false. *See* D.Br. 7. In both *Aqua Metals* and *Uber*, the plaintiffs claimed a series of general statements misleadingly omitted to disclose problems thinly connected to the statements but did not explain why the failure to disclose the problems made the statements misleading. *In re Aqua Metals, Inc. Sec. Litig.*, No. 17-CV-07142-HSG, 2019 WL 3817849, at *7–8 (N.D. Cal. Aug. 14, 2019) & Ludwig Dec. Ex. 2, ¶130; *Irving Firemen's Relief & Ret. Fund v. Uber Techs.*, No. 17-CV-05558-HSG, 2018 WL 4181954, at *5 (N.D. Cal. Aug. 31, 2018) ("The Court agrees with Defendants that Uber was not under a duty to disclose the 'laundry list' of allegedly fraudulent activities that are unconnected to the actual challenged statements."). D.Br. 8. Here, the Defendants either claimed that they had already completed tasks or that they were completing tasks in a certain manner. The Complaint alleges the statements are false because contemporaneous documents showed they were false, because the tasks had not been begun months after Defendants said they were complete, or because the manner in which PG&E performed certain tasks belied Defendants' claims about the specific care they took in completing the tasks. Then, arguing that the Complaint fails to show which statements are misleading and why, Defendants string cite a series of cases without explaining why the complaints in those cases resembled this Complaint. D.Br. 7-8. In fact, the complaint in each of the cases Defendants cite failed to identify the false statements. *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1243 (N.D. Cal. 1998) ("The Complaint does not indicate which among the 14 pages of statements are alleged to be false."); *Xiaojiao Lu v. Align Tech., Inc.*, 417 F. Supp. 3d 1266, 1275 (N.D. Cal. 2019) ("[T]he Court cannot discern which statements are alleged to be actionable and which are not."); *In re Oak Tech. Sec. Litig.*, No. 96-20552 SW, 1997 WL 448168, at *4 (N.D. Cal. Aug. 1, 1997) (the complaint "groups several allegedly false statements, often citing long passages with little, if any, explanation in the surrounding text of which particular statements were false and why they were false.").

9

Defendant Johnson's May 15, 2019 testimony before a California Assembly committee. ¶69.

Defendants acknowledge that the Complaint identifies the **oral** statements' speakers, but contend the Complaint does not sufficiently allege that a Defendant "made" the **written** statements. D.Br. 10. Under *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011), "the maker of a statement is the [person] with authority over the content of the statement and whether and how to communicate it." 564 U.S. at 144. [4] Courts regularly find that the "makers" of statements in press releases include a company's highest-ranking officers. *Kui Zhu v. Taronis Techs. Inc.*, No. CV-19-04529-PHX-GMS, 2020 WL 1703680, at *5 (D. Ariz. Apr. 8, 2020) (officer defendants made unattributed statements in press release); *Khoja v. Orexigen Therapeutics, Inc.*, No. 15-CV-540 JLS (JLB), 2019 WL 4599882, at *15 (S.D. Cal. Sept. 23, 2019) (similar); *In re Illumina, Inc. Sec. Litig.*, No. 3:16-CV-3044-L-KSC, 2018 WL 500990, at *3 (S.D. Cal. Jan. 22, 2018) (similar).

In this case, the Press Release did not announce a small program that might be beneath the CEO's personal involvement. It announced wildfire prevention programs that would cost billions of dollars. Further, Williams was **quoted** in the press release, *see* Ludwig Decl., Ex. 3, supporting an inference that she had ultimate authority over whether the press release was issued at all. *Bruce v. Suntech Power Holdings Co.*, 64 F. Supp. 3d 1365, 1377 (N.D. Cal. 2014) (defendant's being quoted in press release making statements not alleged to be false suggested he was "maker" of all statements in press release, including those which did not quote him).

Defendants' arguments that Williams did not make the statements in the Press Release lack merit. *See* D.Br. 11. Defendants argue that Williams did not make the statements because her name is not mentioned frequently in the Complaint and she was fired a month into the Class Period, *id.*, neither of which has any bearing on whether a CEO with a two-year tenure, ¶24, controlled the Press Release in which she was quoted.

Defendant Singh "made" the misstatements in the Mitigation Plan and CPUC Filing. Under *Janus*, attribution can be "implicit from surrounding circumstances." 564 U.S. at 142. The surrounding circumstances show that the statements in the documents are attributable to Singh. First, Singh is

---

[4] Defendants do not contest – and thereby concede – that PG&E was a maker of statements under *Janus*.

PG&E's Head of Wildfire Risk Management efforts – the division in charge of creating both filings. Just as a CEO may have ultimate authority over a document issued by a company, Singh has ultimate authority over a document issued by his division. Second, the identification of a person in a filing suggests that the person is the speaker. *In re Puda Coal Sec. Inc., Litig.*, 30 F. Supp. 3d 261, 267 (S.D.N.Y. 2014). Here, Singh is identified, by position, in the Mitigation Plan. ¶24. Further, a week later, Singh presented the Mitigation Plan at the Workshop. Singh's taking ownership of the Mitigation Plan shows he "made" the statements therein. *Id.* (defendant who signed off on document, disseminated it, and was authorized to make statements about it made the statements it contained, *even though, unlike here, defendant was outside third party*).

Thus, at least one Individual Defendant made each of the written statements.[5]

### 3.    The Complaint Sufficiently Alleges That The Few Statements Defendants Challenge Are False or Misleading

As a threshold matter, Defendants do not challenge Plaintiffs' allegations that the written statements were false or misleading. They therefore admit that the falsity allegations as to those statements are sufficient. *See PQ Labs, Inc. v. Yang Qi*, No. C 12-0450 CW, 2012 WL 2061527, at *7 (N.D. Cal. June 7, 2012) (arguments not responded to are conceded). Thus, this section addresses

---

[5] Three of Defendants' cases involved attribution of oral statements made by others. *See* D.Br. 10-11. *Markette v. XOMA Corp.*, No. 15-CV-03425-HSG, 2017 WL 4310759, at *13 (N.D. Cal. Sept. 28, 2017) ("Challenged Statements" were seven statements made on conference call by others); *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1071 (N.D. Cal. 2012) ("Nowhere in the Amended Complaint do Plaintiffs allege facts demonstrating that Kriens had 'ultimate authority' over the statements made by Johnson or Denholm during the analyst or investor calls."); *Turocy v. El Pollo Loco Holdings*, Inc., No. SACV 15-1343-DOC, 2017 WL 3328543, at *12-13 (C.D. Cal. Aug. 4, 2017) (defendants' parenthetical admits statements were oral). Oral statements are naturally attributed to the speaker. But at issue here are otherwise unattributed written statements. In a later opinion in *Suntech*, Judge Seeborg clarified that he ruled in the opinion Defendants cite because of a CFO's relative lack of influence over a press release whose statements were made by his superior the CEO. *Suntech*, 64 F. Supp. 3d at 1376 n.12. In *Hefler v. Wells Fargo & Co.*, No. 16-CV-05479-JST, 2018 WL 1070116, at *9 (N.D. Cal. Feb. 27, 2018), the plaintiffs did not even allege the defendants, were provided with a copy of the statements before they were issued, nor how they would have authority over statements as they were mere Vice-Presidents and division heads. Here, Williams is quoted in the press release, while Singh heads the division responsible for the other statements. Finally, in *In re Finisar Corp. Sec. Litig.*, No. 5:11-CV-01252-EJD, 2013 WL 5442356, at *5 (N.D. Cal. Sept. 30, 2013), the statements were made by an analyst employed by a third party firm.

Defendants' arguments as to the oral statements alone.

In October 2018, PG&E took four days to restore power after its only de-energization that occurred prior to the Class Period. When asked by a California Assembly member whether it would take four days to restore power after a re-energization, Johnson testified that his "jaw dropped" at PG&E's October 2018 performance. ¶125. He added that "four days is ridiculous" and that PG&E "will do better this year," citing the efforts it had made "figuring out how to do this" and installing equipment. *Id.* Thus, Johnson plainly meant that PG&E would restore power after de-energization in fewer than four days – and, indeed, that it would be "ridiculous" were it to take so long. Yet according to an internal benchmark, PG&E expected to take five days to restore power in 2019. ¶126.

Defendants argue that it can at once be true that PG&E expected it would restore power in less than four days (Defendant Johnson's statement), and, at the same time, that it expected it would take five days to restore power (PG&E's internal benchmark). D.Br. 14. Five days is more than four, so Defendants are wrong. Defendants also argue that Johnson was only expressing his personal surprise to learn that it took four days to restore power, rather than the fact of his surprise that PG&E conducted the October 2018 de-energization so poorly that it had taken four days to restore power. *Id.* But they ignore Johnson's claim that PG&E would "do better." Were Johnson telling the California Assembly *not* that four-day de-energizations were a thing of the past *but that California could look forward to many more of them*, the Assembly would have reacted with outrage, not acquiescence.

Johnson also testified that PG&E was taking specific steps to prepare for de-energizations. He claimed that PG&E was identifying medical needs patients and working with local governments to identify shelter sites. ¶69. Johnson testified that preparation was almost complete, with only "a little coordination to go." *Id.* Thus, Johnson testified that if PG&E had to de-energize, it and local governments would have preplanned locations for shelters and contact information for customers who need power to address medical needs. In fact, even *five months later*, local governments did not know whether or where PG&E would site shelters and PG&E lacked contact information for any customers with medical needs who were did not qualify as part of the medical baseline program. ¶¶14, 72, 89, 177-183, 208-216. Thus, in September, PG&E hadn't even begun the steps Johnson stated PG&E had almost completed in May. Johnson's statements were false.

Defendants argue that Singh's statements are either "too generalized or vague" or "inactionable optimism." D.Br. 15. Defendants seem to be arguing that the statements are sales puffing, which is why courts deemed the allegations insufficient in the cases they cite.[6] *Id.* But Singh's statements are misleading because they are objectively verifiable, however phrased. *Bielousov v. GoPro, Inc.*, No. 16-CV-06654-CW, 2017 WL 3168522, at *6 (N.D. Cal. July 26, 2017) (statement that camera was "amazingly smooth" actionably false); *In re Wells Fargo & Co. S'holder Derivative Litig.*, 282 F. Supp. 3d 1074, 1096 (N.D. Cal. 2017) (statement that particular goal was "attainable" held actionable).[7]

Asked how many local governments PG&E worked with, Singh stated that PG&E was "reaching out *to each of those respective [local governments] to discuss the plans, the implications of proactive unitization [sic – de-energization] [and] the lessons learned from last year.*" ¶85. Singh's statement is objectively verifiable because he claimed that PG&E was taking certain actions. It follows, then, that Singh's statement is false because PG&E was not taking those actions. That the actions Singh falsely claimed PG&E was undertaking consisted of working with local governments does not make the statements puffery.

When Singh spoke, he was "bound to do so in a manner that wouldn't mislead investors." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008). Yet he stated in the Mitigation Plan that PG&E would "*avoid indiscriminate de-energization of transmission lines.*" ¶120. Presenting the Mitigation Plan a week later at the Workshop, Singh expanded on the specific

---

[6] *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1276 (9th Cir. 2017) ("inherently aspirational" statements in code of ethics puffery); *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 379 (9th Cir. 2003) (statement that defendant placed "high priority" on product development puffery); *In re Atossa Genetics Inc Sec. Litig.*, 868 F.3d 784, 800 (9th Cir. 2017) (statement that company was "reasonably confident" was puffery). Defendants do not explain why the cases they cite are relevant to this action.

[7] Defendants claim that the Complaint does not explain why Singh's statements were false. D.Br. 15-16. Paragraphs 81-86 detail statements in which Defendants claimed to be working with local governments in various respects, including Singh's statement quoted at paragraph 85. Paragraph 87 explains why the statements were false. As two other Singh statements, paragraph 124 provides "Defendants' emphasized statements in this section were false because []". The section includes Singh's statements in paragraphs 116 and 122. Singh's final statement appears at paragraph 132, accompanied by several similar statements, and paragraph 135 explains why it was false.

13

measures PG&E was taking or had already taken to micro-target de-energizations: installing hundreds of weather stations, remote switches allowing sectionalization, and developing sophisticated wildfire modeling. ¶¶85, 90, 122. Singh also conveyed to investors that PG&E would emulate the practices of SDG&E, well-known for its de-energizations affect very few customers. ¶¶116, 234. In reality, and unlike SDG&E's, PG&E's system was unable to conduct anything other than indiscriminate de-energization. Singh misled investors.

Finally, Singh boasted of PG&E's four-step process to remove vegetation abutting its distribution lines, including a post-work verification process and audits. ¶132. But he misleadingly omitted to disclose that the inspection and removal was so shoddy that the post-work inspection served as just another inspection, and that even this third level missed hazardous numbers of dangerous trees.[8] ¶135. His statements, moreover, gave the misleading impression that PG&E's multiple redundant layers of inspection were catching substantially all dangerous trees, though it missed one every hundred feet. Singh's detailed description misleadingly "gave comfort that reasonably effective steps were being taken" to prevent wildfires, which was not true. *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014).

### 4. Defendants' False Statements Were Made "In Connection With" The Purchase or Sale of Securities

"The Supreme Court has consistently embraced an expansive reading of § 10(b)'s 'in connection with' requirement." *U.S. S.E.C. v. Pirate Inv'r LLC*, 580 F.3d 233, 244 (4th Cir. 2009). Indeed, "market professionals generally consider most publicly announced material statements about companies … [as] affecting stock market prices." *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1251 (N.D. Ga. 2019). In determining whether a statement is "in connection with" a securities transaction, courts focus more on the statement's content than on its method of distribution. *See id.* Thus, courts have found that statements that "concern a core business operation" are actionable even if they are made to university students, physician customers, app users, or the Federal Communications Commission. *Id.* at 1251 & n. 420 (statement made in speech at university, statements made on website

---

[8] Defendants do not contest – and thereby concede – that their statements concerning transmission lines were false or misleading. *PQ Labs*, 2012 WL 2061527, at *7.

even if "not found prominently on the front page of the company's website."); *In re Carter-Wallace, Inc. Sec. Litig.*, 150 F.3d 153, 156 (2d Cir. 1998) ("technical advertisements in sophisticated medical journals"); *In re Facebook, Inc. Sec. Litig.*, 405 F. Supp. 3d 809, 834 (N.D. Cal. 2019) (privacy policy disseminated to users); *In re Sinclair Broad. Grp., Inc. Sec. Litig.*, No. CV CCB-18-2445, 2020 WL 571724, at *5 (D. Md. Feb. 4, 2020) (FCC filings).

Here, while the statements were not made exclusively to investors, Defendants made all of them in connection with a securities transaction because these public statements were part of the total mix of information incorporated into the market price of the common stock. *Equifax*, 357 F. Supp. 3d at 1251. Indeed, in June 2020, under similar circumstances, a court in this District "f[ound] it plausible that 'reasonable investors would base their investment decisions' on Apple's representations to Congress." *In re Apple Inc. Sec. Litig.*, No. 19-CV-02033-YGR, 2020 WL 2857397, at *17 (N.D. Cal. June 2, 2020) (internal citation omitted).

Further, Defendants' statements concerned PG&E's "core business operations." PG&E itself claimed that it had made "vast changes" "to improve its safety operations and safety culture," ¶59, including firing its CEO and 80% of its Board. ¶¶54-57. PG&E also recognized that investors were among the groups closely following safety developments. ¶57. Another Camp Fire could force PG&E back into bankruptcy shortly after it exited. And further enraging California voters could make it politically impossible for its political branches to allow PG&E to keep its license. ¶¶65-66.

Incorrectly focusing on the forums in which the statements were made rather than their substance, Defendants maintain that Plaintiffs must show the statements were targeted primarily to investors. D.Br. 18. As shown above, the case law holds otherwise. Yet even if it did not, the statements plainly reached investors, as well as other audiences. Among other things, the Mitigation Plan's filing was reported by both Reuters and AP. ¶78. And when its representations proved false, investors paid attention. Both the *Wall Street Journal* and *Bloomberg*, investor-facing publications, reported on the Monitor's report. ¶274. Investor-facing websites like *Seeking Alpha* reported on the de-energizations. ¶300. After PG&E set the Kincade Fire, "[a]nalysts at New-York based hedge funds" "por[ed] over satellite maps to track the fire" or flew to California to "monitor[] the fire hour-by-hour to forecast the damage." ¶321.

Thus, Defendants made their statements "in connection with" securities transactions.

### C.    The Complaint Adequately Pleads Scienter

#### 1.    Legal Standard

Complaints adequately plead scienter where, as here, they support a culpable inference of scienter at least as compelling as any non-culpable inference. *See Tellabs, Inc.*, 551 U.S. at 326. A strong inference "need not be irrefutable, *i.e.*, of the 'smoking-gun genre,' or even the 'most plausible of competing inferences.'" *Tellabs, Inc.*, 551 U.S. at 324 (internal citations omitted).  Rather than scrutinizing each allegation in isolation, courts must analyze scienter allegations holistically. *Id.* at 326. "[A]n extreme departure from the standards of ordinary care . . . that is either known to the defendant or is so obvious that the actor must have been aware of it" suffices. *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 702 (9th Cir. 2012) (internal quotation marks and citations omitted).

Defendants would have this Court hold otherwise, and state that Plaintiffs must plead scienter "in great detail," relying on *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 984 (9th Cir. 1999). D.Br. 20. But the Ninth Circuit later overruled that specific holding. *See S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) ("*Silicon Graphics*, [] [is] too demanding and focused too narrowly in dismissing vague, ambiguous, or general allegations outright."). Instead, "a series of less precise allegations [may] be read together to meet the PSLRA requirement." *Id.* The Complaint meets this controlling standard.

Moreover, Defendants' generic scienter arguments fail in another critical respect. Even though "[t]he [scienter] inquiry is inherently comparative, *Tellabs, Inc.*, 551 U.S. at 323, Defendants never identify a competing nonculpable inference. Because Defendants offer no nonculpable inference, the Court should accept the culpable inferences drawn from the facts in the Complaint and find Defendants acted with scienter.

#### 2.    Defendants Made Specific Statements About PG&E's Core Operations

In the Ninth Circuit, plaintiffs may allege scienter by showing that the statements related to the company's core operations. *Berson*, 527 F.3d at 988. Similarly, corporate speakers who make detailed, confident public statements without inquiring whether the statements are true are reckless. For example, in *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 272 (3d Cir. 2009), a defendant

16

claimed that a company had not discounted its products for sales in the previous quarter, though in truth it had. Though the plaintiffs pointed to no other evidence of scienter, the importance of margins to the company's story, the specificity of the false statements and the questions which prompted them, and the unusual nature of the discounts together sufficed to allege that the defendant had made his false statements with scienter. *Id.* Corporate officers who make specific public statements on important topics without having inquired into whether the statements are true are reckless. *Id.* at 270 n.43; *accord S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1258 (W.D. Wash. 2009) (finding plaintiffs adequately alleged scienter based on reasoning in *Avaya*).

PG&E is perfectly able to deliver power and gas to its customers and perform the various other routine functions required of utilities. Yet by sparking wildfires, PG&E drove itself into bankruptcy and led officials to call for the revocation of its license. ¶¶50, 66. Judge Alsup made compliance with PG&E's Mitigation Plan a condition of its probation. ¶75. Thus, preventing wildfires was the largest unresolved issue PG&E faced in the Class Period, as it acknowledged by firing senior officials and 80% of its Board. The steps PG&E was taking and would take to prevent wildfires was, in that sense, *the* PG&E story of 2019.

When a defendant makes a "detailed factual statement, contradicting important data to which she had access, a strong inference arises that she knowingly misled the public as to its clear meaning." *Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014) *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017). By making detailed statements, Defendants "held themselves out as possessing significant knowledge" regarding company operations, thereby supporting an inference of scienter. *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, No. CIV.A. 13-6731, 2015 WL 3755218, at *14 (E.D. Pa. June 16, 2015). Further, the sheer specificity of the false statements suggests Defendants have access to the data showing their statements were false. *City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012) (while plaintiffs "do[] not allege facts showing [Defendants] knew their statements were false" they "allege [Defendants made specific statements" and the "specificity of those statements [] is strong circumstantial evidence that [Defendants] were receiving some form of specific information[.]") Moreover, when a defendant makes a detailed false

17

statement, the inference that the defendant simply got it wrong is less plausible. *Simmons Investments, Inc. v. Conversational Computing Corp.*, No. 09-CV-2345-EFM/KMH, 2011 WL 673759, at *6 (D. Kan. Feb. 17, 2011) (allegation that potential investor was "down the hall" conducting due diligence supported strong inference of scienter because of its precision); *KB Partners I, L.P. v. Barbier*, 907 F. Supp. 2d 826, 832 (W.D. Tex. 2012) ("defendants were at least severely reckless in making repeated, specific statements [] without detailed knowledge regarding how the [problem] had been resolved.").

Here, Defendants made specific false statements in response to specific questions about these critical efforts. An Assembly member asked Defendant Johnson whether PG&E would take four days to restore power in case of de-energization. Johnson responded that PG&E would do "much better." ¶69. His answer was material, specific – and false. In fact, PG&E's internal guidelines called for it to restore power in *five* days. ¶126.

Defendants' other statements were also false and misleading.

Before the de-energizations, Defendant Johnson testified that:
[W]e have spent a great deal of time preparing for [de-energization] and working with local governments, local EMS, so that people will know where to go. [] We are working with local governments to say "can we set up a shelter in this gymnasium?" We're identifying medical need patients. So I think we're doing all the right things here. There's still a little coordination to go but I think we certainly understand the issue and I think we're doing all the right things to make sure we're ready.

After the de-energizations, Defendant Johnson testified that:
I think we thought the big event was turning off the power because for us this is an unnatural act. You know, in utility business your job is to keep the power on 24/7 and I think we focused on that as the main event instead of the impact of that, right, on the, on the people it affected. [¶14]

Indeed, Defendants made specific false statements about concrete steps PG&E was taking to "focus [] on the people [de-energization] affected."[9] ¶70. These statements included the exact strategy and equipment PG&E had in place to limit the scope of de-energizations, that PG&E was working with local governments to set up shelters, and that PG&E had established a system to contact municipal grids prior to de-energizations. ¶72. Investors assume that when companies make specific statements

---

[9] Defendants argue that the Complaint does not adequately allege scienter because it does not frequently use the conclusory term "scienter." D.Br. 20. Defendants' suggestion turns *Twombly* on its head. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (in evaluating motion to dismiss, courts should ignore "labels and conclusions, and a formulaic recitation of the elements of a cause of action[.]").

about actions they are undertaking, they do not just make them up.

Defendants' other statements were equally specific. Defendants boasted that PG&E had employed an advanced methodology involving internal and external experts to figure out how to inspect its transmission line equipment most likely to set wildfires. Indeed, Defendants claimed when they made their false statements that the inspections were already more than 56% complete. ¶141. Yet the inspections were so perfunctory they were missing the exact defect which had caused the Camp Fire. And as to distribution lines, Defendants set out in detail the four-step strategy PG&E was employing to remove vegetation, and claimed PG&E's inspections were detecting and removing dangerous trees. ¶¶127-135. These statements were staggeringly misleading. The Monitor reported that PG&E missed one dangerous tree every hundred feet. PG&E admitted that its own experience "ha[d] been similar." ¶253.

Defendants' lengthy statements, brimming with details about PG&E's purportedly robust inspection programs, without disclosure that these steps were known to be ineffective, created an obvious risk of misleading investors. Had Defendants told investors the truth, they would not have been left to wonder at the close of the Class Period, like Judge Alsup, "[w]hat good are inspections that don't find problems?" ¶262.

### 3.    The Court Can Impute Singh's Scienter To PG&E[10]

"The scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b–5 when those senior officials were acting within the scope of their apparent authority." *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015).  So the scienter of an agent who did not "make" statements under *Janus* may nonetheless be imputed to the corporation if the agent drafted and authorized the statements. *Sec. & Exch. Comm'n v. City of Victorville*, No. EDCV1300776JAKDTBX, 2018 WL 3201676, at *4 (C.D. Cal. Jan. 24, 2018).

Here, Singh headed the division that prepared the Mitigation Plan, which identifies him by

---

[10] While PG&E has not filed a motion to dismiss, the Complaint alleges that the Individual Defendants were controlling persons of PG&E as to its violations of the securities laws, which requires that Plaintiffs allege PG&E's primary liability.

title. A week after publication of the Mitigation Plan, he presented it at the Workshop. Singh's "role in preparing the challenged statements was sufficiently central to impute his knowledge of their alleged falsity to the [principal], which made the statements." *Id.*

Making statements while knowing facts "suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter." *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1022 (S.D. Cal. 2005) (quoting *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002)). Singh plainly had available such facts for the same reason his scienter is imputed to PG&E. Developing and implementing a plan to prevent wildfires is quite literally Singh's job.

### 4.    Defendants Were Told Their Statements Were False

A plaintiff can allege scienter with sufficient particularity by demonstrating that defendants knew of specific information undermining the challenged public statements to investors. *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 707 (9th Cir. 2016). Confidently asserting compliance despite warnings from a regulator supports an inference of scienter. *Schueneman*, 840 F.3d at 708 (assertion that data supported FDA approval misleading and made with scienter when FDA had expressed doubts about some of the data); *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 811 (C.D. Cal. 2011) ("When the FDA tells a company about the problems with a product, and the company nonetheless continues to make confident statements about the product, courts have inferred scienter and falsity.").

During the Class Period, the California government regularly informed PG&E that its preparation for de-energization was inadequate. ¶¶154-160. After the close of the Class Period, Governor Newsom explained that "[f]or close to a year now, we've been meeting on a consistent basis every damn week with these guys laying out protocols and they're not meeting those protocols." ¶153. Similarly, a December 20, 2019 article claimed that the CPUC met with PG&E at least weekly "pointing out needed improvements and stressing that aspects of the utility's preparation was inadequate." ¶160. When Defendants confidently told investors PG&E was prepared for de-energization *even as the Governor and CPUC told PG&E is was not*, they spoke at least recklessly.

### 5.    The Complaint Adequately Alleges Motive

Though not required, motive is relevant to a Section 10(b) claim. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011) ("absence of a motive allegation, though relevant, is not

dispositive"). A defendant's motive to make false statements to preserve a company's very existence is relevant under the PSLRA. *Aldridge*, 284 F.3d at 83 (scienter supported by corporate officers' understanding that rollout of new product was "important to their own survival and that of the company."). Indeed, the Ninth Circuit has held that close public and government scrutiny of safety practices provides a motive to conceal their deficiencies. *Reese*, 747 F.3d at 571 ("BP's monitoring practices and the question of whether the spill could have been prevented were the focus of both public and government inquiries after the March 2006 spill. In this context, Johnson also had a clear motive for omitting information about the detection of high corrosion levels.").

After the Camp Fire, PG&E had to convince California's legislative and executive branches, and its people, that it could operate safely. The Governor and the CPUC members he or she appoints have the authority to approve PG&E's bankruptcy plan and fundamentally determine whether it will continue to exist. In addition, the California legislature has the authority to revoke enormous subsidies that PG&E would receive should it exit bankruptcy by June 30, 2020, or force a government takeover or municipalization of PG&E. ¶66. The risk Defendants concealed was real: when the misstatements materialized, the CPUC threatened to take away PG&E's license. ¶¶67, 68.[11] Thus, Defendants had a motive to conceal the risks, hoping they would not materialize.

### D.     The Complaint Adequately Pleads Loss Causation[12]

Loss causation is "a causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). To allege loss causation, a plaintiff need only "demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the plaintiff." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). If "the complaint alleges facts that, if taken as true, plausibly establish loss causation . . . dismissal is inappropriate." *Id.* at 1057. So "it is normally inappropriate to rule on loss causation at the pleading stage." *Id.*

---

[11] The question is whether Defendants had a motive to lie, not whether Defendants had a motive to lie to investors. *Reese*, 747 F.3d at 571.

[12] While Fed. R. Civ. P. 9(b) applies to pleading loss causation, *Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014), the Ninth Circuit has yet to define the parameters of review on a motion to dismiss.

Defendants read a line of cases holding the corrective disclosure *may* show that the market "learned of and reacted to th[e] fraud, as opposed to merely reacting to reports of the defendant's poor financial health" *Metzler*, 540 F.3d at 1063, to *require* such a showing. But the Ninth Circuit recently clarified that a corrective disclosure need not reveal that a fraud occurred, as in *Metzler*. Rather, it also suffices if it reveals ***facts that the fraud had concealed***. *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 754 (9th Cir. 2018). Further, the market need not know that the concealed fact caused the corrective disclosure. *Id.* Thus, loss causation is not the rigid requirement Defendants portray, but a "'context-dependent' inquiry . . . as there are an 'infinite variety' of ways for a tort to cause a loss." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016).

Each of the Complaint's corrective disclosures supports loss causation. Defendants had boasted that PG&E's vegetation management program, with its four steps, would catch dangerous trees. The August 14 corrective disclosure revealed, among other things, that the program left more than one dangerous tree every hundred feet inspected. ¶274. The market thereby learned the facts Defendants had concealed by their false statements.

Defendants, likewise, had boasted of the steps PG&E had taken to prepare for de-energization. It is because PG&E had not taken those steps that its de-energizations threw Northern California into chaos, endangering residents. The September 26, October 8, and October 10 corrective disclosures are days on which the market learned that PG&E's de-energizations were shambles. ¶¶280, 295, 301. These allegations suffice. *First Solar*, 881 F.3d at 754 (loss causation adequately alleged "***even if the market was unaware at the time that fraud had concealed the miss***.").

Defendants boasted that PG&E could limit both the length and scope of de-energizations. But because it could not target de-energizations, it was left to cut off power indiscriminately. On September 24, PG&E had to resort to cutting power to 50,000 residents even as another 50,000 were still without power. ¶279. Then, on October 8, 23, 25, and 28, PG&E announced in rapid succession that it would have to conduct some of the largest de-energizations in history. ¶¶288, 307, 315, 318. The market thereby learned that Defendants' claims that PG&E could limit de-energizations' scope were false.

In *Gilead*, the plaintiffs alleged that the defendant, a pharmaceutical company, illegally

marketed its drug for unapproved uses. *Gilead*, 536 F.3d at 1051. On August 7, 2003, the FDA publicly filed a warning letter chastising the company for the off-label marketing. The stock price *rose* that day. *Id.* at 1053. But the Plaintiffs alleged, and the Ninth Circuit agreed, that they could recover because the warning letter caused physicians to stop prescribing the drug which then caused the company to report poor earnings, causing the company's stock price to fall. *Id.* at 1058.

Here, on October 14 and 28, the CPUC threatened and launched an investigation into PG&E's de-energizations. ¶¶302, 319. Indeed, unbeknownst to investors, the Governor and CPUC had been telling PG&E its preparations were inadequate every week, increasing the risk poor performance would engender an investigation. ¶¶153, 160. Likewise, on October 2, the State of California enacted several laws burdening PG&E's business because of its poor safety and de-energization practices. ¶¶283-86. As in *Gilead*, PG&E's stock price fell when it faced the ramifications of the facts its false statements had concealed. Thus, the allegations suffice.

Despite PG&E's boasts to the contrary, its equipment inspections were deficient. They even failed to catch the very defect that had caused the Camp Fire. On October 2, 2019, the market learned that PG&E had already caused 9 fires of 10 acres or more in 2019. Then, on the night of October 24, PG&E's equipment failed exactly as it had in the Camp Fire, causing the Kincade Fire. PG&E's stock price fell on October 24, 25, and 28, as the Kincade Fire raged through much of Sonoma County. ¶¶308-314, 315-17, 321.[13] The Kincade Fire occurred because, contrary to Defendants' misleading statements, PG&E's inspections were merely perfunctory, missing the very defect which had caused the Camp Fire. These allegations suffice. *First Solar*, 881 F.3d at 754.

Thus, each of the corrective disclosures meets the Ninth Circuit's loss causation standard.

### E.    The Complaint Adequately Pleads Control Person Liability

Section 20(a) imposes joint and several liability on persons who directly or indirectly control a violator of the securities laws. "Whether a defendant 'is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions.'" *In re MannKind Securities*

---

[13] Due to a scrivener's error, the Complaint erroneously alleged that the Kincade Fire started at 9:30 PM, October 24, rather than October 23.

*Actions*, 835 F. Supp. 2d at 819. "'[T]o make out a prima facie case, [plaintiffs need not] show actual participation or the exercise of actual power.'" *Id.*[14]

Allegations that a defendant held a high-level executive position by virtue of which the defendant was involved in a company's day-to-day management will suffice to state a claim, *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1157 (S.D. Cal. 2008), as will a defendant's actual authority, even if never exercised, to control the contents of the statements the plaintiffs allege to be false. *In re BofI Holding, Inc. Sec. Litig.*, No. 315CV02324GPCKSC, 2017 WL 2257980, at *29 (S.D. Cal. May 23, 2017). Indeed, this Court has found that allegations that a high-level officer's "participation in and/or awareness of [the company's] operations," and "direct and supervisory involvement in the day-to-day operations of [the company]" suffice to allege control. *In re Aqua Metals, Inc. Securities Litigation*, 2019 WL 3817849, at *10 (plaintiffs only had position allegations as to a specific defendant, Murphy). Those are exactly the allegations Defendants discount as "boilerplate." *Compare* D.Br. 24 *with* ¶¶349-350.

Yet even if more were required, the Complaint adequately alleges the Defendants' control. The Complaint plainly adequately alleges control person claims against Defendant Johnson as to those statements made when he was CEO, as the only such statements are his oral statements. Likewise, the Complaint adequately alleges that Defendant Williams controlled PG&E for the false statements made when she was CEO. The Press Release announced an enormous new wildfire safety program that Williams clearly had to approve and quoted her. *See* Ludwig Decl., Ex. 3.

Defendants claim the Complaint must make specific allegations of control, relying on *Sgarlata v. PayPal Holdings, Inc.*, No. 17-CV-06956-EMC, 2018 WL 6592771, at *8 (N.D. Cal. Dec. 13, 2018). In *PayPal*, the plaintiffs alleged that the defendants' fraudulent scheme was controlled by the Vice President of a recently acquired subsidiary which was being integrated during the Class Period. The only person with a remotely similar title is Defendant Singh.

Defendant Singh headed PG&E's Wildfire Safety Division, was responsible for "oversight and

---

[14] Defendants assert that the Complaint fails to identify the primary violator. It does. ¶349 ("The Individual Defendants acted as controlling persons of PG&E []"). Defendants' argument that the Section 20(a) claims are not sufficiently alleged because the Complaint does not allege a primary violation is wrong because it does.

direction of wildfire risk management efforts" (¶25), was named as the responsible individual in the Mitigation Plan and acted as the Mitigation Plan's public face, presenting it to the Workshop a week after its filing. Thus, the Complaint alleges "specific facts" which show Singh's involvement not only in PG&E's day-to-day operations but in making the false or misleading statements. Singh is a control person for all statements except Defendant Johnson's oral statements.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss in its entirety.[15]

Dated: June 19, 2020                               Respectfully submitted,

                                        **POMERANTZ LLP**

                                        */s/ Louis C. Ludwig*
                                        Patrick V. Dahlstrom
                                        Louis C. Ludwig
                                        (*admitted pro hac vice*)
                                        Jared Schneider
                                        (*admitted pro hac vice*)

                                        Ten South LaSalle Street, Suite 3505
                                        Chicago, Illinois 60603
                                        Telephone: (312) 377-1181
                                        Facsimile: (312) 229-8811
                                        Email: lcludwig@pomlaw.com
                                        Email: jschneider@pomlaw.com

                                        Jeremy A. Lieberman
                                        (*admitted pro hac vice*)
                                        J. Alexander Hood II
                                        (*admitted pro hac vice*)
                                        600 Third Avenue, 20th Floor
                                        New York, NY 10016
                                        Telephone: (212) 661-1100
                                        Facsimile: (212) 661-8665
                                        Email: jalieberman@pomlaw.com
                                        Email: ahood@pomlaw.com

                                        Jennifer Pafiti (SBN 282790)

---

[15] If the Court dismisses the case, it should grant leave to further to amend the Complaint. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
Email: jpafiti@pomlaw.com


**THE ROSEN LAW FIRM, P.A.**

Laurence M. Rosen (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com


Jonathan Horne (*pro hac vice*)
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: jhorne@rosenlegal.com


*Co-Counsel for Co-Lead Plaintiffs*


**THE SCHALL LAW FIRM**

Brian Schall
Sherin Mahdavian
Rina Restaino, Esq.
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: (424) 303-1964
Email: brian@schallfirm.com
sherin@schallfirm.com
rina@schallfirm.com

*Additional Counsel for Plaintiff Allustiarti*