Nicole Lavallee (SBN 165755)
Kristin J. Moody (SBN 206326)
A. Chowning Poppler (SBN 272870)
**BERMAN TABACCO**
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: nlavallee@bermantabacco.com
        kmoody@bermantabacco.com
        cpoppler@bermantabacco.com

*Counsel for the Plymouth County Group
and Co-Lead Counsel for the Class*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| IN RE AQUA METALS, INC. SECURITIES LITIGATION | Lead Case No.: 4:17-cv-07142-HSG |
| | **CONSOLIDATED COMPLAINT FOR VIOLATION OF SECURITIES LAWS** |
| This document Relates to: All Actions. | **CLASS ACTION** |
| | **JURY TRIAL DEMANDED** |

[No. 4:17-cv-07142-HSG] CONSOLIDATED COMPLAINT FOR VIOLATION OF SECURITIES LAWS

# TABLE OF CONTENTS

I.      SUMMARY OF THE ACTION ................................................................................. 1

II.     JURISDICTION AND VENUE .............................................................................. 7

III.    INTRADISTRICT ASSIGNMENT ......................................................................... 8

IV.     THE PARTIES ......................................................................................................... 8

        A.      Lead Plaintiff – The Plymouth County Group ........................................... 8

        B.      Defendants ................................................................................................. 9

                1.      The Company ................................................................................... 9

                2.      Officer Defendants .......................................................................... 9

V.      BACKGROUND ................................................................................................... 12

        A.      Traditional Lead-Acid Battery Recycling ................................................ 12

        B.      Aqua Metals And Its Purported AquaRefining Process .......................... 13

        C.      The Process Was Malfunctioning And Not Commercially
                Viable Prior to and Throughout the Class Period .................................... 16

        D.      Former Employee Accounts ..................................................................... 17

VI.     EXCHANGE ACT VIOLATIONS ....................................................................... 28

        A.      Material Misrepresentations and Omissions During the First Part of the
                Class Period ............................................................................................. 28

                1.      The May 2016 False and Misleading Statements Regarding
                        Interstate Batteries' Investment in Aqua Metals and The Existing
                        Status of the AquaRefining Technology As of Q1 2016 ................. 28

                2.      The August and September 2016 False and Misleading Statements
                        Regarding Its Open House at its TRIC Facility and The Existing
                        Status of the AquaRefining Technology as of Q2 2016 ................. 35

                3.      The November 2016 False and Misleading Statements Regarding Having
                        Produced AquaRefined Lead at TRIC and The Existing Status of the
                        AquaRefining Technology As of Q3 2016 ...................................... 44

                4.      The False and Misleading Statements Regarding The
                        November 2016 Public Offering .................................................... 53

                5.      The December 22, 2016 False and Misleading Statements from
                        Clarke Regarding the Status of The Company's Efforts ................. 55

                6.      The February 2017 False and Misleading Statements Regarding
                        the Strategic Partnership with Johnson Controls International plc ..... 56

7.    The February and March 2017 False and Misleading Statements Regarding Q4 2016 and YE 2017 ...................................................... 59

8.    The March and April 2017 False and Misleading Statements Touting the Market's Reaction to AquaRefining ............................. 65

B.    While the Truth Slowly Begins to Emerge in Spring 2017, Defendants Continued to Issue False and Misleading Statements................................... 68

1.    The May 2017 False and Misleading Statements Regarding The Existing Status of the AquaRefining Technology As of Q1 2017 ...................... 68

2.    The May and June 2017 False and Misleading Statements Touting the Market's Reaction to the AquaRefining Technology....................... 76

3.    The June 2017 False and Misleading Statements Regarding the Status of AquaRefining.................................................................. 79

4.    The July 2017 False and Misleading Statements Regarding The Existing Status of the AquaRefining Technology As of Q2 2017................ 81

5.    The August 2, 2017 False and Misleading Statements Regarding Site Visits..................................................................................... 82

6.    The August 9, 2017 False and Misleading Statements and Partial Corrective Disclosures.................................................................. 84

7.    The September 2017 False and Misleading Statements Regarding the Johnson Controls Partnership........................................................... 87

8.    The October 23, 2017 Partial Corrective Disclosure ........................................ 89

9.    November 9, 2017 Corrective Disclosure............................................................ 89

C.    Post Class Period Events................................................................................................. 91

1.    Following the Disclosure of Sticky Lead Issues, the Company's Statements Effectively Confirmed That the AquaRefining Process Had Not Been Functioning. .................................................................. 91

2.    Investors Express Serious Doubts About the Company's Statements and Leadership............................................................................. 93

3.    Key Management "Resign" ................................................................................. 93

4.    The "Strategic Partnership" With Johnson Controls Is Stalled Pending Development of the AquaRefining Process......................................... 96

D.    Additional Allegations of Scienter................................................................................. 97

1.    The Consistent Accounts By Former Employees that the AquaRefining Process Was Malfunctioning and Defendants' Knowledge of or Reckless Disregard of the Problems Evidences Scienter................................ 97

a. The Defendants Knew About or Recklessly Disregarded that the AquaRefining Technology Was Malfunctioning Even Before the Reno Plant Was Built ........................................................................ 97

b. The Defendants Knew of And/or Recklessly Disregarded the Failures at the Reno Plant and With the AquaRefining Process .............. 98

2. The Consistent Accounts by Former Employees of Defendants' Direct Involvement in Fraudulent Visitor Presentations Evidences Scienter ............... 100

3. The Nature and Significance of the Problems with AquaRefining, Which is the Company's Core Business, Further Support Allegations of Scienter ...... 101

4. The Insider Selling Supports Scienter ................................................................ 102

a. Murphy And Mould Profited From The Fraud By Selling Off Large Blocks Of Personal Holdings Of Aqual Metals Common Stock At Inflated Prices ...................................................................... 102

b. The Defendants Consummated the November 2016 Offering In Order to Exploit The Artificial Inflation In The Company's Common Stock ................................................................................................ 105

E. Loss Causation .................................................................................................... 106

F. Presumption Of Reliance .................................................................................... 109

G. Exchange Act Counts .......................................................................................... 110

1. Count One ........................................................................................................... 110

2. Count Two .......................................................................................................... 112

3. Count Three ........................................................................................................ 113

VII. SECURITIES ACT VIOLATIONS ................................................................................. 114

A. Summary of Offering ........................................................................................... 114

B. The Materially Untrue and Misleading Statements in the Offering Documents ........... 116

1. Untrue And Misleading Statements Concerning The Alleged "Success" Of AquaRefining At A Small Scale Level ............................................................. 117

2. Untrue and Misleading Statements Concerning The Acceleration Of Commercial Production ...................................................................................... 119

3. Untrue & Misleading Statements Regarding Licensing & Strategic Relationships ....................................................................................................... 123

C. The Securities Act Counts ................................................................................... 124

1. Count One ........................................................................................................... 124

2. Count 2 ..................................................................................................... 126

VIII. CLASS ALLEGATIONS ....................................................................................... 127

IX. NO SAFE HARBOR ............................................................................................. 129

X. PRAYER FOR RELIEF ......................................................................................... 129

XI. DEMAND FOR TRIAL BY JURY ......................................................................... 130

Court-appointed Lead Plaintiff the Plymouth County Group, which is comprised of the Plymouth County Retirement Association, Denis Taillefer and his private company 1103371 Ontario Ltd ("Lead Plaintiff"), brings claims individually and on behalf of investors who purchased or otherwise acquired common stock of Aqua Metals, Inc. ("Aqua Metals," "AQMS" or the "Company"), including shares sold in the November 21, 2016 Offering (defined below), between May 19, 2016 and November 9, 2017, inclusive (the "Class Period"), and were damaged as a result (the "Class").

Lead Plaintiff asserts claims under two federal statutes against Aqua Metals and its three co-founders, Stephen R. Clarke ("Clarke"), Thomas Murphy ("Murphy") and Selwyn Mould ("Mould") (collectively, the "Defendants"). First, Lead Plaintiff brings claims for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a) (the "Exchange Act"), and the rules and regulations promulgated thereunder, including Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b5"). Second, Lead Plaintiff brings claims for violations of Sections 11 and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k and 77o (the "Securities Act"). The Securities Act claims allege strict liability and/or negligence and do not sound in fraud.

Lead Plaintiff alleges the following based upon personal knowledge as to the allegations specifically pertaining to Lead Plaintiff and upon information and belief as to all other matters. Lead Plaintiff's information and belief as to allegations concerning matters other than itself and its own acts is based upon an investigation of Lead Counsel, which included a review and analysis of (a) U.S. Securities and Exchange Commission ("SEC") filings by Aqua Metals; (b) press releases and other public statements; (c) securities analyst reports and media reports about the Company; and (d) interviews with former Aqua Metals employees who were employed by Aqua Metals before and/or during the Class Period. Lead Plaintiff believes that further substantial evidentiary support exists for these allegations, and will be revealed after a reasonable opportunity for discovery.

## I.    SUMMARY OF THE ACTION

1. Aqua Metals is a one-trick pony that went public in 2015 with promises to revolutionize the lead-acid battery ("LAB" or the "batteries") recycling industry. Indeed, Aqua Metals' sole line of business is "commercializing a non-polluting electrochemical lead recycling technology called AquaRefining."

2. LAB recyclers generate income by breaking down and extracting the various components from the batteries, including and most significantly lead, and selling them. By some accounts, LAB recycling is a $22 billion industry that is expected to grow over the next few years. However, because traditional LAB recycling involves the smelting and processing of lead resulting in the emissions of noxious gases, LAB recycling is a highly regulated industry.

3. Throughout the Class Period, Aqua Metals claimed that its AquaRefining process would revolutionize this $22 billion LAB recycling industry by (a) reducing the environmental impact of smelting, which uses extremely high heat; (b) producing pure and ultra-pure lead at high yield; and (c) recycling batteries at a lower cost than smelting. At the core of the AquaRefining process are the "modules." The modules are each made up of six electrolyzers. Each electrolyzer contains several rotating disks upon which the lead is electroplated and then the lead is intended to continuously be removed. The modules would make it possible to start recycling LABs at a much smaller scale than is possible with smelters. Smelters need to be constructed on site, but modules could be built at Aqua Metals' facility in Alameda and easily shipped and installed anywhere in the world. According to the Company, the modular nature of Aqua Metals' business significantly reduces the investment risk associated with building a lead production facility.

4. The news of this revolutionary technology was well-received by the LAB industry and exciting to the investing market. Indeed, based on the Company's reports of its progress and actual achievements, Aqua Metals' stock price soared from its Initial Public Offering ("IPO") price of $5.00 to a Class Period high of $21.89.

5. However, as explained below, Defendants' statements regarding the Company's achievements were untrue and misleading when made. As news about the true status of the AquaRefining technology was revealed, the stock price fell, closing at $3.79 on the last day of the Class Period. Now, eight months later, it still trades in the $3 range. The following chart reflects the price of Aqua Metals' stock from May 1, 2016 to date:

//

//

//

[No. 4:17-cv-07142-HSG] CONSOLIDATED COMPLAINT FOR VIOLATION OF SECURITIES LAWS          2



6. To be clear, this case is not about the fact that AquaRefining did not become profitable as quickly as hoped or the fact that AquaRefining did not generate revenue during the Class Period. Rather, Defendants are liable to Class members because they falsely portrayed the then-existing facts regarding the success, scalability, implementation and operations of the AquaRefining technology. Throughout the Class Period, Defendants touted having achieved specific milestones when, in reality, the AquaRefining technology was unproven and had not achieved commercial viability. As a result of these untrue and misleading statements, Class members purchased their shares at artificially inflated prices.

7. The story starts with the fact that, by the start of the Class Period, Aqua Metals had hyped that it had "successfully tested" its AquaRefining technology at Aqua Metals' Oakland and Alameda facilities (the "California Testing Facilities"), and that it was on track to produce 80 metric tons of recycled lead per day by the fourth quarter of 2016 ("Q4 2016") and then ramp up to 160 tons per day.

8. On the first day of the Class Period, the Company touted a new partnership with Interstate Battery System International, Inc. ("Interstate Batteries"), the country's leading battery recycler, stating that it constituted a "strong validation of [the AquaRefining] technology" and would allow the Company to ramp up and accelerate its growth. Analysts' response to this strategic partnership was strong. For example, in response to this news, an Oppenheimer & Co. Inc. ("Oppenheimer") report stated that the Interstate Batteries (which is 49% owned by Johnson Controls

(defined below)) partnership was indeed a "validation of its product quality from the global leader in lead acid batteries."

9. Shortly thereafter, Aqua Metals touted that it had completed the construction of its "first-ever AquaRefinery" near Reno, Nevada, at the Tahoe Reno Industrial Complex ("TRIC" or the "Reno Plant"). Defendants claimed that the Reno Plant "open[ed] for business" in August 2016. Then, in November 2016, the Company announced that the Reno Plant had "produced" AquaRefined lead that was over 99.99% pure and that it was expanding its production to 120 tons of lead production per day by early 2017, a 50% improvement over the 80 tons per day that was previously announced. It also reiterated its production rate of 160 tons of lead per day by 2018.

10. Riding the wave of Defendants' hype, Aqua Metals closed a secondary public offering of 2.3 million shares of its common stock at a price of $10.00 per share, for gross proceeds of $23 million, on November 21, 2016, six months into the Class Period (the "November 2016 Offering"). In a November 21, 2016 press release, the Company explained:

> Aqua Metals intends to use the net proceeds from the offering to accelerate its AquaRefining product development and licensing efforts inclusive of pre-sales and post-sales support staff and infrastructure, enhance processes to further improve operating margins, regulatory activities, working capital and other general corporate purposes.

11. Building on its oft-repeated partnerships with Interstate Batteries and others, the Company touted a key partnership with Johnson Controls International plc ("Johnson Controls" or "JCI"), the world's largest manufacturer of automotive batteries, on February 9, 2017. Clarke touted the partnership with Johnson Controls as "a tremendous step forward," enabling Aqua Metals to transition to licensing its AquaRefining process. Oppenheimer called this agreement "transformative," a "demonstration of JCI's belief in the technology" and "a marquee validation of AQMS' technology and business model."

12. Just days later, on February 14, 2017, the Company claimed to have achieved the crucial milestone of moving from the commissioning phase to the operational phase of its AquaRefining process, stating that it had "successfully built, commissioned and *beg[un] producing products* at the world's first AquaRefinery" as well as having "deepened our strategic relationships with major players throughout the industry."

13. When, shortly thereafter, a short seller questioned whether AquaRefining could ever be commercially viable, the Company publicly invited investors and analysts to its facility to see the AquaRefining process in action. The Company described the visits as a way to "openly show" analysts and investors the "facility in operation" – consistent with its "belief in transparency." In a May 31, 2017 press release, Clarke described the visits as a "behind-the-scenes look at our process," including the full production process of AquaRefining on simultaneously running modules and shipment of the product.

14. In its press release touting the success of its first official analyst visit day, the Company stated that it expected that analyst to update their coverage reports to reflect findings from that site visit. As prompted, several analysts issued favorable reports stating they saw the full AquaRefining process in operation including the production of recycled lead. For example, Oppenheimer reported "seeing the battery breaker, the separation process, sulfurization engaged, and the AquaRefining process all up and operational" and the Company was "tracking [its] estimates well." The report went on, "[w]e observed six semi truckloads of material delivered and taken away during our four-hour visit." In addition, National Securities Corporation issued a report describing the visits as "incrementally positive for transparency" and stating that the "modules were up and running and producing recycled lead.… [T]he fact that we observed trucks delivering used batteries for off-loading and recycling, and more importantly, finished recycled lead packaged and ready to be shipped out [is] highly encouraging."

15. By this time, the Company was repeatedly stressing that its focus was on expansion, through additional recycling facilities, increasing its capacity to 800 tons per day and licensing its technology and equipment to third parties, with shipments of the AquaRefining equipment beginning in 2017. In May 2017, the Company touted that it was not only in commercial operation but also "***generating revenue***."

16. In truth, however, the highly touted "revolutionary" technology had not been successfully tested in the California Testing Facilities, the Reno Plant was not operating, the critical modules could not run for any length of time and Aqua Metals had not commissioned its process, commercialized AquaRefining or sold any AquaRefined lead during the Class Period.

17. The truth was eventually revealed at the end of the Class Period and described by former employees herein. Indeed, former employees provide highly consistent accounts that (a) throughout the Class Period, the AquaRefining process continuously malfunctioned, including due to "sticky lead" and "hard lead" issues, whereby the lead would get stuck on the machines and have to be manually scraped or chiseled off – at both the California Testing Facilities and the Reno Plant; (b) the technology was not ready to be scalable; (c) the Company opened the Reno Plant before AquaRefining had operated successfully at the California Testing Facilities and the Reno Plant effectively became another test site; (d) despite efforts to try to fix the various problems (including the "sticky" and "hard" lead issues), they remained unresolved throughout the Class Period; (e) the Reno Plant was not functioning during the Class Period – the machinery (including the modules and the breakers) was routinely breaking down and the modules could only run for a few hours or less a day; and (f) only a scant amount of lead had been produced and no AquaRefined lead was ever commercially produced, facts which were reflected in the Daily Production Reports (defined below) to which the Officer Defendants had access.

18. Even more significantly, confidential witnesses (the "Confidential Witnesses" or "CW") confirm that the Officer Defendants (defined below) knew about or were deliberately reckless in not knowing about the status of the AquaRefining technology. Witnesses explain that two co-founders, the Chief Executive Officer ("CEO") Clarke and Chief Operating Officer ("COO") Mould, personally witnessed and were informed of the problems, and attended meetings discussing the problems and how to fix them. They also reveal that Clarke and Mould provided carefully orchestrated shows, which employees referred to as "dog and pony shows," to investors (including Aqua Metals' critical partners Interstate Batteries and Johnson Controls) and others who visited the Reno Plant designed to make the modules look like they were operational, when in fact, they were not. The Confidential Witnesses also confirmed that Clarke lacked any basis for the statements about the Company's ability to produce the targeted tons of lead.

19. The modest Class Period revenue, the Company started reporting in the second quarter of 2017 ("Q2 2017"), was from sales of secondary lead compounds and plastics that had minimal value, and was not AquaRefined or pure-lead. To date, the Company has still not derived any revenue

from AquaRefining. *See* Form 10-Q for the Quarterly Period Ended March 31, 2018 ("Q1 2018"), filed on May 9, 2018 ("Q1 2018 Form 10-Q").

20. When the Company eventually disclosed, through a series of partial disclosures, that, *inter alia*, (a) the AquaRefining technology was unproven; (b) the technology was malfunctioning (in part because it suffered from the very sticky lead problems that had existed throughout the entire Class Period); and (c) the technology had not been commercialized, the stock price fell through a series of one-day drops, including one-day drops of approximately 26%, 23.6% and 18%. As a result, Lead Plaintiff and the Class suffered significant damages.

21. At the end of the Class Period, shareholders expressed concern about management's credibility. For example, as one market player stated: "I can understand delays in building a facility. I can't, however, understand how a facility can be built based upon a process that is still undetermined. Wouldn't you think that the optimal operational parameters would be discovered in a lab prior to installation? And, how can you have 'certain conditions' in a controlled warehouse environment? I see this and get very scared."

22. After the Class Period, there was a significant shake-up of both senior management and the Board of Directors (or "Board"), apparently in response to the actions of a large shareholder group. Most notably, the Board implemented a plan to transition Clarke out of his roles as President, CEO and Chairman of the Board and, in April 2018, Clarke resigned and the Company announced corporate governance enhancements.

## II. JURISDICTION AND VENUE

23. Lead Plaintiff's claims arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, and Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o.

24. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and Section 22 of the Securities Act, 15 U.S.C. §77v. This Court has jurisdiction over Defendants because each Defendant has sufficient minimum contacts with this district, particularly since Aqua Metals' principal place of business is located at 1010 Atlantic Avenue, Alameda, California 94105.

25.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act and Section 22 of the Securities Act because many of the false and misleading statements were made in or issued from this District.  Many of Defendants' acts and practices that give rise to this complaint substantially occurred in this District.

26.     In connection with the acts, conduct and other wrongs Lead Plaintiff alleges, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications and national securities markets.

## III.     INTRADISTRICT ASSIGNMENT

27.     Pursuant to Northern District of California Civil Local Rules 3-2(c) and 3-5(b), assignment to the Oakland Division of this district is proper because a substantial part of the events or omissions, which give rise to the claims asserted herein, occurred in Alameda County, and Aqua Metals' principal place of business is located, in Alameda County, California.

## IV.     THE PARTIES

### A.     Lead Plaintiff – The Plymouth County Group

28.     Established in 1937, Plymouth County Retirement Association is the retirement system for the benefit of employees of cities, towns, districts and authorities within Plymouth County, Massachusetts.  As of December 31, 2017, the Plymouth County Retirement Association had assets under management with a market value of over $1.01 billion.  As set forth in its Certification attached as **Exhibit 1**, the Plymouth County Retirement Association purchased Aqua Metals' common stock during the Class Period and was damaged as a result.

29.     Denis Taillefer is an individual.  He was the sole founder and operator of 1103371 Ontario Ltd. until he sold all physical assets owned by the company in March 2016.  Since then, he has operated 1103371 Ontario Ltd.  as an investment company and serves as the company's president with sole voting rights and sole responsibility for all decision-making on its behalf.  Mr. Taillefer has a 70% ownership interest in 1103371 Ontario Ltd. and his wife, Teresa Taillefer, has the remaining 30% ownership interest in the company.  Mrs. Taillefer has assigned her litigation rights as to her Aqua Metals' securities to Mr. Taillefer.  As set forth in its Certification attached as **Exhibit 2**, Mr. Taillefer,

Mrs. Taillefer and 1103371 Ontario Ltd. purchased Aqua Metals' common stock during the Class Period and were damaged as a result.

## B. Defendants[1]

### 1. The Company

30. Aqua Metals, Inc. ("Aqua Metals") is a Delaware corporation with its principal executive offices located at 1010 Atlantic Avenue, Alameda, California. Aqua Metals completed its IPO in August 2015 and its common stock trades on the NASDAQ under the ticker symbol "AQMS." Aqua Metals touts itself as "reinventing lead recycling with its patented and patent-pending AquaRefining technology" that uses a water-based, non-polluting process to recycle LABs.

### 2. Officer Defendants

31. Defendant Stephen R. Clarke ("Clarke") co-founded the Company in 2014. He was the President, CEO and Chairman of the Board of the Company at all relevant times. During the Class Period, he made materially false and misleading statements and omissions in press releases, quarterly conference calls, industry events and events for analysts, investors and industry leaders. Clarke signed the Company's Form 10-K for the year ended December 31, 2016, filed on March 2, 2017 (the "2016 Form 10-K"). He also signed and certified all of the Company's quarterly reports on Form 10-Q filed with the SEC during the Class Period and all of the Form 8-Ks and Form 8-K/As Current Reports filed with the SEC during the Class Period, except for those filed on December 28, 2016, May 24, 2017, June 15, 2017, August 28, 2017 and September 6, 2017. In addition, Clarke signed the Form S-3 Registration Statement Under the Securities Act of 1933 for Aqua Metals' November 2016 Offering, signed and filed on September 2, 2016, which was subsequently amended on September 16 and 21, 2016.

32. Defendant Thomas Murphy ("Murphy") co-founded the Company in 2014. He was the Chief Financial Officer ("CFO") and a Director of the Company from the beginning of the Class Period to August 10, 2017. During the Class Period, he made materially false and misleading statements and omissions in press releases and quarterly conference calls. Murphy signed the 2016

---

[1] On May 31, 2018, Defendants Aqua Metals, Murphy and Clarke stipulated to accept service of this consolidated complaint. ECF. No. 61.

Form 10-K and signed and certified all of the Form 10-Qs filed with the SEC during the Class Period, except for the one filed on November 9, 2017. In addition, Murphy signed the registration statement for Aqua Metals' November 2016 Offering, signed and filed on September 2, 2016.

33. Defendant Selwyn Mould ("Mould") co-founded the Company in 2014. He was the COO during the Class Period. During the Class Period, he made materially false and misleading statements and omissions in press releases and events for analysts, investors and industry leaders.

34. Defendants Clarke, Murphy and Mould are collectively referred to as the "Officer Defendants."

35. The Officer Defendants, by virtue of their high-level positions at Aqua Metals, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business operations, growth and financial condition. As set forth below, the materially misstated information conveyed to the public was the result of the collective actions of these individuals.

36. As a co-founder, Clarke was closely involved in all aspects of the Company's operations from its inception. For example, he oversaw development of the AquaRefining process and production of modules in both the California Testing Facilities. He regularly visited the Reno Plant and saw the machinery breaking down and attended production and operations meetings with plant management. During the production meetings, plant efficiency, materials, schedules and problems at the plant, including machinery break downs, were discussed. Clarke observed and was informed by employees that the AquaRefining technology had significant issues, including the modules' sticky lead problems. Clarke also orchestrated and led demonstrations at the Reno Plant for analysts, investors and potential partners in the battery industry.

37. As a co-founder, Murphy was closely involved in all aspects of the Company's business and operations from its inception. For example, he was aware of the development of the AquaRefining process and production of modules in both the California Testing Facilities. He had access to Daily Production Reports from the Reno Plant, which included the number of batteries crushed, as well as the amount of lead paste and lead produced for each shift the Reno Plant operated.

38. As a co-founder, Mould was closely involved in all aspects of the Company's business and operations from its inception. In his role as COO, he was responsible for Aqua Metals' operations, including the Reno Plant, equipment manufacturing, manufacturing strategy, technology development, process development and product engineering throughout the Class Period. Mould regularly visited the Reno Plant and saw the machinery breaking down, spoke with plant managers about operations and was aware of production issues. Mould routinely attended production meetings and had access to Daily Production Reports. The reports included the number of batteries crushed, as well as the amount of paste and lead produced for each shift the Reno Plant operated. During the production meetings, plant efficiency, materials, schedules and problems at the plant, including machinery break downs, were discussed. Mould, along with Clarke, orchestrated and led demonstrations at the Reno Plant for analysts, investors and potential partners in the battery industry.

39. As senior executives at a publicly held company with common stock registered with the SEC and traded on the NASDAQ, the Officer Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to the Company's business, operations, financial statements and internal controls, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Aqua Metals' publicly traded common stock would be based on accurate information. Officer Defendants Clarke, Murphy and Mould each violated these requirements and obligations during the Class Period.

40. As a result of their positions of control and authority as senior executives, the Officer Defendants were able to and did control the content of SEC filings, press releases and other public statements issued by Aqua Metals during the Class Period. Each Officer Defendant was provided with a copy of the statements at issue in this action before they were disseminated to the public, and each Officer Defendant had the ability to correct the statements or prevent them from being released into the public sphere. Accordingly, Officer Defendants Clarke, Murphy and Mould are responsible for the accuracy of the public statements detailed in this complaint.

41. As a result of their positions of control and authority as senior executives, the Officer Defendants had access to the adverse undisclosed information about Aqua Metals' business, operations, financial statements and internal controls through access to internal corporate documents,

conversations with other corporate officers and employees, visiting the Reno Plant, observing the California Testing Facilities, attending management, production and board meetings, and viewing production and other reports. The Officer Defendants knew or recklessly disregarded that these adverse undisclosed facts rendered the positive representations made by or about Aqua Metals materially false and misleading.

42.     The Officer Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Aqua Metals' common stock by disseminating materially false and misleading statements and/or concealing adverse facts. The scheme deceived the investing public about the status of the AquaRefining technology as the modules malfunctioned and were not producing ultra-pure AquaRefined lead, and the technology was not ready to scale commercially or be licensed to third-parties. This deception caused Lead Plaintiff and members of the Class to purchase Aqua Metals' common stock at artificially inflated prices.

## V.     BACKGROUND

### A.     Traditional Lead-Acid Battery Recycling

43.     LABs have been in use for nearly 160 years and they are the oldest type of rechargeable battery. They are a mainstay in the automotive battery industry. There are four primary elements to a LAB: (1) the positive plate which is covered with a paste of lead dioxide; (2) the negative plate which is made of sponge lead (pure lead); (3) the separator which is an insulating material between the positive and negative plates, and allows electrolyte and ions into it which enables conduction without the two plates touching; and (4) electrolyte which consists of water and sulphuric acid. These four elements are contained in a plastic container.

44.     The lead in LABs is a valuable material. Thus, rather than send used LABs to landfills at the end of their life, used LABs are sent to recycling centers. The batteries are then recycled and lead is removed from the batteries. Lead is one of the most effectively recycled materials in the world. Today, the vast majority of lead is produced by recycling rather by than mining.

45.     The current process for recycling LABs involves the breaking down of batteries and separation of the components such as metallic lead, lead paste, plastics and electrolyte (acid). The lead components are then smelted and refined. Smelting is a dirty process and has negative implications

for the environment surrounding the recycling facility. Smelting employs a high-temperature (1400°F), endothermic chemical reduction, making it inefficient, energy intensive and often a highly pollutive process. Smelters are sources of significant emissions that have resulted in the contamination of hundreds of sites around the country. As a result, there are very strict environmental regulations on smelting.

### B. Aqua Metals And Its Purported AquaRefining Process

46. Aqua Metals was incorporated in 2014 and was founded by Defendants Clarke, Murphy and Mould. It is a small company that, at its Class Period peak, employed about 70 people.

47. Aqua Metals claims that it has developed a "cutting edge" alternative to smelting, called AquaRefining. Aqua Metals claims that the AquaRefining process produces ultra-pure lead at a high yield without the environmental impact and at a lower cost than smelting. Thus, the Company contends, AquaRefining will revolutionize the $22 billion lead recycling industry.

48. According to Aqua Metals, the AquaRefining process begins, similar to traditional LAB recycling, with the crushing of used LABs and the separation of the metallic lead, active materials (lead compounds), sulfuric acid and plastic for recycling. Purportedly, the metallic lead is ingoted, i.e., cast as a bar or plate and then sold.

49. After that, AquaRefining differs from traditional LAB recycling through the use of its proprietary machines called modules to recycle the lead compounds. Each module contains six electrolyzers. The modules use "electroplating," which is intended to continuously remove lead as the modules operate. The process, purportedly, lightly plates disk cathodes with soft lead, making the lead easier to harvest. AquaRefining, purportedly, dissolves the lead compound in a biodegradable, non-toxic solvent, strips the primary lead from the solvent into a lead paste and then uses an electro-chemical process and electrolyzer to convert the dissolved lead compounds into pure, primary grade lead. Each electrolyzer contains several rotating disks and scrapers that, purportedly, scrape the lead off the disks and onto chutes. From there, the lead is intended to slide off the chute and onto a conveyor belt. Then, purportedly, that "pure" lead is ingoted and sold at a premium as pure and ultra-pure lead. This process is, purportedly, fully automated and does not release toxic emissions into the atmosphere and is less expensive than smelting because it does not require high heat. The

AquaRefining process is also completely wet, unlike smelting which is dry, and thus, does not produce lead dust.

50.     In a slide presentation for the Company's third quarter of 2016 ("Q3 2016") earnings call on November 7, 2016, Aqua Metals described the process as purportedly "produc[ing] lead without heat which is recovered continuously and compressed into blocks of ultra pure lead."  On the call, Clarke further described the purported process:

> [A] single module [has] six electrolyzers, each electrolyzer has a series of large rotating disk cathodes.  They rotate during the plating process and are continuously scraped. What we plate is a very, very high surface area foam of lead that consists primarily of nano-structures of lead, very, very, very high surface area.  The cathodes are continuously stripped, the lead comes off, drops on to a conveyor, then it's taken off to a machine that we call [ph] applicator, that compresses that soft lead.  What it actually does is, it consolidates the lead into solid metallic lead at room temperature and it's quite a remarkable process.  Then we – we've taken the decision to then put that into an ingot machine and make a standard ingot of lead for sale.

51.     During an August 15, 2016 interview with Daniel Carlson of Tailwinds Research Group, LLC ("Tailwinds"), Clarke described the difference between AquaRefining and traditional LAB recycling as follows:

> The incumbent technology is called smelting and it traces back to about 6,000 years ago. It's a very high temperature thermal process in which lead and lead compounds are heated up to 2200 degrees Fahrenheit and then reacted with a series of chemicals to pull the compounds off the lead and convert lead sulfite, lead oxide back into metallic lead. Our process is a low temperature, water-based approach.  It uses a mild acid that is biodegradable and non-toxic.  So whereas smelting occurs at very high temperatures, our process occurs at essentially room temperature.  Whereas smelting requires the addition of quite nasty reducing agents, our technology is a very simple electro-chemical process. Overall, we use less than half the energy to make the transition from lead compounds to metallic lead.

52.     Aqua Metals has illustrated how the AquaRefining process produces pure lead in marketing materials as follows:

//

//

//



53.     In July 2015, the Company went public and stated that the IPO proceeds were to be used for the construction of a recycling facility in McCarran, Nevada, near Reno, at the Tahoe Reno Industrial Complex (the Reno Plant).  Aqua Metals broke ground on the Reno Plant construction on August 17, 2015.  Roughly a year later, on July 28, 2016, the Company held an open house at the Reno Plant and, shortly thereafter on August 10, 2016, announced that the Reno Plant is "now opening for business."

54.     Even prior to the Class Period, Aqua Metals had marketed that the AquaRefining process was successfully tested in both of its California Testing Facilities.  *See, e.g.,* Q1 2016 Conference Call (defined below) (Clarke stated our "full-sized electrolyzed test facility," "allows us to demonstrate our process to third-party license[e]s without having to take [them] into Reno to show the process there").

**C.  The Process Was Malfunctioning And Not Commercially Viable Prior to and Throughout the Class Period**

55.  Although the Company concealed this during the Class Period, in truth, the process was malfunctioning and faced a myriad of continuing issues beginning in 2015, well before the start of the Class Period, at the California Testing Facilities and continuing throughout the Class Period at the Reno Plant.  In fact, the modules barely ran throughout the Class Period.

56.  These problems included a "hard lead" issue, whereby the lead would get stuck and harden on the disks and had to be manually chiseled off, and a "sticky lead," issue whereby the lead would get stuck on the chutes and have to be manually scraped off.  These issues were the result of, *inter alia*, (a) the Company not getting the correct chemical ratios so the lead was the wrong consistency – it would not stay soft as the process required, and instead would re-solidify and compact upon itself; (b) design flaws with the modules; and (c) electrical voltage.

57.  These problems were apparent since 2015 and were observed by and discussed with Defendants at the California Testing Facilities.

58.  Given these and other problems, the AquaRefining technology was not ready to scale.  Yet, Defendants prematurely pushed ahead with the Reno Plant, publicly touting that operations would commence in no time.  Indeed, although chemists and engineers at the California Testing Facilities were scrambling to come up with solutions to the aforementioned problems before the Reno Plant opened,  they were not resolved and the AquaRefining process continued to malfunction.

59.  Not surprisingly, the same sticky lead and hard lead problems, among others, experienced at the California Testing Facilities occurred at the Reno Plant.  As former employees explained, once it opened, the Reno Plant was used as another testing facility, as a means to continue Aqua Metals' research and development to try to develop a functioning AquaRefining process and to make it commercially viable.  Moreover, additional problems were encountered during every step of the AquaRefining process, including the breakers, used in traditional lead recycling, which repeatedly broke down.

60.  Moreover, as the accounts of former employees demonstrate, Defendants knew or recklessly disregarded that the AquaRefining process was not working.  Indeed, Defendants regularly

visited the Reno Plant and witnessed the machines and the process malfunctioning first-hand. Defendants spoke with former employees and plant managers about these problems and attended meetings where the issues were discussed. Moreover, Defendants invited investors, analyst and potential strategic partners to visit the Reno Plant and staged "dog and pony show[s]" whereby they would make the process appear to be functional.

61. Defendants also had access to Daily Production Reports, which reported the number of batteries crushed, the amount of lead paste produced, the chemicals used, and the tons of lead produced. Based on this report "everyone knew that the [lead production] numbers were not met." In fact, the process never got far enough to produce commercially AquaRefined lead.

62. Despite this, Defendants' repeatedly touted that the process was successfully tested and repeatedly insisted that the commercialization of AquaRefining was progressing during the Class Period. As set forth in more detail below, former employees tell a compelling story that is in stark contrast to Defendants' public statements throughout the Class Period.

**D. Former Employee Accounts**

**Confidential Witness No. 1**

63. CW1 was a Senior Mechanical Design Engineer at Aqua Metals from 2015 through January 2017. CW1's responsibilities included creating designs that were used to build the modules. CW1 provided guidance and design advice to make the machinery work.

64. CW1 first worked at the original Oakland location and then moved to the Company's headquarters in Alameda, California after it opened. CW1 also visited the Reno Plant for the grand opening.

65. CW1 said that the Company had several problems with the AquaRefining technology and was not able to use it commercially or get it to an operational state. CW1 said the process was tested before the Reno Plant was built, both in the lab unit and the full-scale test unit, which consisted of one electolyzer, at the California Testing Facilities. CW1 explained the Company had issues with the AquaRefining process in both of these testing environments. CW1 said that two of the big issues were "sticky lead" and "hard lead." CW1 relayed that these issues were present ever since CW1 was at the Company and that CW1 became aware of these issues within the first month of CW1's

employment. CW1 relayed that these issues were occurring prior to and at the time the Company was building the Reno Plant. CW1 also stated that these issues were present at the Reno Plant in addition to both of the California Test Facilities. CW1 is aware of the problems as a result of CW1's role to provide guidance and design advice to make the machinery work.

66. CW1 said that rather than solve the issues first and then build the plant, the Company went ahead with building the Reno Plant and banked on being able to solve the issues before the Reno Plant was completed, which never happened. CW1 is aware of this based on CW1's role at the Company and CW1's conversations with Clarke and Mould.

67. CW1 explained that because lead is dense it can compact upon itself and re-solidify so there is only a finite amount of time in which the lead remains soft enough to work in the process. According to CW1, the "hard lead" issue occurs when the AquaRefining process is unable to scrape the lead off the disks in the electrolyzers before it hardens. CW1 said that, in the California Testing Facilities, the lead was hardening before getting scraped off and had to be chiseled off manually. This was an issue throughout CW1's time at the Company and was not resolved during that time.

68. CW1 also said the AquaRefining process also always had a "sticky lead" issue. CW1 said that they did not call the problem a "sticky lead" issue while CW1 was employed there, but stated that it is the same issue that the Company disclosed in late 2017 and called the "sticky lead" issue. CW1 stated that this issue was also related to the lead being dense and re-solidifying. CW1 described the sticky lead issue as one where the lead is not able to slide off the chute onto a conveyer belt. CW1 said that, even in the California Test Facilities, the lead had trouble coming off the chute and they had to use a stick to scrape off lead from the chute. CW1 thought the issue would be even worse at a full-scale plant.

69. CW1 suggested that the angle for the chute be adjustable so that the angle could be changed based on the circumstances to aid the lead in sliding off the chute. However, when CW1 brought these and other suggestions to Clarke and Mould, they were ignored.

70. CW1 was aware of these issues because CW1 worked on trying to solve the "sticky lead" and "hard lead" issues both before and after the Reno Plant opened. CW1 relayed that there were three variables that affected the Company's ability to resolve those issues. CW1 said the first is

[No. 4:17-cv-07142-HSG] CONSOLIDATED COMPLAINT FOR VIOLATION OF SECURITIES LAWS     18

chemistry – getting the correct chemical ratios so that the lead is at the right consistency. CW1 said that the Company could not get the lead to be the correct consistency. CW1 said the chemists at the California Testing Facilities worked on the consistency problem throughout the time CW1 was at the Company. CW1 said the second issue was the machinery, i.e., the actual design of the equipment. CW1 said CW1 tried to fix these design flaws in the mechanics throughout CW1's tenure. CW1 said the third variable was electrical/voltage. CW1 said that because there is more voltage as the process scales bigger, this can have an impact as well. The amount of voltage used in the small test lab was less than what was used in the full-sized test facility. Moreover, the full voltage needed at the Reno Plant was not used at the California Testing Facilities, as it was not permitted there.

71. Indeed, CW1 said that, "ever since I was there [2015] they knew about [these] issue[s]," including Clarke and Mould. CW1 said that it was also known, including by Clarke and Mould, that, as designed, the AquaRefining technology could not meet full scale capacity.

72. CW1 explained that because of all of the variables in the technology, including those discussed above, as the process goes to large-scale, even just one change can impact everything and make existing issues worse. CW1 explained, for example, that in the Reno Plant more power would be needed, so even changing the voltage could impact the process and create different results and issues and make existing issues worse. CW1 stated that the technology "didn't translate in the factory."

73. CW1 said that Clarke and Mould were aware of the scaling issues as well because they witnessed this on a smaller scale when taking the technology from the small test lab to the full-size test facility. CW1 said, without fixing the scaling, sticky lead, or hard lead issues, Clarke and Mould decided to "go big," even though the technology could not support it.

74. CW1 stated that the time leading up to the opening of the Reno Plant was very chaotic because they were trying to solve the problems with the AquaRefining process before the plant opened. These problems included the sticky lead and hard lead issues, two of the biggest issues they were facing. Several different potential solutions were proposed and explored both before and after the Reno Plant opened. CW1 stated that, after it was built, the Reno Plant became a testing factory as they tested potential solutions to the issues there. CW1 said that, although the Company later

[No. 4:17-cv-07142-HSG] CONSOLIDATED COMPLAINT FOR VIOLATION OF SECURITIES LAWS    19

conceded that it was using the Reno Plant, in part, as a test facility (on February 14, 2017, it falsely stated it was testing improvements in the context of licensing of the equipment, rather than the underlying process), in truth, it was a test facility as soon as it opened.

75. CW1 stated that when CW1 left the Company in January 2017, the modules were running only a few hours at a time. CW1 said the Company only received revenue from the traditional breaking of batteries into alloys and plastics since the AquaRefining process was not operational.

76. CW1 relayed that while at the Alameda facility, several visitors came through for presentations – what CW1 called a "dog and pony show." CW1 said these visitors included representatives from Interstate Batteries, Johnson Controls and Oppenheimer. CW1 stated that either Clarke or Mould, or both, were present during each of the visits. CW1 said that these visits occurred throughout CW1's tenure at the Company. CW1 is aware of this because CW1 was there when the visitors came through.

**Confidential Witness No. 2**

77. CW2 was an Environmental Systems Supervisor and ran the water treatment facility at the Reno Plant from right after the Reno Plan opened until the fall of 2017. CW2 reported to the Vice President, Recycling Technology Battery and Lead Recycling Operation. CW2 said CW2 also helped out in production if they needed someone to fill in for a bit.

78. CW2 said the Reno Plant had many problems. CW2 said, "they couldn't get the equipment to work" in the AquaRefining area. Consistent with what CW1 relayed, CW2 stated that only one module worked for about an hour or so per day before it would break down and need maintenance. It would then be idle for two or three days. CW2 said that the AquaRefining technology "was not functional." Similar to CW1, CW2 said that one of the problems the process was facing and was causing the modules to malfunction was a "sticky lead" problem. CW2 said that, although CW2 did not run the modules, CW2 was aware of the problems because the employees all talked about it and tried to solve it. CW2 said other employees would ask for help with the issues. CW2 further stated that, because CW2 ran the water systems, CW2 knew the machines were not running often because CW2 was not running the water systems often.

[No. 4:17-cv-07142-HSG] CONSOLIDATED COMPLAINT FOR VIOLATION OF SECURITIES LAWS          20

79. CW2 said Clarke and Mould knew the plant was inoperable and had problems because CW2 saw them at the plant regularly, including witnessing the problems. CW2 said they were on the Reno Plant floor whenever they were in town and could see what was happening. CW2 also said Clarke and Mould attended meetings at the plant where these problems were discussed.

80. CW2 stated that, after going through the module, the extracted lead is supposed to go into a kettle. CW2 said CW2 saw the kettle, which had a 50-ton capacity, was not once filled to capacity with lead. CW2 said there was no revenue earned from AquaRefining, as no AquaRefined lead was ever sold. CW2 said the only revenue was from selling by-products that were produced from breaking the batteries in the breaker. Although CW2 did not see records regarding revenue, CW2 knows that AquaMetals made no money from AquaRefining because CW2 knows the industry and what was actually produced at the Reno Plant.

81. CW2 oversaw air emissions in the plant and was required to test air quality. However, CW2 said the plant was not operating; thus, while the air infiltration was turned on, it only pulled air out of the room, as there was nothing to vent.

82. CW2 described investor visits to the Reno Plant where management ensured that the faulty modules would run when investors came to visit. CW2 said CW2 and the other employees at the plant were told, "don't run the machines until [the investors] show up" and to "make yourself look busy." CW2 said they were told to "stage everything up." CW2 was told these things by CW2's manager and was told the message originated from Clarke. Once the investors left, the plant employees would clean up. CW2 said "we only ran the machines when investors came to the plant."

83. CW2 said that CW2 believes the investor visits to the Reno Plant began in late 2016 or early 2017. CW2 said that visits with investors were happening on a regular basis, and these included visits by Interstate Batteries and Johnson Controls. CW2 relayed that some of the other employees, including one that had formerly worked at Johnson Controls, knew people from Interstate Batteries and Johnson Controls, which is how CW2 learned that these entities were the visitors on the days they were at the plant. Specifically, CW2 said that both Interstate Batteries and Johnson Controls visited and were given the same "dog and pony show" as the other investors. CW2 further said it was a "big

deal" when Johnson Controls came through and that they prepared for three days prior to their arrival. CW2 said that Johnson Controls visited at least twice.

84.     CW2 said the visitors were only on the plant floor for about five to ten minutes watching the machines run.  CW2 said that the floor employees would get a call from the plant management to start the machines and about five minutes later the visitors would come to the plant.

85.     CW2 said that records were kept reflecting the problems and how long the machines would run.  CW2 prepared reports for the Vice President, Recycling Technology Battery and Lead Recycling Operation, on the lack of production and requests for maintenance.  The production reports were called "Daily Production Reports" (or "Production Reports").  There was also a log called the "Operations Log" in which employees would record how long the machines, including the modules, ran.

86.     CW2 further relayed that, in addition to the modules, CW2 saw, while on the production floor, other machinery that was non-functional, such as motors, pumps and tanks.  CW2 saw that machines needed repair, but were not fixed.  CW2 also said that repair requests were sent to maintenance, but repairs were not done.

**Confidential Witness No.  3**

87.     CW3 was a Production Supervisor at the Reno Plant from fall 2016 to after the close of the Class Period.

88.     CW3 stated that CW3's responsibility was to set up the Reno Plant and get it running. CW3 relayed that this involved the breaking and refining process, but not the AquaRefining process. CW3 stated that CW3's team worked on the traditional part of the process – the breaking and separating.  CW3 said CW3's team was responsible for meeting the numbers, but "no matter how hard production pushed, we couldn't make the numbers" that management wanted.  CW3 said that the breaker would break down because it was run too hard, too much was put through it.

89.     CW3 said the modules did not meet the production numbers the Company announced. Consistent with what CWs 1 and 2 relayed, CW3 recalled that the modules would break down during the process.  CW3 said CW3 was told that that modules were having problems and breaking down and all of the employees were aware of it.

90. Like CW2 relayed, CW3 said CW3 witnessed people visiting the Reno Plant often and CW3 was told that they were investors. Similar to the other accounts, CW3 said CW3 witnessed Clarke, Mould and the plant director escorting the visitors and said Clarke and Mould "ran the show." CW3 said that CW3 personally ran the machinery during the visits. CW3 would be told of an upcoming visit by the plant manager a day or two before the visits. It was CW3's job to make sure the production area was clean and that the "machinery kept running" during the visits. CW3 said these visits happened regularly the entire time CW3 was at the Company.

91. Like CW2, CW3 also stated that the Reno Plant used reports called Production Reports that reflected activity in the production process including the amount of batteries broken, chemicals used, and tons of lead produced. CW3 said each shift supervisor was responsible for preparing Production Reports daily, after their shift ended. CW3 prepared them for CW3's shift. Based on the Production Reports, "everyone knew the numbers were not met." CW3 said the Production Report was a "pre-made" one-page Excel spreadsheet with rows and columns on it and the numbers – what was produced during that shift – were entered into it daily. CW3 said that, although CW3 did not see what the reports reflected regarding AquaRefined lead, the process did not get far enough to produce any AquaRefined lead. CW3 said that all managers were emailed the Production Reports daily. CW3 believes Mould was on the email list and received the reports. CW3 stated that "just by looking at the production records, management would know the estimates were not being met," and "you just had to compare the estimates to the production reports."

**Confidential Witness No. 4**

92. CW4 was a Production Manager, Battery Recycling at the Reno Plant from January 2017 to summer 2017. CW4 reported to the Vice President, Recycling Technology Battery and Lead Recycling Operation.

93. CW4 said "I saw what was published and had a front row seat" at Aqua Metals. CW4 said the "promises" made by Aqua were not true. CW4 said that by this CW4 means that Clarke was saying that a certain amount of AquaRefined lead would be produced, but no AquaRefined lead was produced. CW4 said that CW4 read the Company's publications and press releases. CW4 said the releases included numbers for revenue and production, but they were "nowhere near" those numbers

[No. 4:17-cv-07142-HSG] CONSOLIDATED COMPLAINT FOR VIOLATION OF SECURITIES LAWS          23

and it was "not possible to reach them." CW4 also said that when Clarke spoke publicly about products being produced, Clarke left it up to interpretation.

94.     CW4 said that, in fact, the only products being produced were the by-products from the known technology (the breaker), not the AquaRefining process. CW4 said CW4 knows this because CW4 saw what was produced. CW4 further relayed that "no revenue came from AquaRefining." Any revenue came from by-products of the batteries being crushed in the breakers. CW4 said that the AquaRefining process "was not even close to be[ing] commercially operating." CW4 said that, as the Plant Superintendent, nothing went on at the Reno Plant that CW4 did not know about. CW4 said that because CW4 ran the plant, CW4 knew what was being produced and the quantities.

95.     CW4 said that the AquaRefining process did not work. Like CWs 1, 2 and 3 described, CW4 said the module could not operate for more than about an hour or it would break down. CW4 said that the module "was still in R&D mode." CW4 said the modules only operated for about one hour a day the whole time CW4 was employed at the Company. CW4 further stated that, while employed there, Aqua Metals had four modules but only ran two and would only run one at time because they were trying to address why it was going into failure and why it only ran for a short period of time. CW4 said the module would overheat and had to be shut down and maintenance performed. Just as CWs 1 and 2 relayed, CW4 also said the modules had a sticky lead issue and the Company could not figure out how to fix it. CW4 said a lot of R&D was done on the sticky lead issue, including scrapers removing the lead and many other potential solutions.

96.     CW4 and the Vice President, Recycling Technology Battery and Lead Recycling Operation, went to Clarke and Mould on several occasions and told them about the problems and that the Company could not reach the revenue and production numbers the Company announced.

97.     CW4 said Clarke would tell investors how much product they would produce and then, after, go to the Vice President, Recycling Technology Battery and Lead Recycling Operation and say, now that I have said that, how can we make that happen. CW4 said they could not make it happen because of all of the problems.

98.     Like CW2, CW4 said CW4 witnessed that Clarke and Mould both visited the Reno Plant regularly.  Echoing CW2, CW4 said Clarke and Mould knew the plant was not operational and saw the problems for themselves, too.

99.     Just as CWs 2 and 3 relayed, CW4 said that, on several occasions, investors came to the Reno Plant for a demonstration of the Aqua Refining process.  CW4 described how management put on a "show" for the investors, as similarly described by CWs 2 and 3.  CW4 stated that Mould would email the Vice President, Recycling Technology Battery and Lead Recycling Operation and copy CW4 to advise them of the visits so they could operate the module for the investors.  CW4 said that a few days before the visit, employees would be reminded to "clean [the plant] up really nice" and would also be informed of the logistics of the demonstration.  CW4 said that essentially this meant confirming the timing of the run to make sure that the modules were still operating while the investors were in the Reno Plant.  CW4 said the employees called the visits the "dog and pony show," because it was a "gyp."

100.    CW4 said investors would meet with Clarke and Mould in the conference room at the Reno Plant while CW4 and the Vice President, Recycling Technology Battery and Lead Recycling Operation, "assembled a team to stage a show."  The team included some key people, including a project manager and some people from the maintenance department as well as a program engineer, to assist in restarting the process if anything shut down.  CW4 said, because the module could not operate for more than about an hour before it would break down, CW4 had to start it at a time where it would run during the investors' visit and not break down.  CW4 said the visitors would spend about five to ten minutes on the plant floor watching the demonstration, and the rest of the time they were in a conference room with Clarke and Mould.  CW4 knows this because CW4 witnessed it.

101.    CW4 did these presentations at least four or five times over a period of four or five months.  CW4 remembers doing them twice in May 2017 and once in January 2017.  Like CW2 stated, CW4 relayed that Johnson Controls was one such visitor.  CW4 relayed that Johnson Controls visited the Reno Plant in January 2017.  Just as CW2 relayed, CW4 also said the representatives for Interstate Batteries were also one of the groups of visitors.

102.    CW4 recounted that whenever a group came in for a visit "we had to prep the [factory] floor, clean the floors, turn on the lights, and start running the equipment and modules." CW4 further relayed that Clarke would leave his meetings with investors and come out to the floor first to ensure everything was running properly before a demonstration started.

103.    CW4 also described production reports at the Reno Plant, similar to what CWs 2 and 3 described. CW4 stated CW4 prepared a report called a Daily Production Report and saved it on a shared drive. CW4 said that all executive management had access to those reports and the drive. In the beginning, CW4 attached the report to an email and sent it to the Vice President of Recycling Technology Battery and Lead Recycling Operation, but it was decided to put it on the shared drive so everyone had access to it. CW4 said that the report identified everything production did. CW4 said that these reports showed no AquaRefined lead was produced. CW4 said at the far-right side of the report was the column for AquaRefined lead and it was blank because no AquaRefined lead was produced. CW4 said that there was no production for AquaRefining because "it was still in the R&D stage"; nothing was produced, and so no revenue could have been earned from the sale of AquaRefined lead. The report only showed the by-products produced.

104.    CW4 said that the lead alloy is in the top part on a battery. Inside the battery is powder lead that is purer, but harder to get. CW4 said that to sell the lead alloy, which is less valuable, it is melted down and cast. However, CW4 said, Aqua Metals was not able to get the lead alloy melted to be pure enough to cast and sell, because the process required higher heat, such as that which would be available in smelting, which uses a furnace. Thus, CW4 said, even this part of recycling was not working as the kettles were not hot enough. CW4 said that, therefore, Aqua Metals just sold the lead alloy right off the breaker. CW4 also said the hammermill (the breaker) often broke down because they were putting too many batteries through it and its throughput was limited.

105.    CW4 said that at the time CW4 left Aqua Metals, the ladders were not even bolted to the tanks as the Occupational Safety and Health Administration (OSHA) requires for an operating factory, but held to the tank with twine. CW4 relayed that this shows that the Reno Plant was not operational, but just in start-up phase.

**Confidential Witness No. 5**

106.    CW5 was a Senior Process Engineer at the Reno Plant from summer 2017 until 2018. CW5 said CW5 was on the plant floor most of the time working to develop the AquaRefining process and modify the modules based on data collected.  CW5 said, while CW5 was at the Company, the AquaRefining process was in the R&D stage.

107.    CW5 said while CW5 was at Aqua Metals the modules "weren't ready for full production"; "they did not achieve its operational targets Aqua Metals wanted"; and the modules were "not fully operational."

108.    Similar to CWs 1, 2 and 4, CW5 said that a major issue with the modules was getting the lead off the modules.  CW5 said that this was called a "sticky lead" issue.  CW5 explained that the issue was that the lead was getting stuck in the chutes of the modules.  CW5 said that the lead was supposed to slide off the chutes onto the conveyer belt, but got stuck on the chutes.  CW5 said that this prevented Aqua Metals from gathering the lead and shipping it out.  CW5 said that the process wasn't working.  CW5 said "I know I never saw that much lead coming off the modules."

109.    CW5 attended production meetings at the Reno Plant.  CW5 said that the meetings were also attended by Mould and Clarke, when they were at the Reno Plant.  As CWs 2 and 4 relayed, CW5 said that Clarke came to the Reno Plant often.  CW5 estimated that Clarke attended between five and ten of these meetings during the time CW5 was employed at Aqua Metals.  CW5 said that, in these meetings, they discussed problems with the modules and the whole production process as well as possible solutions.  CW5 said that Clarke and Mould were in those meetings and heard of the problems.

110.    CW5 said that, additionally, a general update and discussion meeting was held whenever Clarke and Mould came into town, and Clarke and Mould attended these meetings.  Topics discussed in these meetings were plant efficiency and problems at the plant, including with machinery, break downs, materials and scheduling.

111.    CW5 said that, based on his observations and attendance in various meetings, and as CWs 2, and 4 stated, Clarke was fully aware of what was happening at the Reno Plant and the specific problems that were occurring with production.

112. As likewise relayed by CWs 2 and 3, CW5 said each shift supervisor prepared reports called Daily Production Reports. CW5 received the reports via email. CW5 said that the plant managers also received them as CW5 was on an email list of people who received them.

113. Just as CWs 2, 3 and 4 relayed, CW5 said visitors came to the Reno Plant periodically. CW5 said the visitors were shown around by Mould, Clarke and the plant manager.

## VI. EXCHANGE ACT VIOLATIONS

114. Even before the Class Period began and in the January 25, 2016 press release issued by the Company titled "Aqua Metals Issues Annual Letter to Shareholders" ("January 25, 2016 Press Release"), Aqua Metals described itself as "commercializing a non-polluting electrochemical lead recycling technology called AquaRefining." Defendants touted that they had successfully tested AquaRefining and that the Reno Plant would produce 80 metric tons of lead per day by the end of 2016. For example, in the January 25, 2016 Press Release, the Company announced, "We remain on track to begin lead production in the second quarter of 2016, with plans to increase production to 80 metric tons of lead per day by the fourth quarter of 2016." Throughout the Class Period, when it never was able to do so.

### A. Material Misrepresentations and Omissions During the First Part of the Class Period

#### 1. The May 2016 False and Misleading Statements Regarding Interstate Batteries' Investment in Aqua Metals and The Existing Status of the AquaRefining Technology As of Q1 2016

115. At the market open on May 19, 2016, the first day of the Class Period, Aqua Metals issued a press release titled "Interstate Battery and Aqua Metals Form Strategic Partnership" ("May 19, 2016 Press Release").[2] The Company announced a partnership between Aqua Metals and Interstate Batteries, "the No. 1 replacement battery brand, the largest independent battery distribution system in North America and the country's leading battery recycler." The May 19, 2016 Press Release further announced that, "[w]ith a nationwide network of more than 200,000 dealers returning battery cores, Interstate Batteries recycled more than 24.9 million automotive batteries in 2015, which is more than it sells." The Company touted that Interstate Batteries agreed to supply more than a

---

[2] Unless otherwise stated, the Form 8-Ks referenced herein were signed by defendant Clarke.

million automotive and other lead-acid batteries as feedstock for Aqua Metals' AquaRefineries and agreed to make a strategic investment of approximately $10 million into Aqua Metals ("Interstate Batteries Partnership"). Clarke commented that, "[w]ith its forward-thinking environmental goals, broad distribution network and strong brand name, *Interstate Batteries is an ideal partner for us as we scale our business*."[3]

116. Also, at the market open on May 19, 2016, Aqua Metals filed a Form 10-Q for its first quarter of 2016 ("Q1 2016") ended March 31, 2016 with the SEC ("Q1 2016 Form 10Q"). The Company stated that "we have built and operated both a small-scale unit of our AquaRefining process and a full size production prototype [and that] [t]hrough the operation of such units we have successfully produced 99.99% pure lead on a limited scale." The Company reported that the "*testing of our AquaRefining process has been successful to date*."

117. In the Q1 2016 Form 10Q, the Company laid out its plan to produce 80 tons of recycled lead per day by Q4 2016 and to ramp that up to 160 tons per day:

> *As of the date of this report, we believe that interest in our first recycling facility and demand for our recycling capacity is strong.* Consequently, we have implemented a plan to achieve *production at the rate of 80 tons of recycled lead per day by the fourth quarter of 2016 and, over time, expand to 160 tons per day*. Our TRIC [Tahoe-Reno Industrial Center] facility is designed and is being constructed in order to accommodate a total of 32 AquaRefining modules and additional battery breaking and component separations equipment sufficient to support expansion to 160 tons of recycled lead per day.
>
> Construction of the TRIC facility began on August 17, 2015 and is progressing with a completion expected in the second quarter of 2016. *We expect to install our first AquaRefining modules in approximately the second quarter of 2016 and to install a total of 16 AquaRefining modules to support an initial lead production capacity of 80 tons per day by the close of the third quarter of 2016. In keeping with our modular approach, we intend to commence commercial LAB recycling operations shortly after the first AquaRefining module is delivered*.

118. The Q1 2016 Form 10-Q also reported that the Interstate Batteries Partnership would provide Aqua Metals with "working capital [] sufficient to fund … the completion of [its facility] and attainment of production at a rate of 80 tons of recycled lead per day."

---

[3] All emphasis is added, unless otherwise noted.

[No. 4:17-cv-07142-HSG] CONSOLIDATED COMPLAINT FOR VIOLATION OF SECURITIES LAWS      29

119. Following these statements, the price per share of Aqua Metals' stock increased $2.26, or roughly 29%, from a close of $7.80 on May 18, 2016, to a close of $10.06 on May 19, 2016, on heavy trading volume of 895,344 shares.

120. Analysts reacted extremely positively to the Interstate Batteries Partnership. For example, a May 19, 2016 Oppenheimer report stated that the partnership was a "big step forward" and, as Interstate Batteries is 49% owned by Johnson Controls, a "validation of its product quality from the global leader in lead acid batteries." Oppenheimer further stated that it expects the funding to provide the capital to "double capacity at the [Reno Plant] to 160 tons/day" and estimated it would generate revenue of $32.5 million in 2017. Likewise, on May 26, 2016, a Northland Capital Markets ("Northland") report stated that "this strategic relationship with a meaningful[] player in battery recycling helps de-risk and validate AQMS' business."

121. On May 24, 2016, at the market open, Aqua Metals issued a press release titled "Aqua Metals Provides First Quarter 2016 Corporate Update" ("Q1 2016 Press Release") announcing its results for the first quarter of 2016 ("Q1 2016"). Murphy was identified as the "Company Contact" on this press release. The Company stated it is "commercializing a non-polluting electrochemical lead recycling technology called AquaRefining," and that the "modular systems allow the lead acid battery industry to simultaneously improve environmental impact and scale production to meet demand." The Company again touted its "strategic relationship" with Interstate Batteries.

122. In the Q1 2016 Press Release, Clarke told investors that the Interstate Batteries deal "validate[d]" Aqua Metals' technology and would allow the Company to begin production in Q3 2016 and attain production of "80 metric tons of recycled lead per day by the end of 2016":

> Over the last year, we have spent significant time deepening our strategic relationships and advancing discussions with major players throughout the lead industry. These players include lead-acid battery recyclers, distributors, manufacturers and end users. To this end, **last week we announced a major strategic partnership with Interstate Batteries, the largest battery distributor and recycler in the U.S.**, which has agreed to invest $10 million in our Company and agreed to supply more than a million automotive and other lead-acid batteries as feedstock.
>
> **We believe this serves as a strong validation of our technology** and **we continue to see a tremendous amount of interest** in our environmentally friendly and economically efficient recycling equipment and processes to supplement, and in some cases, replace conventional recycling and smelting operations altogether. **Our goal for the remainder of the year is to solidify a clear path for national expansion of our AquaRefineries, enabling us to rapidly gain market share after a successful commercial production launch. We also expect to be in a position to license our equipment and processes and**

*related services to qualified third parties, with whom we are already advancing discussions, beginning in 2017*.

With the additional capital from Interstate Batteries and other investors, we have decided to make certain enhancements to the AquaRefinery. As a result, *we now expect to begin recycling lead-acid batteries early in the third quarter of 2016. Our plan remains to increase production to 80 metric tons of lead per day by the end of 2016*. We expect to begin by taking feedstock supply from Battery Systems, Inc., our next-door neighbor in the TRIC, which will *allow us to ramp the facility effectively in the commissioning and early growth period*. We will then add to that supply with feedstock from Interstate Batteries and other sources, which we expect to begin receiving in the fourth quarter of 2016.

123.    Also, at the market open on May 24, 2016, Aqua Metals issued a press release titled "Aqua Metals Wins Platts Global Metals Rising Star Award for Innovations in Lead Industry" ("May 24, 2016 Press Release") announcing that it won a Platts Global Metals Rising Star Award for innovations in the metals industry. In the May 24, 2016 Press Release, the Company described its AquaRefining process as "*the industry's first commercially viable alternative lead-acid battery recycling technology*" and that it "emits virtually no harmful byproducts, while yielding lead recovery of nearly 100 percent." The May 24, 2016 Press Release further stated that the "modular design of the *AquaRefining technology enables unprecedented scalability*, allowing facilities to efficiently meet even the most stringent environmental regulations and opening the door for the co-location of lead-acid battery manufacturing, distribution and recycling."

124.    In the May 24, 2016 Press Release, Clarke remarked:

It is an honor to earn the accolades of such a highly respected organization for our work to revolutionize the lead industry. As we enter a "Battery Age," lead-acid technologies can experience continued market dominance with the development of a recycling method that is economically sustainable and environmentally responsible. *This distinction affirms that Aqua Metals has developed just that*.

125.    On May 24, 2016, while the market was open, Aqua Metals held its Q1 2016 earnings conference call ("Q1 2016 Conference Call") with Clarke and Murphy. During that call, Clarke touted that it had started assembling the "first *commercial ready* AquaRefining module … in January of this year" at the Company's AquaRefining module assembling test facility located at its corporate headquarters. Clarke stated that Aqua Metals' "full-sized electrolyzed test facility … allow[ed] [it] to demonstrate [the] process to third-party license[e]s without having to take [them] into Reno to show the process there." Clarke further stated, "[w]e're ready to compete in the global $22 billion lead

market. *We're generating strong positive interest that's an understatement, we are generating massive interest in the market with supplies and customers as evidence[d] by our recent announcement*…." Clarke further stated that the Reno Plant "*remain[s] on track to achieve 80 metric tons of lead per day output by the end of 2016 and on track to expand that to 160 metric tons per day by 2018*," and that the Reno Plant "will operate 24 hours a day, seven days a week."

126. An analyst from Oppenheimer asked, "when do you expect the first startup to happen in the first test runs?" Clarke again minimized the risk of AquaRefining:

> *[S]ome of them have already been completed. So, there isn't a first test run. It's a continuing operation. So, in one sense, we've already done it. In the sense of when will the first modules be running in their base in Reno, we're projecting late July, maybe early August.* The timing of the first run, that's critical, the more critical items are getting the much larger scale equipment installed and running [indiscernible] the battery breakers and all the various support equipment. *There's little risk associated with the actual AquaRefinery themselves.* The important point is just the scale of the operation.

127. Clarke also touted the Interstate Batteries Partnership as a "pretty significant event and a *pretty good endorsement of our business*." In discussing the significance of strategic partnerships to the growth and expansion of the Company, he further stated:

> I'm going to talk to the recently announced *strategic partnership with Interstate Batteries and the whole point of this relationship is to accelerate our growth.* So those of you don't know, Interstate Batteries is the number one replacement battery brand in the U.S. It's the largest independent battery distribution system in North America and the country's leading battery recycler.
>
> ***
>
> *But the important thing is, this provides a path for us in which we can now plan in detail along with a high level of surety those additional recycling facilities. And one of the big things it does for us is, it removes the sourcing risk that was inherent in expanding into an industry that is based on a number of pre-established relationships.* So, what *Interstate brings to us, importantly, is a supply of these batteries. And we believe it also brings a huge amounts of credibility to what we're trying to build.*
>
> ***
>
> *With the strategic relationships we have in place, we now believe we can expand quickly with relatively low risk whilst we control IP and quality.* And in parallel to that, we're working to develop our own LME brand for our process. *So the scope for that is to expand the Tahoe-Reno facility to 160 tons a day during 2017 and 2018. We got the supply to do that now, and then move forward to build multiple additional facilities collocated with our strategic partners…. So right now, we are jointly evaluating multiple locations across the U.S. with our strategic partners.* We're not announcing where they are going to be yet, and it will be probably a few months before we do that, but it's a serious ongoing exercise with a great partner.

[No. 4:17-cv-07142-HSG] CONSOLIDATED COMPLAINT FOR VIOLATION OF SECURITIES LAWS      32

128. In response to a question posed by an analyst from Northland regarding the Interstate Batteries Partnership, Clarke stated:

> We've focused on building our additional facilities with Interstate as the strategic partner…. [O]ur focus right now is that we have a strategic partner who is essentially looking towards to expanding rapidly so that they can take advantage of lead produced that isn't subject to a smelter. ***So that's our entire focus and what it gives us is surety of not only supply of batteries, but of locations, so it allows us to accelerate. And as I said earlier, we talked a lot about our desire to build 10 facilities a year, which is a great statement, but how do you validate and move towards the end, and this relationship provides us the pathway to do that***.

129. During the Q&A portion of the call, Clarke explained what types of lead the Reno Plant purportedly produces:

> ***[W]e make two types of lead. We make specific grade alloys for specific battery customers and we make also pure lead***, which is more typically used as an active material, although some modern batteries use relatively pure lead in one of the plates. The amount of lead that we produce in terms of active material to plate lead will vary somewhat depending on the mix of batteries that come in. But we specifically are making or we plan to make specific alloy grades for specific customers and ultra-pure lead for specific customers and for the auto market. The ultra-pure side of what we are making is equivalent to virgin lead.

130. Defendants' statements in paragraphs 115 through 129 above were false and misleading in several ways:

(a) The statements above regarding the then-existing status, success and commercialization of the AquaRefining process were false and misleading when made because these statements concealed the facts that AquaRefining was malfunctioning including due to the problems such as the sticky lead problem (which the Company did not disclose until the end of the Class Period and was not resolved during the Class Period), the hard lead problem, and problems with the chemical ratios for the process, was not successful or proven, nor was it on the verge of generating income. The truth of these facts is demonstrated by: (i) statements by CW1, including that the AquaRefining technology was malfunctioning and plagued with continuing problems at both California Testing Facilities since 2015, including issues with chemical ratios, the hard lead issue and the sticky lead issue that persisted throughout the Class Period and well into 2018 and was not resolved (¶¶ 65-75); (b) the end of and post-Class Period admissions regarding the sticky lead problems and the need to find a solution to such problems and then test the solution (¶¶ 290, 296, 298); and (c) the end of and post-

Class Period admissions that the AquaRefining process was "unproven technology" (¶¶ 294, 298). Moreover, as the Company finally admitted in its Form 10-K for the year ended 2017, filed on March 15, 2018 ("2017 Form 10-K"), the Company had "not put into operation, the processes that we believe will support the production of AquaRefined lead on a commercial scale" (¶¶ 298(f)).

(b)     The statement above that the Company's "full-sized electrolyzed test facility," "allows us to demonstrate our process to third-party license[e]s without having to take [them] into Reno to show the process there" was false and misleading when made for the reasons in paragraph ¶ 130(a) above, as well as the additional reason that CW1 stated that representatives from Interstate Batteries and Johnson Controls (who is also a 49% owner of Interstate Batteries), among others, were subjected to Clarke and Mould's dog and pony shows in the California Testing Facility (¶ 76).

(c)     The statements above touting the strategic partnerships, including with Interstate Batteries, and that they are a validation of the technology and will allow the Company to accelerate growth were false and misleading when made for the reasons discussed in paragraphs 130(a) & 130(b), above.

(d)     The statements above touting the demand and interest in the technology were false and misleading when made for the reasons discussed in paragraphs 130(a) & 130(b), above.

(e)     The statements above regarding licensing equipment and building additional facilities are statements of the Company's current existing goals and focus, which are actionable because they were false and misleading when made for the reasons discussed in paragraphs 130(a) & 130(b), above. Further, that Defendants knew these statements were false and misleading when made, is demonstrated by the statement by CW1 that significant issues with the technology, including the sticky lead issue, hard lead issue and issues with chemical ratios, as well as the fact that the technology would have issues scaling, were known, including by Clarke and Mould, and apparent at the California Testing Facilities since 2015 and that Clarke and Mould ignored potential solutions to the issues (¶¶ 63-75).

(f)     The statements above regarding production rates, including 80 metric tons of lead per day by the end of 2016 and expanding that to 160 metric tons per day by 2018 and it is "on track" to achieve the production rate and the Company commencing revenue-producing operations in

the Q3 2016, were statements of current conditions of the Company and were false and misleading when made for the reasons discussed in paragraphs 130(a), above. Further, Defendants knew these statements were false and misleading when made for the reasons discussed in paragraphs 130(e), above.

### 2. The August and September 2016 False and Misleading Statements Regarding Its Open House at its TRIC Facility and The Existing Status of the AquaRefining Technology as of Q2 2016

131. On August 2, 2016, at the market open, Aqua Metals issued a press release titled "Aqua Metals Unveils World's First AquaRefinery" ("August 2, 2016 Press Release") announcing that it held an open house at its Reno Plant. The Company announced in the August 2, 2016 Press Release that the Company is "commercializing" AquaRefining, and further explained the technology: "AquaRefining is the world's first environmentally friendly process to recycle lead-acid batteries (LABs)" and that "*[t]he process produces lead that is as pure as – or purer than – mined lead, requiring no secondary processing*." The Company touted that these "modular systems are expected to allow the lead acid battery industry to simultaneously improve environmental impact and scale production to meet rapidly growing demand." The Company stated that, in addition to its Reno Plant, it would "sell licenses to partners for AquaRefining technology and equipment, which can be co-located with battery manufacturers and distributors, as well as existing battery recycling facilities globally."

132. In the August 2, 2016 Press Release, Clarke stated:

> Lead-acid batteries are over 99% recyclable, *but until now*, there has been no way to recycle lead in an environmentally friendly fashion. With this AquaRefinery and more expected to come, Aqua Metals is doing its part to create the most sustainable battery technology the world has ever seen, while also providing economic benefits to recyclers, manufacturers and distributors.

133. In the August 2, 2016 Press Release, the Company again touted its partnership with Interstate Batteries, which "controls 20 percent of the lead-acid battery recycling market in the United States," and quoted Interstate Batteries' CEO as endorsing the Company: "Because Aqua Metals' breakthrough technology is so promising, Interstate Batteries is supplying more than a million automotive and other lead-acid batteries to the AquaRefinery over the next year. We feel we're making a smart investment in our future, and in the future of our industry."

134. On August 10, 2016, at the market open, Aqua Metals issued a press release titled "Aqua Metals Provides Second Quarter 2016 Corporate Update," which was attached as Exhibit 99.1 to a Form 8-K filed with the SEC before the open ("Q2 2016 Press Release") announcing results for the second quarter of 2016 ("Q2 2016"). Murphy was identified as the "Company Contact." The Company stated that it was "commercializing" AquaRefining and that "[c]ommissioning and testing for all key equipment [was] to be completed with initial production commencing in October." The Company also said that "[l]ead production [was] projected to scale quickly during the fourth quarter, *reaching 80 metric tons per day by the of 2016*."

135. Clarke also stated that production was "on track" to reach 80 tons per day by the end of the year:

> Our key focus has remained on commercializing the world's first AquaRefinery, which is now largely complete…. We're quickly approaching a meaningful inflection as we bring our first facility online and begin producing lead early in the fourth quarter of 2016. *Most importantly, we remain on track to reach full scale capacity of 80 metric tons of lead output per day by the end of 2016.*

136. The Company stated in the Q2 2016 Press Release that six AquaRefining modules had been tested, four of which were in place at the Reno Plant, and that AquaRefining module deliveries to third-parties were expected to begin in third quarter of 2017 ("Q3 2017"), and that a second AquaRefinery was in the works:

> *The manufacturing facility [in Alameda, California] has already assembled and tested six modules, four of which are in place at the TRIC AquaRefinery.* The Company currently has the physical capacity to produce 160 modules annually, or enough to support 10 AquaRefineries the size of the TRIC AquaRefinery. Providing AquaRefining technology and equipment on a fully serviced licensing model is the next stage of the Company's duel (sic) business model, and the *first module deliveries to third parties are expected in the third quarter of 2017*.

> Aqua Metals is also in advanced planning stages for a second facility, and is working on supply, offtake and financing options. The Company plans to build additional regional AquaRefining facilities that will be strategically located near battery manufacturers and distributors, as well as existing battery recycling facilities globally, thereby significantly reducing logistics costs. Subject to the availability of the required capital, the *Company plans to operate facilities that will generate the equivalent of ~800 metric tons of lead output day*.

137. The Company touted that the Reno Plant "is largely complete and is now moving into the commissioning and testing phase to ensure the facility is able to rapidly and efficiently scale." The Company stated that it held "a successful grand opening ceremony at its TRIC AquaRefinery which

was attended by over 200 people, including investors, strategic partners, industry participants, key employees and government officials. The tour highlighted the installed equipment and processing lines, while enabling discussions with key personnel about how the production facility and the supply chain will proceed." The Company stated that a "*substantial majority of U.S. battery producers have visited our facility and expressed interest in AquaRefining*" and the Company was "*[g]enerating strong interest from additional potential strategic partners*."

138. Clarke again touted its strategic partnerships as an endorsement of its business:

We have also concentrated on deepening our strategic relationships with key partners, such as Wirtz Manufacturing, Interstate Batteries and Battery Systems, Inc., while advancing discussions with other *major players throughout the industry who have recognized our potential to revolutionize the $22 billion lead market*. These players include lead-acid battery recyclers, distributors, manufacturers and end users that are interested in supplementing, and in some cases, replacing conventional recycling and smelting operations altogether. Taken together, we are well positioned to rapidly gain market share upon the successful launch of our first facility and look forward to driving further value for shareholders.

139. On August 10, 2016, after the market close, Aqua Metals filed a Form 10-Q for the second quarter of 2016 ("Q2 2016") ended June 30, 2016 with the SEC ("Q2 2016 Form 10-Q"). In the filing, Aqua Metals reported "revenue-producing operations" were expected to commence in Q4 2016. It represented that, although revenue-producing operations and completion of the Reno Plant had been postponed one quarter (as compared to what it stated in its prior 10-Q filing), the Company's expected production rate of 80 tons of recycled lead per day by Q4 2016, and ramping up to 160 tons per day, remained unchanged. The Company also reiterated that the "*testing of our AquaRefining process has been successful to date*."

140. The Q2 2016 Form 10-Q further stated:

As of the date of this report, we believe that interest in our first recycling facility and demand for our recycling capacity is strong. Consequently, *we have implemented a plan to achieve production at the rate of 80 tons of recycled lead per day by the fourth quarter of 2016 and, over time, expand to 160 tons per day*. Our TRIC [Tahoe-Reno Industrial Center] facility is designed and is being constructed in order to accommodate a total of 32 AquaRefining modules and additional battery breaking and component separations equipment sufficient to support expansion to 160 tons of recycled lead per day.

Construction of the TRIC facility began on August 17, 2015 and is progressing with a completion expected in the third quarter of 2016. We began installing our first AquaRefining modules in June 2016 and expect to install a total of 16 AquaRefining modules to support an initial lead production capacity of 80 tons per day by the close of the fourth quarter of 2016.

[No. 4:17-cv-07142-HSG] CONSOLIDATED COMPLAINT FOR VIOLATION OF SECURITIES LAWS          37

141. On August 10, 2016, while the market was open, Aqua Metals also hosted its Q2 2016 earnings conference call ("Q2 2016 Conference Call") with Clarke and Murphy. During this call, Aqua Metals referred to the following commissioning and ramp up schedule, which was attached as Exhibit 99.2 to the Form 8-K filed with the SEC on August 10, 2016, and Clarke discussed this commissioning and ramp up schedule:[4]

> And so, in terms of the time line, we broke it out to August, September, October through the end of the year.
>
> ***
>
> The managers are on site. We've got a pretty extensive staff and subcontractors that help with the commissioning work, and we're recruiting dayshift supervisors and having them start in early September. We'll bring our dayshift operators on site and train them up in early October. **So, by the beginning of November, we're targeting to be at somewhere around 20 tons a day of lead production, while the beginning of December to be at 40 tons a day of lead production and by the end of the year at 80 tons of lead production. And essentially, what we're doing is scaling by adding shifts. The facility will be a 24-hour day, 7 day a week, 52 weeks of the year operation running in four shifts, rotating. So, the scale [ph] of this about getting the process up and running and then adding shifts.**

142. Clarke also claimed that the AquaRefining module production and shipment schedule was proceeding as planned, "another one of several milestone[s] is we actually built and shipped our first AquaRefining module in June, which is pretty much when we said we'd do it." He further stated, "things are really starting to come together now. We've now got four modules on site and an additional 12 modules at various stages of assembly here in our facility."

---

[4] Murphy was identified as the "Aqua Metals Contact" in the presentation materials.

[No. 4:17-cv-07142-HSG] CONSOLIDATED COMPLAINT FOR VIOLATION OF SECURITIES LAWS      38

143.    When asked by an analyst, "to get up and running, which piece are you guys most concerned about or pieces that, as you turn on, this equipment may have some hiccups along the way?" Clarke reassured investors and analysts that "everything that we think we might have a problem with, we've got contingency plans in place for. So, ***I don't have a single thing that we're worried about***. It's really about the commissioning process itself."

144.    Another query posed to Clarke during the Q2 2016 Conference Call was whether there was "any concern that the modules will encounter problems when employed on a mass scale." Clarke stated, "***we have been operating a single full scale electrolyzer for 12 months now. That was pre-production prototype. Then, nearly four months ago now, we took a single electrolyzer off the production line and installed in our full scale test facility and have been operating that ever since. And we don't anticipate any issues operating at full scale***. Full scale is just essentially 96 of the same thing."

145.    During the Q2 2016 Conference Call, Clarke reiterated the Reno Plant's daily lead production and provided the composition of the lead output:

> [T]he world's first AquaRefinery is now opening for business. ***As we've said before, it's planned to be 160 tons of lead produced per day. It's going to start with 80 tons a day of lead output by Q4 2016 and then have a 160 tons of lead output by 2018. And the lead that we produce, 50% of that will be refined alloys for specific applications within lead acid-batteries and 50% of it will be pure and ultra pure lead*** [ph] also primarily uses the active material in lead-acid batteries and the key point that not only is a building built and I'll show you in a few slides that all of the key equipment is installed and was installed largely on schedule. We've also recruited a very experienced and capable operations team. They're on site and they're leading the commissioning activities....
>
> ***[I]f we're selling lead, we'll be selling it at a premium because we're producing ultra pure lead***. LME spot price is for secondary lead, which is kind of a mongrel lead that's – that needs a pure – ultra pure lead or a specific alloy. So, secondary lead produced by smelters needs to be further refined and alloyed into usable product. So, it is typically the lowest cost lead. So, we're actually going to be selling at premium.

146.    On the Q2 2016 Conference Call, Clarke explained that the Company's open house was strategically timed in advance of commissioning the Reno Plant, and that a "vast majority of the North American lead-acid battery industry has been on site" and had not found any "problems":

> ***So, we held an open day on July 28, and we chose to do this because this is the latest week we could do it before we start commissioning.*** And when you're commissioning a large chemical facility, which essentially what an AquaRefining facility is, there are all kinds of operations going on that you don't really want to have people wandering around you.

***

[No. 4:17-cv-07142-HSG] CONSOLIDATED COMPLAINT FOR VIOLATION OF SECURITIES LAWS          39

It seemed what *we've got the overwhelming response is wow, you guys really thought this through. Yet, yet – and we ticked all the boxes and even some companies have visited the site, wanting to find a problem and went away smiling and shaking our hands. So, basically, there is a real [audio gap] alternative to smelting*.

147. Clarke stated that the Company was "already pursuing debt financing options for our next facility, and we have in fact the potential to pre-sell similar all of its capacity before we even break ground. *We've got massively strong demand for AquaRefining modules and support equipment* and – did I mention that we've got strong interest from debt and other diluting sources of capital to fund our expansion."

148. Clarke also touted the Company's "strategic relationships":

[S]ince we started with building strategic relationships and we talked before about strength of our relationship with Wirtz Manufacturing who supply the battery breaking systems and supplied rather the battery breaking, ingoting and sort of water treatment facilities. Our ongoing and strong relationship with Battery Systems Inc., second largest distributor and collector of batteries in North America, they became our second strategic investor in our IPO in 2015. And then, not coincidentally, they operate a 200,000 square foot warehouse, less than a 100 yards from our facility from which they can supply dead batteries to us.

And then, I just need to speak to the fact that we brought on board Interstate Battery in May of this year. They are the largest distributor and collector of batteries in the U.S. Their initial [audio gap] to provide a million batteries a year to help with our scale up, and they became our first strategic investor with a fairly significant $10 million investment structured as straight equity and convertible in May of this year.

What I can say is that what's happened since then is that – and *I think down to the commitment of Battery Systems and, in particular, Interstate Batteries has driven a phenomenal level of credibility and interest in our technology. So, we're now in pretty significant discussions with multiple additional strategic partners.*

149. Clarke stated that "*[w]e don't see a major challenge in building, expanding the first facility and building the next one*…. *We're absolutely serious about a global rollout* …." Clarke said that the Company's "objective is to expand our own capacity to 800 tons a day from four to five facilities":

*And the idea behind that is 800 tons a day, we'd be at about 2% of global lead. And we think that gives us pretty serious commercial validation and credibility. That also gives us distributed training facilities to support our licensing model. In that, we plan to expand the Tahoe Reno facility to 160 tons a day by 2018*,...

Providing AquaRefining equipment on a fully serviced licensing model [ph] is stage and that's going to run in parallel. We're not planning to wait until we've built out all of our four to five facilities. Initially, I thought we would have to just to gain the credibility. But what we're finding is this massive support for an alternative to smelting. So, we're at a point now where a substantial majority of North American battery manufacturers and lead smelters have [ph] visited the facility, and I mean a substantial majority. And what

the feedback we're getting is, as Selwyn said it loud, cost quality and environmental permits and advantaged is not lost on anybody, and we're getting really serious interest. So, we've been approached by interested parties in not only America, but also in Europe, South America, China and India.

* * *

*So, on that basis, with both the U.S. and non-U.S. licensing rollout, what we said to the interested parties is that we're not going to – we don't plan to ship any modules until quarter three of 2017 not because we can't, but we just think it's prudent to have got six to seven months of operating experience under our belt before we do that.* Right now, we have indicative interest. That's equivalent to about two years of module production at full scale. So, *we've currently got the capacity to make 160 modules a year.* We've got indicative interest for about 320 modules and which we think is pretty fantastic considering the early stage that we're at.

150. Analysts reacted positively to the statements. For example, in an August 10, 2016 report, Oppenheimer raised its estimated revenue for Aqua Metals for 2017 to $37.8 million stating "[w]e expect strategic relationships with Wirtz Manufacturing, Battery Systems Inc, and Interstate Batteries to prove beneficial, as AQMS pursues discussions with other potential partners." Northland noted in an August 11, 2016 report that "AQMS provided a positive operational update that indicates to us that its longer-term business plans are progressing well. The Company reiterated key production capacity targets of 80 tons per day by year-end 2016 and 160 tons per day by 2018 and also noted it is in advanced planning stages for its second facility."

151. On September 22, 2016, Aqua Metals issued a press release titled "Aqua Metals Receives Estimated $3.6 Million in Nevada Tax Incentives" ("September 22, 2016 Press Release"). In the September 22, 2016 Press Release the Company announced that it was "commercializing" the AquaRefining technology and that it "expects the AquaRefinery will create over 50 jobs by the end of the year, with that number continuing to grow throughout 2017." Murphy stated "[t]hese incentives will substantially support our bottom line as we begin to ramp recycling production and generate revenue."

152. Defendants' statements in paragraphs 131 through 151 above were false and misleading in several ways:

(a) The statements above regarding the then existing status, success and commercialization of the AquaRefining process and the operations at the Reno Plant, including that it

would be producing 50% lead alloys and 50% AquaRefined lead, were false and misleading when made for the reasons discussed in paragraphs 130(a), above, and for the following additional reasons:

(i)     Statements by CW 1, 2, 3, 4 and 5 that AquaRefining did not work and suffered from significant malfunctions, including the sticky lead, hard lead and other problems; the modules could not operate for more than a few hours or less without breaking down; from the time the Reno Plant opened and throughout the Class Period, the Reno Plant was a testing facility; the AquaRefining process and the Reno Plant were in start-up and R&D phase throughout the Class Period (¶¶ 65-75, 77-80, 85-89, 90-96, 98, 103-110).

(ii)     Moreover, even by the end of the Class Period, Aqua Metals had barely produced any pure lead and the limited revenue generated by Aqua Metals starting in the second quarter of 2017 was for sales of unrefined lead compounds and plastics sold directly after being separated in the breaker.  This fact is evidenced by (a) the Company's disclosures beginning May 9, 2017 (¶¶ 233-235, 244, 271-275, 289-291, 294-296, 298); (b) CWs 2, 3 and 4 statements that very limited amounts of lead were produced, and particularly a lack of AquaRefined lead (¶¶ 80, 91, 93-94); and (c) CWs 1, 2 and 4 statements that the only products Aqua Metals sold were by-products (unrefined lead compounds and plastics) right off the breaker (¶¶ 75, 80, 94).

(iii)     Furthermore, as the Company admitted in October 2017, it was still in the commissioning process even in Fall 2017 (¶¶ 290-291).

(b)     The statements above touting the strategic partnerships, including with Interstate Batteries, and that they are a validation of the technology and allow the Company to accelerate growth were false and misleading when made for the reasons discussed in paragraphs 130(a), 130(b), 152(a)(i)-(iii), above, as well as the additional reasons that:

(i)     statements by CWs 2, 3 and 4 that regular visitors to the Reno Plant were subjected to dog and pony shows carefully orchestrated to conceal the above noted problems and that the process was not functioning (¶¶ 82-84, 90, 99-102);

(ii)     statements by CWs 1, 2 and 4 that representatives from Interstate Batteries were subjected to Clarke and Mould's dog and pony shows both in the California Testing Facility and at the Reno Plant  (¶¶ 76, 83); and

(iii)    statements by CWs 1, 2 and 4 that representatives from Johnson Controls were also subjected to dog and pony shows, both at the California Testing Facility and at the Reno Plant (¶¶ 76, 83, 101).

(c)    The statements above touting the demand and interest in the technology, including as a result of visits to the Reno Plant, were false and misleading when made for the reasons discussed in paragraphs 130(a), 130(b), 152(a)(i)-(iii), 152(b)(i)-(iii), above.

(d)    The statements above regarding licensing equipment and building additional facilities are statements of the Company's current existing goals and focus, which are actionable because they were false and misleading when made for the reasons discussed in paragraphs 130(a), 130(b), 152(a)(i)-(iii), 152(b)(i)-(iii), above.  Further, Defendants knew these statements were false and misleading when made for the reasons discussed in paragraphs 130(e), above.  That Defendants knew these statements were false and misleading when made is further demonstrated by the facts that:

(i)    Statements by CWs 2, 4 and 5 that Defendants regularly visited the Reno Plant and witnessed the problems with the AquaRefining process and knew the Reno Plant was not operational (¶¶ 79, 98, 110-111).

(ii)    statements by CWs 2, 3, 4 and 5 that Defendants had access to Daily Production Reports which showed the problems at the Reno Plant, including with the AquaRefining process, and the lack of production of any AquaRefined lead (¶¶ 85, 91, 103) and  statements by CWs 2 and 5 that Clarke and Mould periodically attended production meetings at the plant at which the problems were discussed (¶¶ 79, 109).

(iii)    statements by CW4 that CW4 and the Vice President of Recycling Technology Battery and Lead Recycling Operation at the Reno Plant went to Clarke and Mould on several occasions and told them about the problems and that the Company could not reach the revenue and production goals that the Company publicly announced and that Clarke would tell investors how much product they would produce and then, after, go to Vice President of Recycling Technology Battery and Lead Recycling Operation and say, now that I have said that, how can we make that happen (¶¶ 96-97).

(e)     The statements above regarding the production rates, including 80 metric tons of lead per day by the end of 2016 and expanding that to 160 metric tons per day by 2018 and that it is "on track" to achieve the production rate, and that the Company commencing revenue-producing operations in the Q3 2016, were statements of current conditions of the Company and were false and misleading when made for the reasons discussed in paragraphs 130(a), 152(a)(i)-(iii), above.  Further, Defendants knew these statements were false and misleading when made for the reasons discussed in paragraphs 130(e), 152(d)(i)-(iii), above.

### 3.     The November 2016 False and Misleading Statements Regarding Having Produced AquaRefined Lead at TRIC and The Existing Status of the AquaRefining Technology As of Q3 2016

153.     On November 1, 2016, at the opening of the market, Aqua Metals issued a press release titled "Aqua Metals Produces First AquaRefined Lead at World's First AquaRefinery," which was attached as Exhibit 99.1 to a Form 8-K filed with the SEC after the market close ("November 1, 2016 Press Release"), announcing production of the "first-ever AquaRefined lead" at its Reno Plant.  In the November 1, 2016 Press Release, Clarke stated, "*[t]his is the most critical step in the commissioning process of the Nevada AquaRefinery*."

154.     The November 1, 2016 Press Release posted to the Company's website included photographs with captions of the AquaRefining process "continuously producing AquaRefined pure lead, flowing like a waterfall of lead infused electrolytes":



AquaRefining module with six electrolyzer units continuously producing AquaRefined pure lead, flowing like a waterfall of lead infused electrolytes



Closeup of the first casted ingot

---



Conveyer belt carries pure lead to ingot casting area

155.    The Company described its process in the November 1, 2016 Press Release:

AquaRefining uses an entirely reusable water-based technology to produce ingots of ultrapure lead.  Through its own on-site assay, ***Aqua Metals has verified that the lead produced in the AquaRefining module is over 99.99 percent pure***.  The Company will send its initial production samples to several U.S.  battery manufacturing companies— which collectively represent over 50 percent of U.S.  battery production—to allow them to conduct their own assays.

***Aqua Metals previously demonstrated the effectiveness of its technology at bench scale, pilot scale and with a single, full-size electrolyzer.  The Company has now produced high-quality AquaRefined lead with a commercial-scale AquaRefining module at its facility in the Tahoe-Reno Industrial Center in Nevada.***

156.    The Company touted that it has "built and delivered a total of five modules to its Nevada AquaRefinery thus far and currently plans to install and commission a total of 16 modules for ***initial production capacity of 80 metric tons of lead per day.  The Company anticipates that the Nevada AquaRefinery will reach its initial production capacity within the coming months***."

157.    Aqua Metals reiterated its "strategic partnerships" with Interstate Batteries and Battery Systems International and stated that the Company "is in discussions with nearly every major U.S. based battery manufacturer and recycler, as well as data center operators and household internet brands (which use lead-acid batteries for backup power)."

158.    Before the market open on November 7, 2016, Aqua Metals filed a Form 10-Q for the third quarter of 2016 ("Q3 2016") ended September 30, 2016, with the SEC ("Q3 2016 Form 10-Q"). In the filing, the Company again reported that "***the testing of our AquaRefining process has been successful to date***."  Aqua Metals also stated that limited lead production had commenced at the Reno

Plant, the AquaRefining process had produced 99.99 percent pure lead, and that the Company would begin earning revenue from commercial-scale recycling in Q4 2016:

> On October 28, 2016, we **commenced limited lead-producing operations** at our TRIC facility through the processing of recycled lead through a single AquaRefining module. **Through our own on-site assay, the Company has verified that the lead produced in the AquaRefining module is over 99.99 percent pure. We expect to commence earning revenue through the commercial-scale recycling of LABs at our TRIC facility during the fourth quarter of 2016.** Additionally, **we have implemented process and other improvements which have increased the capacity of the TRIC facility to 120 tonnes per day. We expect to achieve a production rate of 120 tonnes per day early in 2017.**

159. Although the Company had not even come close to reaching the 80 ton per day production it had been touting since earlier in the year, the Company reported that its "plan of operations for the 12-month period following the date of this report [was] to **expand operations at our first recycling facility at TRIC to 120 tonnes of lead production per day**" and **"expand [its] business with additional recycling facilities and licensing of our recycling technology and equipment to third parties**." The Company claimed that, by 2018, it could expand production to 160 tons of lead per day: "**[o]ur TRIC facility is designed to accommodate additional AquaRefining modules and has battery breaking and component separations equipment sufficient to support expansion to 160 tonnes of recycled lead per day,**" and **"[o]ur goal is to increase our production of lead at our TRIC facility to 160 tonnes per day by 2018.**"

160. As to the additional facilities and licensing, the Company stated:

> Separately, we are engaged in detailed discussions with providers of non-dilutive capital to finance up to an additional four facilities, each of would have a production capacity of approximately 160 tonnes per day. On the strength of these discussions we have started to evaluate locations for facilities two and three, however, as of the date of this report, we have no agreements or understandings with regard to the financing and there can be no assurance that we will be able to consummate an agreement on terms acceptable to us, or at all.

> In the longer term, we intend to expand our business in the United States and internationally, through the provision of AquaRefining equipment to third parties using a "serviced licensing" business model. We now have exploratory discussions with third parties interested in this option in the United States and various foreign jurisdictions. These discussions have now progressed to the point that **we have started to evaluate materials supplied to us by third parties for compatibility with our technology. As of the date of this report, these trials have been successful and we intend to commence the formal pursuit of licensing arrangements during 2017**

161.   Also, at the market open on November 7, 2016, Aqua Metals issued a press release titled "Aqua Metals Provides Third Quarter 2016 Corporate Update," which was attached as Exhibit 99.1 to a Form 8-K filed with the SEC after the market close ("Q3 2016 Press Release"), announcing results for Q3 2016.   Murphy was identified as the "Company Contact."   The Company touted that it was "commercializing" AquaRefining and expects its modular systems to "increase production to meet rapidly growing demand."   The Company stated that it had, among other things:

- Produced the first-ever AquaRefined lead at its AquaRefinery in McCarran, Nevada at the Tahoe Reno Industrial Center (TRIC) and confirmed more than 99.99% purity

- Commissioning activities at TRIC transitioning into lead production and first sales planned for Q4 2016

- Determined that when fully commissioned, the TRIC facility will have the capacity to produce 120 metric tons per day (T/day) of lead; a 50% improvement over the previously announced 80 T/day capacity

- Furthered discussions with interested parties regarding expansion opportunities, both for licensing and future facilities

- Hosted a successful grand opening ceremony at its TRIC AquaRefinery, which was attended by over 200 people, including investors, strategic partners, industry participants, key employees and government officials

- Initial sales of lead in the Q42016

- Expanding to provide AquaRefining technology and equipment on a serviced licensing model, which was expected to commence in 2017

162.   Clarke stated in the Q3 2016 Press Release that the Company had produced AquaRefined lead at TRIC and that they were transitioning into commercial lead production for sales to begin in Q4 2016:

The primary focus throughout the third quarter has been on testing of essential systems and equipment to begin commercial lead production at the world's first AquaRefinery. To that end, *earlier this month we announced the first-ever AquaRefined lead produced at the facility after commissioning the first production module.*   This is a major milestone and the most critical step in the commissioning process.   We are working to complete the integration of front-end battery-breaking and other supporting systems and are transitioning into commercial lead production.   *We expect to begin selling lead in the fourth quarter of 2016.*

While working to bring the AquaRefinery online, we incorporated several process and other improvements, and consequently, *we now expect to ramp to a capacity of 120 T/day in early 2017, which will provide greater revenue and earnings potential.*

*We have also accelerated discussions with US based lead-acid battery manufacturers and distributors, who collectively represent a substantial majority of the US battery*

[No. 4:17-cv-07142-HSG] CONSOLIDATED COMPLAINT FOR VIOLATION OF SECURITIES LAWS          47

*industry. Most have already visited our facility and expressed interest in our products and technology*. We are now sending our initial production samples to these companies, to allow them to conduct their own assays.

*With the progress that we have made and with unprecedented interest in our revolutionary technology, we are positioned to ramp revenue in the coming year, which ultimately, will contribute meaningfully to growing shareholder value*.

163. The Company stated the "successful production of AquaRefined lead at the TRIC facility that is over 99.99% pure … confirms the Company's ability to produce premium lead."

164. The Company further stated that "*Aqua Metals will begin selling lead in the fourth quarter of 2016…. [T]he Company expects to reach initial capacity of 120T/day in early 2017, representing a 50% increase to the previously announced capacity of 80 T/day of lead output. Aqua Metals plans to expand to 160 metric tons of lead per day at the TRIC AquaRefinery in 2018*."

165. The Company stated that it was expanding to provide its AquaRefining technology and equipment on a serviced licensing model, which would commence in 2017:

Providing AquaRefining technology and equipment on a fully serviced licensing model is the next stage of the Company's business strategy. *The first module deliveries to third parties are expected in 2017. To expedite this roll out, the Company has already successfully tested [3]rd party feed stocks from potential licensees in North America* and expects to test others in the coming months. Aqua Metals has engaged in substantive discussions with highly credible potential partners and developed a "master license" approach for China and other large markets.

166. In addition to licensing, the Company touted that it had the capacity to produce 160 modules annually and that it intends to build additional regional AquaRefining facilities: "Aqua Metals is pursuing non-equity financing options for four to five facilities throughout North America which would bring lead output to ~800T/day and is currently evaluating sites for a second and third facility …."

167. A slide presentation was filed with the SEC after the market close on November 7, 2016 (attached as Exhibit 99.2 to a Form 8-K filed with the SEC) in advance of the Q3 2016 earnings conference call and used during the call:

//

//

//





False and misleading statements made on the earnings conference call (described below) were also made in the slide presentation. The presentation included images of commissioning module 1, which the Company touted as having "self cleaning rotating cathodes" that "produce lead without heat which is recovered continuously and compressed into blocks of ultra pure lead":

168. Shortly after the market close on November 7, 2016, Aqua Metals held its earnings conference call ("Q3 2016 Conference Call") with Clarke and Murphy, to provide a Q3 2016 update. Clarke stated the Company was "***transitioning into commercial operations now***" and that "first lead samples assayed at 99%, and potential customers and licensees have recognized this as a massive achievement." Clarke confirmed on the call that "***[w]e plan to sell pure lead AquaRefined lead in quarter four.***"

169.    On the Q3 2016 Conference Call, Clarke stated that "*we've made lead now at first of what would be several AquaRefining facilitie*s" and that "[i]t's been a huge milestone for us to be able to make AquaRefined lead ….  We built our first lab scale AquaRefining test nearly three years ago.  More than two years ago, we had a large scale pilot and then a single electrolyzer operating.  *So we all knew it works, but it doesn't mean anything until you put into a commercial operation and make some lead and sell it, and we've been able to get to that point and it's hugely thrilling*."

170.    Clarke stated that the Reno Plant has "a single six electrolyzer module installed and commissioned, five more are being commissioned and, in total, we'll have 16 AquaRefining modules on site" and is "*now transitioning into production has the capacity to produce 120 tonnes of lead per day, not the 80 tonnes a day that we initially gave guidance on them*."  Clarke stated that the Company would "expand our capacity to 120 tonnes a day in early 2017."  Clarke touted "I think we've more than compensated [for its delay] with about 50% uplift in the capacity of the facility."

171.    Clarke stated that the Company planned to increase its lead production by building other facilities, "we want to build up to 800 tonnes a day of our own lead recycling capacity and *with 120 under our belt,* we're looking to expand into the remainder."

172.    On the Q3 2016 Conference Call, Clarke showed a video and explained the process:

[W]hat that video showed was a single module of six electrolyzers, each electrolyzer has a series of large rotating disk cathodes.  They rotate during the plating process and are continuously scraped.

What we plate is a very, very high surface area foam of lead that consists primarily of nano-structures of lead, very, very, very high surface area.  The cathodes are continuously stripped, the lead comes off, drops on to a conveyor, then it's taken off to a machine that we call [ph] applicator, that compresses that soft lead.  What it actually does is, it consolidates the lead into solid metallic lead at room temperature and it's quite a remarkable process.  Then we – we've taken the decision to then put that into an ingot machine and make a standard ingot of lead for sale.

173.    Clarke also stated, "[w]e figured out how to operate the facility in a more flexible way than we'd originally considered.  And we've developed some intermediate products, which allow us to accelerate revenue ramp up and accelerate into positive cash flow":

[T]he front-end where we break a battery and then we separate out the plastics and the metallics and what is referred to as lead paste.  And then there is a stream of production in which the lead paste is what's called desulphurized before its AquaRefined and then turn into ingots of high purity primary lead.

And there's a parallel stream that comes from the breaker in which the metallic lead that's the lead alloys that are used to make the lead grids is a separate stream, and that

goes into an ingoting process and is sold either as secondary lead or as lead alloys. And the most of our timing in building and planning this business, we viewed the process of commissioning is to be one in which we would have to get every single one of those processes fully commissioned in synchronization before we could turn on. And we came to realize that quite so obviously maintaining that ideal situation is difficult and unrealistic in the real world of operating large scale plant that's going to consume hundreds of tonnes of batteries a day and produce hundreds of tonnes of lead a day.

So we put a lot of work into looking how we can de-link those processes from each other. So, for example, running larger or lower quantities of metallic lead through the ingoting site and larger or lower quantities of lead paste through the desulfurization and ultimately into AquaRefining. And what we'd been able to do is actually achieve the ability to de-link those processes. That's given us a large degree of flexibility in how we operate the plant. And it allows us to actually release additional capacity that gets us to that 120 tonnes a day. In that process, there are a number of products that we can actually sell and sell into battery companies for direct use in battery production.

174. Regarding licensing, Clarke stated that:

[W]e're generating **very strong interest** in licensing to third parties. It's been our stated goal that we would expand this business through a fully serviced license business model in which we will provide equipment to third parties and we'll maintain it and provide spare parts and continue maintenance to third parties on the licensing base as well.

We have taken those conservations [sic] to the point that **we have now tested feed stocks from third parties and already successfully taken in feed stocks from third who parties who have expressed interest in licensing on equipment and we've made lead from them**.

175. Clarke also stated that "**we expect to start shipping licensed AquaRefining equipment during 2017**. What we want to do before that is actually operate our own facility, make sure we've learnt everything we can, and absolutely not falling to the trap of having our licensees be our beta testers. We're not a software company, we're an equipment company, and we live or breathe on the reliability of the equipment and services that we provide through that."

176. Regarding revenue, Clarke stated on the call that 160 tons of lead a day, with 32 AquaRefining modules, could generate "**revenue between $100 million and $120 million a year of that scale**." Five AquaRefineries totaling 800 tons a day, with 160 modules, "**would give us somewhere in the region of $500 million to $600 million a year in revenue**."

177. During the Q&A portion of the Q3 2016 Conference Call, Clarke was asked about the **move from 80 tons to 120 tons**. Clarke responded that the Company "**wanted to make sure we could do it, before we told anybody**. It is a theme here of make sure you can do it before you tell anybody is

[No. 4:17-cv-07142-HSG] CONSOLIDATED COMPLAINT FOR VIOLATION OF SECURITIES LAWS          51

kind of key within the company …. Is there an opportunity to expand beyond that, never say never, but we think 120 tonne to 160 tonne is optimal for that particular site."

178. Again, analysts reacted positively to the announcements. A November 8, 2016 Northland report stated "AQMS has reached several important near-term milestones including first lead production" and the Company "*provided a positive surprise with an expansion in the near-term capacity at its first AquaRefinery from 80 tons per day to 120 tons per day … AQMS is also making positive progress with follow-on AquaRefineries and ³ʳd party licensing potential*." Likewise, on November 8, 2016, Oppenheimer issued a report stating the Company announced a "50% output improvement" at the Reno Plant which is "expected to be fully ramped in early 2017 … AQMS says better than expected flexibility in the NV facility will allow it to ramp to 120 tons a day, up from the 80 tons originally forecast. It now targets 160 tons/day by 2018 in NV." The report concluded, "AQMS is uniquely positioned to take share in the … lead recycling market …."

179. The Defendants' statements in paragraphs 153 through 178 above were false and misleading in several ways:

(a) The statements above regarding the then existing status, success and commercialization of the AquaRefining process and the operations at the Reno Plant, including regarding the production of lead and AquaRefined lead and the transition to commercial operations, were false and misleading when made for the reasons discussed in paragraphs 130(a), 152(a)(i)-(iii), above.

(b) The statements above touting the strategic partnerships, including with Interstate Batteries, were false and misleading when made for the reasons discussed in paragraphs 130(a), 130(b), 152(a)(i)-(iii), 152(b)(i)-(iii), above.

(c) The statements above touting the interest in the technology, including as a result of visits to the Reno Plant, were false and misleading when made for the reasons discussed in paragraphs 130(a), 130(b), 152(a)(i)-(iii), 152(b)(i)-(iii), above. 130(a), 130(b), 152(a)(i)-(iii), 152(b)(i)-(iii), above.

(d) The statements above regarding licensing equipment and building additional facilities are statements of the Company's current existing goals and focus, which are actionable

[No. 4:17-cv-07142-HSG] CONSOLIDATED COMPLAINT FOR VIOLATION OF SECURITIES LAWS          52

because they were false and misleading when made for the reasons discussed in paragraphs 130(a), 130(b), 152(a)(i)-(iii), 152(b)(i)-(iii), above. Further, Defendants knew these statements were false and misleading when made for the reasons discussed in paragraphs 130(e), 152(d)(i)-(iii), above.

(e)     The statements above regarding production rates, including increasing its production to 120 metric tons of lead per day in early 2017 and expanding that to 160 metric tons per day by 2018, which would generate revenue between $100 million and $120 million, were statements of current conditions of the Company and were false and misleading when made for the reasons discussed in paragraphs 130(a), 152(a)(i)-(iii), above. Further, Defendants knew these statements were false and misleading when made for the reasons discussed in paragraphs 130(e), 152(d)(i)-(iii), above.

### 4.     The False and Misleading Statements Regarding The November 2016 Public Offering

180.     On November 21, 2016, the Company completed a public offering of 2.3 million shares of common stock for $10.00 per share, for gross proceeds of $23 million and net proceeds of $21.5 million (the November 2016 Offering). In connection with the offering, on September 2, 2016, Aqua Metals filed with the SEC a Registration Statement on Form S-3 for a proposed offering of shares of its common stock, which was subsequently amended on September 16 and 21, 2016 (collectively, the "Registration Statement"). The Registration Statement stated that the Company is "engaged in the business of recycling lead through a novel, proprietary patent-pending process that we developed and named 'AquaRefining'" which "uses an aqueous solvent and a novel electro-chemical process to produce pure lead (i.e., higher than 99.99% purity)." The Company also touted in the Registration Statement that the "modular nature of AquaRefining makes it possible to start LAB recycling at a much smaller scale than is possible with smelters, thereby significantly reducing the investment risk associated with building a lead production facility."

181.     Also, on November 15, 2016, Aqua Metals filed a Preliminary Prospectus on Form 424B5 with the SEC, and on November 17, 2016, Aqua Metals filed a Form 424B5 Prospectus Supplement with the SEC (collectively with the preliminary prospectus, "Prospectus"). The Preliminary Prospectus reiterated verbatim all of the same statements made in the Registration

Statement (quoted in this paragraph, *supra*) regarding commercialization, lead purity, and the modules making it possible to start LAB recycling at a much smaller scale and reducing investment risk.

182. In the Prospectus, Aqua Metals assured investors that the production process was successful to date, operating without a single glitch:

> While *the testing of our AquaRefining process has been successful to date,* there can be no assurance that we will be able to replicate the process, along with all of the expected economic advantages, on a large commercial scale. *As of the date of this prospectus supplement, we have built and operated both a small-scale unit of our AquaRefining process and a full size production prototype*. In addition, on October 28, 2016, we commenced limited operations at our TRIC facility through the processing of recycled lead through a single AquaRefining module. While *we believe that our development, testing and limited production to date has proven the concept of our AquaRefining process*, we have not undertaken the processing of used LABs nor have we commenced the production of lead in large commercial quantities ....

183. The Prospectus similarly repeated that "[w]e have tested our AquaRefining process on a small scale, and on October 28, 2016 we commenced limited production of recycled lead at our TRIC facility." The Prospectus again repeated that the Company "recently commenced limited lead-producing operations."

184. The Prospectus represented that the funds from the offering would be used to accelerate the production process of AquaRefining:

> We expect to use the net proceeds from this offering for working capital and general corporate purposes, including the acceleration of our AquaRefining product development and licensing efforts inclusive of pre-sales and post-sales support staff and infrastructure, enhancement of processes to further improve our operating margins and regulatory activities.

185. The Prospectus further explained that, given that the necessary capital had been obtained, the AquaRefining process was ready and capable of producing 120 tons of recycled lead per day:

> As of the date of this prospectus supplement, we believe that we have working capital sufficient to fund our current business plan over the next 12 months, including *attainment of production at the rate of 120 tons of recycled lead per day.*

186. The Prospectus repeated that commercial production was imminent:

> *We expect to commence the commercial recycling of used LABs during the fourth quarter of 2016 and increase our production of lead to 120 tonnes per day in early 2017*. However, there can be no assurance that as we commence large scale operations at our TRIC facility that we will not incur unexpected costs or hurdles that might restrict the

[No. 4:17-cv-07142-HSG] CONSOLIDATED COMPLAINT FOR VIOLATION OF SECURITIES LAWS     54

desired scale of our intended operations or negatively impact our projected gross profit margin.

187. Defendants' statements in paragraphs 180 through 186 above were false and misleading in several ways:

(a) The statements above regarding the then existing status, success and commercialization of the AquaRefining process and the operations at the Reno Plant, including regarding the production of lead and AquaRefined lead, were false and misleading when made for the reasons discussed in paragraphs 130(a), 152(a)(i)-(iii), above.

(b) The statements above regarding the use of the proceeds from the November 2016 Offering to accelerate product development and licensing were false and misleading when made for the reasons discussed in paragraphs 130(a), 152(a)(i)-(iii), above.

(c) The statements above regarding production rates, including production of 120 metric tons of lead per day and the commencement of recycling in the Q4 2016 were false and misleading when made for the reasons discussed in paragraphs 130(a), 152(a)(i)-(iii), above. Further, Defendants knew these statements were false and misleading when made for the reasons discussed in paragraphs 130(e), 152(d)(i)-(iii), above.

### 5. The December 22, 2016 False and Misleading Statements from Clarke Regarding the Status of The Company's Efforts

188. During a December 22, 2016 interview with Tailwinds, Clarke provided an update for the Reno Plant:

> So in terms of an update for Reno. We've had all the equipment on site now for a few months, and we've been working through a diligent commissioning process. The big event for the last couple of weeks has been commissioning the breaker and having that run. *We've got our first full shift of operators on site. We expect to run through January on a single shift and then in February, March increase to two shifts, three shifts and four shifts and essentially be running 24 hour a day, 7 day a week, continuous operation* ….

189. Regarding production volumes at the Reno Plaint, Clarke stated, "[w]e announced [on] the earnings call that we are able to get better use out of the equipment on site so that *we are not starting at 80 tons a day. We are starting actually starting at 120 tons and we are expecting to be able to quickly take that to 160 tons a day in the second half of next year*." Clarke stated that **"we remain on track to be producing 800 tons a day from our own facilities"** in five years.

190. Clarke further stated during the interview that "we're confident that we'll be announcing some licensing deals within quarter 1 of next year and planning a *very accelerated roll out*."

191. Clark's statements in paragraphs 189 through 190 above were false and misleading in several ways:

(a) The statements above regarding the then existing status and success of the AquaRefining process and the operations at the Reno Plant were false and misleading when made for the reasons discussed in paragraphs 130(a), 152(a)(i)-(iii), above.

(b) The statements above regarding production rates, including the Company increasing its production to 120 metric tons of lead per day in early 2017 and expanding that to 160 metric tons per day in 2017, and that it is "on track" to be producing 800 tons a day from its own facilities were statements of current conditions of the Company and were false and misleading when made for the reasons discussed in paragraphs 130(a), 152(a)(i)-(iii), above. Clarke knew these statements were false and misleading when made for the reasons discussed in paragraphs 130(e), 152(d)(i)-(iii), above. Moreover, these statements were not accompanied by any cautionary language.

### 6. The February 2017 False and Misleading Statements Regarding the Strategic Partnership with Johnson Controls International plc

192. Before the market open on February 9, 2017, Aqua Metals issued a press release titled "Johnson Controls and Aqua Metals Sign Break-through Battery Recycling Technology Partnership," which was incorporated into a Form 8-K filed with the SEC on February 13, 2017 ("February 9, 2017 Press Release"). The February 9, 2017 Press Release announced a "battery recycling technology" partnership between the world's largest manufacturer of automotive batteries Johnson Controls and Aqua Metals ("Johnson Controls Partnership") covering North America, China and Europe. Clarke touted that "[o]ur partnership with Johnson Controls is *a tremendous step forward* and is an opportunity for us to work with the global leader in automotive battery manufacturing and responsible recycling. We will build on this exciting relationship in order to enable clean and efficient battery recycling around the world."

//

193. The Company touted that "[u]nder the agreement Johnson Controls will also":

- Become the first licensee for AquaRefining technology
- Supply Aqua Metals with batteries to recycle as a service, as part of the Johnson Controls closed-loop network
- Purchase AquaRefined metals produced from Aqua Metals' facilities
- Acquire just under 5 percent of Aqua Metals outstanding shares

194. The February 9, 2017 Press Release further stated that Aqua Metals "uses an advanced electrochemical process for recycling batteries. As it scales up capacity, Aqua Metals plans to hire hundreds of employees for exhibits and future operations across the United States."

195. On February 9, 2017, before the market close, Bloomberg News issued an article titled "Aqua Metals CEO Says JCI Deal Is 'Massive Vote of Credibility'" reporting on a 2017 phone interview with Clarke. The reporter quoted Clarke as stating that the new partnership with Johnson Controls is a "massive vote of credibility" in the Company's technology. The article further quoted Clarke as stating that he expects to see a "dramatic transformation" in revenue in the next two or three years, and that the Company "can make a much better quality product with less capital equipment and so it is purely an economic driver for us." Clarke also stated that Aqua Metals may directly employ 800 people in the next four to five years, a ten-fold increase.

196. Following the February 9, 2017 Press Release and in response to this purported positive news, the price per share of Aqua Metals increased $4.75, or approximately 41.6%, from a close of $11.41 on February 8, 2017, to a close of $16.16 on February 9, 2017, on highly unusual trading volume of roughly 3.5 million shares. Bloomberg News also reported that "[s]hares of Aqua Metals jumped as much as 44 percent after Johnson Controls signed an agreement on battery recycling technology and took an almost 5 percent stake in the company."

197. Analysts also reacted extremely positively to the Johnson Controls Partnership. For example, a February 9, 2017 Oppenheimer report called the agreement "transformative" and a "demonstration of JCI's belief in the technology." The report further stated, "we believe the purchase commitment from JCI is enough to support three new facilities for AQMS, the non-exclusive licensing of AQMS' technology, and the strategic investment in AQMS are a marquee validation of AQMS' technology and business model." A February 10, 2017 report by Euro Pacific Capital noted that "[t]he deal with Johnson Controls puts AQMS on the map …. For a multi-billion dollar company such as

JCI to sign a partnership agreement with AQMS for its battery recycling technology should further strengthen investor confidence …."

198. Similarly, Tailwinds issued a report on February 9, 2017, reacting to this "incredibly exciting news" and noting that it reflects "an independent voice sounding off on the success of [the AquaRefining] technology."

199. The next day, on February 10, 2017, in an article titled "Aqua Metals Gets Major Battery Company Backing," Mould further touted the agreement with Johnson Controls. In the article, Mould is quoted as saying, "Johnson Controls backing us is a great statement to the industry and the world that aqua refining is the future …. It is major for this facility. It allows us to build out the facility to its full capacity."[5]

200. Defendants' statements in paragraphs 192 through 199 above were false and misleading in several ways:

(a) The statements above regarding the strategic partnership with Johnson Controls, including statements that it validates the AquaRefining technology and supports the Company's growth and revenue plans, were false and misleading when made for the reasons discussed in paragraphs 130(a), 130(b), 152(a)(i)-(iii), 152(b)(i)-(iii), above, and for the following additional reasons:

(i) statement by CW1 that a visit by Johnson Controls occurred at the Alameda facility at a time prior to the announcement of the Johnson Controls partnership (¶ 76);

(ii) the statements by CW2 that an orchestrated dog and pony show for Johnson Controls occurred at the Reno Plant; and that the dog and pony shows began at a time prior to the consummation of this partnership (¶¶ 82-83); and

(iii) statement by CW4 that a visit by Johnson Controls occurred at the Reno Plant in January 2017, which is prior to the commencement of the Johnson Controls partnership (¶¶ 99-101).

[5] *See Aqua Metals Gets Major Battery Company Backing*, KOLO TV (Feb. 10, 2017), http://www.kolotv.com/content/news/Aqua-Metals-gets-major-battery-company-backing-413473933.html.

[No. 4:17-cv-07142-HSG] CONSOLIDATED COMPLAINT FOR VIOLATION OF SECURITIES LAWS       58

(b) The statements above regarding the then existing status and success of the AquaRefining process were false and misleading when made for the reasons discussed in paragraphs 130(a), 152(a)(i)-(iii), above.

(c) The statement above that Aqua Metals will see a "dramatic transformation in revenue in the next two or three years" was false and misleading when made for the reasons discussed in paragraphs 130(a), 152(a)(i)-(iii), above. The statement was known by Defendants to be false and misleading when made for the reasons discussed in paragraphs 130(e), 152(d)(i)-(iii), above. Moreover, this statement was not accompanied by any cautionary language.

**7. The February and March 2017 False and Misleading Statements Regarding Q4 2016 and YE 2017**

201. At the market open on February 14, 2017, Aqua Metals issued a press release titled "Aqua Metals Provides Fourth Quarter and Year End Corporate Update," which was attached as Exhibit 99.1 to a Form 8-K filed with the SEC on the same day ("FY 2016 Press Release"), announcing the Company's financial and operating result for the fourth quarter of 2016 ("Q4 2016") and year ended December 31, 2016. Murphy was identified as the "Company Contact." The FY 2016 Press Release stated that Aqua Metals was "commercializing" its AquaRefining process and had "*successfully commissioned and in the process of scaling up production of AquaRefined lead at AquaRefinery 1 in McCarran, Nevada at the Tahoe Reno Industrial Center (TRIC)*."

202. In the FY 2016 Press Release, Clarke also touted that 2016 was a pivotal year for the Company:

> *[W]e successfully built, commissioned and began producing products at the world's first AquaRefinery and deepened our strategic relationships with major players throughout the industry.* Our partnerships, most recently with Johnson Controls—the global leader in automotive battery manufacturing and responsible recycling— and Interstate Batteries—the largest independent battery distribution system in North America and the country's leading battery recycler. — and Battery Systems Inc. – one of the largest independent battery distributors in the U.S. effectively rounds out a sustainable ecosystem for the automotive lead acid battery industry and provides a level of supply and off-take to support our expansion of AquaRefinery 1 and the construction of additional facilities.
>
> *As we move through 2017, we will continue the expansion of AquaRefinery 1, look to build additional AquaRefineries and build out our licensing program.*

203. A slide presentation was filed and distributed on February 14, 2017 (attached as Exhibit 99.2 to a Form 8-K filed with the SEC) in advance of the Company's financial and operating results for Q4 2016 and year ended December 31, 2016 ("FY 2016 Conference Call") and used during the call. In this presentation, the Company reiterated that "*our first facility is running from breaker to AquaRefining*," touting that it had, among other things:

- Expanded potential capacity *to 120T/day*
- Produced and validated 99.99% pure lead – working on 99.999% pure
- *Had added second shift and scaling up to four shifts*

204. The Company further stated in the presentation that, in light of the Johnson Controls Partnership and the "relationships with Interstate Batteries and Battery Systems, Inc., we believe we have secured sufficient supply and off-take to underpin our growth from 160 to 800T/day in North America."

205. The same day, on February 14, 2017, the Company held its FY 2016 Conference Call. Aqua Metals' Clarke stated that "[o]ne of the headlines today is that the first-ever *AquaRefinery located at Tahoe-Reno Industrial Center, has moved from commissioning to operational*. *That means that we are breaking batteries and making lead from the batteries that we've broken, both from – both metallic lead and Aqua-refined lead. It's continuing to ramp-up."* Clarke stated the "*first-ever AquaRefinery [is] up and running,*" and "*we have product ready to ship*."

206. Clarke reiterated on the FY 2016 Conference Call, "*let's talk about the Tahoe-Reno facility … it's now running. We've transitioned out of a mostly start-up phase into a – and commissioning phase into an operational phase …."* Murphy also stated on the call that "*we're starting to – beginning commercial operations*."

207. Clarke stated that the Company was expanding the AquaRefinery's capacity from producing 120 tons per day to 160 tons: "We've mentioned in the last earnings call that we have expanded that potential capacity from 80 tonnes to 120 tonnes a day. *And we're now looking at expanding from 120 tonnes to 160 tonnes a day. We're producing validated 99.99% pure lead.*"

208. Clarke further stated that additional shifts were being added at the Reno Plant, "[a]nd we've moved from a single shift production to second shift. And now, we're scaling up to four shifts."

209.    While he was touting the Company's increased capacity to produce 160 tons of lead per day and adding shifts to the Reno Plant, Clarke outlined – for the first time – certain challenges that the Company had faced, but assured investors that these challenges had been resolved.  He noted that, although the Company had "***been able to run the AquaRefining systems because it's modular for several years now***," the process faced "challenges" and "surprises."  These challenges included (a) jams on the conveyor belt leading up to the breaker; (b) pumps and materials issues transporting lead paste from the breaker through desulfurization; and (c) capacity problems with the desulfurization process.  In assuring investors that these issues had been resolved, Clarke stated that "the big news is that ***we've got that dialed in now and it's operating.  That means we can provide feedstock to the AquaRefiners and make AquaRefined lead***."

210.    During the Q&A session of the FY 2016 Conference Call, an analyst from Oppenheimer specifically asked about current operations at the Reno Plant, including the number of shifts and the output per shift.  Clarke's answer was evasive, "what we're saying is that we're making lead from batteries that we've broken.  We're currently operating a single shift.  We got a stockpile of raw materials ready to ship.  We've got – not raw materials – ***products ready to ship***.  As I said, we're operating on a single shift.  We brought on us a second shift."

211.    Analyst Bhakti Pavani from Euro-Pacific Capital, Inc.  inquired about whether the Reno Plant was currently producing 120 tonnes of lead per day.  Clarke stated that "we figured out how to expand that to 120 tonnes a day with the equipment we had onsite.  120 tonnes a day is our four-shift capacity."  Murphy added that a second shift had been "implemented within the last few weeks" and that the Company was "presently recruiting for a third shift."

212.    Clarke stated that the Johnson Controls Partnership would allow the Company to move forward with additional AquaRefineries as well as licensing: "***it provides the feed and off take for the additional facilities that we've been talking about for the past two years.  It fills AquaRefinery long-term capacity and it moves us forward in the additional AquaRefineries that we want to build on and upgrade ourselves.  But more importantly, it transitions us to the start of a really exciting new phase of the company, which is licensing***."  Clarke stated that Johnson Controls "has agreed to purchase pretty much all of the lead output from Aqua Metals…."

[No. 4:17-cv-07142-HSG] CONSOLIDATED COMPLAINT FOR VIOLATION OF SECURITIES LAWS          61

213. During that call, Clarke stated that the supply, demand and off-take provided by the Company's "strategic relationships" would allow it to scale from 160 tons to 800 tons a day:

Well, we have been working on this agreement with JCI for a number of months now. And looking at the tolling/lead purchase agreement, I alluded to this a moment ago, it pretty much gives us all the supply. *If you take what we've got with Interstate Batteries and Battery Systems, Inc., and then layer on top the demand and supply and off-take with JCI, it gives us everything that we need scale from 160 tonnes to 800 tonnes a day*.

214. Clarke stated that with the announcement of the Johnson Controls Partnership, "we're contemplating a very significant roll out of AquaRefining equipment," and that the Reno Plant "is going to have two roles now. It's going to be running as an operational facility, but it's also going to be the cornerstone of where we[] test things and test improvements and implement improvements … of AquaRefining before we finalize the blueprint and start rolling out equipment to third parties…. [W]e've been talking since inception about building a single AquaRefinery and then building a total of 800 tonnes a day of capacity, and then rolling out with the licensing model":

So, AquaRefinery, number one at Tahoe-Reno Industrial Complex is starting out with a plant capacity of 120 tonnes of lead per day. And we're expecting to expand that to 160 tonnes a day. To do that will require 32 AquaRefining modules. And when it's at full scale at 160 tonnes a day, that will represent just 0.2% of global lead production and generate revenue potential in the region of *$100 million to $120 million a year*.

We chose and we believe it's important to grow the company to 800 tonnes a day. We believe that 800 tonnes a day is a credible global supplier of lead or represents a credible global supplier of lead, and we started out thinking maybe we do that, we tend – the current thinking is we'll do that with a total of five AquaRefineries, about 800 tonnes a day. That would require 160 AquaRefining modules. And when constructed, that would be just 2.1% of global lead production, representing $500 million to $600 million a year in revenue.

215. Clarke touted the Company's three front expansion plan on the call: (a) "build additional facilities in North America … to get to 800 tonnes a day"; (b) "start providing AquaRefining equipment to third parties on a service license basis"; and (c) "move to higher value products and markets."

216. After the market close on February 15, 2017, National Securities Corporation issued a report initiating coverage of the Company. In this report, it estimated that the facility would generate *$46 million in 2017 revenue* and stated that it believed that Aqua Metals' "revenue projections … are sufficiently conservative." The report further stated, *"[w]e believe that this facility has begun to produce lead for commercial sales as of January 2017. The facility has just been completed and*

[No. 4:17-cv-07142-HSG] CONSOLIDATED COMPLAINT FOR VIOLATION OF SECURITIES LAWS      62

*has no operating history but we believe that the equipment has been successfully tested*." National Securities Corporation also stated: "Aqua Metals has two strategic stake holders Johnson Controls and Interstate Battery, each owning 5% of the shares outstanding. We believe that these two leading battery companies' investment in Aqua Metals not only validates Aqua Metals' revolutionary technology but also creates a vested and integral part of the battery recycling supply chain for the company."

217. Following the February 15, 2017 National Securities Corporation' report, Aqua Metals per share price increased $1.17, or approximately 6.9%, from a close of $16.94 on February 15, 2017, to a close of $18.11 on February 16, 2017, on 469,819 shares traded.

218. On March 2, 2017, Aqua Metals filed its 2016 Form 10-K with the SEC reporting the Company's financial and operating results for Q4 2016 and year ended December 31, 2016.[6] The Company reiterated in the filing that "*testing of our AquaRefining process has been successful to date*" and that:

> **We produced our first AquaRefined lead in October 2016 and we verified that the lead produced by AquaRefining is over 99.99 percent pure.**
>
> During late 2016, **we implemented upgrades to the facility that have resulted in an initial production capacity of 120 metric tons per day of lead based products**. Our facility is designed to accommodate additional AquaRefining modules to support expansion to 160 tonnes of lead products per day.
>
> We commenced initial battery breaking during December 2016 and progressed to regular single shift operation of the battery breaker in January 2017.

219. The Company stated in the filing that AquaRefining "is deployed as a factory built modular system **which allows the lead-acid battery industry to simultaneously improve impact and scale production to meet rapidly growing demand.**… We believe that our proprietary AquaRefining process will provide for the recycling of LABs and the **production of a pure grade lead with a significantly lower cost of production**, and with fewer environmental and regulatory issues, than conventional methods of lead production." The Company stated its plan of operations:

> Our plan of operations for the 12-month period following the date of this report is to expand operations at our first recycling facility at TRIC to 120 tonnes of lead production per day. In the longer term, our goal is to increase our production of lead at our TRIC

[6] The 2016 Form 10-K was signed by Clarke and Murphy.

[No. 4:17-cv-07142-HSG] CONSOLIDATED COMPLAINT FOR VIOLATION OF SECURITIES LAWS          63

facility to 160 tonnes per day. Our 12-month plan of operations also includes our collaboration with Johnson Controls for the development of a program for the installation of new greenfield builds and conversion of Johnson Controls and certain strategic partners of Johnson Controls' existing lead smelters throughout North America, China and Europe to a lead recycling process utilizing our proprietary and patent-pending AquaRefining technology and equipment, know-how and services. ***Finally, our 12-month plan of operations includes our continued pursuit of the expansion of our business with additional recycling facilities and licensing of our recycling technology and equipment to third parties***.

Separately, we continue to pursue providers of non-dilutive capital to finance up to an additional four facilities, each of which would have a production capacity of approximately 160 tonnes per day. Through the supply and off-take relationships that we have established with Battery Systems Inc., Interstate Battery and Johnson Controls, we believe we are better positioned to acquire the necessary funding, including potential forms of non-diluting financing, in order to finance our next facilities.

220. In the filing, the Company also touted that, "[t]hrough our relationships with Battery Systems Inc., Interstate Batteries System International, Inc., and Johnson Controls, we believe we are now able to pursue our expansion of our directly-owned recycling facilities in the U.S. subject to our receipt of necessary funding." Regarding the agreements with Johnson Controls:

[W]e agreed to work with Johnson Controls on the development of a program for the installation of new greenfield builds and conversion of Johnson Controls and certain strategic partners of Johnson Controls' existing lead smelters throughout North America, China and Europe to a lead recycling process utilizing our proprietary and patent-pending AquaRefining technology and equipment, know-how and services.

221. Defendants' February and March 2017 statements in paragraphs 201 through 220 were false and misleading in several ways:

(a) The statements above regarding the then existing status, success and commercialization of the AquaRefining process and the operations at the Reno Plant, including regarding the production of lead and AquaRefined lead, that there were products ready to ship, the commencement of commercial operations from breaker to AquaRefining, and that the Reno Plant is going to be partially used for testing improvements in connection with licensing, were false and misleading when made for the reasons discussed in paragraphs 130(a), 152(a)(i)-(iii), above.

(b) The statements above touting the demand for the technology were false and misleading when made for the reasons discussed in paragraphs 130(a), 130(b), 152(b)(i)-(iii), 200(a)(i)-(iii), above.

---

[No. 4:17-cv-07142-HSG] CONSOLIDATED COMPLAINT FOR VIOLATION OF SECURITIES LAWS     64

(c)     The statements above regarding the strategic partnerships, including with Johnson Controls and Interstate Batteries, and that they support the Company's growth and revenue plans, were false and misleading when made for the reasons discussed in paragraphs 130(a), 130(b), 152(a)(i)-(iii), 152(b)(i)-(iii), 200(a)(i)-(iii), above.

(d)     The statements above regarding licensing equipment and building additional facilities are statements of the Company's current existing goals and focus, which are actionable because they were false and misleading when made for the reasons discussed in paragraphs 130(a), 130(b), 152(a)(i)-(iii), 152(b)(i)-(iii), 200(a)(i)-(iii), above.  Further, Defendants knew these statements were false and misleading when made for the reasons discussed in paragraphs 130(e), 152(d)(i)-(iii), above.

(e)     The statements above regarding the production rates, including production of 120 metric tons of lead per day in 2017 and expanding that to 160 metric tons per day by 2018, which would generate revenue between $100 million and $120 million, were statements of current conditions of the Company and were false and misleading when made for the reasons discussed in paragraphs 130(a), 152(a)(i)-(iii), above.  Further, Defendants knew these statements were false and misleading when made for the reasons discussed in paragraphs 130(e), 152(d)(i)-(iii), above.

### 8.     The March and April 2017 False and Misleading Statements Touting the Market's Reaction to AquaRefining

222.     On March 27, 2017, at the market open, Aqua Metals issued a press release titled "Aqua Metals Named Platts Global Metal Awards Finalist in Three Categories" ("March 27, 2017 Press Release"), announcing that its AquaRefining technology was a finalist for a Platts Global Metals Award.  In the March 27, 2017 Press Release, Clarke stated that it was an exciting time for the Company "as we ramp up production at our first facility and expand to continue *to meet our partner needs*."  Aqua Metals further stated that it is "commercializing" the AquaRefining process and "*[t]he Company is rapidly expanding its production capabilities as it scales the first facility and plans additional facilities*," including deploying "AquaRefining in Johnson Controls facilities throughout North America, China and Europe."  The Company "plans to hire hundreds of employees for existing and future operations across the United States."

---

[No. 4:17-cv-07142-HSG] CONSOLIDATED COMPLAINT FOR VIOLATION OF SECURITIES LAWS          65

223.    On April 19, 2017, before the market close, Bloomberg First Word issued an article titled "Aqua Metals is 'Just Getting Started' on Partnerships, CEO Says." The article reported on a telephone interview with Clarke in which he stated that "we might do some acquisitions, but what we're pursing more aggressively is strategic relationships" and that more industry partnerships will help with scale. The article also stated that "Johnson Controls signed agreement with Aqua Metals on battery-recycling technology and took almost 5% stake."

224.    On April 20, 2017, a short seller issued a report on SeekingAlpha.com titled "Aqua Metals: As Toxic As The Lead It Claims To Recycle."[7] The report asserted that:

> Aqua Metals claims to be in the business of designing and licensing the "technology" for lead recycling facilities that are more efficient and more environmentally friendly than the current process used to recycle lead known as smelting. However, given management's background with a little-known UK penny stock called Applied Intellectual Capital, and AQMS's capital raising ties to former principals of the infamous MDB Capital, we believe that the company is actually in the business of telling tall tales…. AQMS is unlikely to ever be commercially viable....

> The real exuberance in AQMS stock emerged after the company announced an investment and collaboration with Johnson Controls (NYSE:JCI) a few months ago. After announcing this to the market, AQMS stock went parabolic, with investors jumping for joy that AQMS was able to strike a partnership with a company of JCI's clout.

> To investors who are excited about the AQMS/JCI partnership, we regretfully inform you that this is not the first time that Stephen Clarke has gotten investors excited about a brand name collaboration.

225.    In response, the Company announced in an April 24, 2017 press release titled "Aqua Metals Announces 'Visitor Days' Beginning in May" ("April 24, 2017 Press Release"), that it would arrange on-site visits for analysts and investors to see the AquaRefining operations at the Reno Plant. In the April 24, 2017 Press Release, Clarke stated: "We believe the best way to address this misinformation is to ***openly show analysts and investors our facility in operation as we continue to scale it up***." He reiterated that the Company "remains focused on our ***primary goal – to scale commercial operations at the first AquaRefinery to 120 metric tons per day by the end of the year, and to expand operations through our strategic relationships***."

---

[7] *See Aqua Metals: As Toxic As The Lead It Claims To Recycle,* Seeking Alpha (Apr. 20, 2017), https://seekingalpha.com/article/4063485-aqua-metals-toxic-lead-claims-recycle.

226. As discussed in ¶¶ 249-256, below, the Company was successful in dispelling the negative short-seller report though its analyst visitor days.

227. On April 27, 2017, before the market open, Aqua Metals issued a press release titled "Aqua Metals Named Winner of the San Francisco Business Times Technology and Innovation Award" ("April 27, 2017 Press Release"). The April 27, 2017 Press Release announced:

> The Company is **rapidly expanding its production capabilities as it scales the first facility**. Additionally, Aqua Metals **plans to install AquaRefining in a to-be named smelter site beginning in 2018, through its deal with Johnson Controls**, the world's largest manufacturer of automotive batteries. **As it scales up capacity, Aqua Metals plans to hire hundreds of employees for existing and future operations across the United States, including in the Bay Area.**

228. Defendants' March and April 2017 statements in paragraphs 222 through 227 were false and misleading in several ways:

(a) The statements above regarding the then existing status, success and commercialization of the AquaRefining process and the operations at the Reno Plant, were false and misleading when made for the reasons discussed in paragraphs 130(a), 152(a)(i)-(iii), above.

(b) The statements above regarding the strategic partnerships, including with Johnson Controls, and that they support the Company's growth and revenue plans, and that Aqua Metals will install an AquaRefinery in a Johnson Controls' facility, were false and misleading when made for the reasons discussed in paragraphs 130(a), 130(b), 152(a)(i)-(iii), 152(b)(i)-(iii), 200(a)(i)-(iii), above, and for the additional reason that Aqua Metals was not ready to convert or retrofit a Johnson Controls' facility as further evidenced by the fact that, in an April 26, 2018 press release titled "Johnson Controls and Aqua Metals Agree to Extend Timelines of Strategic Licensing Agreement" ("April 26, 2018 Press Release"), the Company disclosed that Aqua Metals needed to postpone the deadline to conclude discussions regarding these agreements for another year, giving the parties until 2019, an agreement memorialized in the first Amendment to the equipment Supply Agreement dated April 16, 2018, a copy of which is attached as Exhibit 10.2 to Aqua Metal's Q1 2018 Form 10-Q. In the April 26, 2018 Press Release, defendant Mould expressed that "[w]e appreciate Johnson Control's flexibility in this matter," implying that it was Aqua Metals, and not Johnson Controls, that needed the additional time.

(c)     The statements above regarding licensing equipment and building additional facilities are statements of the Company's current existing goals and focus, which are actionable because they were false and misleading when made for the reasons discussed in paragraphs 130(a), 130(b), 152(a)(i)-(iii), 152(b)(i)-(iii), 200(a)(i)-(iii), above.  Further, Defendants knew these statements were false and misleading when made for the reasons discussed in paragraphs 130(e), 152(d)(i)-(iii), above.

(d)     The statements above regarding the production rates, including production of 120 metric tons of lead per day by the end of the year were statements of current conditions of the Company and were false and misleading when made for the reasons discussed in paragraphs 130(a), 152(a)(i)-(iii), above.  Further, Defendants knew these statements were false and misleading when made for the reasons discussed in paragraphs 130(e), 152(d)(i)-(iii), above.

(e)     The statements above regarding visitor days for analysts and investors and that at such visits they would "openly show" the AquaRefining facility were false and misleading because, in truth, the site visits were carefully orchestrated to conceal the problems and that the process was not functioning and for the reasons discussed in paragraphs 130(a), 152(a)(i)-(iii), 152(b)(i)-(iii), above.

**B.     While the Truth Slowly Begins to Emerge in Spring 2017, Defendants Continued to Issue False and Misleading Statements**

**1.     The May 2017 False and Misleading Statements Regarding The Existing Status of the AquaRefining Technology As of Q1 2017**

229.     On May 9, 2017, after the market close, Aqua Metals issued a press release titled "Aqua Metals Provides First Quarter 2017 Corporate Update," which was attached as Exhibit 99.1 to a Form 8-K filed with the SEC on the same day after the market close ("Q1 2017 Press Release"), announcing results for the first quarter of 2017 ("Q1 2017").  Murphy was identified as the "Company Contact."  In the Q1 2017 Press Release, Clarke stated that the AquaRefinery is "***now in commercial operation and generating revenue, we are aggressively scaling up operations and ramping our capacity to reach 120 metric tonnes per day by the end of 2017***."

230.     As part of this purported ramp up, Clarke asserted shifts were being added to operations: "[w]e currently have shifts A and B completely staffed, and plan to complete our recruitment efforts for shifts C and D in the next month … which would ***allow us to rapidly expand***

*our innovative lead recycling technology* and deliver better quality solutions to our partners and the market as a whole."

231.    Clarke also continued to tout "the support provided by strategic partnerships with some of the largest players in the battery industry, we are taking the opportunity to implement the lessons learned during commissioning of AquaRefinery 1 which will accelerate our roll-out of additional facilities. These improvements and our ongoing work with our strategic partners is creating a blueprint for future facilities – both for our own and for our partners. Our goal is to roll-out facilities in the rest of North America, China, the European Union and elsewhere, based upon this blueprint."

232.    Clarke summarized by stating, "*[f]or the remainder of 2017, we plan to ramp up production at AquaRefinery 1 and to prepare for accelerated build-out of additional facilities, while concurrently moving forward with our plans for additional AquaRefineries*, securing non-dilutive financing to accommodate our growth and finalizing our plan to retrofit a to-be-named recycling facility with our strategic partner in 2018."

233.    Yet, having touted that AquaRefining was "commerical[ly] operation[al]" and "scaling up," the Company faced a dilemna when it had to report its results for Q1 2017, which again showed that the Company had not yet generated any revenue.

234.    Accordingly, in justifying its failure to generate revenues, at the Q1 2017 earnings conference call after the close of the market on May 9, 2017 ("Q1 2017 Conference Call"), attended by Clarke and Murphy, Aqua Metals disclosed a series of "issues" and "challenges" at the Reno Plant. Some of these issues were the same as those it claimed it had resolved in February 2017, including issues with (a) breaking and separating the batteries; and (b) the input conveyor. Others had not been previously disclosed, including issues with (a) the holding tanks; (b) Aqua Preparation (described by Aqua Metals as where they take the lead compound and convert it to electrolyte that they then feed into the AquaRefining systems); (c) commissioning more than one AquaRefining module; and (d) commissioning the ingot casting process. However, Aqua Metals touted that it had overcome or was overcoming these isues and challenges:

> And what we can say is *it took longer than we planned to get the breaking and separation up and running*, but actually considerably shorter than industry norms. One of the challenges that was unique to us that we faced is that, because we don't have a smelter, we don't have a furnace, we needed to achieve much higher degree of separation than is normal in this industry. What I mean by that is, our plastic had to be clean plastic

with no lead oxide, no lead dust on it.  Our metallic lead had to be metallic lead with no plastic and no lead oxide, no lead sulfate on it.  Our lead compounds had to be lead oxide, lead sulfate and other lead compounds with no plastic and no metallic lead in it.  *That's a really tough order and we achieved it.*

And we worked very closely with Wirtz Engineering, who have been tremendous in this operation.  We asked them to do things that no other battery breaking company has ever been asked to do.  It took us a while to get there, *but we achieved it and we developed and implemented numerous, far too numerous to mention, upgrades to support what is essentially an industry-leading level of separation.*  And we think that's something that we are working actually on developing to knowhow and maybe even some IP down the line.  But when we talk about breaking and separation, we are operating at levels of separation that we don't know of anybody else in the industry even close to.

One of the other things that we have or a couple of other things that we have done in the breaking and separation areas, *we figured out fairly early on that to be able to operate over 24 hours and match timing and phasing between breaking and the next stages down the line, we needed to improve and upgrade our holding tanks, which we are doing, with higher capacity holding tanks with better mixing.*

One of the other issues that we faced is, we needed to rethink and rework the input conveyor to the breaker to upgrade it, to support the higher feed rates that we want to achieve to manage 160 tonnes a day of lead production.  *Initially, we undersized that, because we planned for 80 tonnes a day, and rather than stop when we are at scale we thought would upgrade it sooner rather than later.*

Looking at the Aqua Preparation, which is where we make the electrolyte, we were [ph] a bit later, quite a bit later and slower in being able to bring this online, initially because of intermittent supply from the breaker, without consistent high quality lead compounds from the breaker is very difficult to commission the processes that turn that and turn it into electrolyte.

*We weren't idle though, whilst we had this spare time and capacity, we actually used that to switch to an improved and lower cost chemistry for our desulfurization and [ph] separization technology which is a real big benefit down the line.  And we've learned some [ph] tough lessons on tank mixing and filtration, which needed to be changed and upgraded to improve reliability, but the Aqua Preparation now is up and running.*

Similarly with AquaRefining, those of you who followed us knew that we had a module online in October and we were struggling with intermittent supply from both Aqua Preparation, which was struggling with intermittent supply from the breaker, to get sufficient electrolyte up and running to commission all of the modules.

*So we were limited to only [Technical Difficulty] of electrolyte to run a single module.*  Until that opportunity, again to learn, to improve and to implement, so we used that delay in commissioning the additional AquaRefining modules to test and implement numerous upgrades that have improved potential liability, lifetime, reduced cost and improved consistency of operation.

*And last but not least, again, same theme here, we were struggling to commission the ingot casting process, because, again, of intermittent supply of processed lead that – we've now got all of that and the ingot commissioning is underway.*

[No. 4:17-cv-07142-HSG] CONSOLIDATED COMPLAINT FOR VIOLATION OF SECURITIES LAWS          70

235. Further, while Clarke reiterated that the Reno Plant continued to be "on track to be at 120 metric tons a day by the end of the year," he conceded for the first time that Aqua producing only "*40 tonnes a day of [AquaRefined lead]*" while the remaining 80 tons would be "lead alloys and metallics from the breaker" – contrary to the Company's repeated prior representations that the makeup would be 50% lead alloys and 50% AquaRefined lead.

236. In addition to promoting their success in addressing these issues and challenges, Defendants continued to issue false and misleading statements.

237. In a slide presentation attached as Exhibit 99.2 to the Company's May 9, 2017 Form 8-K filed with the SEC in advance of the Q1 2017 Conference Call, and referred to during the call, the Company stated that "AquaRefinery 1 (McCarran, NV) [is] operating and in revenue":

## Strategic relationships helped de-risk our start-up…….

- AquaRefinery 1 (McCarran, NV) operating and in revenue
    - Began production in Q1 – truckloads of feedstock crushed
    - Sales to strategic partner in Q2 – truckloads of product shipped
    - Ramping production to >120mT/day of lead by the end of 2017
    - Validating our economic projections and incorporating lessons learned
- Now planning AquaRefineries 2-5 and learning from chemical industry and datacenter operators
    - Moving away from opportunistic build-out of small stand-alone facilities and evaluating "clusters" centered on logistics nodes
- Equipment licensing has started
    - Working with JCI to plan the retrofit of an existing facility, as the blueprint for others
- Acquisition of Ebonex should accelerate development of higher value products

….and provide the stability to optimize our business expansion

NASDAQ: AQMS    3    AQUAMETALS

[No. 4:17-cv-07142-HSG] CONSOLIDATED COMPLAINT FOR VIOLATION OF SECURITIES LAWS    71

## Strategic partners brought scale and urgency

| Opportunity delivered through strategic relationships | Lead Capacity (mT/day) | AquaRefining Modules needed | Potential annual revenue | Start Date |
|---|---|---|---|---|
| AquaRefinery 1 | 120-160 | 16-32 | $100-120M/year | Operational |
| AquaRefinery 1-5 | ~800 | ~160 | $500-600M/year | 2017 |
| Licensing (JCI and beyond) | >8,000 | >1,600 | TBD | 2018 |

- The scale and demand for additional facilities and licensing means that we cannot wait until Facility 2 to start implementing advances and lessons learned
- Facility 1 is being used both for revenue generation, continuous improvement and to validate process upgrades
- Built a talent acquisition function, recruiting from role models and complementary industries

NASDAQ: AQMS    5



## AquaRefinery 1 is running and we are scaling output

- Started production in Q1 and sales in Q2
- Status
  - Breaking and separation: commissioned and operating
  - Aqua Preparation: process operating – adding capacity and streamlining operations
  - Aqua Refining: Module 1 operational, Modules 2-4 in-start-up, Modules 5-16 being updated to latest specification
  - Ingot production: being commissioned
    - Metallic lead being shipped pre-ingot
  - Plant staffing
    - A & B shifts: fully staffed, C & D shifts: recruiting to full complement in next month
- The focus of process development has moved from Alameda to Reno
- Implementing next year's improvements now

NASDAQ: AQMS    6



238.    During the Q1 2017 Conference Call, Clarke stated, "*every single one of the processes that we need to operate is operating*" and "*we've proven that the process overall works*." Clarke reassured investors that "*[e]verything that we have done so far has validated our business model…*"

239.    Clarke also stated that:

Sales to a strategic partner commenced in quarter two using materials that were made in both quarter one and quarter two.  And again, we're into the situation of truckloads of feedstock crushed and shipped now.  For remainder of this year, *we're going to do ramping production to 120 metric tonnes a day of lead which we aim to achieve by the end of 2017 or sooner….*

\*\*\*

*[W]e look at AquaRefinery 1, we're planning on having a production capacity of 120 metric tonnes a day by the end of the year, and then expanding it to 160 metric tonnes a day in 2018.*  And that essentially means that we will have 16 AquaRefining modules on-site and operational at 120 tonnes a day and 32 modules on-site and operational 160 tonnes a day.  For the mathematicians among you that doesn't add up ....

But in terms of what does that mean, 120 tonnes to 160 tonnes a day of lead produced, that represents about $100 million to $120 million a year of revenue, *and it is operational.*  And we've been talking about [ph] a rollout to 800 tonnes a day for more than a year now, and initially that was going to be 10 to 15 smaller facilities.

Now, we're thinking, we can achieve that with 1-5 AquaRefineries, if we stop at 800 tonnes a day, and there is really no reason why we should specifically stop at 800 tonnes a day.  But at 800 tonnes a day, that would mean, we have deployed 160 AquaRefining modules and we will be looking at a combined potential annual revenue of $500 million to $600 million a year and we're starting that process this year, that is we are starting that rollout this year.

\*\*\*

*The headline is its running and we are scaling output.*  We started production in Q1 and we have started actually moving those into sales in Q2….  [T]he breaking and separation is commissioned and operating.  *The Aqua Preparation is the next step … so that process is now operating.  We are adding capacity to it and streamlining operations.  AquaRefining itself, module 1 is operating, modules 2 to 4 are on-site and in startup mode and modules 5 to 16 are being updated to latest specifications and will be installed over the coming weeks and months.*

240.    Clarke stated that "AquaRefinery 1 is commissioned in revenue and on track.  It continues to be our primary focus and we are using it to prepare for accelerated growth."  Regarding "strategic partners" Clarke stated that "they *de-risked our ramp up*" and "provided stability for efficient scale up."

241.    Clarke touted the Company's "invitational site visits":

[W]e announced earlier on that we actually are doing some invitational site visits.  So we have arranged an invitational for sell-side analysts in May that will take place in May.  We have been asked not to give out when that date is.  I believe the analysts want some time to prepare and publish.  Similarly, we are arranging invitationals of buy-side analysts and investors which will occur in June and beyond.

242.    In response to analyst's question about whether the Company's ability to finance additional facilities would be hampered by the fact the Reno Plant was not producing 120 tons of lead

a day, Clarke responded: "if we got the battery-breaking working, and we've got the ingot line running, and we'll be making electrolyte and we are producing electrolyte into lead, and *they can see modules operating effectively, that's pretty much enough of a de-risk from the perspective of the people we're talking to*."

243.    After this May 9, 2017 news, Aqua Metals' stock price declined $4.34 from a close of $16.65 per share on May 9, 2017, to a close of $12.31 per share on May 10, 2017, a drop of approximately 26%, on unusually heavy trading of 1,781,561 shares.

244.    Just after the market close on May 10, 2017, the Company filed a Form 10-Q for Q1 2017 with the SEC ("Q1 2017 Form 10-Q") reporting the Company's financial and operating results for the period ended March 31, 2017.  In that filing, the Company, while confirming what they had disclosed the day before – that they had sold only lead compounds and plastics rather than AquaRefined lead ("Lead compounds and plastic produced in the quarter were not shipped as details were still being worked out for delivery to customers.  Shipments began in April 2017."), they further stated, "*[w]e expect TRIC to achieve a production rate of 120 metric tons of recycled lead per day by the end of 2017*."

245.    The Company reiterated the same stated plan of operations in the Q1 2017 Form 10-Q as it had previously reported in its 2016 Form 10-K, including "[o]ur plan of operations for the 12-month period following the date of this report is to *expand operations at our first recycling facility at TRIC to 120 tonnes of lead production per day by the end of 2017*" and "[i]n the longer term, our goal is to *increase our production of lead at our TRIC facility to 160 tonnes per day*."  The Company's 12-month plan of "operations also includes our collaboration with Johnson Controls for the development of a program for the installation of new greenfield builds and conversion of Johnson Controls and certain strategic partners of Johnson Controls' existing lead smelters throughout North America, China and Europe to a lead recycling process utilizing our proprietary and patent-pending AquaRefining technology and equipment, know-how and services," and the Company's "continued pursuit of the *expansion of our business with additional recycling facilities and licensing of our recycling technology and equipment to third parties*."  The Company continues "to pursue providers of non-dilutive capital to finance up to an additional four facilities, each of which would have a

production capacity of approximately 160 tonnes per day. Through the ***supply and off-take relationships that we have established with Battery Systems Inc., Interstate Battery and Johnson Controls, we believe we are better positioned to acquire the necessary funding***, including potential forms of non-diluting financing, in order to finance our next facilities."

246. On May 23, 2017, at the market open, Aqua Metals issued a press release titled "Aqua Metals Named Breakthrough Solution of the Year" ("May 23, 2017 Press Release") announcing that it won a Platts Metals Award for advances in lead recycling technology. In the May 23, 2017 Press Release, the Company described itself as "commercializing a non-polluting electrochemical lead recycling technology called AquaRefining." The May 23, 2017 Press Release further stated that the awards from Platts "recognize the AquaRefining process, the lead industry's first environmentally friendly technology for lead-acid battery recycling" and that the "modular design of the AquaRefining technology enables unprecedented scalability … [f]or the first time, the lead industry has an environmentally and economically sustainable solution to efficiently recycle lead-acid batteries."

247. In the May 23, 2017 Press Release, Clarke remarked that the recognition "delivers credibility to the significant progress we've made in bringing AquaRefining to commercialization" and that "[t]his is a reflection of the sheer talent and hard work of our team, as we ramped up production at our flagship AquaRefinery over the past several months."

248. While the Q1 2017 statements did provide some visibility of the true condition of the AquaRefining technology, the statements in paragraphs 229 through 247 were also false and misleading in several ways:

(a) The statements above regarding the then existing status, success and commercialization of the AquaRefining process and the operations at the Reno Plant, including that it is in commercial operation with all processes working and generating revenue and scaling output, making improvements that will accelerate the roll out and that truckloads of product were shipped, were false and misleading when made for the reasons discussed in paragraphs 130(a), 152(a)(i)-(iii), above.

(b) The statements above regarding the strategic partnerships and that they support the Company's growth and revenue plans and de-risked its start up, and that Aqua Metals is working

with Johnson Controls to retrofit a facility, were false and misleading when made for the reasons discussed in paragraphs 130(a), 130(b), 152(a)(i)-(iii), 152(b)(i)-(iii), 200(a)(i)-(iii), 228(b), above.

(c)     The statements above touting the demand for the technology were false and misleading when made for the reasons discussed in paragraphs 130(a), 130(b), 152(b)(i)-(iii), 200(a)(i)-(iii), above.

(d)     The statements above regarding licensing equipment and building additional facilities are statements of the Company's current existing goals and focus, which are actionable because they were false and misleading when made for the reasons discussed in paragraphs 130(a), 130(b), 152(a)(i)-(iii), 152(b)(i)-(iii), 200(a)(i)-(iii), above.  Further, Defendants knew these statements were false and misleading when made for the reasons discussed in paragraphs 130(e), 152(d)(i)-(iii), above.

(e)     The statements above regarding the production rates, including production of 120 metric tons of lead per day in 2017 and expanding that to 160 metric tons per day by 2018, which would generate revenue between $100 million and $120 million, including that it is "on track" to do so, were statements of current conditions of the Company and were false and misleading when made for the reasons discussed in paragraphs 130(a), 152(a)(i)-(iii), above.  Further, Defendants knew these statements were false and misleading when made for the reasons discussed in paragraphs 130(e), 152(d)(i)-(iii), above.

(f)     The statements above touting the analyst visits were false and misleading because, in truth, the site visits were carefully orchestrated to conceal the problems and that the process was not functioning and for the reasons discussed in paragraphs 130(a), 152(a)(i)-(iii), 152(b)(i)-(iii), above.

**2.     The May and June 2017 False and Misleading Statements Touting the Market's Reaction to the AquaRefining Technology**

249.    On May 31, 2017, after the market close, the Company issued a press release titled "Aqua Metals Hosts First Analyst Visitor Day" ("May 31, 2017 Press Release") announcing that it had hosted analysts at its Reno Plant.  Aqua Metals expressly touted that:

> The analysts were given a tour of AquaRefinery 1, located in the Tahoe-Reno Industrial Complex (TRIC), led by Aqua Metals' executive management team. ***Analysts were able to view the critical processes at the AquaRefinery as they happened, including: battery***

[No. 4:17-cv-07142-HSG] CONSOLIDATED COMPLAINT FOR VIOLATION OF SECURITIES LAWS          76

*feedstock deliveries; battery breaking and separation; desulfurization and pre-AquaRefining digestion processes; AquaRefining on simultaneously running AquaRefining modules; and shipments of lead products to customers.*

250. Clarke stated in the May 31, 2017 Press Release:

It has been a busy few months for our team as *we continue to pursue our production milestones and step ever closer to full output of AquaRefined lead at TRIC. We aim to be as transparent as possible while protecting our IP, as we expand our operations and collaborate with new partners. This was a valuable opportunity to open our doors to the analyst community, providing a behind-the-scenes look at our process.*

251. The May 31, 2017 Press Release further stated that the "*Company expects all the analysts who attended the visitor day to update their coverage reports to reflect findings from the site visit in the coming days.* AquaRefinery 1 is ramping towards a total production output of 120 metric tonnes of lead products per day by the end of 2017. Aqua Metals is currently also working on plans to build a second AquaRefinery and integrating AquaRefining into a to-be-named existing lead smelter with its strategic partner, Johnson Controls."

252. In response to the on-site visits at the Reno Plant and at the direct invitation of the Company to report on them, several analysts issued reports after their visits.

253. Indeed, on June 1, 2017, Oppenheimer reported a favorable site visit stating:

- "We visited AQMS's Reno facility yesterday, *seeing the battery breaker, the separation process, sulfurization engaged, and the AquaRefining process all up and operational.* We believe the biggest issue facing AQMS shares is fundamentally whether the process can be balanced to deliver the cost numbers management has guided to. Our visit suggests the *company is tracking those estimates well.* We expect there is a significant amount of additional margin for higher purity lead and believe mix could drive upside to our expectations."

- "We *observed six semi truckloads of material delivered and taken away during our four-hour visit.* We saw spent batteries loaded into the recycling line and being processed with fully recycled lead coming out of the end of the process flow. *There appeared to be a week or more of spent batteries as inputs and finished goods inventory.*"

- "*We remain constructive on shares as we believe the company will systematically counter lingering short arguments over the course of the year.*"

254. Also, on June 1, 2017, National Securities Corporation issued a report after its site visit stating:

- We came away seeing the progress that the company has made in the ramp up of the facility and a clearer picture of the expansion plans. We believe that management plans to hold similar events in the coming months which we view as *incrementally positive for transparency* and for the sentiment on the shares.

[No. 4:17-cv-07142-HSG] CONSOLIDATED COMPLAINT FOR VIOLATION OF SECURITIES LAWS          77

- **The Reno facility is ramping up, on track for 120 tonnes by year end**
  *On our facility tour we observed that 3 Aqua refining modules were up and running and producing recycled lead. There was work being done assembling the fourth module and also equipment ready for the next set of modules to be built.* Improvements have already been made in the Aqua refining process that has been learned from the working of the first module and is being implemented in the fourth module from the start. We believe that the company is on track for all sixteen modules to be up and running by the end of 2017.

- **Lead is being produced and revenues are being generated**
  *Given that Aqua Metals did not report any revenues in the March quarter, we view that fact that we observed trucks delivering used batteries for off-loading and recycling, and more importantly, finished recycled lead packaged and ready to be shipped out as highly encouraging. Given the amount of lead produced and our belief of what has already been sold, coupled with the throughput of the current modules for the month of June, we believe that our revenue estimate for the June quarter of $2 million is achievable.*

255. On June 1, 2017, before the market close, Bloomberg News issued an article titled "Aqua Metals CEO Says New Plant May be Announced This Summer." According to the article, Clarke stated during a phone interview that the Company was getting ready to announce its "next one, maybe two" facilities over the summer or even sooner and that there was a "reasonable chance" that the Company would reach 120 metric tons of capacity before the end of 2017.

256. On June 5, 2017, Euro Pacific Capital issued a report after visiting the Reno Plant stating:

On May 31, 2017, we attended the Analyst Day hosted by Aqua Metals where we had an opportunity to see the facility and operations and meet with the management and operational team. During our visit, we saw the entire process of lead production starting from the feedstock/ lead acid batteries being loaded on the conveyor belt moving into the battery breaker system to the AquaRefining preparation process (desulphurization process) and to the AquaRefining modules, where the end product (AquaRefined lead) comes out at the end of the process. *The key takeaway from the site visit was as the Company fixes the minor issues/modification to the equipment/process over the next few weeks, it should be able to produce guided quantities of lead by the end of this year*…. We noted that the key bottleneck of the operation is the battery breaking system/equipment, which is having issues to appropriately separate/filter components from the bigger load of the feedstock. We believe with minor modifications that are expected to be implemented over the next few weeks, the Company should be able to resolve the issue and process targeted levels of feedstock.

257. The statements in paragraphs 249 through 256 above regarding the analysts' day, including touting them as opening their doors to provide a behind the scenes look at the process, made directly by or adopted by Defendants, were false and misleading because, in truth, the site visits were

sham shows that concealed the issues and for the reasons discussed in paragraphs 130(a), 152(a)(i)-(iii), 152(b)(i)-(iii), above.

### 3. The June 2017 False and Misleading Statements Regarding the Status of AquaRefining

258. On June 1, 2017, before market close, Bloomberg First Word issued an article titled "Aqua Metals CEO says New Plant May Be Announced this Summer," which stated that "[p]lans for additional facilities will be announced this summer as lead acid battery recycler looks to expand." The article quotes Clarke as stating that the Company is "getting ready" to announce "next one, maybe next two" facilities.

259. Also in June 2017, Aqua Metals prepared a "Corporate Presentation" entitled "'Lead Reinvented' Facilitating a revolution in the lead acid battery industry," which stated that "[t]he World's first AquaRefinery is now in commercial production" and that "[w]e are ramping revenues, planning additional facilities of our own":



## Key Takeaways

- Preparation for large scale roll-out is our priority
- AquaRefinery 1, commissioned, in revenue and on track for 120mT/day
  - Continues to be our primary focus
  - Using it to prepare for accelerated growth
- Strategic partners brought scale and urgency
  - De-risked our ramp-up
  - Provided stability for efficient scale-up
  - Allows for more aggressive build-out
- Beginning early stage work on higher value products and services
  - Positioned to leverage existing and future strategic partners




NASDAQ: AQMS     20                 **AQUA**METALS

260. The Defendants' statements in paragraphs 258 through 259 above were false and misleading in several ways:

(a) The statements above regarding building additional facilities are statements of the Company's current existing goals and focus, which are actionable because they were false and misleading when made for the reasons discussed in paragraphs 130(a), 130(b), 152(a)(i)-(iii), above. Further, Defendants knew these statements were false and misleading when made for the reasons discussed in paragraphs 130(e), 152(d)(i)-(iii), above.

(b) The statements above regarding the then existing status, success and commercialization of the AquaRefining process and the operations at the Reno Plant, including that it is commissioned, in commercial operation and scaling output, were false and misleading when made for the reasons discussed in paragraphs 130(a), 152(a)(i)-(iii), above.

(c) The statements above regarding the production rates, including production of 120 metric tons of lead per day in December 2017 and expanding that to 160 metric tons per day by 2018, including being "on track" to do so, were statements of current conditions of the Company and

were false and misleading when made for the reasons discussed in paragraphs 130(a), 152(a)(i)-(iii), above. Further, Defendants knew these statements were false and misleading when made for the reasons discussed in paragraphs 130(e), 152(d)(i)-(iii), above.

(d)  The statements above regarding the strategic partnerships and that they support the Company's growth and revenue plans and de-risked its ramp up, were false and misleading when made for the reasons discussed in paragraphs 130(a), 130(b), 152(a)(i)-(iii), 152(b)(i)-(iii), 200(a)(i)-(iii), above.

**4.  The July 2017 False and Misleading Statements Regarding The Existing Status of the AquaRefining Technology As of Q2 2017**

261.  On July 25, 2017, at the market open, Aqua Metals issued a press release titled "Aqua Metals Announces Preliminary Q2 2017 Revenues" ("July 25, 2017 Press Release") announcing that the Company "expects total revenues for the second quarter of 2017 to be $603,000, which represents the commencement of commercial revenues." Murphy was listed as a "Company Contact." Clarke remarked in the July 25, 2017 Press Release that "[*m]oving into revenue generation is another significant milestone of growth*" and shows that *"[w]hat we have accomplished to-date is truly unprecedented and represents [a] level of progress not generally seen in advanced materials technologies*." Clarke further explained that the Company had "worked hard to bring the front-end of our process into consistent operation and are now working to install the balance of our AquaRefining modules as we work towards our goal of achieving *120 metric tonnes per day of capacity by year end*."

262.  The Company touted that "[w]e are working to expand the reach and scope of our technology with additional facilities of our own, the commencement of equipment licensing and the expansion of our product offerings to include advanced materials and methods to advance the capabilities of lead acid batteries."

263.  The Defendants' statements in paragraphs 261 through 262 above were false and misleading in several ways:

(a)  The statements above regarding the then existing status, success and commercialization of the AquaRefining process including that moving onto revenue generation is

unprecedented in "advanced materials technologies," were false and misleading when made because the revenue generated was not the product of "advanced materials technology," but from traditional breaking and separating and for the reasons discussed in paragraphs 130(a), 152(a)(i)-(iii), above.

(b)     The statements above regarding the production rates, including production of 120 metric tons of lead per day by the end of the year were statements of current conditions of the Company and were false and misleading when made for the reasons discussed in paragraphs 130(a), 152(a)(i)-(iii), above.  Further, Defendants knew these statements were false and misleading when made for the reasons discussed in paragraphs 130(e), 152(d)(i)-(iii), above.

(c)     The statements above regarding equipment licensing and building additional facilities are statements of the Company's current existing goals and focus, which are actionable because they were false and misleading when made for the reasons discussed in paragraphs 130(a), 130(b), 152(a)(i)-(iii), above.  Further, Defendants knew these statements were false and misleading when made for the reasons discussed in paragraphs 130(e), 152(d)(i)-(iii), above.

**5.     The August 2, 2017 False and Misleading Statements Regarding Site Visits**

264.     On August 2, 2017, when the market opened, the Company issued a press release titled "Aqua Metals Successfully Hosts First Investor Day" ("August 2, 2017 Press Release"), announcing that it had hosted institutional and accredited investors at its Reno Plant led by Aqua Metals' executive management team.  The August 2, 2017 Press Release stated that "[i]nvestors were able to ***view the full production process at the AquaRefinery as it happened, including battery breaking and separation, desulfurization, electrolyte production, and AquaRefining on four simultaneously running AquaRefining modules***."

265.     Defendants also adopted an institutional investor's statement in its August 2, 2017 Press Release where it quoted Brett Conrad of Longboard Capital Advisors:

> Our Aqua Metals plant tour was a real eye opener.  The team has put in countless hours and expertise ***perfecting*** the first closed loop non-polluting lead refining process.  This is my third time visiting the plant and I'm very impressed with the accelerating progress in the commissioning process.

266.     Clarke touted the Company's purported belief in transparency:

> With the world's first clean lead recycling facility now in commercial operation, we have continued to scale our operations.  ***This investor day speaks to our belief in transparency***

while still protecting our IP, an important value for a company working with a technology as disruptive as AquaRefining.

267. The August 2, 2017 Press Release also represented that it was working on plans to build a second AquaRefinery and "integrating AquaRefining into a to-be-named existing lead smelter with strategic partner, Johnson Controls."

268. On August 14, 2017, H.C. Wainwright & Co. issued a report after its site visit stating:

- We visited AQMS' TRIC facility on August 8, 2017, and were given a tour of the operations by the company's COO, Selwyn Mould. We observed: 1) infrastructure to recycle lead batteries using the company's proprietary process is in place; 2) four modules were operational, producing recycled lead paste; 3) room to deploy 12 additional modules has been carved out in the setup; 4) there is adjacent available space to add another line of 16 modules; 5) the operational crew appears to be scaling the learning curve; 6) facilities were quite clean for a place where lead is recycled; and 7) technology and infrastructure deployed were fairly straightforward and should be easy to bolt on to, or lined up with, licensee infrastructure.

- We believe volatility in the stock has been driven by high initial expectations set by management that have not been delivered in a timely manner. Management's ambitions to put in place a larger facility than originally planned, fueled by investor interest, has caused a one year delay in achieving production goals, understandably creating skeptics. However, after our site visit, we believe the solvent based lead recycling process can be scaled up and the company should be closer to full utilization levels beginning in 1Q18.

269. The statements above in paragraphs 264 through 268 above were false and misleading in several ways:

(a) The statements regarding the Investor Day, including that it speaks to the Company's belief in transparency, made directly by or adopted by Defendants, were false and misleading when made because the visits were carefully orchestrated to conceal the problems and that the process was not functioning and for the reasons discussed in paragraphs 130(a), 152(a)(i)-(iii), 152(b)(i)-(iii), above.

(b) The statements above regarding the strategic partnerships and plans to build a second AquaRefinery with Johnson Controls, were false and misleading when made for the reasons discussed in paragraphs 130(a), 130(b), 152(a)(i)-(iii), 152(b)(i)-(iii), 200(a)(i)-(iii), 228(b), above.

**6.      The August 9, 2017 False and Misleading Statements and Partial Corrective Disclosures**

270.      After the market close on August 9, 2017, Aqua Metals issued a press release titled "Aqua Metals Provides Second Quarter 2017 Corporate Update," which was attached as Exhibit 99.1 to a Form 8-K filed with the SEC after the market close on the same day ("Q2 2017 Press Release"), announcing the Company's financial and operating result for the second quarter ended June 30, 2017 ("Q2 2017").  The Q2 2017 Press Release stated:

> *As of July, the Company had four AquaRefining modules commissioned and in operation.  The Company is currently in the process of scaling up AquaRefining operations to include 16 modules by the end of 2017.... [Aqua Metals] [s]uccessfully hosted several invitational investor and analyst days at AquaRefinery 1 in late May and early August.  These events showcased the production process at the AquaRefinery, including battery feedstock deliveries, battery breaking and separation, desulfurization and pre-AquaRefining digestion processes and AquaRefining on four running AquaRefining modules.*

271.      After the market close on August 9, 2017, Aqua Metals held the Q2 2017 earnings conference call ("Q2 2017 Conference Call") with Clarke and Murphy.  During that call, although it had been nearly a year since the Company announced that the first module had supposedly produced the first AquaRefined lead, Clarke disclosed that, in fact, the modules were not operational, "*Modules 1 to 4 are being used to validate operating parameters right now*, and we plan to have modules 5 to 16 installed during October and then operational by the end of the year."

272.      The Company further revealed that the lead compounds that accounted for much of its small $603,000 Q2 2017 revenue derived from low value lead compounds and that its facility might run at less than 120 tons per day:

> *[T]he lead compounds have a low value in the less established market than lead alloys*. And moving forward, our focus is really about the AquaRefined products and the licensing of AquaRefining equipment.
>
> So it's all about AquaRefining but optimal product mix and profitability.  We're focused on running all of our AquaRefining modules to the maximum benefit.  And that means that *we may choose to operate the overall facility with an output of less than 120 tons a day*, but with maximized AquaRefining.  And we're looking to change our product mix to a higher level of AquaRefining product.

273.      Clarke stated: "*And we have the option of producing and selling lead components from AquaRefining feedstock*, and we've done this.  And as Tom will say shortly, that's *where much of our revenue for the second quarter came from.*"

274. Clarke further discussed the problems the Reno Plant was having and had been having for quite some time, including issues with (a) breaking and separating, (b) commissioning and scaling Aqua Preparation, and (c) commissioning modules 1-4.

275. The same day, August 9, 2017, the Company filed a Form 10-Q for Q2 2017 with the SEC ("Q2 2017 Form 10-Q") reporting the Company's financial and operating result for the Q2 2017. The Company reported in that filing:

> We have implemented numerous process improvements and expect to be capable of producing significantly more than 120 metric tonnes of recycled lead per day by the end of 2017. This is more battery processing capacity than we can utilize with 16 AquaRefining modules. As such, until we have increased our AquaRefining capacity, we will have the option of producing lead compounds from unused AquaRefining feedstock. **The lead compounds have a less established market and some demand uncertainty.** For this reason, following the commission of all 16 modules, we may choose to run TRIC at less than 120 tonnes per day, should this provide for a more optimal product mix.

276. During the Q2 2017 Conference Call, Clarke assured investors, once again, that "**AquaRefining works in capital letters with a lot of exclamation points. We are now AquaRefining lead.**" He stated that the Company had "**four modules operating**" and expected to have 16 operating by the end of 2017 and that the facility was currently running "two shifts of ten hours each … for four days a week."

277. During the Q&A portion of the call, in response to a question about Q3 revenues, Clarke stated "[o]ur expectation is quite modest for quarter three that will be largely flat in revenue but *we're expecting to see a big growth in revenue until the backend of quarter four as we ramp the final modules and we really start cranking on them*."

278. On the call, Murphy stated:

> *The additional licensees coming from battery companies and lead companies, we see it as – the level of interest on multiple site visits and observing processes in operation and thinking around how they would integrate into their existing facilities where they have their own in-house recycling, or whether they are – if they are lead company or how would they go about building a facility if they are currently outsourcing to a third-party for battery recycling, and discussions around do they want to start off with a standalone AquaRefining facility or do they we want to go a hybrid route*.

279. Responding to a question about the short seller report, Clarke stated on the call:

> One of the other strands was that AquaRefining just doesn't work. *Well we had – it was about 90 people through the facility watching it work now at some point, some of those 90 people will start communicating to the guys who are holding [] short positions and explaining actually it does work*.

[No. 4:17-cv-07142-HSG] CONSOLIDATED COMPLAINT FOR VIOLATION OF SECURITIES LAWS     85

*We've shown videos of it working* and I don't know, maybe the shorts are so upside down and buried in their own bubble of misbelie[f] they just can't get out now, I don't know. It makes no sense to me at all.

I would point out that there are probably one or two entities in this world who would be very upset if smelting was to go away and be replaced by something else.

***

And as Tom said earlier *it worked the first time we turned it on*. I mean you got to recognize that we actually – we put our second mortgages 401(k) and kids education for instance found in this business if this is a get rich quick scheme, please show me where I got rich. I haven't monetized anything from this, I have not sold a single share.

And the reason we were happy to look our spouses in the eye and say, I am going to write another $100,000 check tomorrow darling because *when we turned AquaRefining modules on they worked and they still do*.

280. Murphy also added to Clarke's statement regarding the short seller report, "just summarizing what Steve words said, the reason the search will eventually go away and it may not be overnight unfortunately *as this works. And why I am comfort level and we never leave because this works*."

281. Continuing to tout its strategic partnerships, the Company's plan of operations remained largely unchanged from its prior 10-Q filing:

Our plan of operations for the 12-month period following the date of this report is to expand operations at our first recycling facility at TRIC to include 16 AquaRefining modules by the end of 2017. In the longer term, our goal is to increase the number of AquaRefining modules and to move our product range to be more focused on AquaRefined lead. Our 12-month plan of operations also includes our collaboration with Johnson Controls for the development of a program for the installation of new greenfield builds and conversion of Johnson Controls and certain strategic partners of Johnson Controls' existing lead smelters throughout North America, China and Europe to a lead recycling process utilizing our proprietary and patent-pending AquaRefining technology and equipment, know-how and services. Finally, our 12-month plan of operations includes our continued pursuit of the expansion of our business with additional recycling facilities and licensing of our recycling technology and equipment to third parties. Additional funding will be required to increase the production of AquaRefined lead at TRIC beyond that provided by the first 16 modules and to work with Johnson Controls on equipment integration and licensing to third parties.

282. On August 9, 2017, after market close, Seeking Alpha issued an online post entitled "Aqua Metals misses by $.22, misses on revenue," which explained that "Aqua Metals (NASDAQ: AQMS) Q2 EPS of -$.42 misses by $.22" and that "Revenue of $0.6M misses by $0.63M."

283. On the release of the news, Aqua Metals' stock price declined $2.56 from a close of $10.87 per share on August 9, 2017, to a close of $8.31 per share on August 10, 2017, a drop of approximately 23.6%, on heavy volume of 658,303 shares traded.

284. The Defendants' statements in paragraphs 270 through 282 above were false and misleading in several ways:

(a) The statements above regarding the then existing status, success and commercialization of the AquaRefining process and the operations at the Reno Plant, including repeatedly stressing that AquaRefining works and has worked from the beginning, were false and misleading when made for the reasons discussed in paragraphs 130(a), 152(a)(i)-(iii), above.

(b) The statements above touting the demand for the technology were false and misleading when made for the reasons discussed in paragraphs 130(a), 130(b), 152(b)(i)-(iii), 200(a)(i)-(iii), above.

(c) The statements above regarding the production rates, including production of 120 metric tons of lead per day by the end of the year and that the Company would see a big growth in revenue in the back half of the year, were statements of current conditions of the Company and were false and misleading when made for the reasons discussed in paragraphs 130(a), 152(a)(i)-(iii), above. Further, Defendants knew these statements were false and misleading when made for the reasons discussed in paragraphs 130(e), 152(d)(i)-(iii), above.

(d) The statements above touting the visitors that have come through the Reno Plant to see the process at work were false and misleading when made for the reasons discussed in paragraphs 130(a), 152(a)(i)-(iii), 152(b)(i)-(iii), 200(a)(i)-(iii), above.

**7. The September 2017 False and Misleading Statements Regarding the Johnson Controls Partnership**

285. Before the market open on September 28, 2017, Aqua Metals filed a Form 8-K with the SEC announcing that the Company was progressing in its agreement with Johnson Controls ("September 28, 2017 Form 8-K"). The Form 8-K stated in relevant part:

On September 15, 2017, Johnson Controls delivered to us written notice of the first Johnson Controls facility designated by it, on a preliminary basis, for conversion or retrofit. ***On September 25, 2017, we delivered to Johnson Controls written notice our readiness to commence discussions to convert or retrofit a Johnson Controls facility to be capable of using AquaRefining to produce lead.***

[No. 4:17-cv-07142-HSG] CONSOLIDATED COMPLAINT FOR VIOLATION OF SECURITIES LAWS      87

During the week of September 25, 2017, *we commenced meetings with Johnson Controls for purposes of furthering the discussions concerning the conversion or retrofit of the initial Johnson Controls facility and the negotiation of the definitive Development Program Agreement pursuant to which we will provide to Johnson Controls, and certain strategic partners of Johnson Controls, by way of licensing or sale, AquaRefining technology and the related equipment, engineering and systems integration support sufficient to convert or retrofit existing smelter-based operations.* Johnson Controls has reserved the right to definitively designate the initial facility upon the parties' execution of the definitive Development Program Agreement.

286. Also, on September 28, 2017, before market open, the website thefly.com made an online post entitled "Aqua Metals commences talks with Johnson Controls over retrofit of facility," amplifying the statement Aqua Metals made in its 8-K from the following day that in which it "commenced meetings with Johnson Controls (JCI) for purposes of furthering the discussions concerning the conversion or retrofit of the initial Johnson Controls facility and the negotiation of the definitive Development Program Agreement pursuant to which we will provide to Johnson Controls, and certain strategic partners of Johnson Controls, by way of licensing or sale, AquaRefining technology and the related equipment, engineering and systems integration support sufficient to convert or retrofit existing smelter-based operations." On September 15, Johnson Controls gave "written notice to Aqua Metals of the first Johnson Controls' facility designated by it, on a preliminary basis, for conversion or retrofit." On September 25, Aqua Metals delivered to Johnson Controls written notice of its "'readiness to commence discussions to convert or retrofit a Johnson Controls facility to be capable of using AquaRefining to produce lead.'" TheFly reported that "[s]hares of Aqua Metals are up 29%, or $1.75, to $7.80."

287. Following this September 28, 2017 news, Aqua Metals per share price increased $1.10, approximately 18%, from a close of $6.05 on September 27, 2017, to a close of $7.15 on September 28, 2017, on 2,094,755 shares traded.

288. The statements in paragraphs 285 through 286 above regarding the strategic partnerships with Johnson Controls, including that Aqua Metals delivered a notice of readiness to commence discussions regarding a conversion or retrofit of a Johnson Controls' facility were false and misleading when made for the reasons discussed in paragraphs 130(a), 130(b), 152(a)(i)-(iii), 152(b)(i)-(iii), 200(a)(i)-(iii), 228(b), above.

**8.**     **The October 23, 2017 Partial Corrective Disclosure**

289.     On October 23, 2017, at the market open, Aqua Metals issued a press release titled "Aqua Metals Provides Update On Plant's Operations" ("October 23, 2017 Press Release").  In the October 23, 2017 Press Release, the Company admitted that it had only "***produced small quantities of AquaRefined lead***."

290.     Aqua Metals further disclosed that, contrary to statements made starting in February 2017, it was still trying to commission AquaRefining:

> [A]n important part of the commissioning process is to operate the modules consistently at progressively higher electrical currents to determine the appropriate control parameters and operating procedures.  Once completed these parameters and procedures can be replicated across all modules.  During model commissioning, the Company also found that under certain conditions, the operators would need to periodically assist the lead removal.  Several solutions have now been tested and the Company is evaluating which options are best for long term use.

291.     The Company further revealed that it was still "***in the process of synchronizing all of the[] stages***" of its production process and was far from selling AquaRefined lead, despite its repeated statements otherwise:

> For over six months, Aqua Metals has been breaking batteries and selling lead compounds.  Aqua Metals is currently in the process of taking the next major step by ***transitioning to the production of lead ingots that are produced from battery grids and a small amount of AquaRefined lead.  These lead ingots will be sold as lead "bullion." The next step will be to produce and sell ingots of lead alloy, and the last step will be to produce and sell ingots of AquaRefined lead.***

292.     On the release of the news, Aqua Metals' stock price declined $.96 per share, or 17.9%, from a close of $5.37 per share on October 20, 2017, to a close of $4.41 per share on October 23, 2017, on heavy trading of 647,901 shares.  The stock fell another 9.07% the next trading day on heavy trading of 735,301 shares.

**9.**     **November 9, 2017 Corrective Disclosure**

293.     On November 9, 2017, after the market close, Aqua Metals issued a press release titled "Aqua Metals Provides Third Quarter 2017 Corporate Update," which was attached as Exhibit 99.1 to a Form 8-K filed with the SEC after the market close on the same day ("Q3 2017 Press Release"), announcing the Company's financial and operating result for the third quarter of 2017 ("Q3 2017")

ended September 30, 2017 and disclosing that it had only generated revenues of $600,000 for Q3 2017 (the same amount that it had generated in Q2 2017).

294. Also, after market close on November 9, 2017, the Company filed a Form 10-Q for Q3 2017 with the SEC ("Q3 2017 Form 10-Q"), in which it admitted, AquaRefining technology is "*unproven technology*." Further, the Company admitted that "[a]s of the date of this report, our commercial operations have involved the production of lead compounds and plastics from recycled LABs and *we have not commenced the commercial production of AquaRefined lead*."

295. Clarke stated, "we still anticipate having all 16 AquaRefinery modules installed and operational by the end of the year and from there will transition them to continuous operation. Ramp up of AquaRefined lead production is expected to continue through the fourth quarter of 2017 and into 2018 as modules are brought on-line and shifts are added. We faced and overcame multiple challenges during the quarter, and should expect more as we work to scale production."

296. After the market close on November 9, 2017, Aqua Metals held its earnings conference call for the Q3 2017 ("Q3 2017 Conference Call") with Clarke and then-CFO Mark Weinswig ("Weinswig"). During the call Clarke admitted that "*one of the key challenges we face" is a "sticky lead" issue, meaning that, in the AquaRefinery, the lead "plated and was easily removed from the rotating discs, but it slid more slowly [in] the exit shoot, and in some cases, needed manual assistance*." Clarke also admitted that a solution to the issue would need to be applied to all of the modules. Further, in response to several analyst questions, the Company refused to provide information as to (a) "how many tons per day [Aqua Metals was] currently running through the battery breaking system and through the entire process"; (b) the "utilization rates with regards to those four modules" that were being used to test operational parameters, and (c) "how much time … it will take to go … to full AquaRefined lead."

297. In response to the disclosures, the Company's stock price fell $.08 per share, or 2.1%, to close at $3.71 per share on November 10, 2017. On Monday, November 13, the Company's stock fell $.13 per share, or 3.5%, to close at $3.58 per share. By Tuesday, November 14, the Company's stock fell $.58 per share, or 16.2%, to close at $3.00. Over the course of these three trading days, the

stock price declined $0.79 from a close of $3.79 per share on November 9, 2017, to a close of $3.00 per share on November 14, 2017, a drop of approximately 20.8%.

## C. Post Class Period Events

### 1. Following the Disclosure of Sticky Lead Issues, the Company's Statements Effectively Confirmed That the AquaRefining Process Had Not Been Functioning.

298. After the end of the Class Period, the Company made a series of disclosures that effectively admit that its AquaRefining process had *not* been operational, as previously touted. For example:

(a) As previously noted, on November 9, 2017, the Company admitted that it was facing a "sticky lead issue," the very issue that numerous CWs stated had been ongoing prior to and throughout the Class Period.

(b) In its December 1, 2017 press release titled "Aqua Metals Provides Business Update," the Company further admitted that the AquaRefining modules could not operate continuously and announced that it had investigated possible solutions to address the sticky lead issue and was going to test one which, if successful, would have to be applied to all 16 modules with the modules expected to continuously operate starting in January 2018.

(c) Two months later, the Company was still testing this proposed fix. On February 12, 2018, the Company issued a press release titled "Retro-Fit Package Successfully Installed on One Full Module; In Process of Implementing Retro-fit to Remaining Modules," where it announced it had completed testing of the solution on *one* module and had approved the fix for production which would then be applied to all 16 modules.

(d) Then, on March 5, 2018, Aqua Metals advised that it had just completed the "*first* 24 hour run of continuous operation of an AquaRefining module," thereby conceding that such a run had not been effectuated before. The Company was still in the process of retrofitting the other modules.

(e) In the Company's 2017 Form 10-K, the Company stated that "we most recently had to develop special processes and equipment to deal with an unexpected development in the form of 'sticky lead,' whereby the AquaRefined lead produced by our electrolyzers sticks to the

AquaRefining modules' exit chute and fails to exit without manual intervention.  We believe we have developed a process that will allow for the exit of the AquaRefined lead without manual intervention, however, *this additional process will require a certain amount of retrofitting of our modules that will delay our planned commercial operation of all 16 modules*."  In other words, the Company was not yet commercializing its AquaRefining process.

(f)      In the 2017 Form 10-K the Company further stated that, "*we have only recently completed, and have not put into operation, the processes that we believe will support the production of AquaRefined lead on a commercial scale…*."  Indeed, the 2017 Form 10-K confirmed that all revenue the Company reported was derived from the sale of lead compounds and plastics, not AquaRefined lead.

(g)      Over a month later on April 24, 2018, the Company announced in a press release titled "Aqua Metals (AQMS) Reports Operational Progress" that three AquaRefining modules had been transferred into production, "where they are running consistently on a single shift."  Yet again confirming that these modules had neither been in production nor operating continuously prior to this announcement.

(h)      During the Q1 2018 earnings conference call held on May 9, 2018 ("Q1 2018 Conference Call"), Mould acknowledged that it wasn't until April or May 2018 that "we brought our first four modules online and transferred them one by one from the control of the technical team into production" and they were "running on a single shift."  The Company had yet to achieve 24-hour operations with those four modules, let alone bringing all 16 modules online.  Mould stated that the Company was "being realistic in knowing there will continue to be challenges in scaling up …."

(i)      On June 11, 2018, the Company announced in a press release titled "High Grade AquaRefined Lead Now in Production" that, on June 7, 2018, Aqua Metals cast its first block of AquaRefined lead meeting the soft lead grade of 99.985%.  This confirms the Company's prior statement that it had produced 99.99% pure AquaRefined lead, with images of blocks of the lead, in November 2016 was false.  Over a year and a half after that announcement, the Company is still trying to produce its first block of 99.99% pure lead.

## 2. Investors Express Serious Doubts About the Company's Statements and Leadership

299. Following the Company's end of Class Period disclosures, investors lost confidence in Aqua Metals' management, with some even expressing concerns about being misled.

300. On October 24, 2017, Tailwinds, which had been an early supporter of Aqua Metals, noted, "I know several people who bought this on the IPO, and continually added to their positions, who are now selling shares. They believe that they have been deceived (lied to?) by management and don't want to still around any longer." The author further noted that "I can understand delays in building a facility. I can't however, understand how a facility can be built based upon a process that is still undetermined. Wouldn't you think that the optimal operational parameters would be discovered in a lab prior to installation? And, how can you have 'certain conditions' in a controlled warehouse environment? I see this and get very scared."

301. On November 10, 2017, H.C. Wainwright & Co., who had previously reported "after our site visit, we believe the solvent based lead recycling process can be scaled up and the company should be closer to full utilization levels beginning in 1Q18," issued a report "pushing out our assumptions and all related expectations by a period of 12-18 months" and significantly lowering their price target by 64%. The report noted delays in setting up and scaling operations, a "lack of visibility on cadence of capacity utilization at the facility" and a "lack of clarity" about when the Company would start selling AquaRefined lead ingots as no timeline was given. The report further noted the "severe decline in the stock over the last 12 months due to heightened expectations put in place around scaling and utilization levels at the outset."

302. On December 11, 2017, Tailwinds lamented that "the days of excitement around AQMS are clearly over" and shared its skepticism "of the Company's ability to execute in a timely manner, as well as the veracity of the CEO …." Tailwinds stated that the "questions now center around whether or not the technology will ever work."

## 3. Key Management "Resign"

303. In the five months following the Class Period, Aqua Metals has undergone substantial changes to its management, including the abrupt "resignation" of its founder Clarke, the replacement

of the CFO and the expansion of the Board. These changes occurred after a series of efforts by Kanen Wealth Management, LLC ("Kanen") to obtain changes to Aqua Metals' corporate governance practices, management and the Board.[8]

304. On March 5, 2018, the Company issued a press release titled, "Aqua Metals Announces Change to Executive Management Team" announcing that Weinswig had resigned.

305. According to an April 11, 2018 preliminary proxy statement, on March 6, 2018, Kanen purportedly reached out to Aqua Metals' CEO Clarke and CFO Murphy to discuss transitioning CEO Clarke out of this role as CEO. It further states that "Mr. Kanen mentioned Stephen Cotton, the Company's former CCO, as a potential successor to Dr. Clarke, and Dr. Clarke abruptly hung up on Mr. Kanen."

306. The preliminary proxy statement filed on April 3, 2018 (the "Proxy") described additional discussions Mr. Kanen had with Aqua Metals in March 2018 regarding the Company's Board and management:

> On March 7 and 8, 2018, Mr. Kanen telephoned Vincent L. DiVito, one of our independent directors, to introduce himself and describe his views regarding the composition of the Board and of the Company's management team. Mr. Kanen offered his beliefs, among other things, (i) that Mr. Clarke should not continue in his current capacity as the Company's President, Chief Executive Officer and Chairman, (ii) Mr. Kanen's views concerning a successor Chief Executive Officer and Mr. Kanen should be involved in a formal search process to identify Mr. Clarke's successor, and (iii) that the compensation of the Company's directors should be reduced. Mr. Kanen also threatened that he was intending to nominate and seek the election of three insurgent directors to obtain control of the Board at the Annual Meeting.

> On March 22, 2018, Mr. DiVito and Mark Slade, another of our independent directors, had a telephone conversation with Mr. Kanen, during which they discussed matters related to Kanen's threatened director nominations, including Kanen's views regarding the composition and compensation of the Board and the Company's management team. During that conversation, Messrs. DiVito and Slade discussed with Mr. Kanen the financial and operational challenges facing the Company and inquired whether Kanen had any specific views on how to accelerate the commercialization of the Company's AquaRefining™ technology, achieve full-scale operation and maximize profitability. Mr. Kanen indicated that he was not prepared to discuss any specific business plan for the Company at that time, other than the plan to seek to take control of the Board and make changes to the senior management team.

---

[8] On February 22, 2018, Kanen filed an initial statement on Schedule 13D with the SEC disclosing that Kanen and its affiliates had a beneficial ownership of approximately 6.5% of the Company's outstanding shares and that it intended to weigh in on Aqua Metals' operations, strategy, management and Board to maximize shareholder value. Since then, Kanen has filed additional Schedule 13Ds regarding changes in its beneficial ownership.

On March 23, 2018, Kanen delivered to the Company a formal notice nominating its four insurgent director candidates for election to the Board at the Annual Meeting in opposition to the Board's director nominees.[9] The Company's outside counsel acknowledged in a communication to Kanen's outside counsel receipt of such notice of nomination on behalf of the Company. On the same day, Kanen filed with the SEC an amendment to its Schedule 13D, on behalf of Kanen, certain of its affiliates and its four insurgent director nominees as a "group" for the purposes of Section 13(d)(3) of the Securities Exchange Act of 1934, as amended (which we refer to as the "Exchange Act"), disclosing the delivery of its notice of nomination to the Company.

307. On March 26, 2018, Kanen issued a press release titled, "Kanen Nominates Slate of 4 Highly Qualified Director Candidates for Election at Aqua Metals' 2018 Annual Meeting," explaining that "[w]e are incredibly disappointed by the prolonged and severe underperformance that has plagued Aqua Metals. The Company's stock price has precipitously declined by more than 85% in the past year alone.… Forty percent of the Company's Board is composed of non-independent, management co-founders. We have lost confidence in their ability to enhance or maximize stockholder value." Ultimately, a drawn out proxy fight was avoided when, on May 2, 2018, Kanen and Aqua Metals reached an agreement to expand the Board to six.

308. On March 27, 2018, Aqua Metals issued a press release titled "Aqua Metals Inc. Announces Plans for CEO Succession and Process for Board Refreshment," announcing its plans to transition CEO Clarke from his current position as President, CEO and Chairman of the Board. According to the press release, these plans had been in the works since late 2017, unbeknownst to investors. At that time, Aqua Metals purportedly engaged an "executive search firm and corporate governance consultant for advice and assistance on board compositional matters and corporate governance best practices. In February 2018, Aqua Metals authorized such firm to conduct a comprehensive search for a successor CEO …." In a Form 8-K filed with the SEC on April 2, 2018, the Company announced that on March 27 and 28, 2018, Clarke and Mould, respectively, informed the Company that they declined to stand for re-election as directors at the 2018 Annual Meeting of stockholders.

309. On April 12, 2018, the Company announced in a press release titled "Aqua Metals Announces Changes to Executive Management Team" that interim-CFO Murphy would be replaced

---

[9] According to Kanen, "The Reporting Persons believe that substantial change is required to the composition of the Issuer's Board to ensure that the best interests of shareholders are paramount in the board room."

[No. 4:17-cv-07142-HSG] CONSOLIDATED COMPLAINT FOR VIOLATION OF SECURITIES LAWS         95

by Frank Knuettel II, which would take effect on April 16, 2018. Knuettel would assume CFO responsibilities after the Form 10-Q for second quarter of 2018 ("Q2 2018) with the SEC ("Q2 2018 Form 10-Q") was filed. On April 23, 2018, the Company announced in a press release titled "Aqua Metals Announces Executive Management Succession and Board Enhancement" that enhancements to the structure of its corporate governance and the resignation of CEO Clarke. On June 26, 2018, the Company announced in a press release titled "Aqua Metals Issues Letter from Board" that it had appointed Steve Cotton to be the new CEO.

310. On June 28, 2018, the Company announced in a Form 8-K filed with the SEC that Interstate Batteries had agreed to waive all payments under the key-man provisions in its prior agreements with Aqua Metals with respect to the resignation of CEO Clarke.

**4.      The "Strategic Partnership" With Johnson Controls Is Stalled Pending Development of the AquaRefining Process**

311. It appears that Aqua Metals has not been able deliver on any of the promises it made to Johnson Controls because its AquaRefining modules and technology do not work. During the Class Period, Aqua Metals touted its relationship with Johnson Controls as a "tremendous step forward," which would allow Aqua Metals to license its AquaRefining technology to a global leader in the industry and build additional AquaRefineries. In April 2017, Aqua Metals announced that, through its deal with Johnson Controls, it planned to install AquaRefining in a to-be-named smelter site in 2018. Several months later, in September 2017, the Company continued to make it appear that progress was being made with Johnson Controls regarding retrofitting a Johnson Controls' facility with AquaRefining technology and entering into a licensing agreement.

312. However, by April 2018, Aqua Metals and Johnson Controls were no closer to rolling out a licensing program or retrofitting a facility with AquaRefining technology than they had been seven months before. In anApril 26, 2018 Press Release, the Company disclosed that Aqua Metals and Johnson Controls needed to postpone the deadline to conclude discussions regarding these agreements for another year, giving the parties until 2019. In the April 26, 2018 Press Release, Mould stated that "[w]e appreciate Johnson Control's flexibility in this matter," indicating that it was Aqua Metals, and not Johnson Controls, that needed the additional time. Indeed, until Aqua Metals can

commercially produce AquaRefined lead, its purported partnership with Johnson Controls is meaningless.

**D.     Additional Allegations of Scienter**

**1.     The Consistent Accounts By Former Employees that the AquaRefining Process Was Malfunctioning and Defendants' Knowledge of or Reckless Disregard of the Problems Evidences Scienter**

313.    As the consistent accounts of former employees demonstrate, throughout the Class Period, Aqua Metals management, including Defendants, who are also co-founders, were aware of or recklessly disregarded, as far back as 2015 and in the California Testing Facilities, that the AquaRefining process had significant malfunctions, including the sticky lead issue disclosed at the end of the Class Period and that there were problems scaling the technology.  Defendants Clarke, Murphy and Mould had access to Daily Production Reports showing scant amounts of lead was being produced and no AquaRefined lead was ever commercially produced during the Class Period.  Thereafter, Defendants Clarke and Mould were regularly at the Reno Plant and saw that the process was not functioning, that the modules could only run a few hours or less before breaking down and that the plant was not operational.  Indeed, Defendants Clarke and Mould staged carefully orchestrated shows for investors and other visitors to make it look like the process was fully functioning and producing AquaRefined lead, while touting site visits as an aim to be "transparent."

**a.     The Defendants Knew About or Recklessly Disregarded that the AquaRefining Technology Was Malfunctioning Even Before the Reno Plant Was Built**

314.    Former employee accounts demonstrate that Defendants were aware of or recklessly disregarded ongoing and significant problems with the AquaRefining process well before the Reno Plant was built.  These problems continued throughout the Class Period, despite Defendants' statements to the contrary.

315.    As CW1 relayed, even before the Reno Plant was built, there were problems with the AquaRefining technology when it was tested in California.  Specifically, CW1 relayed that the modules had both a "sticky lead" and "hard lead" issue the entire time CW1 worked there – from 2015 until January 2017.  CW1 stated that both issues, including the "sticky lead" issue, which was not disclosed until the end of the Class Period, were known, including by Clarke and Mould, since 2015.

316.    Moreover, CW1 stated that it was also known, including by Clarke and Mould, that the technology would have issues scaling.  CW1 said, without fixing the scaling, sticky lead or hard lead issues, Clarke and Mould decided to "go big" even though the technology could not support it. Indeed, CW1 stated that, after the Reno Plant was built, it became a testing facility to experiment with potential solutions to the issues.  The Defendants' scienter is further evidenced by their reckless disregard of issues and problems.  As CW1 described, the issues and potential solutions to some of the problems that CW1 witnessed well before the Reno Plant was built were communicated to Clarke and Mould, but they ignored suggestions.

### b.    The Defendants Knew of And/or Recklessly Disregarded the Failures at the Reno Plant and With the AquaRefining Process

317.    The Defendants' scienter is further evidenced by their reckless disregard of issues and problems at the Reno Plant.  Former employee accounts demonstrate that Defendants were aware of and/or recklessly disregarded serious problems at the Reno Plant and with the AquaRefining process and the lack of AquaRefined lead produced, in direct contradiction to Defendants' Class Period statements.  As set forth below, Defendants knew or recklessly disregarded these failures because: (a) Defendants went to the Reno Plant and witnessed first-hand that the process was malfunctioning and the machines were not operating; (b) Defendants had access to Daily Production Reports and Operations Logs which showed production numbers and how long machines ran; (c) Defendants attended production meetings where these issues were discussed; and (6) according to CW4, CW4 spoke directly with Defendants about the process,  production and equipment failures.

318.    CWs 1, 2, 3 and 4 provided consistent accounts that, throughout the Class Period, the modules – the critical, proprietary machinery for the AquaRefining process – were routinely breaking down and could only run for a few hours or less before breaking down.  As CW2 stated, the AquaRefining process was not operational; "they couldn't get the [AquaRefining] equipment to work."  CW4 said that the module "was still in R&D mode" and the AquaRefining Process was not working.  CW5 echoed that the process was still in the R&D stage, even at the end, and after the Class Period.  CWs 2, 4 and 5 also said that a major issue with the modules was a sticky lead issue – the

same issue described by CW1 that was known since 2015. As CW2 relayed, the Reno Plant was not operating; "the plant never ran."

319. CWs 2, 4 and 5 provided consistent accounts that Defendants visited the Reno Plant and witnessed these problems. For example, CW2 said Clarke and other executives knew the Reno Plant was inoperable because they were at the plant regularly and "they saw it." Echoing CW 5, CW4 said Clarke and Mould knew the Reno Plant was not operational.

320. Former employee accounts, including CWs 2, 3, 4 and 5, also consistently detail Daily Production Reports, to which Defendants had access, which showed the problems at the Reno Plant, including with the AquaRefining process, and the lack of production of AquaRefined lead. Furthermore, as CW2 relayed, the Company kept an Operations Log which reflected how long the machines at the Reno Plant, including the modules, ran each day. Moreover, former employees, including CWs 2 and 5 describe production meetings, which Clarke and Mould periodically attended, at which the problems were discussed.

321. CWs 2, 3, 4 and 5 relayed that not much lead, and particularly AquaRefined lead, was produced. CWs 1, 2 and 4 also relayed that Aqua Metals did not receive revenue from AquaRefining lead.

322. As CW4, a production manager at the Reno Plant, relayed, CW4 and the Vice President of Recycling Technology Battery and Lead Recycling Operation at the Reno Plant went to Clarke and Mould on several occasions and told them about the problems and that the Company could not reach the revenue and production goals that the Company publicly announced. Indeed, CW4 said Clarke would tell investors how much product they would produce and then, after, go to the Vice President of Recycling Technology Battery and Lead Recycling Operation and say, now that I have said that, how can we make that happen. CW9 said Aqua Metals could not make the numbers because of all of the problems.

//

//

**2.    The Consistent Accounts by Former Employees of Defendants' Direct Involvement in Fraudulent Visitor Presentations Evidences Scienter**

323.    Defendants knowledge is also evident from their direct involvement in the staged investor shows.  Former employees, CWs 2, 3 and 4, provide consistent accounts of how, knowing the problems discussed above, Clarke and Mould would stage sham "dog and pony shows" for investors (including Interstate Batteries and Johnson Controls) and others, to make it appear that the Reno Plant was operational and producing AquaRefined lead.

324.    CW2 described how management ensured that the faulty modules would run when investors came to visit.  For example, CW2 was told "don't run the machines until [the investors] show up" and "make yourself look busy."  CW2 was specifically told that these instructions originated from Clarke.  Once the investors left, the plant employees would clean up.  CW2 said "we only ran the machines when investors came to visit."

325.    CW2 said that both Interstate Batteries and Johnson Controls visited and were given the same "dog and pony show" as the other investors.  CW2 further said it was a "big deal" when Johnson Controls came through and that they prepared for three days prior to their arrival and that Johnson Controls came at least twice.  CW2 also related that the dog and pony shows began at a time prior to the consummation of this partnership.

326.    Similar to the other former employee accounts, CW3 said Clarke and Mould, who knew about the problems with the machinery, escorted the visitors and they "ran the show."  CW3 would be told of an upcoming visit by the plant manager a day or two before the visits.  It was CW3's job to make sure the production area was clean and that the "machinery kept running" during the visits.

327.    CW4 also said that on several occasions investors came into the plant for a demonstration of the AquaRefining process.  Like CW2 stated, CW4 relayed that Johnson Controls was one such visitor.  CW4 said that Johnson Controls' visited in January 2017, which is the month before the Company announced the partnership with Johnson Controls.

328.    CW4 stated that Mould would email the Vice President of Recycling Technology Battery and Lead Recycling Operation and copy CW4 and advise them of the visits so they could operate the module for the investors.  CW4 said that a few days before the visit, employees would be

reminded to "clean [the plant] up really nice" and would be informed of the logistics of the demonstration. CW4 said that essentially this meant confirming the timing of the run to make sure that the modules were operating while the investors were in the plant.

329. CW4 said investors would meet with Clarke and Mould in the conference room at the Reno Plant while CW4 and the Vice President of Recycling Technology Battery and Lead Recycling Operation "assembled a team to stage a show." CW4 said, because the module couldn't operate for more than a few hours or it would breakdown, CW4 had to start it at a time where it would run during the investors' visit and not breakdown. CW4 further relayed that Clarke would leave his meetings with investors and come out to the floor first to ensure everything was running properly before a demonstration started.

330. CW4 did these presentations for investors at least four or five times over a period of four or five months. CW4 remembers doing them twice in May 2017 and once in January 2017 – which was just before the announcement of the Johnson Controls Partnership.

331. Moreover, CW1 said that "dog and pony shows" put on by Clarke and/or Mould were a regular occurrence in the California Testing Facilities beginning well before the start of the Class Period. The visitors who came for these presentations included Johnson Controls, Interstate Batteries and Oppenheimer.

### 3. The Nature and Significance of the Problems with AquaRefining, Which is the Company's Core Business, Further Support Allegations of Scienter

332. The Company's sole business is the commercialization of AquaRefining and its revenues, strategic partnerships and plans for growth depended on the technology working. Thus, AquaRefining was of crucial importance to the Company. Furthermore, Aqua Metals is a relatively small company, with only about 70 employees during the Class Period, and only three locations.

333. Facts that are critical to AquaRefining are, thus, presumably known by its executive officers, including the Officer Defendants who were also co-founders of the Company. Indeed, the Company had one of its testing facilities at the Alameda headquarters, where the Officer Defendants had offices. The Officer Defendants directly participated in the management of Aqua Metals, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to

confidential proprietary information concerning Aqua Metals, its business and operations and the AquaRefining process. Furthermore, the Confidential Witnesses confirmed that the Officer Defendants regularly visited the California Testing Facilities and the Reno Plant.

334. Moreover, as the Confidential Witnesses explained, the Officer Defendants had access to internal reports that support the fact that they knew or recklessly disregarded the true facts. First, the Officer Defendants had access to Daily Production Reports, which according to CWs 2, 3, 4 and 5 showed the problems at the Reno Plant, including with the AquaRefining process, and that little to no AquaRefined lead was produced. Moreover, as CWs 2 and 5 relayed, Clarke and Mould often attended production meetings at the Reno Plants at which problems with the machinery and the AquaRefining process were discussed.

335. Thus, given the extreme importance of the AquaRefining process to the Company, the size of the Company, the Officer Defendants' access to reports and information about the problems with the AquaRefining process and its inability to function and the control that the Officer Defendants exhibited, the Officer Defendants knew or were deliberately reckless in ignoring the true facts that rendered the statements false and misleading when made.

### 4. The Insider Selling Supports Scienter

#### a. Murphy And Mould Profited From The Fraud By Selling Off Large Blocks Of Personal Holdings Of Aqual Metals Common Stock At Inflated Prices

336. Aqua Metals' insiders were motivated to engage in the alleged fraudulent scheme and issue materially false and misleading statements and/or omit material facts in order to inflate Aqua Metals' common stock price and maximize their individual profits through insider trading.

337. Pursuant to the IPO, Aqua Metals' insiders were subject to a one-year lock-up agreement whereby no director or officer was permitted to sell Aqua Metals' securities until August 1, 2016. On August 1, 2016, however, Aqua Metals' common stock was only trading at $8.81 per share. By the time the November 2016 Offering was completed two months later, on November 21, 2016, Defendants' fraudulent statements had artificially inflated Aqua Metals' common stock to $12.66 per share. As the stock price continued to climb, Defendants Murphy and Mould were motivated to, and did in fact, capitalize and profit from the artificially inflated prices, collectively disposing of over $2

million worth of common stock in a mere three months. These trades were highly unusual in timing, correlating with market moving events on dates on which Defendants were in possession of material non-public information. Indeed, the time of the sales is highly suspicious, as they were made when the stock was trading at highly inflated prices due to Defendants' false and misleading statements and in close proximity, but in advance of, when the Company began to disclose the truth regarding its AquaRefining technology and the Reno Plant. The following chart summarizes their profits from Class Period sales.

| Insider | Class Period Shares Sold 5/19/2016-11/9/2017 (539 Days) | Class Period Gross Proceeds 5/19/2016-11/9/2017 (539 Days) | Pre-Class Period Shares Sold 11/26/2014-5/18/2016 (539 Days) | Pre-Class Period Gross Proceeds 11/26/2014-5/18/2016 (539 Days) |
|---|---|---|---|---|
| Mould, Selwyn (Chief Operating Officer) | (60,000) | $1,049,632.00 | 0 | $0.00 |
| Murphy, Thomas Michael (Chief Financial Officer, Director) | (60,000) | $1,040,192.00 | 0 | $0.00 |
| **Totals:** | **(120,000)** | **$2,089,824.00** | **0** | **$0.00** |

338. Specifically, beginning in March 2017, Murphy disposed of 60,000 shares of common stock for gross proceeds of $1,040,192. Murphy's first sale occurred on March 8, 2017, when he sold 20,000 shares of Aqua Metals' common stock for $17.2387 per share, amounting to gross proceeds of $344,774. With the exception of only eight trading days in February and March 2017, Murphy's sale occurred when Aqua Metals stock closed at a higher price than any other day in its history. In fact, from August 1, 2016 until February 2017, Aqua Metals' common stock traded well below $17 per share, closing at an average of only $10.44 per share, and reaching an all-time intraday trading high of $14.13 per share on December 28, 2016.

339. Murphy was able to take advantage of this all-time high by strategically timing his sale to occur less than one week after the Company filed its 2016 Form 10-K with the SEC on March 2, 2017, which touted, *inter alia*, the "complet[ion] [of Aqua Metals'] initial LAB recycling facility at

TRIC and commence[ment] [of] the commercial scale production of recycled lead during January 2017." The 2016 Form 10-K hyped that the Reno Plant was expected to "achieve a production rate of 120 metric tons of recycled lead per day during 2017." This announcement also came just weeks after the Company's February 9, 2017 announcement touting the strategic relationship with Johnson Controls and that it was "a tremendous step forward." Following the February 9, 2017 Press Release and in response to this purported positive news, the price per share of Aqua Metals increased $4.75, or approximately 41.6%, from a close of $11.41 on February 8, 2017, to a close of $16.16 on February 9, 2017. Murphy's sale was not made pursuant to a 10b-5 trading plan, further allowing him to take advantage of this opportunistic timing.

340. Murphy also sold 20,000 shares of Aqua Metals' common stock for $17.2524 per share on April 10, 2017, amounting to gross proceeds of $345,048, and 20,000 shares for $17.5185 per share on May 5, 2017, amounting to gross proceeds of $350,370. Murphy's May 2017 sale was strategically timed to occur *only two trading days before* Aqua Metals revealed that, *inter alia*, contrary to prior representations, the Company was actually facing issues and "challenges," including that the Company was "limited to only ... run[ning] a single module," that it had not yet sold AquaRefined lead, was lowering its production rate for AquaRefined lead to 40 metric tons per day and that it may need to need to temporarily suspend operations. Upon this news, Aqua Metals stock plummeted from a closing price of $16.65 per share on May 9, 2017 to $12.31 per share on May 10, 2017, a drop of approximately 26%. Since this revelation, Aqua Metals' stock has never closed above $13.69 per share.

341. Although Murphy's April 10 and May 5, 2017 stock sales were pursuant to 10b-5 trading plans, these plans were suspiciously created just one or two months prior, on March 3, 2017, and only one day after Defendant Murphy engaged in his first sale. During this time Aqua Metals' common stock was artificially inflated due to Defendants' fraudulent misrepresentations. Indeed, since the May 9, 2017 disclosure, Defendant Murphy has not engaged in a single sale.

342. Mould also profited from Defendants' fraudulent scheme, dumping a total of 60,000 shares of commons stock for gross proceeds of $1.05 million. Similar to Murphy, Mould's first sale occurred on March 7, 2017, less than one week after the 2016 Form 10-K was filed and just weeks

after the Johnson Controls' announcement. During this time, Aqua Metals' stock price was artificially inflated, and Mould disposed of 20,000 shares at $17.0291 per share for gross proceeds of $340,582. Mould also sold 20,000 shares on April 3, 2017 at $18.9179 per share for gross proceeds of $378,358, and 20,000 shares of common stock on May 1, 2017 at $16.5346 per share for gross proceeds of $330,692. As with Murphy, Mould's May 1, 2017 sale was meticulously timed to occur *just days* before Aqua Metals began to disclose the truth and the stock began its precipitous decline to its lowest trading price ever. Mould has not engaged in single sale since the May 9, 2017 disclosures.

### b. The Defendants Consummated the November 2016 Offering In Order to Exploit The Artificial Inflation In The Company's Common Stock

343. The Defendants' false and misleading statements concerning the success of AquaRefining and its acceleration to commence commercial production enabled Aqua Metals to artificially inflate the price of its shares of common stock in the November 2016 Offering.

344. After the Reno Plant opened, and unknown to investors, the Company was nowhere near commencing revenue-producing operations from AquaRefining. The AquaRefining technology, was not functioning despite Defendants' repeated assurances that the AquaRefinery would produce 80 metric tons of lead by the end of 2016 and that its AquaRefining technology was successfully tested and proven. Aqua Metals' issues were so fundamental that the Company was still in the R&D stage trying to determine why the process and the modules were malfunctioning and attempting to resolve the "sticky lead" and other problems that were known, but undisclosed, since 2015. Without any sales, the Company incurred an operating loss of $3.3 million during the Q3 2016, and a net loss of $3.5 million.

345. In order to fund the much needed yet undisclosed R&D to try to remediate the fundamental deficiencies in the touted AquaRefining process, on September 2, 2016, the Company announced the November 2016 Offering, which was for the sale of 2,000,000 shares of common stock at an offering price of $10 per share. Consequently, Defendants were motivated to continue to misrepresent the current and future operating capabilities of AquaRefining at this time in order to keep Aqua Metals' stock price artificially inflated and to generate sufficient funds in the offering. The

November 2016 Offering was completed on November 21, 2016, generating gross proceeds of $23 million and net proceeds of $21.5 million.

### E. Loss Causation

346. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the Company's common stock price and operated as a fraud or deceit on purchasers of the Company's common stock. At all relevant times, Defendants issued materially false and misleading statements or omissions regarding the feasibility, scalability, implementation and operations of the AquaRefining technology and the Reno Plant. These materially false and misleading statements caused Aqua Metals' common stock price to be artificially inflated during the Class Period. Lead Plaintiff and Class members purchased Aqua Metal's common stock at those artificially inflated prices.

347. As detailed above, as the truth about Aqua Metals' AquaRefining technology and the Reno Plant was partially revealed, the Company's common stock declined as the prior artificial inflation came out of its common stock price. The timing and magnitude of the common stock price decline negates any inference that the losses suffered by Lead Plaintiff and other members of the Class was caused solely by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct. Accordingly, these false and misleading statements directly or proximately caused Lead Plaintiff and other Class members to suffer damages.

348. The truth about Aqua Metals and the feasibility, scalability, implementation and operations of the AquaRefining technology and the Reno Plant were revealed to the market in a series of disclosures. Each disclosure only partially revealed the truth and Defendants continued to misrepresent the AquaRefining technology and the operations at the Reno Plant until the end of the Class Period:

(a) On May 9, 2017, after the market closed, Aqua Metals disclosed that the AquaRefining process had "issues" and "challenges," including that the Company was limited to only running a single module. Clarke further revealed that, although it had not yet generated revenue, it had started to ship product, but that "we are selling and shipping metallic lead, we are selling and shipping plastics, we are selling and shipping lead compounds, and we are selling and shipping

metallics from the AquaRefining" – essentially conceding they still were not selling AquaRefined lead. Clarke further disclosed that, while still falsely touting that the Reno Plant was on track to produce 120 metric tons a day by the end of the year, only 40 tons of that production would be AquaRefined lead, despite repeatedly saying the makeup would be 50% lead alloys and 50% AquaRefined lead. Clarke further revealed, "[w]hat we are not going to be doing this year is providing forward guidance on ramp up of revenue, products or capacity" and that as the Company tests "improvements" it "may choose to temporarily suspend production." Following this news, Aqua Metals' stock price declined $4.34 from a close of $16.65 per share of Aqua Metals stock on May 9, 2017, to a close of $12.31 per share on May 10, 2017, a drop of approximately 26%, on unusual trading volume of roughly 1.8 million shares.

(b) After the market closed on August 9, 2017, the Company announced that, while it was running four modules, those modules were not operational and were still in a testing mode only "being used to validate operating parameters." The Company further revealed that the product that accounted for much of its small Q2 2017 revenue was not AquaRefined lead, but rather lead compounds. The Company stated that product has a "low value in the less established market than lead alloys," and there is "demand uncertainty" related to lead compounds. Aqua Metals also revealed that it "may choose to operate [the Reno Plant] with an output of less than 120 tons a day." On this news, Aqua Metals' stock price declined from a close of $10.87 per share on August 9, 2017, to a close of $8.31 per share on August 10, 2017, a drop of approximately 23.6%, on unusual trading volume of 658,303 shares.

(c) Before the market opened on October 23, 2017, the Company admitted that it had only "produced small quantities of AquaRefined lead." Aqua Metals further disclosed that it was still testing "electrical currents to determine the appropriate control parameters and operation procedures." Aqua Metals further revealed that, "under certain conditions, "the operators would need to periodically assist the lead removal." The Company also disclosed that it was still "in the process of synchronizing all of the[] stages" of its production process and was far from selling AquaRefined lead, despite its repeated statements otherwise:

> For over six months, Aqua Metals has been breaking batteries and selling lead compounds. Aqua Metals is currently in the process of taking the next major step by transitioning to the production of lead ingots that are produced from battery grids and a

small amount of AquaRefined lead. These lead ingots will be sold as lead "bullion". The next step will be to produce and sell ingots of lead alloy, and the last step will be to produce and sell ingots of AquaRefined lead.

Following this news, Aqua Metals' stock price declined $.96 per share, or 17.9%, from a close of $5.37 per share of Aqua Metals stock on October 20, 2017, to a close of $4.41 per share on October 23, 2017, on a volume of 647,901.

(d)     Finally, on November 9, 2017, after the market closed, expanding on the October 23 disclosure, the Company admitted to and finally named "sticky lead" as "one of the key challenges" the Company was facing. The Company described the sticky lead problem with the modules: when the lead was plated and being removed from the rotating discs, it slid more slowly in the exit chute, and in some cases, needed manual assistance. The Company further admitted that a solution to the issue would need to be applied to all of the modules. Further, in response to analyst questions, the Company refused to provide information as to (i) "how many tons per day [Aqua Metals was] currently running through the battery breaking system and through the entire process"; (ii) the utilization rates for the modules, or (iii) when it would be producing full AquaRefined lead. Finally, Aqua Metal admitted that its highly touted technology that would purportedly revolutionize the lead battery recycling industry was, in truth, "an unproven technology" and that it "ha[d] notcommenced the commercial production of AquaRefined lead." In response, the Company's stock price fell $.08 per share, or 2.1%, to close at $3.71 per share on November 10, 2017. On Monday, November 13, the Company's stock fell $.13 per share, or 3.5%, to close at $3.58 per share. By Tuesday, November 14, the Company's stock fell $.58 per share, or 16.2%, to close at $3.00. Over the course of the three trading days, the stock price declined $0.79 from a close of $3.79 per share of Aqua Metals stock on November 9, 2017, to a close of $3.00 per share on November 14, 2017, a drop of approximately 20.8%.

349.    The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and other Class members was a direct result of Defendants' false and misleading statements and fraudulent scheme to artificially inflate the Company's common stock price and the subsequent significant decline in the value of the Company's common stock when the true facts started to be revealed.

**F.      Presumption Of Reliance**

350.    Lead Plaintiff is entitled to a presumption of reliance under the fraud-on-the-market doctrine.  At all times, the market for the Company's securities was an efficient market that promptly digested current information related to the Company from all publicly available sources and reflected such information in the prices of the Company's securities.  Throughout the Class Period:

(a)      Aqua Metals' common stock was actively traded on the NASDAQ;

(b)      The market price of Aqua Metals' common stock reacted promptly to the determination of public information regarding the Company;

(c)      The Company's stock was followed by financial analysts, including those cited in this complaint.

(d)      The average weekly trading volume for Aqua Metals stock during the Class Period was approximately 1.268 million shares;

(e)      As a regulated issuer, Aqua Metals filed with the SEC periodic public reports during the Class Period;

(f)      Aqua Metals regularly communicated with public investors via established market communication mechanisms; and

(g)      During the Class Period, the Company's market capitalization was as high as $423 million and the Company had over 20.4 million shares outstanding.

351.    Throughout the Class Period, the Company was consistently followed by the market, including securities analysts.  The market relies upon the Company's financial results and management to accurately present the Company's financial results.  During this period, Aqua Metals and the Officer Defendants continued to pump materially false and misleading information into the marketplace regarding the Company and the status of the AquaRefining technology, process and operations.  This information was promptly reviewed and analyzed by analysts and institutional investors, and assimilated into the price of the Company's securities.

352.    As a result of the misconduct alleged herein (including Defendants' false and misleading statements and omissions), the market for Aqua Metals' common stock was artificially inflated.  Under such circumstances, the presumption of reliance available under the "fraud-on-the

market" theory applies. Thus, Class members are presumed to have indirectly relied upon the misrepresentations and omissions for which Defendants are each responsible.

353. Lead Plaintiff and other Class members justifiably relied on the integrity of the market price for the Company's securities and were substantially damaged as a direct and proximate result of their purchases of Aqua Metals' common stock at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

354. Lead Plaintiff and the other Class Members are also entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because claims asserted in this complaint against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

355. Had Lead Plaintiff and other members of the Class known of the material adverse information not disclosed by Defendants or been aware of the truth behind Defendants' material misstatements, they would not have purchased Aqua Metals' common stock at artificially inflated prices.

### G.    Exchange Act Counts

#### 1.    Count One
#### Violations of Section 10(b) and Rule 10b-5(a)
#### (Against Aqua Metals and the Officer Defendants)

356. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

357. Throughout the Class Period, the Defendants (*i.e.*, Aqua Metals and the Officer Defendants), directly or indirectly, by the use of means or instrumentalities of interstate commerce, the United States mails, interstate telephone communications and a national securities exchange, made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices and a course of business which operated as a fraud and deceit upon Lead Plaintiff and the other members of the Class in connection with their purchases of the common stock of Aqua Metals during the Class Period, all in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5(b).

358.     The Company and Officer Defendants, as the most senior officers of Aqua Metals during the Class Period, are liable as direct participants in all of the wrongs complained of through the date they left the Company.

359.     As detailed above, Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts even though such facts were available to them.

360.     Lead Plaintiff and other members of the Class relied upon Defendants' statements and/or on the integrity of the market in purchasing shares of Aqua Metals' common stock during the Class Period.

361.     As a direct and proximate cause of the wrongful conduct described herein, Lead Plaintiff and the Class suffered damages in connection with their purchases of Aqua Metals' common stock at artificially inflated prices during the Class Period.  Had Lead Plaintiff and the other members of the Class known of the material adverse information not disclosed by Defendants, or been aware of the truth behind Defendants' materially false and misleading statements, they would not have purchased Aqua Metals' common stock at artificially inflated prices during the Class Period.

362.     In addition to the duties of full disclosure imposed on the Officer Defendants, as a result of their responsibility for the Company's financial statements and making affirmative statements and reports to the investing public, the Officer Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including accurate and truthful information with respect to the Company's business operations, growth and financial condition, so that the market price of the Company's securities would be based on truthful, complete and accurate information.

363.     By virtue of the foregoing, Defendants violated 10(b) of the Exchange Act and SEC Rule 10b-5(b) promulgated thereunder and are liable to Lead Plaintiff and the Class members who have been damaged as a result of such violations.

//

//

//

**2.** **Count Two**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) & (c)**
**(Against Aqua Metals and the Officer Defendants)**

364. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

365. During the Class Period, Defendants named in this count carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period: (a) deceived the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (b) caused Lead Plaintiff and other members of the Class to purchase Aqua Metals' securities at artificially inflated and distorted prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants made the false statements and engaged in other unlawful acts as alleged herein.

366. The Defendants named in this count, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Aqua Metals as specified herein.

367. The Defendants named in this count employed devices, schemes and artifices to defraud while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to reassure investors of Aqua Metals that the Company's commercial operations and technology did not have problems. As set forth more particularly herein, these acts included orchestrating on-site visits and demonstrations for investors, analysts and other industry participants, which deliberately concealed problems concerning the commercialization of the Company's AquaRefining process. Such orchestrated visits resulted in the dissemination of analyst reports containing untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Aqua Metals operations not misleading. These practices and course of business operated as a fraud and deceit upon the purchasers of Aqua Metals' securities during the Class Period.

368. As a result of Defendants' fraudulent scheme, and failure to disclose material facts, as set forth above, the market price for Aqua Metals' securities was artificially inflated during the Class Period.

369.    In ignorance of the fact that market prices of Aqua Metals' publicly traded securities were artificially inflated or distorted, and relying directly or indirectly on the false and misleading statements disseminated by analysts following Aqua Metals, or upon the integrity of the market in which the Company's securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants named in this count but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiff and the other members of the Class acquired Aqua Metals' securities during the Class Period at artificially high prices and were damaged thereby.

370.    At the time these misrepresentations and omissions were made as part of Defendants' fraudulent scheme, Lead Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true.  Had Lead Plaintiff and the other members of the Class and the marketplace known the truth regarding Aqua Metals, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired Aqua Metals' securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices or distorted prices at which they did.

371.    As a direct and proximate result of the wrongful conduct of Defendants named in this count, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

372.    By virtue of the foregoing, Defendants named in this count have violated Section 10(b) of the Exchange Act, and Rule 10b-5(a) & (c) promulgated thereunder and are liable to Lead Plaintiff and the Class members who have been damaged as a result of such violations.

### 3.    Count Three
### Violations of Section 20(a) of the Exchange Act
### (Against the Officer Defendants)

373.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

374.    The Officer Defendants acted as control persons of Aqua Metals within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, agency and their ownership and contractual rights, participation in and/or awareness of Aqua Metals' operations and/or intimate

knowledge of the false financial statements filed by Aqua Metals with the SEC and disseminated to the investing public, the Officer Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Aqua Metals, including the content and dissemination of the various statements that Lead Plaintiff contends are false and misleading. The Officer Defendants were provided with or had unlimited access to copies of Aqua Metals' reports, press releases, public filings and other statements alleged by Lead Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

375. In particular, each Officer Defendant had direct and supervisory involvement in the day-to-day operations of Aqua Metals and therefore is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged and exercised that power.

376. As a direct and proximate result of the Officer Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of Aqua Metals' common stock during the Class Period.

377. As set forth above, Aqua Metals and the Officer Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

378. By reason of the conduct of Aqua Metals alleged in this complaint, and by virtue of their positions as control persons, the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## VII. SECURITIES ACT VIOLATIONS

### A. Summary of Offering

379. Court-appointed Lead Plaintiff the Plymouth County Group, comprised of the Plymouth County Retirement Association, Denis Taillefer and his private company 1103371 Ontario Ltd, (collectively, the "Lead Plaintiff"), brings claims arising under the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k and 77o, against defendants Aqua Metals, Inc. ("Aqua Metals," "AQMS" or the "Company") and its three co-founders, Stephen R. Clarke ("Clarke"), Thomas Murphy ("Murphy") and Selwyn Mould ("Mould") (Clarke, Murphy and Mould are collectively

referred to as the "Officer Defendants") (collectively, the "Defendants"). In this Action, the "Class" consists of all persons and entities who purchased or otherwise acquired Aqua Metals' common stock between May 19, 2016 and November 9, 2017, inclusive (the "Class Period") and were damaged as a result. These Securities Act claims are brought on behalf of those Class members who purchased or otherwise acquired shares of Aqua Metals' common stock in a secondary public offering, completed on November 21, 2016 (the "November 2016 Offering"). The Securities Act claims solely allege strict liability and negligence causes of action, and do not sound in fraud. Accordingly, for the purpose of these Securities Act claims, Lead Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud, intentional misconduct or deliberately reckless misconduct. In addition, this disclaimer expressly excludes all allegations above contained in paragraphs 18, 36, 37, 38, 41, 42, 57, 60, 66, 69, 71, 73, 79, 82, 83, 84, 90, 93, 96, 97, 98, 99, 100, 101, 102, 109, 110, 111 and in Sections VI(A), VI(B), VI(D), VI(E), VI(F), VI(G) in their entirety.

380. On September 2, 2016, Aqua Metals filed a Registration Statement on Form S-3 with the U.S. Securities and Exchange Commission (the "SEC") for a proposed offering of shares of its common stock, which was subsequently amended on September 16 and 21, 2016 (collectively, the "Registration Statement"). The Registration Statement was signed by Clarke, Murphy, Vincent DiVito and Mark Slade. On September 26, 2016, the SEC declared the Registration Statement effective.

381. On November 15, 2016, Aqua Metals filed a Preliminary Prospectus on Form 424B5 with the SEC, which preliminarily announced a public offering, but did not state the number of shares being offered for sale or set an offering price. On November 17, 2016, Aqua Metals issued a Form 424B5 Prospectus Supplement (collectively with the preliminary prospectus, "Prospectus"), announcing its offering of two million shares of common stock at an offering price of $10.00 per share (the November 2016 Offering (defined above)).

382. In the November 2016 Offering Prospectus Supplement, Aqua Metals incorporated, by reference, the following documents as part of its offering materials: (a) the annual report on Form 10-K for the year ended December 31, 2015, filed on March 28, 2016 ("2015 Form 10-K"); (b) the quarterly reports on Form 10-Q, for the first quarter of 2016 ("Q1 2016) filed on May 19, 2016

("Q1 2016 Form 10-Q"), for the second quarter of 2016 ("Q2 2016) filed on August 10, 2016 ("Q2 2016 Form 10-Q") and for the third quarter of 2016 ("Q3 2016) filed on November 7, 2016 ("Q3 2016 Form 10-Q"); (c) current reports on Form 8-K, filed on March 25, 2016 ("March 25, 2016 Form 8-K"), May 24, 2016 ("May 24, 2016 Form 8-K"), November 1, 2016 ("November 1, 2016 Form 8-K"), November 7, 2016 ("November 7, 2016 Form 8-K") and November 16, 2016 ("November 16, 2016 Form 8-K"); and (d) the description of the Company's common stock contained in Aqua Metals' Form 8-A12B, filed on July 24, 2015.  These materials, along with the Registration Statement and Prospectus, are collectively referred to herein as the "Offering Materials."

383.    National Securities Corporation ("National Securities") acted as the underwriter and book-running manager in connection with the November 2016 Offering, providing financial advice to Aqua Metals and assisting in the preparation and dissemination of Aqua Metals' Offering Materials. National Securities marketed and solicited support for the November 2016 Offering.  National Securities was granted a 45-day option to purchase up to 300,000 additional shares of common stock at the offering price to cover over-allotments in connection with the November 2016 Offering.

384.    The November 2016 Offering was completed on November 21, 2016, selling 2.3 million shares of common stock for $10.00 per share, for gross proceeds of $23 million and net proceeds of $21.5 million.  National Securities received a fee of $1.4 million and exercised its over-allotment option in full.

385.    The proceeds raised in the November 2016 Offering were allegedly to be used for "working capital and general corporate purposes, including the acceleration of [the] AquaRefining product development and licensing efforts ...  and enhancement of processes to further improve [Aqua Metals'] operating margins and regulatory activities."

**B.    The Materially Untrue and Misleading Statements in the Offering Documents**

386.    The Underwriting Agreement, attached as Exhibit 1.1 to the November 16, 2016 Form 8-K, incorrectly represented that the Registration Statement and Prospectus "complied in all material respects with the requirements of the Securities Act and the Rules and Regulations" and "did not and will not contain any untrue statement of a material fact or omit to state a material fact necessary in

order to make the statements therein, in light of the circumstances under which they were made, not misleading."

387.    Contrary to this representation and, as set forth below, the Offering Materials contain untrue statements of material fact, omit to state material facts required to be stated therein or omit to state material facts necessary to make the statements therein not misleading, concerning the success, status and commercial viability of AquaRefining, lead production levels, the efficiency of operations, and unresolved problems with AquaRefining equipment and machines.

### 1.    Untrue And Misleading Statements Concerning The Alleged "Success" Of AquaRefining At A Small Scale Level

388.    The Offering Materials unequivocally stated that "the testing of the AquaRefining process has been successful to date" when, in reality, the process was still malfunctioning and had not been successful in tests or commercial sale.  For instance, Aqua Metals assured investors in the Prospectus that the production process was successful to date, operating without a single glitch:

> While *the testing of our AquaRefining process has been successful to date,* there can be no assurance that we will be able to replicate the process, along with all of the expected economic advantages, on a large commercial scale.  *As of the date of this prospectus supplement, we have built and operated both a small-scale unit of our AquaRefining process and a full size production prototype*.  In addition, on October 28, 2016, we commenced limited operations at our TRIC facility through the processing of recycled lead through a single AquaRefining module.  While *we believe that our development, testing and limited production to date has proven the concept of our AquaRefining process*, we have not undertaken the processing of used LABs nor have we commenced the production of lead in large commercial quantities ....

(emphasis in original omitted).  The Prospectus similarly repeated that "[w]e have tested our AquaRefining process on a small scale and, on October 28, 2016 we commenced limited production of recycled lead at our TRIC facility."  The Prospectus again repeated that the Company "recently commenced limited lead-producing operations" (emphasis omitted).

389.    The Offering Materials stated the Company was commercializing and producing pure lead.  The Registration Statement specified that the Company is "engaged in the business of recycling lead through a novel, proprietary patent-pending process that we developed and named 'AquaRefining'" which "uses an aqueous solvent and a novel electro-chemical process to produce pure lead (i.e., higher than 99.99% purity)."  The Company also touted in the Registration Statement

that the "modular nature of AquaRefining makes it possible to start LAB recycling at a much smaller scale than is possible with smelters, thereby significantly reducing the investment risk associated with building a lead production facility." Similarly, The Preliminary Prospectus filed on November 15, 2016, reiterated verbatim all of the same statements made in the Registration Statement (quoted in this paragraph, *supra*) regarding commercialization, lead purity, and the modules making it possible to start LAB recycling at a much smaller scale and reducing investment risk.

390. Similarly, the Company reiterated that the "testing of our AquaRefining process has been successful to date" in its Q1 2016 Form 10-Q, Q2 2016 Form 10-Q and Q3 2016 Form 10-Q. Further, the Q1 2016 Form 10-Q stated that the Company expected to "commence[] revenue-producing" operations in the Q3 2016. The Q2 2016 Form 10-Q stated that it expected to "commence[] revenue-producing" operations in the fourth quarter of 2016 ("Q4 2016"). The Q3 2016 Form 10-Q stated that the Company stated that it expected to "commence earning revenue through the commercial-scale recycling of LABs at our TRIC facility during the fourth quarter of 2016."

391. In the Company's November 1, 2016 Form 8-K, the Company stated:

Aqua Metals previously demonstrated the effectiveness of its technology at bench scale, pilot scale and with a single, full-size electrolyzer. The Company has now produced high-quality AquaRefined lead with a commercial-scale AquaRefining module at its facility in the Tahoe-Reno Industrial Center in Nevada.

392. In its November 7, 2016 Form 8-K, the Company stated the "successful production of AquaRefined lead at the TRIC facility that is over 99.99% pure … confirms the Company's ability to produce premium lead." The Company also touted that it was "commercializing" AquaRefining and expected its modular systems to "increase production to meeting rapidly growing demand."

393. The statements above regarding the then existing status, success and commercialization of the AquaRefining process were untrue and misleading when made because:

(a) these statements (i) concealed the fact that AquaRefining did not work; (ii) could not operate for more than a few hours or less without breaking down and suffered from significant problems, such as the sticky lead problem (which the Company did not disclose until the end of the Class Period and never resolved during the Class Period), the hard lead problem and problems with the chemical ratios for the process; and (iii) AquaRefining was not on the verge of

generating income. The truth of these facts is demonstrated by (i) the testimony of confidential witnesses (the "Confidential Witnesses" or "CW") 1, 2, 3, 4 and 5 (¶¶ 65, 67, 68, 70, 72, 74, 75, 78, 81, 89, 95, 107, 108); (ii) the end- and post-Class Period admissions regarding the sticky lead problems and the need to find a solution to such problems and then test the solution (¶¶ 290, 296, 298); and (iii) the end- and post-Class Period admissions that the AquaRefining process was "unproven technology" (¶¶ 294, 298). Indeed, CW1 stated that the sticky lead issue that persisted throughout the Class Period and well into 2018 existed at both Aqua Metals' Oakland and Alameda facilities (the "California Testing Facilities") and was never resolved (¶¶ 65, 67, 70, 74). Moreover, as the Company finally admitted in its Form 10-K for the year ended 2017, filed on March 15, 2018 ("2017 Form 10-K"), the Company had "not put into operation, the processes that we believe will support the production of AquaRefined lead on a commercial scale" (¶¶ 298(f)).

(b)     Furthermore, as relayed by CWs 1, 2, 3, 4 and 5, from the time the recycling facility in McCarran, Nevada, near Reno, at the Tahoe Reno Industrial Complex ("TRIC") (the "Reno Plant") was built, the Reno Plant was effectively a testing facility, the AquaRefining process was plagued with issues and the plant and the process were in start-up and R&D phase (¶¶ 74, 95, 103, 105, 106).

394.    Accordingly, Aqua Metals had not successfully implemented the AquaRefining process and was facing numerous challenges that hindered operations and production, none of which was disclosed in the Prospectus.

### 2.    Untrue and Misleading Statements Concerning The Acceleration Of Commercial Production

395.    Not only did the Prospectus misrepresent that the AquaRefining process was a success at a small-scale level, but it also was untrue in its assurance to investors that the process was being accelerated to increase commercial levels of production to 120 metric tons of recycled lead per day when the technology was not operating and it was unable to produce even a fraction of that amount.

396.    The Prospectus represented that the funds from the November 2016 Offering would be used to accelerate the production process of AquaRefining:

> *We expect to use the net proceeds from this offering for working capital and general corporate purposes, including the acceleration of our AquaRefining product development* and licensing efforts inclusive of pre-sales and post-sales support staff and

infrastructure, enhancement of processes to further improve our operating margins and regulatory activities.

397. The Prospectus further explained that, given that the necessary capital had been obtained, the AquaRefining process was ready and capable of producing 120 metric tons of recycled lead per day:

As of the date of this prospectus supplement, we believe that we have working capital sufficient to fund our current business plan over the next 12 months, including *attainment of production at the rate of 120 tons of recycled lead per day.*

398. The Prospectus repeated that commercial production was imminent:

*We expect to commence the commercial recycling of used LABs during the fourth quarter of 2016 and increase our production of lead to 120 tonnes per day in early 2017.* However, there can be no assurance that as we commence large scale operations at our TRIC facility that we will not incur unexpected costs or hurdles that might restrict the desired scale of our intended operations or negatively impact our projected gross profit margin.

399. The Prospectus also made definitive statements indicating that commercial production levels would lead to expansion, such "[a]s our business expands outside the United States ...," and "we intend to expand first throughout the US and then overseas."

400. In the Q1 2016 Form 10-Q, the Company laid out its plan to produce 80 metric tons of recycled lead per day by Q4 2016 and to ramp that up to 160 tons per day:

As of the date of this report, we believe that interest in our first recycling facility and demand for our recycling capacity is strong. Consequently, *we have implemented a plan to achieve production at the rate of 80 tons of recycled lead per day by the fourth quarter of 2016 and, over time, expand to 160 tons per day*. Our TRIC [Tahoe-Reno Industrial Center] facility is designed and is being constructed in order to accommodate a total of 32 AquaRefining modules and additional battery breaking and component separations equipment sufficient to support expansion to 160 tons of recycled lead per day.

Construction of the TRIC facility began on August 17, 2015 and is progressing with a completion expected in the second quarter of 2016. We expect to install our first AquaRefining modules in approximately the second quarter of 2016 and to install a total of 16 AquaRefining modules to support an initial lead production capacity of 80 tons per day by the close of the third quarter of 2016. In keeping with our modular approach, we intend to commence commercial LAB recycling operations shortly after the first AquaRefining module is delivered.

401. The Q2 2016 Form 10-Q reported:

As of the date of this report, we believe that interest in our first recycling facility and demand for our recycling capacity is strong. Consequently, we have implemented a plan to achieve production at the rate of 80 tons of recycled lead per day by the fourth quarter of 2016 and, over time, expand to 160 tons per day. Our TRIC [Tahoe-Reno Industrial Center] facility is designed and is being constructed in order to accommodate a total of 32 AquaRefining modules and additional battery breaking and component separations equipment sufficient to support expansion to 160 tons of recycled lead per day.

Construction of the TRIC facility began on August 17, 2015 and is progressing with a completion expected in the third quarter of 2016. We began installing our first AquaRefining modules in June 2016 and expect to install a total of 16 AquaRefining modules to support an initial lead production capacity of 80 tons per day by the close of the fourth quarter of 2016.

402. On November 1, 2016, at the opening of the market, Aqua Metals issued a press release titled "Aqua Metals Produces First AquaRefined Lead at World's First AquaRefinery," which was attached as Exhibit 99.1 to a Form 8-K filed with the SEC after the market close ("November 1, 2016 Press Release"). In the November 1, 2016 Press Release, the Company announced that it had "built and delivered a total of five modules to its Nevada AquaRefinery thus far and currently plans to install and commission a total of 16 modules for initial production capacity of 80 metric tons of lead per day. The Company anticipates that the Nevada AquaRefinery will reach its initial production capacity within the coming months."

403. The Q3 2016 Form 10-Q reported:

On October 28, 2016, we commenced limited lead-producing operations at our TRIC facility through the processing of recycled lead through a single AquaRefining module. Through our own on-site assay, the Company has verified that the lead produced in the AquaRefining module is over 99.99 percent pure. We expect to commence earning revenue through the commercial-scale recycling of LABs at our TRIC facility during the fourth quarter of 2016. Additionally, we have implemented process and other improvements which have increased the capacity of the TRIC facility to 120 tonnes per day. We expect to achieve a production rate of 120 tonnes per day early in 2017.

404. The Q3 2016 Form 10-Q reported that "[o]ur plan of operations for the 12-month period following the date of this report is to expand operations at our first recycling facility at TRIC to 120 tonnes of lead production per day and begin to expand our business with additional recycling facilities and licensing of our recycling technology and equipment to third parties." It further stated that "[o]ur TRIC facility is designed to accommodate additional AquaRefining modules and has battery breaking and component separations equipment sufficient to support expansion to 160 tonnes

of recycled lead per day." The Company also stated that "[o]ur goal is to increase our production of lead at our TRIC facility to 160 tonnes per day by 2018."

405. At the market open on November 7, 2016, Aqua Metals issued a press release titled "Aqua Metals Provides Third Quarter 2016 Corporate Update," which was attached as Exhibit 99.1 to a Form 8-K filed with the SEC after the market close ("Q3 2016 Press Release"), announcing results for Q3 2016. In the Q3 2016 Press Release, the Company announced that it had produced AquaRefined lead at TRIC and that they were transitioning into commercial lead production for sales to begin in Q4 2016:

> The primary focus throughout the third quarter has been on testing of essential systems and equipment to begin commercial lead production at the world's first AquaRefinery. To that end, earlier this month we announced the first-ever AquaRefined lead produced at the facility after commissioning the first production module. This is a major milestone and the most critical step in the commissioning process. We are working to complete the integration of front-end battery-breaking and other supporting systems and are transitioning into commercial lead production. We expect to begin selling lead in the fourth quarter of 2016.

> While working to bring the AquaRefinery online, we incorporated several process and other improvements, and consequently, we now expect to ramp to a capacity of 120 T/day in early 2017, which will provide greater revenue and earnings potential.

> We have also accelerated discussions with US based lead-acid battery manufacturers and distributors, who collectively represent a substantial majority of the US battery industry. Most have already visited our facility and expressed interest in our products and technology. We are now sending our initial production samples to these companies, to allow them to conduct their own assays.

> With the progress that we have made and with unprecedented interest in our revolutionary technology, we are positioned to ramp revenue in the coming year, which ultimately, will contribute meaningfully to growing shareholder value.

406. Aqua Metals further stated that "Aqua Metals will begin selling lead in the fourth quarter of 2016…. The Company expects to reach initial capacity of 120T/day in early 2017, representing a 50% increase to the previously announced capacity of 80 T/day of lead output. Aqua Metals plans to expand to 160 metric tons of lead per day at the TRIC AquaRefinery in 2018."

407. The statements above regarding the then existing and accelerated production capacity of up to 120 metric tons of lead per day and 160 metric tons of lead per day from the AquaRefining

process were untrue and misleading for the reasons stated in paragraphs 393(a) and 393(b) above, as well as for the additional reasons that:

(a) Even by the end of the Class Period, Aqua Metals had barely produced any pure lead and the limited revenue generated by Aqua Metals starting in the second quarter of 2017 ("Q2 2017") was for sales of unrefined lead compounds and plastics sold directly after being separated in the breaker. This fact is evidenced by (i) the Company's disclosures beginning May 19, 2017 (¶¶ 233-235, 244, 271-275, 289-291, 294,296, 298); (ii) CWs 2, 3 and 4 statements that very limited amounts of lead were produced, and particularly a lack of AquaRefined lead (¶¶ 80, 91, 94); and (iii) CWs 1, 2 and 4 statements that the only products Aqua Metals sold were by-products (unrefined lead compounds and plastics) right off the breaker (¶¶ 75, 80, 94).

(b) Furthermore, as the Company admitted in October 2017, it was still in the commissioning phase even in Fall 2017 (¶¶ 298-291).

408. While the aforementioned problems were occurring as of the date of the Prospectus, the Prospectus discloses *none* of them, whether among its risk disclosures or anywhere else. Accordingly, Defendants' representations that the AquaRefining process was ready and capable of producing 120 tons of recycled lead per day and that obtaining financing was the only known potential hindrance to that level of production were untrue and misleading when made because the AquaRefining process was not functioning and Aqua Metals was in fact suffering production problems that prevented even a small-scale production.

**3. Untrue & Misleading Statements Regarding Licensing & Strategic Relationships**

409. In its Q1 2016 Form 10-Q, the Company stated that, "[a]s of the date of this report, and after giving effect to the closing of the Interstate Battery investment transactions disclosed above, we believe that our cash is sufficient to achieve production at a rate of 80 tons of lead per day."

410. In the Q3 2016 Form 10-Q, the Company touted building additional facilities and licensing its equipment to third parties in 2017:

> Separately, we are engaged in detailed discussions with providers of non-dilutive capital to finance up to an additional four facilities, each of would have a production capacity of approximately 160 tonnes per day. On the strength of these discussions we have started to evaluate locations for facilities two and three, however, as of the date of this report, we have no agreements or understandings with regard to the financing and there can be no

assurance that we will be able to consummate an agreement on terms acceptable to us, or at all.

In the longer term, we intend to expand our business in the United States and internationally, through the provision of AquaRefining equipment to third parties using a "serviced licensing" business model. We now have exploratory discussions with third parties interested in this option in the United States and various foreign jurisdictions.

These discussions have now progressed to the point that we have started to evaluate materials supplied to us by third parties for compatibility with our technology. As of the date of this report, these trials have been successful and we intend to commence the formal pursuit of licensing arrangements during 2017.

411. The Q3 2016 Press Release announced that the Company was expanding to provide its AquaRefining technology and equipment on a serviced licensing model which would commence in 2017:

Providing AquaRefining technology and equipment on a fully serviced licensing model is the next stage of the Company's business strategy. ***The first module deliveries to third parties are expected in 2017. To expedite this roll out, the Company has already successfully tested 3rd party feed stocks from potential licensees in North America*** and expects to test others in the coming months. Aqua Metals has engaged in substantive discussions with highly credible potential partners and developed a "master license" approach for China and other large markets.

412. The statements above regarding licensing equipment, building additional facilities and touting strategic partnerships are statements of the Company's current existing goals and focus, which are actionable because they were untrue and misleading when made for the reasons discussed in paragraphs 393(a) and 407(b), above.

C. **The Securities Act Counts**

1. **Count One**
**Violations of Section 11 of the Securities Act**
**(Against the Aqua Metals, Clarke and Murphy)**

413. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein, with the exception of any that could be construed as alleging fraud, recklessness or intentional misconduct. In addition, this disclaimer expressly excludes all allegations above contained in paragraphs 18, 36, 37, 38, 41, 42, 57, 60, 66, 69, 71, 73, 79, 82, 83, 84, 90, 93, 96, 97, 98, 99, 100, 101, 102, 109, 110, 111 and in Sections VI(A), VI(B), VI(D), VI(E), VI(F), VI(G) in their entirety.

414. This count is brought pursuant to Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k, on behalf of all class members who bought shares of Aqua Metals' common stock pursuant to or traceable to the November 2016 Offering against defendants Aqua Metals, Clarke and Murphy. This count is based solely on claims of strict liability and/or negligence under the Securities Act.

415. As set forth above, the Registration Statement, which incorporated all the Offering Materials, issued in connection with the November 2016 Offering contained untrue, false and/or misleading statements of material fact and omitted material facts which were necessary to make those statements not misleading. The facts misstated and omitted would have been material to a reasonable person reviewing the Registration Statement.

416. Class members who purchased shares pursuant or traceable to the November 2016 Offering did not know, or in the exercise of reasonable diligence could not have known, of the untrue statements of material fact or omissions of material facts in the Offering Materials. Less than one year elapsed from the time Class members discovered or reasonably could have discovered the facts upon which this cause of action is based. Less than three years elapsed from the time that the securities upon which this cause of action is brought were bona fide offered to the public.

417. Class members who purchased shares pursuant or traceable to the November 2016 Offering have sustained damages and are entitled to damages pursuant to 15 U.S.C. § 77k(e).

418. Aqua Metals is the registrant for the November 2016 Offering and, as issuer of the shares, it is strictly liable to Lead Plaintiff and to the members of the Class for materially untrue and/or misleading statements and omissions alleged herein.

419. Defendants Clarke and Murphy each signed or authorized the signing of the Registration Statement. By virtue of signing the Registration Statement, they issued, caused to be issued and participated in the issuance of the Registration Statement, which contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein. These defendants failed to conduct a reasonable investigation and did not possess reasonable grounds for believing that the statements contained therein were true and not materially misleading.

420. For the foregoing reasons, Aqua Metals, Clarke and Murphy violated Section 11 of the Securities Act and are strictly liable to class members who purchased shares pursuant to or traceable to the Prospectus.

**2. Count 2**
**Violations of Section 15 of the Securities Act**
**(Against the Officer Defendants)**

421. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein, with the exception of any that could be construed as alleging fraud, recklessness or intentional misconduct. In addition, this disclaimer expressly excludes all allegations above contained in paragraphs 18, 36, 37, 38, 41, 42, 57, 60, 66, 69, 71, 73, 79, 82, 83, 84, 90, 93, 96, 97, 98, 99, 100, 101, 102, 109, 110, 111 and in Sections VI(A), VI(B), VI(D), VI(E), VI(F), VI(G) in their entirety.

422. This count is brought pursuant to Section 15 of the Securities Act of 1933, 15 U.S.C. § 77o, on behalf of all class members who bought shares of Aqua Metals' common stock pursuant to or traceable to the November 2016 Offering against the Officer Defendants, *i.e.*, Clarke, Murphy and Mould. This count is based solely on claims of strict liability and/or negligence under the Securities Act.

423. At all relevant times, the Officer Defendants were control persons of the Company within the meaning of Section 15 of the Securities Act. Each of these defendants served as an executive officer and/or director of Aqua Metals prior to and at the time of the November 2016 Offering.

424. At all relevant times, the Officer Defendants had the power, influence and control over the operation and management of the Company and the conduct alleged herein. Each conducted and participated, directly and indirectly, in the conduct of Aqua Metals' business affairs. As officers of a publicly owned company, the Officer Defendants had a duty to disseminate accurate and truthful information with respect to Aqua Metals' business operations, growth and financial condition.

425. None of the Officer Defendants conducted a reasonable investigation or possessed a reasonable basis for the belief that the statements contained in the Offering Materials were true, were without omissions of material fact and were not misleading. By reason thereof, each of the Officer

Defendants is liable under Section 15 of the Securities Act, jointly and severally with, and to the same extent as the Company is liable under Section 11 of the Securities Act, to the Class members who purchased Aqua Metals' common stock pursuant to or traceable to the November 2016 Offering.

426.    As a direct result of the aforementioned conduct, these Class members suffered damages in connection with their purchase of Aqua Metals' common stock.  Less than one year elapsed from the time Class members discovered or reasonably could have discovered the facts upon which this cause of action is based.  Less than three years elapsed from the time that the securities upon which this cause of action is brought were bona fide offered to the public.

## VIII.   CLASS ALLEGATIONS

427.    Lead Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil procedure on behalf of a class consisting of all persons and entities who purchased or otherwise acquired Aqua Metals' common stock during the Class Period, including shares sold in the Secondary Offering, and were damaged as a result (the "Class").  Excluded from the Class are: (a) Defendants; (b) members of the immediate families of Defendants; (c) the subsidiaries and affiliates of Defendants; (d) any person who is an officer, director or controlling person of Aqua Metals; (e) any entity in which any Defendant has a controlling interest; (f) Defendants' directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof; and (g) the legal representatives, heirs, successors or assigns of any such excluded party.

428.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are thousands of members in the proposed Class.  Indeed, as of November 6, 2017, Aqua Metals had 20,402,454 outstanding shares of common stock.

429.    Members of the Class may be identified from records maintained by Aqua Metals or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

430.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class, including:

(a)     whether the federal securities laws were violated by Defendants' respective acts as alleged herein;

(b)     whether the statements made were materially false or misleading, or omitted material facts.

(c)     whether Defendants acted knowingly or with deliberate recklessness in issuing false and misleading financial statements;

(d)     whether Defendants engaged in a scheme to defraud investors;

(e)     whether the prices of Aqua Metals' securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

(f)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

431.    Lead Plaintiff's claims are typical of the claims of other members of the Class and the other members of the Class sustained damages arising out of Defendants' wrongful conduct in violation of federal law as alleged in this complaint.

432.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation. Lead Plaintiff has no interests antagonistic to, or in conflict with, those of the Class.

433.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

434.    Lead Plaintiff will rely, at least in part, on the presumption of reliance established by the fraud-on-the-market doctrine.  All purchasers of Aqua Metals' securities during the Class Period suffered similar injuries, including injury through their purchase of the securities at artificially inflated prices.  A presumption of reliance therefore applies.

## IX.    NO SAFE HARBOR

435.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false and misleading statements pleaded in this complaint.  The statements alleged to be false and misleading all relate to historical or then-existing facts and conditions.

436.    In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not adequately identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

437.    Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker had actual knowledge that the particular forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Aqua Metals who knew that those statements were false, misleading or omitted necessary information when they were made.  In addition, to the extent any of the statements set forth above were accurate when made, they became inaccurate or misleading because of subsequent events, and Defendants failed to update those statements which later became inaccurate

## X.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

(a)    Determining that this action is a proper class action, certifying Lead Plaintiff as Class representative under Federal Rule of Civil Procedure 23, and appointing Lead Plaintiff's counsel as Class Counsel;

(b)    Awarding compensatory and/or rescissionary damages in favor of Lead Plaintiff and the other members of the Class against all Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre- and post-judgment interest thereon;

(c)     Granting equitable and/or injunctive relief as permitted by law, equity and federal law;

(d)     Awarding Lead Plaintiff and the Class their reasonable fees and expenses incurred in this action, including counsel fees and expert fees;

(e)     Awarding such other and further relief as the Court may deem just and proper.

## XI.     DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Lead Plaintiff hereby demands a trial by jury.

DATED:  July 20, 2018                                    Respectfully submitted,

**BERMAN TABACCO**

By:   */s/ Nicole Lavallee*
             Nicole Lavallee

Kristin J. Moody
A. Chowning Poppler
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: nlavallee@bermantabacco.com
             kmoody@bermantabacco.com
             cpoppler@bermantabacco.com

Leslie R. Stern
**BERMAN TABACCO**
One Liberty Square
Boston, MA 02109
Telephone: (617) 542-8300
Facsimile: (617) 542-1194
Email: lstern@bermantabacco.com

Shannon L. Hopkins
Nancy A. Kulesa
Stephanie A. Bartone
**LEVI & KORSINSKY, LLP**
733 Summer Street, Suite 304
Stamford, CT 06901
Telephone: (203) 992-4523
Facsimile: (212) 363-7171
Email: shopkins@zlk.com
          nkulesa@zlk.com
          sbartone@zlk.com

Rosemary M. Rivas
**LEVI & KORSINSKY, LLP**
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 291-2420
Facsimile: (415) 484-1294
Email: rrivas@zlk.com

*Counsel for the Plymouth County Group and Co-Lead Counsel for the Class*

# Exhibit 1

**CERTIFICATION OF MOVANT PLYMOUTH COUNTY RETIREMENT ASSOCIATION PURSUANT TO FEDERAL SECURITIES LAW**

I, David Sullivan, Executive Director of the Plymouth County Retirement Association ("Plymouth County"), hereby certify that the following is true and correct to the best of my knowledge, information and belief:

1. I have reviewed the first-filed class action complaint filed in the United States District Court for the Northern District of California in this matter captioned *Hampton v. Aqua Metals, Inc., et al.*, No. 4:17-cv-07142-HSG. At this time, I generally adopt the key substantive allegations of that complaint.

2. Plymouth County has authorized Berman Tabacco to file a motion for consolidation, appointment as lead plaintiff and appointment of counsel on its behalf in this litigation.

3. Plymouth County did not engage in transactions in the securities that are the subject of this action at the direction of counsel or in order to participate in this or any other litigation under the securities laws of the United States.

4. Plymouth County is willing to serve as a representative party on behalf of the class and to provide testimony at deposition and trial, if necessary.

5. Plymouth County's transactions in the securities of Aqua Metals, Inc. between May 19, 2016 and November 9, 2017, inclusive, (the "Class Period") are set forth in Exhibit A, attached hereto.

6. Other than those transactions set forth in Exhibit A attached hereto, Plymouth County has engaged in no transactions during the Class Period in the securities that are the subject of this action.

7. During the three-year period preceding the date of this certification, Plymouth County has sought to serve, or served, as a representative party on behalf of a

1

class under the federal securities laws in the following matters:

- *Plymouth Country Retirement Association* v. *Advisory Board Co.*, No. 17-cv-01940 (D.D.C.) (not appointed);

- *In re Envision Healthcare Corp. Sec. Litig.*, No. 17-cv-01112 (M.D. Tenn.) (not appointed);

- *Kinzler v. First NBC Bank Holding Co.*, No. 16-cv-04243 (E.D. La.) (currently serving as a member of a lead plaintiff group);

- *North Collier Fire Control & Rescue District Firefighter Pension Plan v. MDC Partners Inc.*, No. 15-cv-06034 (S.D.N.Y.) (previously served as co-lead plaintiff; matter dismissed in October 2016);

- *Harrington v. Tetraphase Pharmaceuticals Inc.*, No. 16-cv-10133 (D. Mass.) (currently serving as co-lead plaintiff);

- *Van Noppen v. Innerworkings Inc.*, No. 14-cv-01416 (N.D. Ill.) (previously served as lead plaintiff; matter settled in November 2016);

- *Norfolk County Retirement System v. Tempur-Pedic Int'l Inc.*, No. 12-cv-00195 (E.D. Ky.) (previously served as member lead plaintiff group; matter dismissed in May 2014, affirmed on appeal in June 2015); and

- *Medoff v. CVS Caremark Corp.*, No. 09-cv-00554 (D.R.I.) (previously served as a member of a lead plaintiff group; matter settled in February 2016).

8. Plymouth County will not accept any payment for serving as class representative on behalf of the class beyond Plymouth County's *pro rata* share of any recovery, except for an award, as ordered or approved by the Court in compliance with the federal laws, directly relating to the representation of the class.

9. As Executive Director for Plymouth County, I am duly authorized to sign this Certification on behalf of Plymouth County.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 12, 2018.

David Sullivan

*Executive Director*
*Plymouth County Retirement*
*Association*

3

# EXHIBIT A

**AQUA METALS INC.**
**Common Stock (CUSIP 03837J101)**
**Exhibit A**

**Class Period:**  05/19/16 - 11/09/17
**Shareholder:**  Plymouth County Retirement Association

| Trade Date | Transaction Type | Shares Bought | Shares Sold | Base Unit Price |
|---|---|---|---|---|
| 02/21/17 | BUY | 3,184 | | $17.5150 |
| 02/21/17 | BUY | 35 | | $17.6350 |
| 02/22/17 | BUY | 844 | | $17.5735 |
| 02/22/17 | BUY | 10,321 | | $17.3882 |
| 02/23/17 | BUY | 4,398 | | $17.1967 |
| 04/20/17 | BUY | 3,698 | | $16.0575 |
| 06/07/17 | BUY | 3,175 | | $12.8290 |
| 06/08/17 | BUY | 1,150 | | $13.1775 |

# Exhibit 2

## CERTIFICATION OF DENIS TAILLEFER AND 1103371 ONTARIO LTD. PURSUANT TO THE FEDERAL SECURITIES LAW

I, Denis Taillefer, individually and on behalf of my wife, Theresa Taillefer, who has assigned to me all of her rights in any federal securities claims arising from her Aqua Metals securities, and 1103371 Ontario Ltd., of which I am majority owner and duly authorized to act, hereby certify that the following is true and correct to the best of my knowledge, information and belief:

1.      I have reviewed the class action complaint filed in the United States District Court for the Northern District of California in this matter captioned *Hampton v. Aqua Metals, Inc., et al*, No. 4:17-cv-07142-HSG.  At this time, I generally adopt the key substantive allegations of that complaint.

2.      I have authorized Levi & Korsinsky, LLP to file a motion for consolidation, appointment as lead plaintiff and appointment of co-lead counsel on my and 1103371 Ontario Ltd.'s behalf in this litigation.

3.      Neither 1103371 Ontario Ltd., Mrs., Taillefer nor I engaged in transactions in the securities that are the subject of this action at the direction of counsel or in order to participate in this or any other litigation under the securities laws of the United States.

4.      1103371 Ontario Ltd. and I are willing to serve as representative parties on behalf of the class and to provide testimony at deposition and trial, if necessary.

5.      My transactions as well as the transactions of Mrs. Taillefer and 1103371 Ontario Ltd. in the securities of Aqua Metals, Inc. between May 19, 2016 and November 9, 2017, inclusive, (the "Class Period") are set forth in Exhibit A, attached hereto.

6.      Other than those transactions set forth in Exhibit A attached hereto, neither Mrs. Taillefer, 1103371 Ontario Ltd., nor I have engaged in any other transactions during the Class Period in the securities that are the subject of this action.

1

7.      During the three-year period preceding the date of this certification, neither 1103371 Ontario Ltd. nor I have sought to serve, or served, as a representative party on behalf of a class under the federal securities laws.

8.      1103371 Ontario Ltd. and I will not accept any payment for serving as class representative on behalf of the class beyond a pro rata share of any recovery, except for an award, as ordered or approved by the Court in compliance with the federal laws, directly relating to the representation of the class.

9.      As assignee of Theresa Taillefer's rights arising from this litigation, and as majority owner of 1103371 Ontario Ltd., I am duly authorized to sign this Certification.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 12, 2018.

_____
Denis Taillefer

*Individually and on Behalf of Theresa Taillefer and 1103371 Ontario Ltd.*

2

# EXHIBIT A

**Exhibit A**

Transactions of Denis Taillefer Individually, as Assignee of Theresa Taillefer, and on Behalf of 1103371 Ontario Ltd.

| | |
|---|---|
| **Company Name** | Aqua Metals, Inc. |
| **Ticker Symbol** | AQMS |
| **Class Period Start** | 5/19/2016 |
| **Class Period End** | 11/9/2017 |

**Account 1 (Theresa Taillefer)**

| Date of Transaction | Puchase or Sale | Quantity | | Price per Security | Total Cost/Proceeds |
|---|---|---|---|---|---|
| 9/28/2016 Purchase | | 425 | $ | 8.6600 | $3,680.50 |
| 12/8/2016 Purchase | | 1,250 | $ | 11.8500 | $14,812.50 |
| 9/14/2017 Purchase | | 1,325 | $ | 6.6630 | $8,828.48 |
| 9/26/2017 Purchase | | 1,500 | $ | 5.6700 | $8,505.00 |
| 10/6/2017 Purchase | | 1,500 | $ | 6.9500 | $10,425.00 |
| 10/10/2017 Purchase | | 500 | $ | 6.5620 | $3,281.00 |
| 11/6/2017 Sale | | (4,500) | $ | 3.7500 | ($16,875.00) |
| 11/9/2017 Purchase | | 3,000 | $ | 3.8340 | $11,502.00 |
| 11/16/2017 Sale | | (5,000) | $ | 3.0520 | ($15,260.00) |

**Account 2 (Denis Taillefer)**

| Date of Transaction | Puchase or Sale | Quantity | | Price per Security | Total Cost/Proceeds |
|---|---|---|---|---|---|
| 9/28/2016 Purchase | | 425 | $ | 8.6600 | $3,680.50 |
| 12/9/2016 Purchase | | 1,250 | $ | 11.8500 | $14,812.50 |
| 9/14/2017 Purchase | | 1,325 | $ | 6.6700 | $8,837.75 |
| 9/26/2017 Purchase | | 1,500 | $ | 5.6700 | $8,505.00 |
| 10/6/2017 Purchase | | 1,500 | $ | 6.9500 | $10,425.00 |
| 10/10/2017 Purchase | | 500 | $ | 6.6000 | $3,300.00 |
| 10/24/2017 Purchase | | 1,200 | $ | 4.3680 | $5,241.60 |
| 11/6/2017 Sale | | (5,700) | $ | 3.7500 | ($21,375.00) |
| 11/9/2017 Purchase | | 3,000 | $ | 3.8770 | $11,631.00 |
| 11/16/2017 Sale | | (5,000) | $ | 3.0500 | ($15,250.00) |

**Account 3 (Denis Taillefer)**

| Date of Transaction | Puchase or Sale | Quantity | | Price per Security | Total Cost/Proceeds |
|---|---|---|---|---|---|
| 8/10/2016 Purchase | | 500 | $ | 8.9000 | $4,450.00 |
| 11/2/2016 Purchase | | 500 | $ | 8.9000 | $4,450.00 |
| 8/11/2017 Purchase | | 1,000 | $ | 8.1980 | $8,198.00 |
| 9/14/2017 Purchase | | 2,000 | $ | 6.6850 | $13,370.00 |
| 9/21/2017 Purchase | | 2,000 | $ | 5.6390 | $11,278.00 |
| 10/11/2017 Sale | | (4,000) | $ | 6.3120 | ($25,248.00) |
| 10/11/2017 Purchase | | 8,000 | $ | 6.4610 | $51,688.00 |
| 10/13/2017 Purchase | | 2,000 | $ | 5.9500 | $11,900.00 |

| Date of Transaction | Puchase or Sale | Quantity | Price per Security | Total Cost/Proceeds |
|---|---|---|---|---|
| 10/23/2017 Purchase | | 2,000 | $ 4.6800 | $9,360.00 |
| 11/6/2017 Sale | | (14,000) | $ 3.6550 | ($51,170.00) |

**Account 4 (Theresa Taillefer)**

| Date of Transaction | Puchase or Sale | Quantity | Price per Security | Total Cost/Proceeds |
|---|---|---|---|---|
| 8/10/2016 Purchase | | 500 | $ 8.9000 | $4,450.00 |
| 11/2/2016 Purchase | | 500 | $ 8.9100 | $4,455.00 |
| 8/11/2017 Purchase | | 500 | $ 8.2500 | $4,125.00 |
| 9/14/2017 Purchase | | 2,500 | $ 6.6760 | $16,690.00 |
| 9/21/2017 Purchase | | 2,000 | $ 5.6030 | $11,206.00 |
| 10/11/2017 Purchase | | 4,000 | $ 6.4180 | $25,672.00 |
| 10/13/2017 Purchase | | 2,000 | $ 5.9500 | $11,900.00 |
| 10/23/2017 Purchase | | 2,000 | $ 4.7310 | $9,462.00 |
| 11/6/2017 Sale | | (14,000) | $ 3.6920 | ($51,688.00) |

**Account 5 (Denis Taillefer)**

| Date of Transaction | Puchase or Sale | Quantity | Price per Security | Total Cost/Proceeds |
|---|---|---|---|---|
| 6/1/2016 Purchase | | 390 | $ 11.4100 | $4,449.90 |
| 11/16/2017 Purchase | | 390 | $ 3.0500 | $1,189.50 |

**Account 6 (Theresa Taillefer)**

| Date of Transaction | Puchase or Sale | Quantity | Price per Security | Total Cost/Proceeds |
|---|---|---|---|---|
| 6/1/2016 Purchase | | 500 | $ 11.4100 | $5,705.00 |
| 11/16/2017 Purchase | | 500 | $ 3.0500 | $1,525.00 |

**Account 7 (1103371 Ontario Ltd.)**

| Date of Transaction | Puchase or Sale | Quantity | Price per Security | Total Cost/Proceeds |
|---|---|---|---|---|
| 6/27/2016 Purchase | | 2,000 | $ 10.2500 | $20,500.00 |
| 7/28/2016 Purchase | | 1,200 | $ 9.1700 | $11,004.00 |
| 8/3/2016 Purchase | | 1,000 | $ 8.5000 | $8,500.00 |
| 9/9/2016 Purchase | | 1,000 | $ 8.7800 | $8,780.00 |
| 9/21/2016 Purchase | | 1,000 | $ 9.0000 | $9,000.00 |
| 9/30/2016 Purchase | | 1,000 | $ 8.7000 | $8,700.00 |
| 10/20/2016 Purchase | | 1,000 | $ 9.2000 | $9,200.00 |
| 11/2/2016 Purchase | | 800 | $ 8.4800 | $6,784.00 |
| 1/24/2017 Purchase | | 1,000 | $ 11.8840 | $11,884.00 |
| 1/25/2017 Purchase | | 1,000 | $ 11.4000 | $11,400.00 |
| 3/14/2017 Sale | | 1,000 | $ 19.0000 | $19,000.00 |
| 3/23/2017 Purchase | | (5,000) | $ 17.9780 | ($89,890.00) |
| 3/23/2017 Purchase | | 5,000 | $ 18.0810 | $90,405.00 |
| 4/10/2017 Purchase | | 5,000 | $ 17.0610 | $85,305.00 |

| | | | | |
|---|---|---|---|---|
| 5/10/2017 | Purchase | 5,000 | $ | 12.4990 | $62,495.00 |
| 8/11/2017 | Purchase | 5,000 | $ | 8.0380 | $40,190.00 |
| 9/1/2017 | Purchase | 4,000 | $ | 7.5220 | $30,088.00 |
| 9/7/2017 | Purchase | 5,000 | $ | 6.0000 | $30,000.00 |
| 10/10/2017 | Purchase | 4,000 | $ | 6.6000 | $26,400.00 |
| 11/3/2017 | Sale | (32,000) | $ | 3.7120 | ($118,784.00) |
| 11/3/2017 | Sale | (8,000) | $ | 3.7070 | ($29,656.00) |