UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER VATAJ, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>WILLIAM D. JOHNSON, JOHN R. SIMON, GEISHA WILLIAMS, and JASON P. WELLS,<br><br>Defendants. | Case No. 4:19-cv-06996-HSG<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Hon. Haywood S. Gilliam Jr.<br><br><u>CLASS ACTION</u> |

**TABLE OF CONTENTS**

I.    INTRODUCTION........................................................................................................2

II.   SUMMARY OF THE LITIGATION AND SETTLEMENT ....................................4

    A.    The Litigation ................................................................................................4

    B.    The Claims.....................................................................................................4

    C.    Settlement Discussions..................................................................................5

    D.    The Settlement's Terms.................................................................................6

III.   PRELIMINARY APPROVAL OF THE SETTLEMENT IS WARRANTED .........8

    A.    Legal Standard ..............................................................................................8

    B.    The Proposed Settlement Results From Serious, Informed, Non-Collusive Negotiations .................................................................................8

    C.    Each *Churchill* Factor Considered at This Stage Supports Preliminarily Approving the Settlement.....................................................................................9

        1.    The strength of Plaintiffs' case, risk of further litigation, and risk of maintaining class action status ...............................................................10

        2.    The Amount Offered in Settlement ............Error! Bookmark not defined.

        3.    Extent of discovery completed and the stage of the proceedings ..Error! Bookmark not defined.

        4.    The experience and views of counsel..........Error! Bookmark not defined.

IV.   THE PROPOSED PLAN OF ALLOCATION SHOULD BE PRELIMINARILY APPROVED .......................................................................................................14

VI.   THE PROPOSED CLASS NOTICE SHOULD BE APPROVED...........................17

VII.   THE COURT SHOULD CERTIFY THE CLASS FOR SETTLEMENT PURPOSES..................................................................................................................20

    A.    Numerosity...................................................................................................20

    B.    Commonality ...............................................................................................21

C.    Typicality ...............................................................................................22

D.    Adequacy ...............................................................................................22

E.    Common Questions of Law Predominate and a Class Action Is the Superior Method of Adjudication ...........................................................................23

VIII.    THE COURT SHOULD APPROVE LEAD COUNSEL'S SELECTION OF CLAIMS ADMINISTRATOR ..................................................................24

IX.    CONCLUSION...........................................................................................25

**TABLE OF AUTHORITIES**

**Pages**

**Cases**

*Betorina v. Randstad US, L.P.*,
No. 15-CV-03646-EMC, 2017 WL 1278758 (N.D. Cal. Apr. 6, 2017) ..................................... 9

*Blackie v. Barrack*,
524 F.2d 891 (9th Cir. 1975) ........................................................................................... 19, 20

*Booth v. Strategic Realty Tr., Inc.*,
No. 13-CV-04921-JST, 2015 WL 3957746 (N.D. Cal. June 28, 2015) .............................. 3, 19

*Cheng Jiangchen v. Rentech, Inc.*,
No. CV 17-1490-GW(FFMX), 2019 WL 5173771 (C.D. Cal. Oct. 10, 2019) ........................ 15

*Ciuffitelli v. Deloitte & Touche LLP*,
No. 3:16-CV-00580-AC, 2019 WL 1441634 (D. Or. Mar. 19, 2019)...................................... 21

*Cooper v. Thoratec Corporation*,
14-cv-00360 (N.D. Cal.) .......................................................................................................... 23

*Craft v. Cty. of San Bernardino*,
624 F. Supp. 2d 1113 (C.D. Cal. 2008) .................................................................................... 15

*Der-Hacopian v. Darktrace, Inc.*,
No. 18-CV-06726-HSG, 2020 WL 1904471 (N.D. Cal. Apr. 17, 2020)................................... 7

*Dunakin v. Quigley*,
No. 2:14-CV-00567-JLR, 2017 WL 123011 (W.D. Wash. Jan. 10, 2017) ............................... 8

*Eisenberg v. Gagnon*,
766 F.2d 770 (3d Cir. 1985)...................................................................................................... 22

*Enriquez, et al. v. Nabriva Therapeutics PLC, et al.*,
19-cv-04183 (S.D.N.Y.).............................................................................................................. 23

*Glickenhaus & Co. v. Household Int'l, Inc.*,
787 F.3d 408 (7th Cir. 2015) .................................................................................................... 10

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) ............................................................................................ 19, 21

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992) ........................................................................................ 20

*Hefler v. Wells Fargo & Co.*,
  No. 16-CV-05479-JST, 2018 WL 6619983 (N.D. Cal. Dec. 18, 2018) .................................. 14

*Ikuseghan v. Multicare Health Sys.*,
  No. 3:14-CV-05539-BHS, 2016 WL 3976569 (W.D. Wash. July 25, 2016) ............... 10, 11, 13

*In re Blue Apron Holdings, Inc. Sec. Litig.*,
  17-cv-4846-WFK-PK (E.D.N.Y.) ..................................................................................... 23

*In re Bluetooth Headset Prod. Liab. Litig.*,
  654 F.3d 935 (9th Cir. 2011) ........................................................................................... 9

*In re Genworth Fin. Sec. Litig.*,
  210 F. Supp. 3d 837 (E.D. Va. 2016) ............................................................................. 15

*In re Heritage Bond Litig.*,
  No. 02-ML-1475 DT, 2005 WL 1594403 (C.D. Cal. June 10, 2005) .............................. 7, 11

*In re Illumina, Inc. Sec. Litig.*,
  No. 3:16-CV-3044-L-MSB, 2019 WL 6894075 (S.D. Cal. Dec. 18, 2019) ......................... 22

*In re Immune Response Sec. Litig.*,
  497 F. Supp. 2d 1166 (S.D. Cal. 2007) ........................................................................... 15

*In re Intelcom Grp., Inc. Sec. Litig.*,
  169 F.R.D. 142 (D. Colo. 1996) ..................................................................................... 22

*In re Juno Therapeutics, Inc.*,
  16-cv-1069 (W.D. Wash.) ............................................................................................... 23

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,
  No. 4:14-MD-2541-CW, 2017 WL 6040065 (N.D. Cal. Dec. 6, 2017) .............................. 14

*In re Pac. Enterprises Sec. Litig.*,
  47 F.3d 373 (9th Cir. 1995) ........................................................................................... 13

*In re Sequans Communications S.A. Securities Litigation*,
  17-cv-4665-FB-SJB (E.D.N.Y.) ...................................................................................... 23

*In re UTStarcom, Inc. Sec. Litig.*,
  No. C 04-04908 JW, 2010 WL 1945737 (N.D. Cal. May 12, 2010) .................................. 19

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016).............................................................................................. 10

*In re Wireless Facilities, Inc. Sec. Litig.*,
  253 F.R.D. 630 (S.D. Cal. 2008) ...................................................................................... 20

*Just Film, Inc. v. Buono*,
  847 F.3d 1108 (9th Cir. 2017) .................................................................................... 20, 21

*Lerwill v. Inflight Motion Pictures, Inc.*,
  582 F.2d 507 (9th Cir. 1978) ............................................................................................ 21

*Murillo v. Pac. Gas & Elec. Co.*,
  266 F.R.D. 468 (E.D. Cal. 2010) ....................................................................................... 7

*Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*,
  688 F.2d 615 (9th Cir. 1982) ............................................................................................ 11

*Pelzer v. Vassalle*,
  655 F. App'x 352 (6th Cir. 2016)...................................................................................... 16

*Perez-Funez v. Dist. Dir., I.N.S.*,
  611 F. Supp. 990 (C.D. Cal. 1984) ................................................................................... 19

*Razilov v. Nationwide Mut. Ins. Co.*,
  No. 01-CV-1466-BR, 2006 WL 3312024 (D. Or. Nov. 13, 2006)........................................... 15

*Rinky Dink, Inc. v. World Bus. Lenders, LLC*,
  No. C14-0268-JCC, 2016 WL 4052588 (W.D. Wash. Feb. 3, 2016)............................ 7, 10, 12

*Rodriguez v. W. Publ'g Corp.*,
  563 F.3d 948 (9th Cir. 2009) ................................................................................. 8, 10, 13, 16

*Rosenburg v. I.B.M.*,
  No. CV06-00430PJH, 2007 WL 128232 (N.D. Cal. Jan. 11, 2007)........................................ 13

*Sandoval v. Tharaldson Employee Mgmt., Inc.*,
  No. EDCV 08-482-VAP(OP), 2010 WL 2486346 (C.D. Cal. June 15, 2010) ........................ 16

*Scott v. United Servs. Auto. Ass'n*,
  No. C11-1422-JCC, 2013 WL 12251170 (W.D. Wash. Jan. 7, 2013) ...................................... 8

*Staton v. Boeing Co.*,
  327 F.3d 938 (9th Cir. 2003) ............................................................................................ 14

*Todd v. STAAR Surgical Co.*,
No. CV145263MWFGJSX, 2017 WL 4877417 (C.D. Cal. Oct. 24, 2017) ............................ 15

*Van Bronkhorst v. Safeco Corp.*,
529 F.2d 943 (9th Cir. 1976) ........................................................................................... 7

*Vizcaino v. Microsoft Corp.*,
290 F.3d 1043 (9th Cir. 2002) ........................................................................................ 8

*Wehner v. Syntex Corp.*,
117 F.R.D. 641 (N.D. Cal. 1987)..................................................................................... 20

**Statutes**

15 U.S.C. § 77z-1(a)(4)...................................................................................................... 15

15 U.S.C. § 78u-4(a)(4) ..................................................................................................... 15

**Rules**

Fed. R. Civ. P. 23................................................................................................... passim

**Other Authorities**

Laarni T. Bulan *et al*, Securities Class Action Settlements: 2019 Review and Analysis
(Cornerstone Research)................................................................................................. 11

Brian T. Fitzpatrick, *The End of Objector Blackmail?*, 62 Vand. L. Rev. 1623 (2009)............... 16

## STATEMENT OF ISSUES TO BE DECIDED

1.  Whether the Court should preliminarily approve the $10 million cash settlement.

2.  Whether the Settlement Class should be preliminarily certified for purposes of the Settlement.

3.  Whether Plaintiffs should be certified as Class Representatives of the Settlement Class for purposes of the Settlement.

4.  Whether Lead Counsel should be appointed Class Counsel for the Settlement Class for purposes of the Settlement.

5.  Whether the proposed Settlement Notice and Proof of Claim and Release Form and the manner for dissemination of the Notice and Proof of Claim to the Settlement Class should be approved.

6.  Whether the Court should set a date for a hearing for final approval of the proposed Settlement, the proposed Plan of Allocation, and the application of Lead Counsel for an award of attorneys' fees and reimbursement of litigation expenses.

Co-Lead Plaintiffs Ironworkers Local 580 Joint Funds, Ironworkers Locals 40, 361 & 417 Union Security Funds and Robert Allustiarti ("Plaintiffs") collectively, and on behalf the proposed Class, move this Court for Preliminary Approval of the Proposed Settlement Agreement and Notice to the Class on the Class's claims that William D. Johnson, Geisha Williams,  and Sumeet Singh ("Complaint's Individual Defendants"), as well as PG&E Corporation, violated Section 10(b) and 20 (a) of the Securities Exchange Act of 1934 ( "Exchange Act") ("Settlement").

## I.    INTRODUCTION[1]

The Parties have agreed to settle this case for $10 million. The Settlement provides a meaningful recovery to Settlement Class Members in trying circumstances. After PG&E's equipment sparked devastating wildfires in 2017 and 2018, including the Camp Fire that killed 86, it was clear that it had to fundamentally change. So in 2019, PG&E took on three massive projects which sought to prevent wildfires: temporary power shutoffs when high winds and low humidity made wildfires particularly likely ("de-energization"), visual inspections of all of its poles located in high fire threat areas, and inspection for and removal of vegetation overhanging or abutting its power lines in a significant portion of all high fire threat areas.

The Complaint alleges that PG&E misleadingly overstated both the scope of these measures and the protection they offered. It alleges, for example, that PG&E had promised that it had undertaken specific preparations to make de-energization as smooth as possible, but had not actually done so. As a result, the de-energizations were a shambles that imperiled California's lives and property.

Yet there was no Camp Fire in the 2019 fire season. To Plaintiffs' knowledge, no Californians lost their lives to fires set by PG&E in 2019, nor have any deaths been linked conclusively to the de-energizations. Property damage in 2019 was far less than in 2018 or 2017. Thus, while the Complaint alleges that Defendants made misleading statements about the scope of

---

[1] Unless otherwise noted, all citations are omitted and emphases are added and all terms not defined herein take the meaning provided in the Stipulation. Citations to "¶_" are to paragraphs of the operative Complaint, dkt. # 58. Citations to "Stip. ¶_" are to paragraphs of the Stipulation of Settlement, filed herewith. Citations to "Joint Decl. ¶_" are to paragraphs of the Declaration of Louis C. Ludwig and Jonathan Horne, filed herewith.

PG&E's 2019 measures, the fact remains that they improved on what PG&E had done before. While Plaintiffs might be right on the law and the facts, it would be difficult to convince a jury.

Beyond that, PG&E filed for bankruptcy in 2019, and is beset by immense claims on the very assets that would settle Plaintiffs' claims. PG&E faces a class action and more than 7,000 individual claims from investors who purchased its shares in the period leading up to October 2018. It also assigned all its corporate derivative claims to a trust litigating the claims of homeowners who were harmed in fires set by its equipment. These actions are both an order of magnitude larger than this case, and the homeowners are highly sympathetic – and both raised claims on the very directors' and officers' insurance policies that would be used to fund a settlement of this case.

Settlement Class Members also avoid the many risks that they would recover nothing at all. The Settlement avoids the risks that the Court would grant the Complaint's Individual Defendants' motion to dismiss or any motions for summary judgment, that Plaintiffs could not certify a class, or that they could not prove that Defendants made false statements with scienter. It avoids, too, a risk that rarely arises in cases like this: that PG&E's stock price was so volatile that Plaintiffs could not show the stock price declines had anything to do with any news at all, rather than random chance.

The Settlement was negotiated by lawyers experienced in securities class action litigation who benefited from the assistance of one of the country's most renowned mediators. It is an excellent result under difficult circumstances, so it should be approved.

The Court should approve the methods and forms of notice to the Class. The Claims Administrator will mail a postcard setting out the principal terms of the settlement ("Postcard Notice") to potential class members, publish a summary notice in a newswire with broad circulation, and post a full Notice of Pendency and Proposed Settlement of Class Action ("Internet Notice") on a case-specific website. Each of the Postcard Notice, Summary Notice, and Internet Notice will advise Settlement Class Members of: (i) the essential terms of the proposed Settlement; (ii) the proposed plan for allocating the Settlement proceeds among Class members; (iii) Class Counsel's application for attorneys' fees of 25%, and reimbursement of expenses not to exceed

$100,000; (iv) the application for compensatory awards to the Plaintiffs not to exceed $5,000 each; and (v) how to file a claim, opt out of the Settlement, or file an objection.

Finally, the Court should preliminarily certify a settlement class. "[S]ecurities fraud cases fit Rule 23 like a glove."[2] Here, all of the Rule 23(a) elements are met, common issues predominate over individual issues, and a class action is superior to other methods of resolving the claims at issue.

The Court should preliminarily approve the Settlement, approve the method and form of notice, and preliminarily certify the Settlement Class.

## II.   SUMMARY OF THE LITIGATION AND SETTLEMENT

### A.  The Litigation

This Action was filed on October 25, 2019 against PG&E and certain of its officers and directors. On February 3, 2020, the Court appointed Plaintiffs as Co-Lead Plaintiffs and approved their selection of Pomerantz LLP ("Pomerantz") and The Rosen Law Firm, P.A. ("Rosen") as Lead Counsel, authorizing them to, among other things, conduct settlement discussions with Defendants. Dkt. # 48.

Plaintiffs timely filed an amended complaint class action complaint ("Complaint") raising claims under Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 ("Exchange Act") against PG&E and Defendants Johnson, Williams, and Singh ("Complaint's Individual Defendants"). Dkt. # 58. The Complaint's Individual Defendants timely moved to dismiss. Dkt. # 59. Their motion to dismiss was fully briefed when the Parties reached the Settlement.

### B.  The Alleged Claims

The Complaint's core allegation is that PG&E and the Complaint's Individual Defendants made false statements about PG&E's efforts to prevent wildfires in dry, high-wind conditions by cutting power to portions of the grid ("de-energization"). They allegedly falsely

---

[2]   *Booth v. Strategic Realty Tr., Inc.*, No. 13-CV-04921-JST, 2015 WL 3957746, at *9 (N.D. Cal. June 28, 2015).

stated that PG&E had consulted with stakeholders and made plans to address their needs, both for prompt notice of PG&E's intended actions and thorough communications about exactly what it would do and its impact on stakeholders. Defendants also claimed that PG&E promised that its system allowed it to micro-target only the affected areas and that it could restore power promptly once unsafe conditions passed. ¶¶69-72, 109-10.

In reality, the Complaint alleges, PG&E had ignored stakeholders' expressed needs and excluded them from planning exercises. Further, PG&E was not equipped to provide notice to stakeholders or to keep them informed of developments. ¶¶197-231. Moreover, PG&E's system was not able to micro-target de-energizations and it had not devoted enough resources to ensure that it could promptly restore power. ¶¶236-38.

The Complaint alleges that the truth concealed by Defendants' misrepresentations was revealed when PG&E mishandled de-energizations in September and October 2020. PG&E then cut power to millions of Californians for extended periods while providing little notice and insufficient information to stakeholders to prepare for de-energization. PG&E's de-energizations drew intense criticisms from California's elected representatives. In addition, its regulator, the California Public Utilities Commission, launched an investigation and threatened serious consequences. As a result, PG&E's stock price fell. ¶¶273-326.

The Complaint also alleges that Defendants made false statements about PG&E's tree management practices and safety inspections of its poles and equipment. Defendants boasted of PG&E's thorough three-step program to remove trees that might come into contact with power lines, thus setting fires. According to Defendants the combination of a pre-removal inspection to identify trees, the removal, and a post-removal inspection would provide assurances that dangerous trees would be removed. ¶¶127-34. In fact, as reported by PG&E's probation monitor, even the post-removal inspections missed numerous trees. ¶252. And while the Complaint does not allege that PG&E did not conduct safety inspections, it alleges that PG&E's inspections were so poor that they missed dangerous conditions – including equipment with the same defect that caused the Camp Fire. ¶¶263-64.

**C. Settlement Discussions**

When this action was filed, it joined a complicated web of claims asserted against PG&E. In 2018, following the deadly Camp Fire, PG&E was sued by a putative class of investors who bought its securities between April 29, 2015 through November 15, 2018 ("PERA Action" and "PERA Class Period"). In re PG&E Corporation Securities Litigation, Case No. 5:18-cv-03509-EJD (N.D. Cal.)Then, in January 2019, PG&E and Pacific Gas and Electric Company ("Utility") filed for Chapter 11 bankruptcy in this District's Bankruptcy Court. *In re PG&E Corporation and Pacific Gas and Electric Company*, Case Nos. 19-30088 (DM) and 19-30089 (DM). In addition to the PERA class claims, more than 7,000 investors who purchased PG&E securities during the PERA Class Period brought individual claims in its bankruptcy. Further, in its bankruptcy proceeding, PG&E sought to resolve claims (among others) asserted against it by persons who lost their homes in wildfires started by its equipment in 2017 and 2018, in which PG&E estimated its liabilities could exceed $30 billion. To settle the claims, PG&E (among other things) assigned any derivative claims it may have against its officers and directors to a Trust established for benefit of these homeowners. Thus, upon appointment, Lead Counsel were thrust into settlement discussions to resolve claims that dwarfed the amount in controversy in this case.

On April 23, 2020, the Parties to this action mediated before The Hon. Layn R. Phillips (ret.), one of the country's premier mediators. The Parties did not reach a settlement on the day of the mediation, but they continued discussions over the summer and fall. After exchanging numerous offers and counteroffers, which among other things explored different settlement structures, Judge Phillips proposed that the Parties settle the claims asserted in this action for $10 million. The Parties accepted the mediator's proposal.

**D.  The Settlement's Terms**

The Settlement calls for PG&E to pay $10 million into a non-reversionary fund for the benefit of the Settlement Class. In exchange, Plaintiffs and Settlement Class Members will release the Released Claims against Defendants and certain persons associated with them, dubbed Released Persons. Both the Released Persons and the Released Claims are defined in the

6

Stipulation; their definition is reproduced below. Both definitions are customary for securities class action settlements.

"Released Persons" are:

[T]he Individual Defendants, PG&E, and the Utility, as well as each of their respective families, parent entities, controlling persons, associates, affiliates, predecessors, successors, subsidiaries, past or present officers, directors, shareholders, stockholders, members, principals, managers, representatives, employees, attorneys, insurers, financial or investment advisors, consultants, accountants, investment bankers, heirs, assigns or transferees.

"Released Claims" are:

[A]ny and all claims, including Unknown Claims, damages, actions, obligations, attorneys' fees, indemnities, subrogations, duties, demands, controversies, and liabilities of every nature, at law or in equity (including, without limitation, claims under federal and state securities laws, and at common law), suspected or unsuspected, accrued or unaccrued, matured or unmatured, whether arising out of or relating to the period prior to or after the date of the Initial Complaint, that have been, could have been, or in the future might be asserted in any court, tribunal, or proceeding, by any Releasing Persons in their capacity as a shareholder of PG&E, arising out of or relating to, or in connection with: (a) the facts, circumstances, allegations, misrepresentations, and/or omissions that were or could have been alleged in the Initial Complaint, the Complaint, or the Action; and/or (b) investments by any Settlement Class Member in PG&E common stock, including the purchase, acquisition, sale or holding of PG&E common stock, during the Class Period.

While the Released Claims include Unknown Claims and other claims that could have been asserted in this Action, as is customary, the release of such claims is appropriate because all released claims are based on the identical factual predicate of the claims asserted in this Action. The proposed Settlement does not release any claims to enforce the Settlement, or claims of any Person that excludes him-, her-, or itself from the proposed Settlement Class.

## III.    PRELIMINARY APPROVAL OF THE SETTLEMENT IS WARRANTED

### A.  Legal Standard

Federal Rule of Civil Procedure 23(e) requires judicial approval of any class-wide settlement. Fed. R. Civ. P. 23(e) ("The Claims . . . of a certified class may be settled . . . only with the court's approval."). "In deciding whether to approve a proposed settlement, the Ninth Circuit has a 'strong judicial policy that favors settlements, particularly where complex class action litigation is concerned.'" *In re Heritage Bond Litig.*, No. 02-ML-1475 DT, 2005 WL 1594403, at *2 (C.D. Cal. June 10, 2005). "[T]here is an overriding public interest in settling and quieting litigation," which is "particularly true in class action suits." *Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943, 950 (9th Cir. 1976).

Courts evaluate class settlements in two steps. In the first step, at issue here, courts determine whether the settlement appears to be sufficiently fair to permit the plaintiffs to notify the class of the settlement and solicit claims, objections, and opt-outs. Fed. R. Civ. P. 23(e); *Murillo v. Pac. Gas & Elec. Co.*, 266 F.R.D. 468, 473 (E.D. Cal. 2010) ("Procedurally, the approval of a class action settlement takes place in two stages.")

"Courts may preliminarily approve a settlement and notice plan to the class if the proposed settlement: (1) appears to be the product of serious, informed, non-collusive negotiations; (2) does not grant improper preferential treatment to class representatives or other segments of the class; (3) falls within the range of possible approval; and (4) has no obvious deficiencies." *Der-Hacopian v. Darktrace, Inc.*, No. 18-CV-06726-HSG, 2020 WL 1904471, at *7 (N.D. Cal. Apr. 17, 2020). At the preliminary approval stage, this Court conduct a "less searching" inquiry than at final approval, and "seek[s] merely to identify any 'glaring deficiencies' prior to sending notice to class members." *Rinky Dink, Inc. v. World Bus. Lenders, LLC*, No. C14-0268-JCC, 2016 WL 4052588, at *4 (W.D. Wash. Feb. 3, 2016).

### B.  The Proposed Settlement Results From Serious, Informed, Non-Collusive Negotiations

The proposed settlement results from extensive adversarial litigation and arm's-length negotiations facilitated by a neutral third-party mediator. "A presumption of fairness and adequacy attaches to a class action settlement reached in arm's-length negotiations by experienced class

counsel after meaningful discovery." *Dunakin v. Quigley*, No. 2:14-CV-00567-JLR, 2017 WL 123011, at *2 (W.D. Wash. Jan. 10, 2017); *see also Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) ("We put a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution."). Here, the parties were not able to resolve their claims at their first mediation. The Parties only settled when, after exchanging numerous offers and counter-offers, the mediator offered a proposed resolution which the Parties accepted.

None of the factors identified by the Ninth Circuit as signs of a potentially collusive settlement are present here. Counsel will not receive a disproportionate distribution of the settlement. Instead, Lead Counsel will seek at most the standard benchmark for fees in this Circuit, 25% of the Settlement Amount. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002). While Plaintiffs will request a modest reimbursement for the time and expenses they incurred in representing the Settlement Class, no Settlement Class Member will receive preferential treatment. *See Scott v. United Servs. Auto. Ass'n*, No. C11-1422-JCC, 2013 WL 12251170, at *1 (W.D. Wash. Jan. 7, 2013) (noting preliminary approval generally granted absent "obvious deficiencies, such as unduly preferential treatment of class representatives or of segments of the class") (citations omitted). Nor is there a clear sailing agreement because Lead Counsel will be compensated from the Settlement Amount rather than through a separate payment by any defendant or insurer. Finally, the funds will not revert to any defendant or their insurer under any circumstances.

In short, the settlement does not show any signs of collusion or of any other deficiency.

**C. Each *Churchill* Factor Considered at This Stage Supports Preliminarily Approving the Settlement**

In addition to assessing whether the settlement is collusive, courts in the Ninth Circuit assessing a proposed class action settlement weigh the various *Churchill* factors. These are:

> (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement.

9

*In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011). Here, the last two factors are not applicable because no government is participating in this Action, and the Court cannot assess the reaction of the Settlement Class Members to the proposed settlement until the Final Approval Hearing is held. However, each of the remaining *Churchill* factors supports preliminary approval.

### 1. The Strength of Plaintiffs' Case, Risks of Further Litigation, and Risk of Maintaining Class Action Status Support Approval

Courts typically examine the first three *Churchill* factors together, and each supports preliminary approval of the settlement. *See Betorina v. Randstad US, L.P.*, No. 15-CV-03646-EMC, 2017 WL 1278758, at \*5 (N.D. Cal. Apr. 6, 2017) (analyzing the first three *Churchill* factors together).

The risks inherent in further litigation are significant. This is a complex case that requires complicated assessments of PG&E's wildfire prevention efforts, its de-energization efforts and processes, and its inspection protocols. The documentary and expert evidence that the parties may present at trial or summary judgment will be similarly complex, may be susceptible to different interpretations, and might lose the jury in a complicated morass. In addition, the Parties dispute the amount of damages and the method by which those damages are calculated. A jury, or this Court at summary judgment, may find in favor of Defendants on the merits, or on the amount of damages or the method by which those damages are calculated.

Plaintiffs face risks proving their core de-energization theory. As ramshackle as the de-energizations seemed, they worked. In 2019, to Plaintiffs' knowledge, no Californians died in wildfires sparked by PG&E equipment. The largest of these 2019 wildfires, the Kincade fire, burned 77,000 acres and damaged 400 structures. ¶316. The Camp Fire blazed through twice as many acres and damaged fifty times as many structures. No deaths were conclusively linked to the de-energizations.

Plaintiffs also face risks proving their other theories. Plaintiffs have no reason to suspect that PG&E did not inspect its equipment or remove vegetation. Instead, Plaintiffs allege that PG&E did so poorly. To prove that these statements were false, Plaintiffs would need to show that the Defendants had detailed knowledge of how these tasks were completed. This would not be easy in

a company with 24,000 employees, multitudinous operations, and a CEO who began working for PG&E a week before his first allegedly false statement and six months before the close of the Settlement Class Period.

The scope of discovery would be immense. At issue in this case are PG&E's efforts to operate safely during a year in which making its operations safe was purportedly its most important goal. Thus, this case touches on a large portion of everything PG&E did in 2019. Plaintiffs would have to analyze millions, or perhaps tens of millions, of documents. Moreover, Defendants made their allegedly false statements in dozens of legislative and regulatory hearings, workshops, and court filings, over 8 months in which the facts on the ground shifted. Plaintiffs would have to prove the Defendants' state of mind for each statement each time they spoke.

During the Class Period, PG&E saw turnover in both executive and non-executive positions. Further, PG&E's efforts involved many executives. And either PG&E or Plaintiffs would likely seek the depositions of the stakeholders who offered much of the information set out in the Complaint. With so many relevant persons, the Parties would likely seek at least 50 merits depositions, and may need more. These depositions would cost both the Parties' and witnesses' time and money.

This case would require experts. Plaintiffs have already retained consulting financial and energy industry experts. Were this case to proceed, Plaintiffs would need testifying experts on, at a minimum, financial matters, de-energization, vegetation management, and safety inspections.

Nor could this case be resolved quickly. The time from filing a securities class action to victory on appeal regularly exceeds a decade. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 232 (2d Cir. 2016) (securities class action filed in 2002 affirmed in 2016); *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 413 (7th Cir. 2015) (appellate decision in 2015 following verdict in favor of plaintiffs remanding case brought in 2002 for further proceedings). The inevitable delay supports approval. *See Rodriguez*, 563 F.3d at 966 ("Inevitable appeals would likely prolong the litigation, and any recovery by class members, for years. This factor, too, favors the settlement.").

Hence, the strength of Plaintiffs' case balanced against the risk, delays, and expense of litigation – assuming that Plaintiffs prevailed on the pending motion to dismiss – support

preliminary approval. *Rinky Dink*, 2016 WL 4052588, at *5 (finding first three *Churchill* factors supported preliminary approval when plaintiffs were confident in their case but continuing to litigate risked losing class certification and was "inherently expensive"); *Ikuseghan v. Multicare Health Sys.*, No. 3:14-CV-05539-BHS, 2016 WL 3976569, at *4 (W.D. Wash. July 25, 2016) ("Absent the proposed Settlement, Class Members would likely not obtain relief, if any, for a period of years.").

Moreover, one issue might moot all of the parties' work. Between the myriad developments in its bankruptcy, comments and actions from its regulators and public officials, developments in its criminal proceedings, and developments in fires set by its equipment, 2020 was the most eventful year of PG&E's history. With PG&E buffeted by a constant stream of material news, PG&E's stock price swayed up and down nearly daily.

Experts typically determine whether a stock price movement on a particular from the revelation of material news by comparing the movement on that day to average stock price movements. Because PG&E's stock price was so volatile, all but 3 of the stock price disclosures identified in the Complaint are not statistically different from an average day. The days are only statistically significant compared to the average stock price movements in the year before the Class Period. While Plaintiffs' expert believes it is appropriate to compare Class Period movements to the previous year's volatility, there are strong counterarguments. Moreover, only one of the statistically significant disclosures is connected to Plaintiffs' core de-energization theory.

Thus, Defendants could substantially end this case on a *Daubert* motion filed with summary judgment after full discovery on a purely technical issue because of a position Plaintiffs have no choice but to take. Worse, after the expenses of a trial, the jury or the Ninth Circuit could find against Plaintiffs' expert on this technical issue. This threat, entirely unrelated to the merits, would haunt Plaintiffs' case right until Plaintiffs achieved complete victory on appeal.

Finally, PG&E's resources, while obviously substantial, are not unlimited. Indeed, the 2017 and 2018 wildfires pushed PG&E into bankruptcy and during the Class Period, investors feared that further wildfires would eliminate equity claims. ¶321. At the end of the Class Period and for some months thereafter, the people of California, their legislators, their governor, and even

12

their Public Utilities Commission seriously discussed breaking PG&E up, municipalizing its grid, revoking its license to operate, or imposing other sanctions. *E.g.* ¶¶ 66-67, 154, 158. Any drastic actions against PG&E might imperil its ability to pay out on a judgment in this case.

### 2. The Settlement Recovers a Reasonable Proportion of Damages

The amount offered in settlement also weighs in favor of preliminary approval. Courts typically weigh the relief obtained in the settlement against the possible relief that could be obtained at trial. *See, e.g. Ikuseghan*, 2016 WL 3976569, at *4 (comparing value obtained in TCPA settlement against possible recovery at trial). That said, the settlement should not be rejected just because the amount of the settlement is small compared to the best possible result. *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 628 (9th Cir. 1982) ("[A] cash settlement amounting to only a fraction of the potential recovery will not per se render the settlement . . . unfair.").

According to a recent review of securities class action settlements, cases alleging damages of $250 million and $499 million typically settle for about 1% of total damages. Laarni T. Bulan *et al*, Securities Class Action Settlements: 2019 Review and Analysis (Cornerstone Research).[3] Plaintiffs' expert estimates that damages from their core case based on false de-energization statements are $468 million.[4] The $10 million recovers slightly more than 2% of these damages, which is roughly the median percentage of investor losses recovered in securities class action settlements. *See Heritage Bond*, 2005 WL 1594403, at *8-*9 (average recovery between 2% to 3% of maximum damages).

### 3. Many of the Relevant Facts Were Set Out in Public Proceedings

Next, the extent of discovery completed and the stage of the proceedings demonstrate that the parties "had enough information to make an informed decision about the strength of their cases

---

[3] Available at https://www.cornerstone.com/Publications/Reports/Securities-Class-Action-Settlements-2019-Review-and-Analysis

[4] Damages would increase to $2.0 billion if Plaintiffs pled and proved their exceptionally difficult claims based on false statements concerning PG&E's vegetation management and fire inspection programs.

13

and the wisdom of settlement." *Rinky Dink*, 2016 WL 4052588, at *5. Though Plaintiffs did not conduct discovery, they had the benefit of dozens of briefs filed in multiple public proceedings in which stakeholders described in detail how PG&E had failed to involve them in planning for de-energization events and failed to conduct them properly, along with PG&E's responses thereto. Plaintiffs also learned the facts of, and PG&E's responses to, deficiencies in its vegetation management and inspection programs through filings in PG&E's criminal case. Thus, Plaintiffs had far more information in this case than is typical for a pre-discovery settlement. Plaintiffs also benefited from airing legal issues through the Parties' memoranda in connection with Defendants' motion to dismiss. The parties were fully informed about all significant issues, and capable of assessing the benefits of the proposed settlement. *See Ikuseghan*, 2016 WL 3976569, at *3 (approving settlement reached "between experienced attorneys who are familiar . . . with the legal and factual issues of this case in particular"). Thus, this factor supports preliminary approval.

### 4. Experienced Counsel Believe the Settlement Is In the Best Interests of the Settlement Class

The final *Churchill* factor also demonstrates that the proposed settlement warrants preliminary approval. Lead Counsel have over 45 combined years of experience and expertise in litigating securities actions. The Plaintiffs were consulted throughout the litigation and had ample opportunity to assess the strengths of the claims in which to appraise the sufficiency of the settlement, which he approved. *See e.g.*, *Rodriguez*, 563 F.3d at 967 ("[P]arties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation.") (citing *In re Pac. Enterprises Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995)); *Ikuseghan*, 2016 WL 3976569, at *4 (considering that class counsel, "who are experienced and skilled in class action litigation, support the [s]ettlement as fair, reasonable, and adequate, and in the best interests of the [c]lass as a whole," and approving settlement).

The Settlement provides a reasonable recovery given the risks of further litigation. The Court should grant preliminary approval and allow Settlement Class Members to be heard.

## IV. THE COURT SHOULD PRELIMINARILY APPROVE THE PROPOSED PLAN OF ALLOCATION

The proposed Plan of Allocation, which is detailed in the Notice, will govern the allocation

14

of settlement proceeds among Settlement Class Members who timely file a Claim Form. Courts in this Circuit typically approval a plan of allocation, so long as "the proposed plan is rationally related to the relative strengths and weaknesses of the respective claims asserted." *Rosenburg v. I.B.M.*, No. CV06-00430PJH, 2007 WL 128232, at *5 (N.D. Cal. Jan. 11, 2007). Lead Counsel prepared the proposed plan of allocation in consultation with Plaintiffs' damages expert. The Plan rationally reflects compensable damages suffered by Settlement Class Members. All Settlement Class members are treated equally under the plan.

The only agreement made in connection with the Settlement – other than the Settlement itself – is the parties' confidential Supplemental Agreement, which sets forth certain conditions under which Defendants may terminate the settlement if requests for exclusion from the settlement Class exceed a certain amount, which is kept confidential ("Termination Threshold"). *See* Stip. ¶L-2. This type of agreement is common in class actions and does not render a settlement unfair. *See Hefler v. Wells Fargo & Co.*, No. 16-CV-05479-JST, 2018 WL 6619983, at *7 (N.D. Cal. Dec. 18, 2018) ("[t]he existence of a termination option triggered by the number of class members who opt out of the Settlement does not by itself render the Settlement unfair."). Thus, the Plan of Allocation will fairly and equitably distribute the proceeds among Settlement Class members who submit valid claims.

## V.    THE INTENDED REQUEST FOR ATTORNEYS' FEES, LITIGATION EXPENSES, AND PLAINTIFFS' EXPENSES

As explained in the Postcard Notice, Summary Notice, and Internet Notice, Lead Counsel intend to seek an award of attorneys' fees of up to 25% of the Settlement Amount and reimbursement of litigation expenses not to exceed $100,000 plus interest earned thereon. Lead Counsel will provide much more detailed information in support of their application in its motion for attorneys' fees and expenses, to be filed with the Court 35 days before the final Settlement Hearing. However, for purposes of the Court's preliminary review in connection with this motion for preliminary approval of the Settlement, Lead Counsel notes that the maximum fee they may request is the "benchmark" established by the Ninth Circuit. *See, e.g.*, *Staton v. Boeing Co.*, 327 F.3d 938, 968 (9th Cir. 2003) ("This Circuit has established 25% of the common fund as a

15

benchmark award for attorney fees.").

Accordingly, a "25% benchmark award is presumptively reasonable" under the circumstances. *See In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, No. 4:14-MD-2541-CW, 2017 WL 6040065, at *2 (N.D. Cal. Dec. 6, 2017) ("The 25% benchmark award is presumptively reasonable, reflecting a market based fee."); *see also Craft v. Cty. of San Bernardino*, 624 F. Supp. 2d 1113, 1127 (C.D. Cal. 2008) ("Cases of under $10 million will often result in result in fees above 25%.").

Lead Counsel also intend to seek reimbursement of their litigation expenses in an amount not to exceed $100,000 which includes substantial work with a damages expert and an investigator. Again, Lead Counsel will provide appropriate detail in support of any request for reimbursement of litigation expenses in connection with its fee application at final approval.

Finally, pursuant to the PSLRA (15 U.S.C. §§ 77z-1(a)(4) and 78u-4(a)(4)), Lead Counsel also will seek an award on behalf of the representative Plaintiffs to recover unreimbursed costs (including the cost of time spent) for the work they performed on behalf of the Settlement Class. Here, Lead Counsel will request $5,000 for each Plaintiff (or an aggregate of $15,000). Among the tasks Plaintiffs have performed in executing their duties and responsibilities as representatives in this Action include: (a) reviewing the complaints and briefing; (b) communicating with Lead Counsel via email and telephone about case developments and litigation strategy; (c) evaluating the Settlement Amount, conferring with counsel, and ultimately approving the Settlement; and (d) communicating with counsel regarding the process of finalizing the Settlement. Joint Decl. ¶ 24. It is well below reimbursement awards in similar complex cases. *See, e.g.*, *Todd v. STAAR Surgical Co.*, No. CV145263MWFGJSX, 2017 WL 4877417, at *6 (C.D. Cal. Oct. 24, 2017) ($10,000 award); *In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1173–74 (S.D. Cal. 2007) ($40,000 reimbursement to lead plaintiff); *Razilov v. Nationwide Mut. Ins. Co.*, No. 01-CV-1466-BR, 2006 WL 3312024, at *1 (D. Or. Nov. 13, 2006) ($10,000 incentive awards to class representatives).

In addition, Lead Counsel requests that any award of fees and expenses be paid at the time

the Court makes its award. Such so-called quick-pay provisions are permissible. *See In re Genworth Fin. Sec. Litig.*, 210 F. Supp. 3d 837, 846 (E.D. Va. 2016) (ordering that "attorneys' fees and Litigation Expenses awarded above may be paid to Lead Counsel immediately upon entry of this Order"). Indeed, they are "common." *Pelzer v. Vassalle*, 655 F. App'x 352, 365 (6th Cir. 2016) *citing* Brian T. Fitzpatrick, *The End of Objector Blackmail?*, 62 Vand. L. Rev. 1623, 1625–26 (2009).

## VI.   THE PROPOSED CLASS NOTICE SHOULD BE APPROVED

Rule 23(c)(2)(B) of the Federal Rules of Civil Procedure requires that notice of a settlement be "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *See also* Fed. R. Civ. P. 23(e)(1) ("The court must direct notice in a reasonable manner to all class members who would be bound by the propos[ed settlement]."). Moreover, "[n]otice is satisfactory if it 'generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.'" *Rodriguez*, 563 F.3d at 962; *see also Sandoval v. Tharaldson Employee Mgmt., Inc.*, No. EDCV 08-482-VAP(OP), 2010 WL 2486346, at *11 (C.D. Cal. June 15, 2010) ("The notice must explain in easily understood language the nature of the action, definition of the class, class claims, issues and defenses, ability to appear through individual counsel, procedure to request exclusion, and binding nature of a class judgment.").

In accordance with the proposed Preliminary Approval Order, Lead Counsel will cause the Claims Administrator to mail the Postcard Notice, in substantially the form of Exhibit A-4 to the Stipulation, to those members of the Class as may be identified through reasonable effort. In addition, the Claims Administrator will solicit nominees for lists of their customers who may be Settlement Class Members and either provide the nominees with sufficient copies of the Postcard Notices or mail directly to these Settlement Class Members. The Claims Administrator will publish the Summary Notice, in substantially the form of Exhibit A-3 to the Stipulation, through a newswire service with wide circulation. The Claims Administrator will also post the Internet Notice, in substantially the form of Exhibit A-1 to the Stipulation, on a case-specific website, along with the Summary Notice, Postcard Notice, Stipulation of Settlement, Preliminary Approval

Order, Complaint, and other important documents.

The Settlement Administrator shall also, among other things, receive Proofs of Claim and determine whether they present valid clams in whole or part, work with Class Members as needed to help them supplement or clarify their Proofs of Claim, and determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund based upon each Authorized Claimant's Recognized Claim compared to the total Recognized Claims of all Authorized Claimants (as set forth in the Plan of Allocation, or in such other plan of allocation as the Court approves).

In addition, Rule 23(h)(1) requires that "[n]otice of the motion [for attorneys' fees] must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner." The proposed Postcard Notice satisfies the requirements of Rule 23(h)(1), as it notifies Class members that Class Counsel will apply to the Court for attorneys' fees in the amount of 25% of the total Settlement and for reimbursement of reasonable litigation expenses not to exceed $100,000, to be paid from the Settlement Fund. The Postcard Notice also notes the application for a Compensatory Award not to exceed $5,000 each to Plaintiffs for the time spent consulting with Lead Counsel throughout the litigation to date. Once they are filed, the Claims Administrator will post a copy of Plaintiffs' Motions in support of final approval and for an award of fees on the case website, along with supporting documents.

The proposed Notice includes all of the information required by the PSLRA, Federal Rules of Civil Procedure, and Due Process. The proposed Notice describes the proposed Settlement and sets forth, among other things: (1) the nature, history, and status of the litigation; (2) the definition of the proposed Settlement Class and who is excluded; (3) the reasons the parties have proposed the Settlement; (4) the amount of the Settlement Fund; (5) the estimated average distribution per damaged share; (6) the Settlement Class's claims and issues; (7) the parties' disagreement over damages and liability; (8) the maximum amount of attorneys' fees and expenses that Lead Counsel intends to seek in connection with final Settlement approval; (9) the maximum amount Plaintiffs' Counsel will request for reimbursement of costs and expenses; and (10) the plan for allocating the Settlement proceeds to the Settlement Class.

Further, the proposed Postcard Notice discusses the rights Settlement Class members have

18

in connection with the Settlement, including (1) the right to request exclusion from the Settlement Class and the manner for submitting a request for exclusion; (2) the right to object to the Settlement, or any aspect thereof, and the manner for filing and serving an objection; and (3) the right to participate in the Settlement and instructions on how to complete and submit a Proof of Claim to the Claims Administrator.

The notice program and the form and content of the Notice and Summary Notice satisfies all applicable requirements of both the Federal Rules of Civil Procedure and the PSLRA. [5] Accordingly, in granting preliminary approval of the Settlement, the Court should also approve the proposed form and method of giving notice to the Class.

Plaintiffs propose the following schedule:

| | |
|---|---|
| Notice mailed to Settlement Class | 14 calendar days after entry of the Preliminary Approval Order |
| Summary Notice published | 21 calendar days after entry of the Preliminary Approval Order |
| Deadline for papers in support of settlement, fee and expense award, and compensatory award | 35 calendar days before the final approval Settlement Hearing |
| Objection deadline | 21 calendar days prior to the final approval Settlement Hearing |
| Opt-Out deadline | 21 calendar days prior to final approval Settlement Hearing |
| Deadline for response to objections and other reply papers in support of Settlement | 14 calendar days before the final approval Settlement Hearing |

[5] This Settlement is comparable to two other Exchange Act case litigated by Lead Counsel: *Bruce v. Suntech Power Holdings Co.*, et al., No. 12-cv-04061 (N.D. Cal.) ("*Suntech*") (final approval granted on February 12, 2016 (*see* Dkt. No. 163)) and In re Silver Wheaton Corp. Sec. Litig., No. 2:15-cv-05146-CAS-PJWx (C.D. Cal.) In *Suntech*, the total settlement fund was $5 million, the total number of class members was approximately 50,000, and notice packets were mailed to more than 87,000 class members and their nominees. As here, the *Suntech* settlement included mailed and published notice. In *Suntech*, approximately 8,000 claim forms were submitted (or 16% of the total class), the average recovery per class member was $153, there was no *cy pres distribution*, and administrative costs were approximately $200,000. The *Suntech* court awarded attorneys' fees totaling $1,400,000 (or 28% of the Settlement amount) as well as $95,000 in unreimbursed expenses. In *Silver Wheaton*, the total settlement fund was $41.5 million, notice packets were mailed to at least 482,000 potential class members, almost 36,000 claims were submitted, of which at least 10,385 were accepted (class members who submitted defective claims still have time to cure defects), and the court awarded $12.45 million in attorneys' fees (30% of the settlement amount) as well as $1.09 million in expenses. Joint Del. ¶ 26.

19

| Deadline to submit Proofs of Claims to Claims Administrator | 44 calendar days prior to the fFinal approval Settlement Hearing |
| --- | --- |
| Final approval Settlement Hearing | To be determined by the Court, approximately 100 days after entry of the Preliminarily Approval Order |

## VII.   THE COURT SHOULD CERTIFY THE CLASS FOR SETTLEMENT PURPOSES

This Court should also preliminarily certify a Settlement Class.  The Ninth Circuit has long recognized that class actions may be certified for the purpose of settlement only as long as the class meets the certification requirements under Rule 23.  *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). Indeed, "securities fraud cases fit Rule 23 like a glove." *Booth*, 2015 WL 3957746, at *9.

Rule 23(a) sets forth four prerequisites to class certification: (i) numerosity; (ii) commonality; (iii) typicality; and (iv) adequacy of representation.  In addition, the class must meet one of the three requirements of Rule 23(b).  *See* Fed. R. Civ. P. 23.  Here, the proposed Class consists of all persons and entities who purchased the common stock of PG&E on the New York Stock Exchange between December 13, 2018, and October 28, 2019, as alleged in the Complaint.[6]

Securities claims are particularly well suited for class treatment because they let private actors supplement civil and criminal proceedings where there are numerous investors with small individual claims who otherwise would have no reason to litigate.  *See Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir. 1975).  This action is no exception and, as explained below, the proposed Class satisfies each of the requirements of Rule 23.

### A.  Numerosity

---

[6] To avoid violating the automatic bankruptcy stay, the Class Period pled in the Complaint as to PG&E opened with its January 30, 2020 bankruptcy petition, though as to all other Defendants, the Class Period began in mid-December 2019. To avoid confusing Settlement Class Members, the Settlement Class Period as to PG&E has been expanded to include the entire Class Period. There are no other changes between the Class Period pled in the Complaint and the Settlement Class Period.

Rule 23(a)(1) requires that the class be so numerous that joinder of all class members is impracticable.  Classes consisting of 25 members have been held to be large enough to justify certification.  *See Perez-Funez v. Dist. Dir., I.N.S.*, 611 F. Supp. 990, 995 (C.D. Cal. 1984). "Some courts have assumed that the numerosity requirement is met in securities fraud suits involving nationally traded stocks." *In re UTStarcom, Inc. Sec. Litig.*, No. C 04-04908 JW, 2010 WL 1945737, at *4 (N.D. Cal. May 12, 2010)

Here, billions of shares of PG&E common stock were traded during the Class Period.  In addition, beneficial holders of PG&E plainly number in the thousands and are geographically located throughout the United States and the world, making joinder of all class members impracticable.  Thus, the numerosity element is satisfied.

**B.  Commonality**

Rule 23(a)(2) is satisfied where the proposed class representative shares at least one question of fact or law with the claims of the prospective class.  *Wehner v. Syntex Corp.*, 117 F.R.D. 641, 644 (N.D. Cal. 1987). Further, commonality tolerates variation among individual members of the class as long as the claims of the plaintiff and other class members are based on the same legal or remedial theory.  *Blackie*, 524 F.2d at 902.  Here, questions that are common to the proposed Class include, among others: (i) whether Defendants' alleged acts violated the federal securities laws; (ii) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about PG&E; (iii) whether the price of PG&E common stock was artificially inflated during the Class Period; and (iv) to what extent the members of the Class have sustained damages and the proper measure of such damages. Securities actions containing such common questions are prime candidates for class certification.

In short, because the core complaint of all class members is that they purchased PG&E common stock at artificially-inflated prices and suffered damages as a result of the alleged securities violations, the commonality requirement of Rule 23(a)(2) is satisfied.  *See In re Wireless Facilities, Inc. Sec. Litig.*, 253 F.R.D. 630, 635 (S.D. Cal. 2008) (finding "core issue" in a securities litigation to be plaintiffs' acquisition of "[defendant's] common stock at artificially inflated

prices").

## C.  Typicality

"The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). "The requirement of typicality is not primarily concerned with whether each person in a proposed class suffers the same type of damages; rather, it is sufficient for typicality if the plaintiff endured a course of conduct directed against the class." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1118 (9th Cir. 2017). Differences in the amount of damages, the size or manner of purchase, the nature of the purchaser, and the date of purchase are insufficient to defeat class certification.  *See id.* Rather, in a securities class action, where the plaintiffs assert that defendants disseminated allegedly false or misleading statements, the claims and nature of the evidence are generally considered sufficient to satisfy the typicality requirement." *Ciuffitelli v. Deloitte & Touche LLP*, No. 3:16-CV-00580-AC, 2019 WL 1441634, at *13 (D. Or. Mar. 19, 2019), *report and recommendation adopted,* No. 3:16-CV-00580-AC, 2019 WL 2288432 (D. Or. May 29, 2019).

Here, Plaintiffs' and the Settlement Class Members' claims arise from the same alleged conduct by Defendants.  Plaintiffs allege that, like the other members of the Class, they purchased PG&E common stock at prices that were inflated because Defendants, in violation of the federal securities laws, made false and materially misleading statements and omissions during the Class Period.  The proof that Plaintiffs would present to establish their claims would also prove the claims of the rest of the Class.  Further, Plaintiffs are not subject to any unique defenses that could make them atypical members of the Class.

## D.  Adequacy

A representative party satisfies Rule 23(a)'s adequacy requirement by showing that it will fairly and adequately protect the interests of the class.  To satisfy this requirement, the proposed class representative must be free of interests that are antagonistic to the other members of the class, and counsel representing the class must be qualified, experienced, and capable of conducting the

litigation. *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978) (citation omitted); *Hanlon*, 150 F.3d at 1020.

Plaintiffs' claims are typical of and coextensive with those of the Class. Plaintiffs, like all class members, purchased PG&E common stock during the Class Period that was artificially inflated by Defendants' allegedly materially false and misleading statements and omissions, and were damaged thereby.

Further, Plaintiffs have retained counsel highly experienced in securities class action litigation, who have successfully prosecuted many securities and other complex class actions throughout the United States. Thus, Plaintiffs are an adequate representative of the proposed Class, and their counsel is qualified, experienced, and capable of prosecuting this action, in satisfaction of Rule 23(a)(4).

**E. Common Questions of Law Predominate and a Class Action Is the Superior Method of Adjudication**

Finally, in addition to the four requirements of Rule 23(a), a class must also satisfy one of the three requirements of Rule 23(b). Here, little question exists that a class action is superior to other available methods for litigation of the claims asserted here, as required by Rule 23(b)(3). To ensure that a class action is more efficient than individual actions, Rule 23(b) requires that common issues predominate over issues that are particular to a class representative. In a securities class action, "whether Defendants' disseminated releases and statements during the Class period misrepresented material facts, outweigh any individual issues that may arise." *In re Illumina, Inc. Sec. Litig.*, No. 3:16-CV-3044-L-MSB, 2019 WL 6894075, at *10 (S.D. Cal. Dec. 18, 2019)

Further, "the superiority of class actions in large securities fraud [matters] is well recognized." *In re Intelcom Grp., Inc. Sec. Litig.*, 169 F.R.D. 142, 149 (D. Colo. 1996). The predominance test is met in this action: the same set of operative facts and a single proximate cause applies to each class member. Further, if Plaintiffs and each of the class members were to bring individual actions, they each would be required to prove the same wrongdoing by Defendant to establish liability, showing superiority. *See Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir.

1985) (class actions are a particularly appropriate and desirable means to resolve claims based on securities laws).

Thus, all of the requirements of Rule 23(a) and (b) are satisfied and the Court should certify the proposed Class for settlement purposes and appoint Lead Plaintiffs as the class representatives.

## VIII. THE COURT SHOULD APPROVE LEAD COUNSEL'S SELECTION OF CLAIMS ADMINISTRATOR

Lead Counsel retained the Claims Administrator, A.B. Data, Ltd., to provide (i) notice of the proposed Settlement to investors who make up the Settlement Class; and (ii) the administration of the claims process. Before retaining A.B. Data, Lead Counsel solicited requests for proposals for notice and administration of the Settlement from four experienced settlement administrators. Lead Counsel then compared the responses, taking into consideration each administrator's estimated cost to administer the entire Settlement, the cost of the notice program, the cost of each processed Claim, and each administrator's guaranteed maximum claims administration fee. Joint Decl. ¶ 12. Lead Counsel also considered certain fixed costs associated with the administration of the settlement, such as the construction and maintenance of the settlement website. *Id.*

Lead Counsel rejected one bid because it assumed ten times fewer claims than the other competing bids. Of the remaining bids, A.B. Data had both the lowest fees and the lowest guaranteed maximum fee. *Id.*

In the past two years, A.B. Data has administered, or is currently administering, the following settlements in which Rosen Law was sole Lead or Co-Lead Counsel: *In re Sequans Communications S.A. Securities Litigation*, 17-cv-4665-FB-SJB (E.D.N.Y.); *In re Blue Apron Holdings, Inc. Sec. Litig.*, 17-cv-4846-WFK-PK (E.D.N.Y.). In the past two years, A.B. Data has administered, or is currently administering, the following settlements in which Pomerantz was sole Lead or Co-Lead Counsel: *In re Juno Therapeutics, Inc.*, 16-cv-1069 (W.D. Wash.); *Cooper v. Thoratec Corporation*, 14-cv-00360 (N.D. Cal.); *In re Sequans Communications S.A. Securities Litigation*, 17-cv-4665 (E.D.N.Y.); *In re Blue Apron Holdings, Inc. Sec. Litig.*, 17-cv-4846

24

(E.D.N.Y.); *Enriquez, et al. v. Nabriva Therapeutics PLC, et al.*, 19-cv-04183 (S.D.N.Y.). A.B. Data's fees for administration of the Settlement will be charged per-service. So long as no more than 1,000,000 postcards are mailed, A.B. Data will not charge more than $500,000 (including out-of-pocket expenses).  Joint Decl. ¶14..

At this time, A.B. Data estimates that the Notice and Administration Costs, *i.e.*, the anticipated costs administering the proposed postcard notice, processing Claims, and distributing the Net Settlement Fund, among others, will be approximately $265,000 (or 2.7% of the Settlement Amount). Joint Decl. ¶ 17. These costs are necessary in order to effectuate the Settlement and are reasonable in relation to the value of the Settlement. If the Settlement is preliminarily approved, the Notice and Administration Costs will be paid from the Settlement Fund.[7]

## IX.   CONCLUSION

The Court should enter the Proposed Order Preliminarily approving partial settlement and providing for notice, which will: (i) preliminarily approve the partial Settlement; (ii) certify the Class for settlement purposes; (iii) approve the form and manner of giving notice of the Settlement to the Settlement Class; and (iv) set a Final Approval Hearing date and time to consider final approval of the partial Settlement and related matters and establish a schedule for various deadlines in connection with the Settlement.

Dated: February 16, 2021                     Respectfully submitted,

**POMERANTZ LLP**

*/s/ Louis C. Ludwig*_____
Patrick V. Dahlstrom
Louis C. Ludwig
 (*admitted pro hac vice*)
Jared Schneider
(*admitted pro hac vice*)

Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603

---

[7] A.B. Data estimates that, based on PG&E's trading history during the Settlement Class Period, about 400,000 Postcard Notices will be mailed to potential Settlement Class Members.

25

Telephone: (312) 377-1181
Facsimile: (312) 229-8811
Email: lcludwig@pomlaw.com
Email: jschneider@pomlaw.com

Jeremy A. Lieberman
(*admitted pro hac vice*)
J. Alexander Hood II
(*admitted pro hac vice*)
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: ahood@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
Email: jpafiti@pomlaw.com


**THE ROSEN LAW FIRM, P.A.**
*/s/Laurence M. Rosen*
Laurence M. Rosen (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Jonathan Horne (*pro hac vice*)
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: jhorne@rosenlegal.com

*Co-Counsel for Co-Lead Plaintiffs*

**THE SCHALL LAW FIRM**
Brian Schall
Sherin Mahdavian
Rina Restaino, Esq.
1880 Century Park East, Suite 404
Los Angeles, CA 90067

Telephone: (424) 303-1964
Email: brian@schallfirm.com
sherin@schallfirm.com
rina@schallfirm.com

*Additional Counsel for Plaintiff Allustiarti*

## **LOCAL RULE 5-1 ATTESTATION**

I, Laurence M. Rosen, am the ECF User whose ID and password are being used to file this PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT. In compliance with Local Rule 5-1(i)(3), I hereby attest that the other signatory to this document, Louis C. Ludwig, concurred in the filing of this document.

Dated: February 16, 2021          */s/Laurence M. Rosen*
                                  Laurence M. Rosen