Validation of Aggregate Damage Estimates in Securities Class Actions

Narinder Walia and Adam Werner

February 16, 2021

Narinder Walia (linkedin/nwalia) is a consultant at Crowninshield Financial Research Inc. Adam Werner (linkedin/awerner) is an affiliated expert at the firm, and a lecturer in economics at Cal Poly San Luis Obispo. The opinions expressed in this paper are strictly those of the two authors and do not reflect the opinions of Crowninshield. The authors can be reached at nwalia@cfrllc.com and awerner@cfrllc.com.

**Validation of Aggregate Damage Estimates in Securities Class Actions**

How accurate are the aggregate damages estimated by Plaintiffs in securities class actions relative to investors' actual damages? Until recently, there was not any credible evidence for or against the accuracy of Plaintiffs' damages estimates. A study[1] published last year by Cornerstone Research provides the best evidence we have seen that sheds light on the aforementioned question. This note supplements Cornerstone's findings, and extends their analysis, to document systematic differences in the accuracy of damage estimates contingent on the size of the actual damages.

The use of aggregate damage estimates in securities class actions has quietly disappeared from expert testimony presented to courts prior to settlement. Aggregate damages are still routinely calculated by both Plaintiffs and Defendants for use in settlement negotiations and mediations but are rarely presented in motions and reports that are subject to cross examination. One reason for this trend is the increasing assault on the investors' trading models that are used to convert per-share damages (also known as 'inflation') into aggregate damage figures for the entire Class.

Trading models are representations of the actual trading behavior of individual investors. These models come in a few different flavors, the most common being the Single-Trader Model ('STM', sometimes referred to as the Proportional Trading Model) and the Two-Trader Model ('TTM', an example of the generalized class of Multi-Trader Models). In the Single-Trader Model, all investors are assumed to be identical to one another and they trade with the same

---

[1] "Approved Claims Rates in Securities Class Actions: Evidence from 2015–2018 Rule 10b-5 Settlements", by Catherine Galley, Nick Yavorsky, Filipe Lacerda, and Chady Gemayel of Cornerstone Research. Downloaded from https://www.cornerstone.com/Publications/Articles/Approved-Claims-Rates-in-Securities-Class-Actions-Evidence-from-2015-2018-Rule-10b-5-Settlements/Approved-Claims-Rates-in-Securities-Class-Actions—Evidence-from-2015–201.pdf (© 2020 by Cornerstone Research, Inc.).

frequency. In the Two-Trader Model, investors are of two types - a small subset that trades at a high frequency and the remaining investors who trade at a low frequency. The most common TTM assumes that roughly 20% of investors account for approximately 80% of daily trading volume. These two models are highly simplified characterizations of thousands of investors in a typical security, each of whom has their unique trading outlook and behaviors. But simplicity in and of itself is not the primary reason for the decline in their legal usage of trading models.

The value of any economic model lies in the accuracy of its predictions or estimates compared to the actual observed outcomes. Until recently, trading models used in securities class actions had never really been robustly tested in this regard and, as a result, they have become vulnerable to valid criticisms. Courts are understandably reluctant to sanction their use, absent credible evidence that these models actually work.[2] In other words, can we trust that aggregate damages calculated using these models are, on average, reliable estimates of the actual total damages suffered by the Class?

One challenge in answering this question is that we cannot measure total damages directly, even after the settlement distribution has concluded. Typically, claims administrators estimate the "total recognized loss" (also known as "approved claims") based on valid damage claims submitted by investors. In a perfect world, total approved claims should be identical to total damages if all damaged investors file properly documented claims, but this is hardly ever the case. In practice, total approved claims are smaller than total actual damages by some uncertain amount, but approved claims are still the best proxy we have for actual damages.

---

[2] In *Kaufman v. Motorola Inc.,* the Northern District Court of Illinois rejected the testimony of Dr. Gregg A. Jarrell regarding the Single-Trader Model used in securities class actions to estimate aggregate damages. The Court noted that, "the model has never been tested against reality." In the *Broadcom Corp. Securities Litigation* case the Court precluded the use of the Two-Trader Model to generate an aggregate damages estimate, noting that the model "has not been tested against "real world" conditions."

**Interpreting Cornerstone's Approved Claims Rate**

The headline finding of the Cornerstone study is that in their sample of 102 settlements in Rule 10b-5 cases the actual valid claims submitted by the Class and approved by the claims administrator are, on average, 66% of total damages estimated by Plaintiffs. Cornerstone calls this number the "approved claims rate." This ratio of approved claims to estimated damages can be thought of as a test of a damages estimation model's accuracy. With a perfect damages model, and a well administered claims process, the approved claims rate should be approximately 100%. While 66% may appear to be a relatively low figure in this context, one has to consider the following details to put this number in perspective.

First, the approved valid claims (in the numerator of the approved claims rate) as determined by the claims administrators are almost always lower than the actual damages suffered by the Class. It is highly unlikely that every single member of the Class will file a claim. Even the most diligent claims administrator is unlikely to reach every one of the thousands or tens of thousands of Class members. And amongst those investors who file a valid claim, a subset is typically disqualified due to improper or missing documentation. Also, if the damages to an investor are small, they may rationally choose not to bother with filing a claim. Hence the numerator in the approved claims rate almost always understates the actual damages to the Class. Even with a perfect damages model used to calculate the denominator, one would expect the approved claims rate to be below 100%.

Second, claims administrators usually apply additional filters to deny claims by certain Class members who file otherwise valid claims for reimbursement. For example, shares acquired as a gift or inheritance are sometimes excluded from claims. These exclusions from valid claims

are not directly modeled in the STM or TTM based damage calculations. Hence, the total valid claims approved by claims administrators will necessarily be lower than the total damages calculated by an otherwise perfect model that does not incorporate these exclusions. Again, this results in the expected approved claims rate being less than 100%.

Third, when faced with a range of estimates for Plaintiffs' aggregate damages, Cornerstone chose to use the highest estimate of the range in their calculation of the approved claims rate. This could be misleading, and it results in an understated approved claims rate. In many cases, the range of aggregate damage estimates are bookended by the STM estimate on the high end and the TTM estimate on the low end. The TTM is generally a closer representation of actual trading patterns and, in practice, most economics Experts have recognized this and moved away from the use of STM. Had Cornerstone chosen the lower estimate of aggregate damages in the denominator, the average approved claims rate in their study would be significantly higher than 66%.

Fourth, before the publication of the Cornerstone study, there did not exist any reliable, large-sample benchmark for the approved claims rate. Anecdotal numbers in the range of 20% to 30% were often cited[3] but these were based on just one or two datapoints. Even without the caveats noted above, the average approved claims rate of 66% based on a sample of 102 class actions is a significant upgrade to the evidence supporting aggregate damage estimates. After making corrective adjustments to Cornerstone's calculations, this rate is likely in the 80% to 90% range. In other words, damage estimates calculated using the TTM are, on average, quite close to the total approved damage claims.

---

[3] "Approved Claims Rates In Securities Class Actions", by Catherine Galley, Erin McGlogan and Pierrick Morel of Cornerstone Research. Published by Law360 on April 10, 2017. Downloaded from https://www.law360.com/articles/911463.

Fifth, and finally, accepting the 66% average approved claims rate value as is — without making any of the corrections and adjustments listed above — is not a mark against the trading models used to estimate aggregate damages. It is usually a subjective judgement on how close a model's estimate needs to be to the true value for that model to be deemed useful. One famous finance rule-of-thumb[4] uses a factor of 2 around the true value to construct a zone of acceptable estimates i.e. if the true value is 100% and the financial model produces estimates ranging from 50% to 200% then the model is valid. This admittedly subjective but well pedigreed rule supports Plaintiffs' use of trading models to estimate total damages in securities class actions.

## Systematic Differences in the Approved Claims Rate

We conducted our analysis in the spirit of the Cornerstone study, but with a few meaningful differences. First, we have a slightly larger sample of 190 securities class actions compared to the 102 datapoints in the Cornerstone study. Our sample is based on all securities class action settlements which had claims filing deadlines between January 1, 2015 and December 31, 2019. We identified 435 such settlements and 190 of these had approved claims and damage estimates data disclosed in court filings. The vast majority of the cases in our sample deal exclusively with damages to shareholders under Rule 10b-5 of the Exchange Act of 1934. A handful of cases include a secondary damage component related to preferred shares, bonds, options or Section 11 of the Securities Act of 1933. Excluding these datapoints from the full sample does not change our conclusions.

Second, in cases where Plaintiffs provide a range of aggregate damage estimates, we use the lower end of the range (frequently associated with the TTM based damage estimate) to

---

[4] In his 1986 Journal of Finance essay "Noise", Fisher Black hypothesized that the efficient market model is valid if the price is within a factor 2 of value, i.e. the price is more than half of value and less than twice value.

calculate the approved claims rate. Third, in addition to the overall averages, we discuss results for subsets of the full sample, based on the size of the total approved claims. We present results for three subsets of the data – large cases, defined as those with approved claims of over $100 million, medium cases with approved claims between $20 million and $100 million and small cases with approved claims of less than $20 million. The full dataset of approved claims and damage estimates for the 190 Defendants is available upon request.

For our full sample of 190 class action settlements we find that the median approved claims rate is 87% and the weighted average rate is 104% (the simple average is also 104%). The approved claims rates range from 6% to 897% and a majority of the cases (120 out of 190) lie in the 50% to 200% range. Overall, while there are a few outliers, Plaintiffs' estimates of damages are, on average, remarkably close to the total damages recognized by claims administrators.

However, this convergence of damage estimates and approved claims does not hold for subsets of the full sample. Even before we calculated subsample averages, it was quite clear from simply eye-balling the data that the approved claims rate is higher for larger cases than it is for smaller cases, as illustrated in Figure 1. This sharp pattern is confirmed by the subsample averages shown in Table 1. Estimated damages for larger and medium sized cases are very close to the final approved claims on average. It is only for the very small cases that estimated damages are significantly larger than approved claims. In fact, the 131 large and medium sized cases have a median approved claims ratio of 104% compared to 41% for the 59 small cases.

This is an unusual result since the damage models (and associated assumptions and parameters) used for large, medium and small cases are identical. It seems implausible that differences in the approved claims rates are being largely driven by the damages models. It

seems to us more likely that variation in the claims administration process is producing the

pattern we observe for approved claims rates.



Figure 1 - Approved Claims Rate

A credible argument can be made that approved claims for large and medium sized class

actions are a closer proxy for total damages than the approved claims for smaller cases. Larger

cases attract far more exposure and press than smaller cases which have damages below $20

million. Claims administrators have more resources to reach out to all damaged investors in

larger cases. These investors generally have greater losses in absolute dollar terms and hence are

more likely to file a claim. In addition, there is greater institutional ownership in these large

companies and institutions are more likely to have systems in place for filing properly

documented claims. This supports the conclusion that Plaintiffs' estimates of damages are

reliable predictors of actual real-world damages in all cases but that in small cases approved

claims are a poor proxy for total damages.

*Table 1 - Approved Claims Rates*

|  | Observations | Approved Claims Rate (Average) | Approved Claims Rate (Median) |
|---|---|---|---|
| Full Sample | 190 | 104% | 87% |
| Large Cases ($100M and above) | 72 | 107% | 120% |
| Medium Cases ($20M to $100M) | 59 | 77% | 89% |
| Small Cases ($20M and below) | 59 | 39% | 41% |

## Conclusion

While courts have been skeptical of trading models and the aggregate damage estimates they generate, our study finds that these models produce fairly accurate and reliable estimates of damages. Our findings are further reinforced by a similar study published by Cornerstone Research. Empirically well-supported damage models that accurately translate per-share inflation into aggregate damages are a boon to both Defendants and Plaintiffs. The "battle of the experts" is best fought over what the appropriate per-share inflation figures are. Comparatively, once the inflation measure is sorted, estimating aggregate damages should be a far less contentious matter. We strongly endorse the use of the Two-Trader Model (or similar Multi-Trader variants) to estimate aggregate damages for both Defendants and Plaintiffs.