UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER VATAJ, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>    v.<br><br>WILLIAM D. JOHNSON, JOHN R. SIMON, GEISHA WILLIAMS, and JASON P. WELLS,<br><br>    Defendants. | Case No. 4:19-cv-06996-HSG<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Hon. Haywood S. Gilliam Jr.<br><br>CLASS ACTION |

## TABLE OF CONTENTS

I.    INTRODUCTION.................................................................................................2

II.   SUMMARY OF THE LITIGATION AND SETTLEMENT ..................................3

    A.    The Litigation .............................................................................................3

    B.    The Alleged Claims ....................................................................................4

    C.    Settlement Discussions ...............................................................................5

    D.    The Settlement's Terms..............................................................................6

    E.    The Court Preliminarily Approves the Settlement...................................8

III.  THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL.....................8

    A.    The Proposed Settlement Meets the Procedural Factors In That it Results from Good Faith Arm's-Length Negotiations by Informed, Experienced Counsel Who Were Aware of the Risks of the Litigation ......................................................9

    B.    The Proposed Settlement Is Substantively Fair .......................................12

        1.    The Strength of Plaintiffs' Case and Risks, Expense, and Complexity of Further Litigation Support Final Approval.................................................12

            a)   Risks Arising From the Complexity of the Case ...............................13

            b)   Risks Arising From the Need for Expert Testimony On Liability.......13

            c)   Risks of Proving Plaintiffs' Case .....................................................14

            d)   Expenses and Risks Arising From the Scope of Discovery................14

            e)   Delays To Class Members' Recovery ...............................................15

            f)   Risks of Proving Damages................................................................15

        2.    Plaintiffs Faced a Modest Risk That They Could Not Secure Class Certification ...............................................................................................17

        3.    The Settlement Recovers a Reasonable Proportion of Damages........................18

        4.    The Reaction of the Class Has Been Positive So Far .............................................19

i

IV.  THE COURT SHOULD PRELIMINARILY APPROVE THE PROPOSED PLAN OF ALLOCATION ............................................................................................19

V.  THE COURT SHOULD FINALLY CERTIFY THE CLASS FOR SETTLEMENT PURPOSES.............................................................................................21

VI.  CONCLUSION ....................................................................................21

# TABLE OF AUTHORITIES

**Pages**

**Cases**

*Christine Asia Co. v. Yun Ma*,
    No. 115MD02631CMSDA, 2019 WL 5257534 (S.D.N.Y. Oct. 16, 2019) ............................ 11

*Craft v. Cty. of San Bernardino*,
    624 F. Supp. 2d 1113 (C.D. Cal. 2008) .................................................................. 20

*Dunakin v. Quigley*,
    No. 2:14-CV-00567-JLR, 2017 WL 123011 (W.D. Wash. Jan. 10, 2017) ............................ 10

*Evans v. Jeff D.*,
    475 U.S. 717 (1986)............................................................................................. 8

*Glickenhaus & Co. v. Household Int'l, Inc.*,
    787 F.3d 408 (7th Cir. 2015) ................................................................................ 15

*Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*,
    No. 20-222, 2021 WL 2519035 (U.S. June 21, 2021) ............................................... 18

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ........................................................................ 9, 10

*Hefler v. Wells Fargo & Co.*,
    No. 16-CV-05479-JST, 2018 WL 6619983 (N.D. Cal. Dec. 18, 2018) ...................... 12, 20

*Ikuseghan v. Multicare Health Sys.*,
    No. 3:14-CV-05539-BHS, 2016 WL 3976569 (W.D. Wash. July 25, 2016).............. 11, 17, 18

*In re Genworth Fin. Sec. Litig.*,
    210 F. Supp. 3d 837 (E.D. Va. 2016) ..................................................................... 21

*In re Heritage Bond Litig.*,
    No. 02-ML-1475 DT, 2005 WL 1594403 (C.D. Cal. June 10, 2005) ...................................... 19

*In re Mego Fin. Corp. Sec. Litig.*,
    213 F.3d 454 (9th Cir. 2000) ............................................................................... 10

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, No. 4:14-MD-
    2541-CW, 2017 WL 6040065 (N.D. Cal. Dec. 6, 2017) ........................................... 20

*In re Pac. Enterprises Sec. Litig.*,
   47 F.3d 373 (9th Cir. 1995) ........................................................................ 11

*In re Petrobras Sec. Litig.*,
   No. 14-cv-9662 (S.D.N.Y. 2018) ................................................................ 11

*In re Syncor ERISA Litig.*,
   516 F.3d 1095 (9th Cir. 2008) ...................................................................... 8

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016) ........................................................................ 15

*In re Yahoo! Inc. Sec. Litig.*,
   No. 17-cv-00373 (N.D. Cal. 2018) .............................................................. 11

*Low v. Trump Univ., LLC*,
   246 F. Supp. 3d 1295 (S.D. Cal. 2017) ...................................................... 12

*Officers for Just. v. Civ. Serv. Comm'n of City & Cty. of San Francisco*,
   688 F.2d 615 (9th Cir. 1982) ................................................................. 9, 18

*Pace v. Quintanilla*,
   No. SACV 14-2067-DOC, 2014 WL 4180766 (C.D. Cal. Aug. 19, 2014) ........... 11

*Pelzer v. Vassalle*,
   655 F. App'x 352 (6th Cir. 2016) ................................................................ 21

*Pirnik v. Fiat Chrysler Automobiles N.V. et al.*,
   No. 1:15-cv-07199-JMF (S.D.N.Y 2019) .................................................... 11

*Rieckborn v. Velti PLC*,
   No. 13-CV-03889-WHO, 2015 WL 468329 (N.D. Cal. Feb. 3, 2015) ................. 10

*Rinky Dink, Inc. v. World Bus. Lenders, LLC*,
   No. C14-0268-JCC, 2016 WL 4052588 (W.D. Wash. Feb. 3, 2016) ................. 17

*Rodriguez v. W. Publ'g Corp.*,
   563 F.3d 948 (9th Cir. 2009) ......................................................... 10, 11, 15

*Rosenburg v. I.B.M.*,
   No. CV06-00430PJH, 2007 WL 128232 (N.D. Cal. Jan. 11, 2007) .................... 19

*Salazar v. Midwest Servicing Grp., Inc.*,
   No. 17-CV-0137-PSG-KS, 2018 WL 3031503 (C.D. Cal. June 4, 2018) ............. 12

*Scott v. United Servs. Auto. Ass'n*,
  No. C11-1422-JCC, 2013 WL 12251170 (W.D. Wash. Jan. 7, 2013) ..................................... 12

*Staton v. Boeing Co.*,
  327 F.3d 938 (9th Cir. 2003) ...................................................................................... 20

*Tadepalli v. Uber Techs., Inc.*,
  No. 15-CV-04348-MEJ, 2016 WL 1622881 (N.D. Cal. Apr. 25, 2016) ................................. 10

*Tom v. Com Dev USA, LLC*,
  No. 16CV1363PSGGJSX, 2017 WL 10378629 (C.D. Cal. Dec. 4, 2017).............................. 9

*Torrisi v. Tucson Elec. Power Co.*,
  8 F.3d 1370 (9th Cir. 1993) ....................................................................................... 9

*Vizcaino v. Microsoft Corp.*,
  290 F.3d 1043 (9th Cir. 2002) .................................................................................. 12

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ................................................................................................. 9

**<u>Rules</u>**

Fed. R. Civ. P. 23 ........................................................................................................ 8, 9

**<u>Other Authorities</u>**

*The End of Objector Blackmail?*,
  62 Vand. L. Rev. 1623 (2009) ................................................................................... 21

## STATEMENT OF ISSUES TO BE DECIDED

1.   Whether the Court should finally approve the $10 million cash settlement.

2.   Whether the Settlement Class should be finally certified for purposes of the Settlement.

3.   Whether Plaintiffs should be certified as Class Representatives of the Settlement Class for purposes of the Settlement.

4.   Whether the proposed Settlement Notice and Proof of Claim and Release Form and the manner for dissemination of the Notice and Proof of Claim to the Settlement Class should be finally approved.

PLEASE TAKE NOTICE that at 2:00 p.m. on September 16, 2021, or as soon thereafter as counsel may be heard, before the Honorable Haywood S. Gilliam Jr., in the United States District Court for the Northern District of California, Oakland Courthouse, Courtroom 2 – 4th Floor 1301 Clay Street, Oakland, CA 94612, Lead Plaintiffs Ironworkers Local 580 Joint Funds, Ironworkers Locals 40, 361 & 417 Union Security Funds and Robert Allustiarti ("Class Plaintiffs") will move this Court for Final Approval of the Proposed Settlement Agreement and Notice to the Class on the Class's claims that William D. Johnson, Geisha Williams, and Sumeet Singh ("Complaint's Individual Defendants"), as well as PG&E Corporation, violated Section 10(b) and 20 (a) of the Securities Exchange Act of 1934 ("Exchange Act") ("Settlement").

## I.    INTRODUCTION[1]

In April, the Court granted Plaintiffs' motion for preliminary approval of the Settlement. The Court preliminarily found that the Settlement is fair, reasonable and adequate.

Nothing has changed that should cause the Court to reconsider its previous findings. This case remains difficult, expensive, and protracted, both for the reasons set out in the Court's Preliminary Approval Order and the remaining reasons set out in Plaintiffs' Memorandum of Law in Support of their motion therefor. Were the Court to reject the Settlement, Plaintiffs would still face the risk that the Court could throw out the case on a motion to dismiss or at summary judgment or by granting a motion to exclude a key expert, or that a jury might rule against them. Should they even survive Defendants' motion to dismiss, Plaintiffs would still have to reconstruct complex and constantly evolving preparations for de-energization that achieved some modicum of success to show that it was not prepared to achieve what Defendants claimed it could do. Plaintiffs would still have to drudge through millions of documents to show Defendants knew, or were reckless in not knowing, that the de-energization program could not achieve what they claimed it could. Plaintiffs would still risk losing nearly their entire case based on an arcane financial economic

---

[1] Unless otherwise noted, all citations are omitted and emphases are added and all terms not defined herein take the meaning provided in the Stipulation. Citations to "¶__" are to paragraphs of the operative Complaint, Dkt. # 58. Citations to "Stip. ¶__" are to paragraphs of the Stipulation of Settlement. Citations to "Joint Decl. ¶__" are to paragraphs of the Declaration of Louis C. Ludwig and Jonathan Horne, filed herewith.

issue forcing them into an aggressive position. Should they succeed at trial, the Settlement Class would still have to wait ten years and pay millions of dollars of litigation costs to see a single cent. In light of these risks, costs, and delays, the $10 million Settlement is still a significant recovery for Settlement Class members, both in absolute terms and as a percentage of Settlement Class Members' maximum recoverable damages. There are no more facts suggesting collusion than there were when the Court determined at preliminary approval that there were none. The Settlement's provisions for attorneys' fees any award of which is in any case within the Court's purview, are just as fair today as they were at preliminary approval.  And while Settlement Class Members have until August 26 to object to or exclude themselves from the Settlement, none have done either so far. Thus, the Court should grant final approval to the Settlement for the same reasons it granted preliminary approval.

 In granting preliminary approval, the Court also found that the plan of allocation of the Settlement proceeds is fair, reasonable, and adequate. The plan of allocation has not changed since the Court's preliminary approval order was entered. It remains fair and reasonable.

The Court further found that this case met the requirements for class certification. Here, too, nothing has changed. The Settlement Class is still numerous, continues to share common issues, these common issues continue to predominate, and with 4,800 claims filed to date, a class action remains superior to any other method of adjudicating claims. Plaintiffs remain typical, and they and their counsel remain adequate.

When it carefully considered the facts Plaintiffs raised to support to support their bid for preliminary approval, the Court already did much of the work it needs to decide this motion. The Court should finally approve the Settlement and the plan of allocation, and finally certify a Settlement class, for the same reasons it has already preliminarily done so.

## II.    SUMMARY OF THE LITIGATION AND SETTLEMENT

### A.  The Litigation

This Action was filed on October 25, 2019 against PG&E and certain of its officers and directors. On February 3, 2020, the Court appointed Plaintiffs as Co-Lead Plaintiffs and approved their selection of Pomerantz LLP ("Pomerantz") and The Rosen Law Firm, P.A.

("Rosen") as Lead Counsel, authorizing them to, among other things, conduct settlement discussions with Defendants. Dkt. # 48.

Plaintiffs timely filed an amended complaint class action complaint ("Complaint") raising claims under Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 ("Exchange Act") against PG&E and Defendants Johnson, Williams, and Singh ("Complaint's Individual Defendants"). Dkt. # 58. The Complaint's Individual Defendants timely moved to dismiss. Dkt. # 59. Their motion to dismiss was fully briefed when the Parties reached the Settlement.

### B.  The Alleged Claims

The Complaint's core allegation is that PG&E and the Complaint's Individual Defendants made false statements about PG&E's efforts to prevent wildfires in dry, high-wind conditions by cutting power to portions of the grid ("de-energization"). They allegedly falsely stated that PG&E had consulted with stakeholders and made plans to address their needs, both for prompt notice of PG&E's intended actions and thorough communications about exactly what it would do and its impact on stakeholders. Defendants also claimed that PG&E promised that its system allowed it to micro-target only the affected areas and that it could restore power promptly once unsafe conditions passed. ¶¶69-72, 109-10.

In reality, the Complaint alleges, PG&E had ignored stakeholders' expressed needs and excluded them from planning exercises. Further, PG&E was not equipped to provide notice to stakeholders or to keep them informed of developments. ¶¶197-231. Moreover, PG&E's system was not able to micro-target de-energizations and it had not devoted enough resources to ensure that it could promptly restore power. ¶¶236-38.

The Complaint alleges that the truth concealed by Defendants' misrepresentations was revealed when PG&E mishandled de-energizations in September and October 2020. PG&E then cut power to millions of Californians for extended periods while providing little notice and insufficient information to stakeholders to prepare for de-energization. PG&E's de-energizations drew intense criticisms from California's elected representatives. In addition, its regulator, the

California Public Utilities Commission, launched an investigation and threatened serious consequences. As a result, PG&E's stock price fell. ¶¶273-326.

The Complaint also alleges that Defendants made false statements about PG&E's tree management practices and safety inspections of its poles and equipment. Defendants boasted of PG&E's thorough three-step program to remove trees that might come into contact with power lines, thus setting fires. According to Defendants the combination of a pre-removal inspection to identify trees, the removal, and a post-removal inspection would provide assurances that dangerous trees would be removed. ¶¶127-34. In fact, as reported by PG&E's probation monitor, even the post-removal inspections missed numerous trees. ¶252. And while the Complaint does not allege that PG&E did not conduct safety inspections, it alleges that PG&E's inspections were so poor that they missed dangerous conditions – including equipment with the same defect that caused the Camp Fire. ¶¶263-64.

### C.  Settlement Discussions

When this action was filed, it joined a complicated web of claims asserted against PG&E. In 2018, following the deadly Camp Fire, PG&E was sued by a putative class of investors who bought its securities between April 29, 2015 through November 15, 2018 ("*PERA* Action" and "*PERA* Class Period"). *In re  PG&E Corporation Securities Litigation*, Case No. 5:18-cv-03509-EJD (N.D. Cal.). Then, in January 2019, PG&E and Pacific Gas and Electric Company ("Utility") filed for Chapter 11 bankruptcy in this District's Bankruptcy Court. *In re PG&E Corporation and Pacific Gas and Electric Company*, Case Nos. 19-30088 (DM) and 19-30089 (DM). In addition to the *PERA* class claims, more than 7,000 investors who purchased PG&E securities during the *PERA* Class Period brought individual claims in its bankruptcy. Further, in its bankruptcy proceeding, PG&E sought to resolve claims (among others) asserted against it by persons who lost their homes in wildfires started by its equipment in 2017 and 2018, in which PG&E estimated its liabilities could exceed $30 billion. To settle the claims, PG&E (among other things) assigned any derivative claims it may have against its officers and directors to a Trust established for benefit of these homeowners. Thus, upon appointment, Lead Counsel were

thrust into settlement discussions to resolve claims that dwarfed the amount in controversy in this case.

On April 23, 2020, the Parties to this action mediated before the Hon. Layn R. Phillips (ret.), one of the country's premier mediators. The Parties did not reach a settlement on the day of the mediation, but they continued discussions over the summer and fall. After exchanging numerous offers and counteroffers, which among other things explored different settlement structures, Judge Phillips proposed that the Parties settle the claims asserted in this action for $10 million. The Parties accepted the mediator's proposal.

**D. The Settlement's Terms**

The Settlement calls for PG&E to pay $10 million into a non-reversionary fund for the benefit of the Settlement Class. In exchange, Plaintiffs and Settlement Class Members will release the Released Claims against Defendants and certain persons associated with them, dubbed Released Persons. Both the Released Persons and the Released Claims are defined in the Stipulation; their definition is reproduced below. Both definitions are customary for securities class action settlements.

"Released Persons" are:

[T]he Individual Defendants, PG&E, and the Utility, as well as each of their respective families, parent entities, controlling persons, associates, affiliates, predecessors, successors, subsidiaries, past or present officers, directors, shareholders, stockholders, members, principals, managers, representatives, employees, attorneys, insurers, financial or investment advisors, consultants, accountants, investment bankers, heirs, assigns or transferees.

"Released Claims" are:

"Released Claims" means any and all claims, including Unknown Claims, damages, actions, obligations, attorneys' fees, indemnities, subrogations, duties, demands, controversies, and liabilities of every nature, at law or in equity (including, without limitation, claims under federal and state securities laws, and at common law), suspected

or unsuspected, accrued or unaccrued, matured or unmatured, whether arising out of or relating to the period prior to or after the date of the Initial Complaint that any Releasing Persons in their capacity as a shareholder of PG&E (a) asserted in the Initial Complaint, the Complaint, or the Action; or (b) could have been asserted in any forum that arise out of, are based upon, or are related in any way, directly or indirectly, in whole or in part, to the allegations, transactions, facts, matters or occurrences, or representations or omissions involved, set forth, or referred to in the Initial Complaint, the Complaint, or the Action and that relate to the purchase, acquisition, sale, disposition, or holding of PG&E common stock during the Class Period.

The "***holding*** of PG&E common stock during the Class Period" is a term of art that refers to claims brought under laws allowing recovery for shareholders who were induced to hold shares during the class period through means of false statements. Nevertheless, certain shareholders raised concerns that the language might inadvertently release claims of shareholders who purchased shares before the Class Period but happened to hold the shares they purchased into the Class Period in connection with PG&E's bankruptcy proceedings. To address this concern, the Parties have stipulated that:

> For the avoidance of doubt, claims that "relate to the . . . holding of PG&E common stock during the Class Period" are those in which a Releasing Person purchased PG&E common stock prior to the Class Period but claims, alleges, or otherwise contends that it or they were induced to hold the PG&E common stock due to alleged misrepresentations made during the Class Period. Nothing in the Settlement Agreement, including but not limited to the Release contained therein releases, dismisses, or in any way impairs any claims arising from the purchase or acquisition of PG&E securities before the Settlement Class Period based on alleged misrepresentations made before the alleged Settlement Class Period.

While the Released Claims include Unknown Claims and other claims that could have been asserted in this Action, as is customary, the release of such claims is appropriate because all

released claims are based on the identical factual predicate of the claims asserted in this Action. The proposed Settlement does not release any claims to enforce the Settlement, or claims of any Person that excludes him-, her-, or itself from the proposed Settlement Class.

### E. The Court Preliminarily Approves the Settlement

On April 20, 2021, the Court entered an order preliminarily approving the Settlement. Dkt. # 107.

The Court preliminarily found that all the Rule 23(a) prerequisites to certification of a Settlement class – numerosity, commonality, typicality, and adequacy of representation – were met. Id. at 7-8. The Court preliminarily found that Plaintiff were entitled to certification under Rule 23(b) because common issues predominated over individual issues and a class action was superior to other means for adjudicating the case. *Id.* at 9.

The Court also found that the Settlement warranted preliminary approval. The Court found that the Settlement was a "significant" result and that the size of the Settlement "weighs in favor of granting preliminary approval." *Id.* at 12, 15.

### III.   THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL

It is within the "sound discretion of the district courts to appraise the reasonableness of [] settlements on a case-by-case basis." *Evans v. Jeff D.*, 475 U.S. 717, 742 (1986). The Ninth Circuit encourages settling complex class action cases. *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008).

Federal Rule of Civil Procedure 23(e), which requires judicial approval of class action settlements, imposes the following standard:

> (2)    ***Approval of the Proposal.*** If the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:

> (A)    the class representatives and class counsel have adequately represented the class;

> (B)    the proposal was negotiated at arm's length;

> (C)    the relief provided for the class is adequate, taking into account:

> (i)    the costs, risks, and delay of trial and appeal;

(ii)     the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii)     the terms of any proposed award of attorney's fees, including timing of payment; and

(iv)     any agreement required to be identified under Rule 23(e)(3); and

(D)     the proposal treats class members equitably relative to each other.

In evaluating whether settlements are fair, reasonable, and adequate, courts in the Ninth Circuit consider the following factors, certain of which overlap with Rule 23(e)(2): "'the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; []² and the reaction of the class members to the proposed settlement.'" *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1025 (9th Cir. 1998) (overruled on other grounds by *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)). Ultimately, "[a] settlement should be approved if 'it is fundamentally fair, adequate and reasonable.'" *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993). And because "it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements," courts should not convert settlement approval into an inquiry on the merits. *Officers for Just. v. Civ. Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982).

**A.   The Proposed Settlement Meets the Procedural Factors In That it Results from Good Faith Arm's-Length Negotiations by Informed, Experienced Counsel Who Were Aware of the Risks of the Litigation**

As set out above, in approving settlements, courts consider not only the settlements' terms but the process through which the parties reached them. The procedural factors are: whether the

---

² While the Court must also consider "the presence of a government participant", there is none so this factor is neutral. *Tom v. Com Dev USA, LLC*, No. 16CV1363PSGGJSX, 2017 WL 10378629, at *5 (C.D. Cal. Dec. 4, 2017).

class representatives and counsel have adequately represented the class and whether the proposal was negotiated at arm's length, Fed. R. Civ. P. 23(e)(2)(A)-(B), the extent and stage of proceedings, and the experience and views of counsel, *Hanlon*, 150 F.3d at 1025. This Settlement meets the procedural factors.

First, the proposed settlement results from adversarial litigation and extensive arm's-length negotiations facilitated by a neutral third-party mediator. "A presumption of fairness and adequacy attaches to a class action settlement reached in arm's-length negotiations by experienced class counsel after meaningful discovery." *Dunakin v. Quigley*, No. 2:14-CV-00567-JLR, 2017 WL 123011, at *2 (W.D. Wash. Jan. 10, 2017); *see also Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) ("We put a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution."). The Parties did not resolve their disputes at their first mediation. The Parties only reached a settlement after considerable further litigation and negotiation.

*Second*, Plaintiffs knew enough about the case to know the deal they struck is good. Courts find that the stage of proceedings weighs in favor of approval if the plaintiffs had enough information to reach a settlement. *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000), *as amended* (June 19, 2000). Courts have found this factor satisfied even when plaintiffs settle before a decision on the motion to dismiss or before any discovery. *Tadepalli v. Uber Techs., Inc.*, No. 15-CV-04348-MEJ, 2016 WL 1622881, at *7 (N.D. Cal. Apr. 25, 2016) (no discovery); *Rieckborn v. Velti PLC*, No. 13-CV-03889-WHO, 2015 WL 468329, at *6 (N.D. Cal. Feb. 3, 2015) (before decision on motion to dismiss). This case concerns several of the biggest news stories in California in 2019. In drafting the Complaint, Counsel reviewed: hundreds of news articles, many of them in-depth investigative pieces; thousands of pages in the four regulatory proceedings concerning PG&E that provided information used in this case, including more than a thousand pages of sophisticated stakeholders' briefing explaining exactly what had happened in microscopic detail during PG&E's de-energizations; with the assistance of bankruptcy counsel, hundreds of bankruptcy filings detailing the settlement landscape to determine how best Plaintiffs could exercise their leverage; approximately 50 reports from stock analysts; thousands of pages from the rich factual record developed before and by Judge Alsup in PG&E's criminal proceeding, *United*

*States v. Pacific Gas & Electric Co.*, 14-cr-175-WHA; thousands of pages obtained through the California Public Records Act; more than sixty hours' worth of regulatory proceedings, legislative hearings, public conferences, and public statements; and complex several-hundred-page regulatory documents filed by PG&E. Plaintiffs obtained more than $2,000 worth of advice from an electric industry consultant, and more than $35,000 worth of advice from economic consultants on the scope of damages. Put simply, this is not a case where Counsel had to evaluate a proposed settlement with only a few scraps of information, where this factor might cut against approval. Counsel could rely on, and had to synthesize, a torrent of documents.

*Third*, Counsel's reputation allowed it to credibly threaten further litigation and trial, while its experience told it that the Settlement is a better option for the Class. Courts have recognized that Counsel "has the necessary skill and knowledge to effectively prosecute" securities class actions. *Pace v. Quintanilla*, No. SACV 14-2067-DOC, 2014 WL 4180766, at *3 (C.D. Cal. Aug. 19, 2014); *Christine Asia Co. v. Yun Ma*, No. 115MD02631CMSDA, 2019 WL 5257534, at *19 (S.D.N.Y. Oct. 16, 2019), *appeal withdrawn sub nom. Tan Chao v. William*, No. 19-3823, 2020 WL 763277 (2d Cir. Jan. 2, 2020) (finding in approving the largest ever settlement in a case brought by investors in a Chinese company that "the quality of representation by both [Rosen] and Defendants' counsel was high in this case."). *In re Petrobras Sec. Litig.*, No. 14-cv-9662 (S.D.N.Y. 2018) (Pomerantz obtained total recovery of more than $3 billion); *Pirnik v. Fiat Chrysler Automobiles N.V. et al.*, No. 1:15-cv-07199-JMF (S.D.N.Y 2019) (Pomerantz and Rosen secured a $110 million settlement for the Class); *In re Yahoo! Inc. Sec. Litig.*, No. 17-cv-00373 (N.D. Cal. 2018) ($80 million settlement of securities class action in which Pomerantz was Co-Lead Counsel).

Lead Counsel have over 45 combined years of experience and expertise in litigating securities actions. The Plaintiffs were consulted throughout the litigation and had ample opportunity to assess the strengths of the claims in which to appraise the sufficiency of the settlement, which they approved. *See e.g.*, *Rodriguez*, 563 F.3d at 967 ("[P]arties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation.") (citing *In re Pac. Enterprises Sec. Litig.*, 47 F.3d 373,

11

378 (9th Cir. 1995)); *Ikuseghan v. Multicare Health Sys.*, No. 3:14-CV-05539-BHS, 2016 WL 3976569, at *4 (W.D. Wash. July 25, 2016) (considering that class counsel, "who are experienced and skilled in class action litigation, support the [s]ettlement as fair, reasonable, and adequate, and in the best interests of the [c]lass as a whole," and approving settlement).

As the Court has already found, none of the factors identified by the Ninth Circuit as signs of a potentially collusive settlement are present here. Counsel seeks 25% of the Settlement as attorneys' fees, the benchmark in this Circuit. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002). While Plaintiffs request a modest reimbursement for the time and expenses they incurred in representing the Settlement Class, no Settlement Class Member will receive preferential treatment. *See Scott v. United Servs. Auto. Ass'n*, No. C11-1422-JCC, 2013 WL 12251170, at *1 (W.D. Wash. Jan. 7, 2013) (noting preliminary approval generally granted absent "obvious deficiencies, such as unduly preferential treatment of class representatives or of segments of the class") (citations omitted). Nor is there a clear sailing agreement because Lead Counsel will be compensated from the Settlement Amount rather than through a separate payment by any defendant or insurer. Finally, the funds will not revert to any defendant or their insurer under any circumstances. *See generally* Dkt. # 107 at 12-14.

The Settlement was negotiated at arm's length by counsel equipped with all the information they needed to evaluate its merits and shows no signs of collusion. The Settlement meets the procedural factors.

**B. The Proposed Settlement Is Substantively Fair**

**1.    The Strength of Plaintiffs' Case and Risks, Expense, and Complexity of Further Litigation Support Final Approval**

A settlement's "elimination of risk, delay, and further expenses weighs in favor of approval." *See, e.g.*, *Salazar v. Midwest Servicing Grp., Inc.*, No. 17-CV-0137-PSG-KS, 2018 WL 3031503, at *6 (C.D. Cal. June 4, 2018). Courts favor settlement where, as here, the case is "'complex and likely to be expensive and lengthy to try'" and presents numerous risks beyond the "'inherent risks of litigation.'" *Low v. Trump Univ., LLC*, 246 F. Supp. 3d 1295, 1301 (S.D. Cal. 2017). Among the different types of class actions, securities actions in particular "are highly complex and [litigating] securities class litigation is notably difficult and notoriously uncertain." *Hefler v. Wells Fargo &*

*Co.*, No. 16-CV-05479-JST, 2018 WL 6619983, at *13 (N.D. Cal. Dec. 18, 2018), *aff'd sub nom. Hefler v. Pekoc*, 802 F. App'x 285 (9th Cir. 2020). The risks inherent in and costs of further litigation are enormous.

### a)   Risks Arising From the Complexity of the Case

This is an extraordinarily complex  case even for a securities class action. Even Plaintiffs' core theory that PG&E misled investors about de-energizations would take great effort to establish. Plaintiffs allege that PG&E had not actually undertaken publicly steps to prepare for De-Energizations they had publicly claimed to have completed. To prove Defendants' statements were false, Plaintiffs would have to walk the jury through the details of a hundred-page plan that was first drafted at the beginning of the class period and constantly evolved throughout. Plaintiffs would have to explain its implementation, which varied throughout Northern California. Plaintiffs allege Defendants falsely asserted that PG&E could microtarget de-energizations. To prove these statements false, Plaintiffs would have to give the jury a detailed technical understanding of the PG&E's grid, the specifications and functioning of the devices PG&E would use to shut off power, PG&E's massive intricate monitoring systems, and the complicated algorithms and criteria PG&E uses  to make de-energization decisions.

To prove scienter for their claims, Plaintiffs would also have to show that when they made their statements, Defendants knew, or recklessly ignored the possibility, that their statements about PG&E's de-energization plan or ability to microtarget de-energizations were false. Plaintiffs would have to build up, patiently and likely mostly through documents, precisely ***what*** Defendants knew when they made their statements. Plaintiffs would then have to prove Defendants' scienter, with no prospects of a cooperating witness, and even as Defendants adamantly professed their innocence on the stand.

### b)   Risks Arising From the Need for Expert Testimony On Liability

This case would require experts. Plaintiffs have already retained consulting financial and energy industry experts. Were this case to proceed, Plaintiffs would need testifying experts on, at a minimum, financial matters, as well as electric industry topics like de-energization, vegetation management, and safety inspections. These electric industry topics are diverse enough that a single

expert would not suffice to cover them all.

Plaintiffs' experts would have to guide the jury through complex assessments of PG&E's wildfire prevention efforts, its de-energization efforts and processes, and its inspection protocols. Plaintiffs' experts would gave to teach the jury about the mathematical models and thousands of weather stations PG&E used to predict weather, the precise specifications of various parts of PG&E's electric system, the details of hundred-pages plans to remove trees and harden PG&E's electric system and to plan and conduct de-energizations, the alleged deficiencies in each of these programs, in order for Plaintiffs to how the deficiencies made Defendants' statements misleading. The evidence would be susceptible to different interpretations and might lose the jury in its sheer size and complexity even if it were presented with extraordinary skill.

### c)   Risks of Proving Plaintiffs' Case

Plaintiffs face risks proving their core de-energization theory. As ramshackle as the de-energizations were, they worked. In 2019, to Plaintiffs' knowledge, no one died in wildfires sparked by PG&E equipment. The largest of these 2019 wildfires, the Kincade fire, burned 77,000 acres and damaged 400 structures. ¶316. The Camp Fire blazed through twice as many acres and damaged fifty times as many structures. No deaths were conclusively linked to the de-energizations.

Plaintiffs also face risks proving their other theories. Plaintiffs have no reason to suspect that PG&E did not inspect its equipment or remove vegetation. Instead, Plaintiffs allege that PG&E did so poorly. To prove that these statements were false, Plaintiffs would need to show that the Defendants had detailed knowledge of how these tasks were completed. This would not be easy in a company with 24,000 employees, multitudinous operations, and a CEO who began working for PG&E a week before his first allegedly false statement and six months before the close of the Settlement Class Period.

### d)   Expenses and Risks Arising From the Scope of Discovery

Without the Settlement, even if Plaintiffs survived Defendants' motion to dismiss, the scope of discovery would be immense. At issue in this case are PG&E's efforts to operate safely during a year in which making its operations safe was purportedly its most important goal. Thus,

14

this case touches on a large portion of everything PG&E's 22,000 employees did in 2019. Plaintiffs would have to analyze millions, or perhaps tens of millions, of documents. Moreover, Defendants made their allegedly false statements in dozens of legislative and regulatory hearings, workshops, and court filings, over 8 months in which the facts on the ground shifted. Plaintiffs would have to prove the Defendants' state of mind for each statement each time they spoke.

Deposition discovery would, likewise, be immense. During the Class Period, PG&E saw turnover in both executive and non-executive positions. Further, PG&E's efforts involved many executives. And either PG&E or Plaintiffs would likely seek the depositions of the stakeholders who offered much of the information set out in the Complaint. With so many relevant persons, the Parties would likely seek at least 50 merits depositions, and may need more. These depositions would cost both the Parties' and witnesses' time and money.

e)   Delays To Class Members' Recovery

Without the Settlement, this case could not be resolved quickly. The time from filing a securities class action to victory on appeal regularly exceeds a decade. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 232 (2d Cir. 2016) (securities class action filed in 2002 affirmed in 2016); *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 413 (7th Cir. 2015) (appellate decision in 2015 following verdict in favor of plaintiffs remanding case brought in 2002 for further proceedings). The inevitable delay supports approval. *See Rodriguez*, 563 F.3d at 966 ("Inevitable appeals would likely prolong the litigation, and any recovery by class members, for years. This factor, too, favors the settlement.").

f)   Risks of Proving Damages

Plaintiffs allege that the Settlement Class suffered damages after a series of corrective disclosures revealed that Defendants' statements were false. Plaintiffs would measure per-share damages by reference to the decline in PG&E's stock price on the first trading day that included or followed these corrective disclosures, correcting for both broader market and industry-specific stock price. For each such corrective disclosure, Plaintiffs must disaggregate through expert testimony the impact of other news released that same day.

Plaintiffs allege fifteen corrective disclosures, all of which took place during two of the

15

most event-packed months of the most eventful year of PG&E's corporate history. PG&E's bankruptcy generated market-moving news nearly every week during the corrective disclosure period.  Disaggregating other news on each of these fifteen corrective disclosure days would be a momentous challenge.

Moreover, one issue might moot all of the parties' work. Between the myriad developments in its bankruptcy, comments and actions from its regulators and public officials, developments in its criminal proceedings, and developments in fires set by its equipment, 2020 was the most eventful year of PG&E's history. With PG&E buffeted by a constant stream of material news, PG&E's stock price swayed up and down nearly daily.



Experts typically determine whether a stock price movement on a particular from the revelation of material news by comparing the movement on that day to average stock price movements.  Because PG&E's stock price was so volatile, all but 3 of the stock price disclosures identified in the Complaint are not statistically different from an average day. The days are only statistically significant compared to the average stock price movements in the year before the Class Period. While Plaintiffs' expert believes it is appropriate to compare Class Period movements to

the previous year's volatility, there are strong counterarguments. Moreover, only one of the statistically significant disclosures is connected to Plaintiffs' core de-energization theory.

Thus, Defendants could substantially end this case on a *Daubert* motion filed with summary judgment after full discovery on a purely technical issue because of a position Plaintiffs have no choice but to take. Worse, after the expenses of a trial, the jury or the Ninth Circuit could find against Plaintiffs' expert on this technical issue. This threat, entirely unrelated to the merits, would haunt Plaintiffs' case right until Plaintiffs achieved complete victory on appeal.

In addition, the Parties dispute the amount of damages and the method by which those damages are calculated. A jury, or this Court at summary judgment or even in a *Daubert* motion, may find in favor of Defendants on the merits, or on the amount of damages or the method by which those damages are calculated.

Finally, PG&E's resources, while obviously substantial, are not unlimited. Indeed, the 2017 and 2018 wildfires pushed PG&E into bankruptcy and during the Class Period, investors feared that further wildfires would eliminate equity claims. ¶321. At the end of the Class Period and for some months thereafter, the people of California, their legislators, their governor, and even their Public Utilities Commission seriously discussed breaking PG&E up, municipalizing its grid, revoking its license to operate, or imposing other sanctions. *E.g.* ¶¶ 66-67, 154, 158. Any drastic actions against PG&E might imperil its ability to pay out on a judgment in this case.

*       *       *       *       *

The strength of Plaintiffs' case balanced against the risk, delays, and expense of litigation – assuming that Plaintiffs prevailed on the pending motion to dismiss – support preliminary approval. *Rinky Dink, Inc. v. World Bus. Lenders, LLC*, No. C14-0268-JCC, 2016 WL 4052588, at *5 (W.D. Wash. Feb. 3, 2016) (finding first three *Hanlon* factors supported preliminary approval when continuing to litigate risked losing class certification and was "inherently expensive"); *Ikuseghan v. Multicare Health Sys.*, No. 3:14-CV-05539-BHS, 2016 WL 3976569, at *4 (W.D. Wash. July 25, 2016) ("Absent the proposed Settlement, Class Members would likely not obtain relief, if any, for a period of years.").

### 2.    Plaintiffs Faced a Modest Risk That They Could Not Secure Class Certification

To show they are entitled to class treatment, Plaintiffs must show that PG&E's stock traded on an efficient market such that news about it was quickly impounded into its stock price. During the Class Period, PG&E's stock traded on the NYSE at high volume. It was followed by numerous analysts. Its travails were an international news story. Analysts literally flew to California to examine firsthand the risk that the Kincade Fire would cause enough damage to wipe out PG&E's equity. Under the law as it exists today and the facts as they have developed, the risk of not being able to proceed on a classwide basis is minimal.

Nevertheless, Defendants may have arguments against class certification. For example, the volatility of PG&E's stock price may support an argument that its stock did not trade on an efficient market. Or Defendants may argue that certain of the allegedly false statements are sufficiently vague or unimportant to show they could not have a price impact under *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, No. 20-222, 2021 WL 2519035 (U.S. June 21, 2021). While these arguments do not at present seem formidable, Defendants may be able to develop a factual record to support them. Thus, Plaintiffs faced a risk, albeit a small one, that they could not obtain class certification and sustain it through judgment.

### 3.    The Settlement Recovers a Reasonable Proportion of Damages

The amount offered in settlement also weighs in favor of preliminary approval.  Courts typically weigh the relief obtained in the settlement against the possible relief that could be obtained at trial.  *See, e.g. Ikuseghan*, 2016 WL 3976569, at *4 (comparing value obtained in TCPA settlement against possible recovery at trial). That said, the settlement should not be rejected just because the amount of the settlement is small compared to the best possible result.  *Officers for Justice*, 688 F.2d at 628 ("[A] cash settlement amounting to only a fraction of the potential recovery will not per se render the settlement . . . unfair.").

According to a recent review of securities class action settlements, cases alleging damages of $250 million and $499 million typically settle for about 1% of total damages. Laarni T. Bulan *et al*, Securities Class Action Settlements: 2019 Review and Analysis (Cornerstone Research).[3]

---

[3] Available at https://www.cornerstone.com/Publications/Reports/Securities-Class-Action-Settlements-2019-Review-and-Analysis

18

Plaintiffs' expert estimates that damages from their core case based on false de-energization statements are $468 million.[4] The $10 million recovers slightly more than 2% of these damages, which is roughly the median percentage of investor losses recovered in securities class action settlements. *See In re Heritage Bond Litig.*, No. 02-ML-1475 DT, 2005 WL 1594403, at *8-*9 (C.D. Cal. June 10, 2005) (average recovery between 2% to 3% of maximum damages).

### 4.    The Reaction of the Class Has Been Positive So Far

To date, the Claims Administrator has mailed 218,504 Postcard Notices to potential Settlement Class Members and nominees. The deadline for Class Members to object to or exclude themselves from the Settlement is July 19, 2021. There have been no objections or requests for exclusion to date.

Plaintiffs will address any objections or requests for exclusion in their Reply memorandum of points and authorities, which they will file on or before August 26, 2021.

## IV.   THE COURT SHOULD PRELIMINARILY APPROVE THE PROPOSED PLAN OF ALLOCATION

The proposed plan of allocation, which was detailed in the Notice, will govern the allocation of settlement proceeds among Settlement Class Members who timely file a Claim Form. Courts in this Circuit typically approval a plan of allocation, so long as "the proposed plan is rationally related to the relative strengths and weaknesses of the respective claims asserted." *Rosenburg v. I.B.M.*, No. CV06-00430PJH, 2007 WL 128232, at *5 (N.D. Cal. Jan. 11, 2007). Co-Lead Counsel prepared the proposed plan of allocation in consultation with Plaintiffs' damages expert. The Plan rationally reflects compensable damages suffered by Settlement Class Members. All Settlement Class members are treated equally under the plan. In its Preliminary Approval Order, the Court found that the plan merited approval. Nothing has changed. Accordingly, the Court should finally approve the plan of allocation.

The only agreement made in connection with the Settlement – other than the Settlement

---

[4] Damages would increase to $2.0 billion if Plaintiffs pled and proved their exceptionally difficult claims based on false statements concerning PG&E's vegetation management and fire inspection programs.

itself – is the parties' confidential Supplemental Agreement, which sets forth certain conditions under which Defendants may terminate the settlement if requests for exclusion from the settlement Class exceed a certain amount, which is kept confidential ("Termination Threshold"). *See* Stip. ¶L-2. In its Preliminary Approval Order, the Court found that the termination agreement was fair and reasonable. Dkt. No. 107, at 15. This type of agreement is common in class actions and does not render a settlement unfair. *See Hefler v. Wells Fargo & Co.*, No. 16-CV-05479-JST, 2018 WL 6619983, at *7 (N.D. Cal. Dec. 18, 2018) ("[t]he existence of a termination option triggered by the number of class members who opt out of the Settlement does not by itself render the Settlement unfair.").

## V.   THE REQUEST FOR ATTORNEYS' FEES, LITIGATION EXPENSES, AND PLAINTIFFS' EXPENSES ARE ADDRESSED MORE FULLY IN THE FEE BRIEF AND ARE REASONABLE

Co-Lead Counsel seek an award of 25% of the Settlement Amount and reimbursement of expenses of $82,046.47, both of which were disclosed to the Class in the Postcard Notice, the Summary Notice, and the Internet Notice.

The Fee Motion, filed herewith, provides much more detailed information in support Lead Counsel will provide much more detailed information in support of their application in its motion for attorneys' fees and expenses.  However, Lead Counsel notes that the maximum fee they may request is the "benchmark" established by the Ninth Circuit.  *See, e.g.*, *Staton v. Boeing Co.*, 327 F.3d 938, 968 (9th Cir. 2003) ("This Circuit has established 25% of the common fund as a benchmark award for attorney fees."). So a "25% benchmark award is presumptively reasonable" under the circumstances. *See In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, No. 4:14-MD-2541-CW, 2017 WL 6040065, at *2 (N.D. Cal. Dec. 6, 2017) ("The 25% benchmark award is presumptively reasonable, reflecting a market based fee."); *see also Craft v. Cty. of San Bernardino*, 624 F. Supp. 2d 1113, 1127 (C.D. Cal. 2008) ("Cases of under $10 million will often result in result in fees above 25%.").

The Fee Motion also details why the Court should award Lead Counsel reimbursement of their litigation expenses of $82,046.47, or almost $18,000 *less* than the $100,000 "not to exceed"

figure communicated to the Settlement Class in the Postcard Notice, Summary Notice, and Internet Notice.

Finally, the Fee Motion also details why the Plaintiffs are entitled to an award of $5,000 for the time they spent and the risk incurred in connection with representing the Class. This, too, was communicated to the Settlement Class in the Postcard Notice, Summary Notice, and Internet Notice.

In addition, Lead Counsel requests that any award of fees and expenses be paid at the time the Court makes its award. Such so-called quick-pay provisions are permissible. *See In re Genworth Fin. Sec. Litig.*, 210 F. Supp. 3d 837, 846 (E.D. Va. 2016) (ordering that "attorneys' fees and Litigation Expenses awarded above may be paid to Lead Counsel immediately upon entry of this Order"). Indeed, they are "common." *Pelzer v. Vassalle*, 655 F. App'x 352, 365 (6th Cir. 2016) *citing* Brian T. Fitzpatrick, *The End of Objector Blackmail?*, 62 Vand. L. Rev. 1623, 1625–26 (2009).

## V.   THE COURT SHOULD FINALLY CERTIFY THE CLASS FOR SETTLEMENT PURPOSES

As set forth above, in its Preliminary Approval Order, the Court made all the findings necessary to certify the Class of settlement purposes. After making these findings, the Court in fact certified a Settlement Class. Nothing has changed since the Court's Preliminary Approval Order. So the Court should finally approve the Settlement Class. Typicality

## VI.   CONCLUSION

For the foregoing reasons, the Court should (i) finally approve the Settlement, (ii) finally approve the plan of allocation, (iii) finally approve the Notice, and (iv) finally certify the Class for settlement purposes.

Dated: July 12, 2021                    Respectfully submitted,

                                        **POMERANTZ LLP**

                                        */s/ Louis C. Ludwig*
                                        Patrick V. Dahlstrom
                                        Louis C. Ludwig

21

(*admitted pro hac vice*)
Jared Schneider
(*admitted pro hac vice*)

Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 229-8811
Email: lcludwig@pomlaw.com
Email: jschneider@pomlaw.com

Jeremy A. Lieberman
(*admitted pro hac vice*)
J. Alexander Hood II
(*admitted pro hac vice*)
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: ahood@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
Email: jpafiti@pomlaw.com

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Jonathan Horne (*pro hac vice*)
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: jhorne@rosenlegal.com

*Co-Counsel for Co-Lead Plaintiffs*

**THE SCHALL LAW FIRM**

Brian Schall
Sherin Mahdavian
Rina Restaino, Esq.
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: (424) 303-1964
Email: brian@schallfirm.com
sherin@schallfirm.com
rina@schallfirm.com

*Additional Counsel for Plaintiff Allustiarti*