**Pages 1 - 27**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Haywood S. Gilliam, Jr., Judge

CHRISTOPHER VATAJ,                )
Individually and on Behalf of  )
All Others Similarly Situated, )
                                )
        Plaintiff,              )
                                )
  VS.                           )   **NO. C 19-06996-HSG**
                                )
WILLIAM D. JOHNSON, et al.,     )
                                )
        Defendants.             )
                                )

Oakland, California
Thursday, September 16, 2021

**TRANSCRIPT OF REMOTE TELECONFERENCE PROCEEDINGS**

**APPEARANCES**: (Appearances via AT&T Teleconference.)

For Plaintiff:
                POMERANTZ LLP
                10 South LaSalle Street - Suite 3505
                Chicago, Illinois  60603
            BY: **LEWIS C. LUDWIG, ATTORNEY AT LAW**

                THE ROSEN LAW FIRM, P.A.
                350 Fifth Avenue - Suite 5508
                New York, New York  10118
            BY: **JONATHAN R. HORNE, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR
          Official Reporter, CSR No. 12219

**APPEARANCES**:   (CONTINUED)

For Defendants:

                    LATHAM & WATKINS LLP
                    505 Montgomery Street - Suite 2000
                    San Francisco, California 94111
                **BY:   GAVIN MASUDA, ATTORNEY AT LAW**

                    MCDERMOTT WILL & EMERY LLP
                    444 West Lake Street  - Suite 4000
                    Chicago, Illinois 60606
                **BY:   STEVEN S. SCHOLES, ATTORNEY AT LAW**

                    MCDERMOTT WILL & EMERY LLP
                    2049 Century Park East
                    Los Angeles, California 90067
                **BY:   JASON D. STRABO, ATTORNEY AT LAW**


Also Present:       Eric Schachter, Claims Administrator
                    Raymond Toh

**Thursday - September 16, 2021**                          **2:09 p.m.**

                    **P R O C E E D I N G S**

                         ---o0o---

THE COURT:  Are we prepared to call the next matter?

Are you there, Madam Clerk?

THE CLERK:  I'm sorry, Your Honor.  I'll call the case.

Calling 19-6996, Vataj v. Johnson, et al.

Counsel, please state your appearances for the record.

MR. HORNE:  Good afternoon, Your Honor.  Jonathan Horne from the Rosen Law Firm for plaintiffs.  And I have the claims administrator on the line as well.

MR. LUDWIG:  Good morning, Your Honor.  Lewis Ludwig of Pomerantz LLP, also on behalf of plaintiffs.

MR. MASUDA:  Good afternoon, Your Honor.  This is Gavin Masuda of Latham & Watkins on behalf of defendant PGE.

MR. SCHOLES:  Good afternoon, Your Honor.  This is Steve Scholes with my partner, Jason Strabo, on behalf of the individual defendants.

THE COURT:  All right.  Good afternoon, everyone.

So we're here this afternoon for a hearing on the motion for final approval.  This is a final fairness hearing.

I've reviewed the motion for fees and service award; and the declarations and exhibits that were attached to it that was filed on July 12th; as well as the motion for final approval

and the accompanying materials with it, also filed on that same date.

I did see that there were a couple of letters from putative class members asking the Court to accept their claims. Then there was a third letter that looked to be a request for further information, and those were filed on July 15th, July 26th, and August 2nd.

And then also the reply brief filed in support of the motion for approval that was filed on September 2nd.

And so I think that that covers the state of the record. Are there any other materials that are part of the final fairness record that I should consider beyond those that I just mentioned?

**MR. HORNE:**  No, Your Honor.

This is Jonathan Horne for the plaintiffs.

**THE COURT:**  All right.  And let's see.

Mr. Horne, did you receive notice that any class members intended to attend this hearing today; and if so, do you have a sense as to whether they wish to be heard?

**MR. HORNE:**  We did not receive any notice, Your Honor.

**THE COURT:**  And I'll just ask -- if I were in physical court, I could just look around the courtroom and see who was there, but is anyone on the line here today who is a member of the class as to which the claims are being settled?

**MR. TOH:**  I'm here, Your Honor.

THE COURT: Who is that?

MR. TOH: The name is Raymond Toh. I received a letter for this class action, for the hearing, and I'm -- yeah. I'm just here to listen.

THE COURT: I see. All right. Welcome, Mr. Toh.

MR. TOH: Thank you.

THE COURT: Are there any other members of the class who are present here today on the phone?

(No response.)

THE COURT: All right. Hearing none beyond Mr. Toh, why don't we proceed.

So I did have a number of questions, and I think the most efficient way to do it is to just walk through them so I understand the lay of the land.

And the first concern for the scope of the release, as I understand it, after the preliminary approval order, the parties submitted the stipulation and agreement clarifying the scope of the release. And at least, as described, that was in response to feedback from class members about the -- their reading of these as to the scope of the release. And so really the two questions are, one, what was the purpose for doing that amendment; and then, second, did class members get notice of it?

Obviously, the description that went out in the notice to the class was different, and so I query whether that was

something that was significant for class members to understand about the nature of the settlement that the parties have now agreed to in the amendment.

That's probably a question for Mr. Horne, in the first instance.

**MR. HORNE:** Your Honor, in our view, the amendment was not significant in the sense that it didn't say anything that wasn't already in the release.

You know, that said, we did have some concerns from some of the class members. And we entered into the clarification of the scope of the release, in essence, to make clear what was already, in our view, implicit in the release itself.

We did file it. We provided notice by filing it on the settlement -- case settlement website. We did have discussions with several -- several -- we had discussions with the class members who raised the issues with us, and they indicated that they were pleased with the clarification.

**THE COURT:** All right. With respect to the -- just setting aside the class members who raised the issue, who prompted the change, if -- just other uninvolved class members, obviously, they got the notice that they got after the preliminary approval was filed, how were -- how, if at all, were they notified that the scope of the release has changed?

**MR. HORNE:** Your Honor, we don't believe the scope of the release has changed. We believe that the scope of the

release is the same.  But there was a term of art included in the release that wasn't entirely clear to people who don't practice securities class actions for a living, and the stipulation simply clarifies the meaning of that term.

In terms of notice, we filed it on the case website.  We made it available there.  And that's the notice that was provided.

THE COURT:  If it's not a significant change, why did you make the change?

MR. HORNE:  Because it was requested by the settlement class members, and because this was a way that we could address their concerns without having them -- this is the way we could address their concerns.

THE COURT:  And so when you say it was posted on the website, I'm assuming it's not as though some notice went out that says "this new document is here."  It would have been, if someone had gone to the website after they got their notice and looked in the right place they would have seen it.

MR. HORNE:  That's correct, Your Honor.

THE COURT:  Let me ask --

MR. MASUDA:  Your Honor --

THE COURT:  Go ahead, whoever that was.

MR. MASUDA:  Yeah.  This is Gavin Masuda on behalf of PG&E.

The one point that I would add on top of that is that, you

know, the clarification that we filed, which I believe is Docket 120, you know, it only, if anything, has the effect of -- of narrowing the scope of the release; clarifying that the release is not any broader than, you know, what we thought was plainly stated in the release itself, but that certain class members, you know, raised concerns about -- by reaching out directly to plaintiffs' counsel.  Which, you know, showed that people were paying attention, that there were sophisticated class members out there who saw that language and had questions about it.

I think one important thing to consider is that our clarification, you know, in no way broadens the scope of the release.  If anything, quite the opposite, it narrows the scope of the release.

So in terms of, I think, where the Court is getting, you know, the protection of class members and people who -- members of this putative class, you know, it's not as though we did any -- there is nothing in that that takes away any rights from them.  If anything, it's narrowing the scope of what -- clarifying that the scope of the release is as narrow as we initially intended it to be.

And we thought it was clear, we just wanted to make it perfectly clear that that's what's going on.

THE COURT:  Right.  And so another way of putting that is if someone saw the prior language and decided not to opt

out, all that has now changed is that some claims that arguably they were releasing before -- and I know that "arguably" is the important word there, but the point is certainly the only way that this could affect the decision whether to opt out or not is that this is a release that is even, if anything, narrower than the one that was presented to the class members in the first place.

MR. MASUDA: Correct. And I think, you know -- right. Excuse me.

(Reporter interruption for clarification of the record.)

MR. HORNE: I take that as a compliment. It was Mr. Masuda. This is Mr. Horne.

THE COURT: Is there anything further on that point?

I think I understand the parties' position and I do think there is good authority for that premise, that a change that only narrows the scope of the release does not necessarily trigger a further notice obligation because the class members' rights, to the extent they even arguably have changed, have only changed in a direction that is further beneficial to the class members who have chosen not to opt out.

All right. Second question is with respect to the notice process -- and as I review the record, it's my understanding that there were about 226,000 notices sent out. And, obviously, I saw the couple of letters that folks said that they -- they either didn't get the materials until shortly

before the deadline or, in some cases, even after the deadline to submit a claim.

And it sounds as though, as I read the claims administrator's materials, that at least initially, there was a -- what I would think of as a sort of more ambiguous response to them as to whether late claims would be considered and how those claims would be considered.  And I think, if I had known that there was going to be this rolling notice process, I probably would have required more of a window between the notice and the deadline, because, obviously, it was not ideal for folks to get something that says that they've already missed the window to submit a claim.

Now, I understand that I have the discretion to consider and grant those claims, and I would, because that's only fair. My question is whether this reflects on the adequacy of the notice and that if you have a circumstance where a lot of people are essentially getting the materials with little or no time to complete them, I have a concern that that might discourage people from submitting claims and might have contributed to the lower-than-expected yield here, basically.

So, Mr. Horne, how did this happen, and what do you think is the import for how I consider whether the notice was adequate?

**MR. HORNE:**  Your Honor, we've been able to trace the claimants to one particular brokerage house, Schwab, who

provided us the names of the -- the names of their clients, and addresses.  I believe it was in late June 2030 [sic], and we were able to send out notice to them in July, on July 7, 2021.  And, as a result, because of normal mailing delays, some of those notices didn't get there in time.

There were about 20,000 Charles Schwab recipients.  I know I have received a fair number of calls from class members saying, you know, "Can I still submit a claim?"  And I know that Mr. Ludwig has received a large -- a very large number of them; and I imagine the claims administrator has as well.

And, you know, the answer to those all those claimants was the same, which is, you know, we -- we will ask the Court to approve your claims.  And, you know, we believe that the Court will approve it, just based on past experience.

You know, in terms of the consequence for the notice process, if the claims ultimately get approved, you know, the only two other things that are missing is -- are the ability to opt out, and the ability to object.

And the deadlines for those two was August 26.  And to our knowledge, everyone got at least -- well, to our knowledge, everyone got -- you know, essentially up to a month of time to object or to opt out.  And so the settlement class members were presented with a full panoply of rights and, to our mind, this has no impact on the adequacy of the notice.

THE COURT:  All right.

MR. HORNE: I'm sorry. Then the Court had a question about the expected yield as well.

You know, the expected yield in securities class actions is typically 10 percent. And, you know, this -- the yield in this case was approximately 11 percent or so. So it falls pretty squarely within the usual expected yield.

The fact is it's just not possible to -- the claims administrators have models based on trading and such things, but it's not possible to know before time exactly how many settlement class members there are, or how many will put in a claim.

THE COURT: Right. I'm just -- and I would have to trace back these numbers. But I thought that in the motion for preliminary approval there is an anticipation that about 80,000 claims would be submitted.

MR. HORNE: That's correct, Your Honor. But -- that's correct, Your Honor. But the anticipation was, as well, that I believe it was something like 400,000 claims packets would be mailed. And, you know, there were substantially fewer claims packets and that's why -- that's partly why there were substantially fewer claims.

The fact is it's simply not possible to know ahead of time how many settlement class members are represented by the trading that occurred during the settlement class period.

THE COURT: Right. I see.

And just -- how many -- what was the rough, gross, total number of claims that have been submitted to date?

MR. HORNE:  24,000, Your Honor.

THE COURT:  I see.

All right.  And then the -- as I read the claims administrator's materials, as of at least July, there were about 230 notices that were undeliverable.  So it sounds like those were remails.

Do you have a rough number as to how many of that number ended up being just finally undeliverable?  I assume that some number of them reached the destination on the second go.

MR. HORNE:  With the Court's consent, I would ask the claim administrator to answer that question.

THE COURT:  Sure.

MR. SCHACHTER:  This is Eric Schachter with AB Data. E-r-i-c, S-c-h-a-c-h-t-e-r.

I don't have that number in front of me.  Typically, of notices that come back deliverable, we expect somewhere in the neighborhood of 60 to 70 percent that we'll be able to successfully remail on a second attempt.

THE COURT:  All right.  Then you don't actually, at this point, have the final numbers.

MR. SCHACHTER:  I don't have it in front of me.  I could -- I could certainly pull that and pass that along to the parties.

**THE COURT:** All right. I may -- why don't you actually, yeah, pull that information and I may ask the parties to do a supplement on that point.

All right. Then the third question is with respect to figuring out the -- how the claims received would be validated.

So it's around 24,000-and-change claims. How long does the claims administrator anticipate it will take to validate the claims so that we can determine which claims are ready to be queued up to be paid?

**MR. HORNE:** With the Court's permission, I would pass that question along to the claims administrator as well.

**THE COURT:** Sure.

**MR. SCHACHTER:** Hi, Eric Schachter again, with AB Data.

We usually expect around a three- to four-month turn time after the claim filing deadline, and much of that time is spent working with claims that are deficient or not complete.

So if someone submits a claims that's missing a piece of documentation, or they didn't fill out part of the form, we'll send them a notification letting them know of the deficiency and giving them a window to respond.

So usually that's sort of a 20- or 30-day window for folks to respond, so there is a little lead time in front, lead time in back; but three to four months is our estimate.

**THE COURT:** All right. So basically at the end of

that three to four months, then I would know how many of the 24,000 claims were actually validated and approved, and ready to be paid out?

MR. SCHACHTER:  That's correct.

THE COURT:  All right.

And then I think this is a question for plaintiffs' counsel.  And I know that in these sorts of cases, it depends on trading volume and all of those types of variables that are individualized, but I'm just always curious:  What at least is the range of what you anticipate people will receive?

I could imagine there could be some quite large recoveries, and I would imagine there are some that might be nominal.  But do you have a sense of the anticipated range of what you think class members are likely to actually get in their pocket?

MR. HORNE:  You know, I -- if we do have -- based on the numbers we have today, and those numbers don't include -- we haven't done any work to identify fraudulent claims or, you know, done any work to determine whether the documentation matches with the settlement class members stated or anything like that.  But accepting every claim, you know, as valid, you know, with those caveats, it would be about a $4,000 check on average, with a median of about $51.

THE COURT:  So you said average of 4K and median of $51?

**MR. HORNE:**  Correct, Your Honor.

**THE COURT:**  And do you have a sense of what the anticipated average recovery per share would be, or is that too difficult given the changes in the share price?

**MR. HORNE:**  You know, with all the same caveats that we had for the check size, it would be about 3 cents per -- per share.

You know, with that being said, you know, there are always large fraudulent claims in these things, and there are always, you know, inadequately documented claims and things like that. So we do expect the number to go down significantly -- to go up significantly.  I'm sorry.

**THE COURT:**  I see.  I think -- wasn't the estimate in the preliminary approval papers something like 14 cents a share?

**MR. LUDWIG:**  It was 1.4 cents per share.

**THE COURT:**  Right.  So we've gone from 1.4 cents to 3 cents?

**MR. HORNE:**  That's correct, Your Honor.

**THE COURT:**  I see.  And some of that is because the class size ended up being smaller, as it turned out, than you thought it might be?

**MR. HORNE:**  The damages numbers are always estimates. And, you know, it's not really possible to know ahead of time.

You know, also, not everyone puts in a claim.  You know,

if individual shareholders have a small number of shares, they may not want to put in the effort to put in a claim. And that just happens in every case.

THE COURT: Right. All right. That's not difficult to understand.

Then the next question is with respect the first opt-outs. How many opt-outs were there? I think it was -- at least as of September 2nd, it was three, even though one of the people opting out said that she didn't purchase PG&E stock during the class period in the first place. But is it still three total opt-outs?

MR. HORNE: There are -- as we use the term, I think -- well, yes, there are still three -- three people who sent letters stating that they're seeking to be excluded from the settlement.

THE COURT: Right. And then the material that looked like it could be considered an objection -- although I'm not sure it entirely was -- was Mr. Jesse. It looked like he wasn't sure whether he purchased stock during the class period or not.

Was that ever determined one way or the other?

MR. HORNE: No, Your Honor. You know, I spoke with Mr. Jesse and he didn't really know one way or another.

THE COURT: I see. And so -- but he didn't opt out, in any event?

MR. HORNE:  No, Your Honor.

THE COURT:  All right.  And I'm not sure whether his communication formally even counts as an objection since he didn't seem to be objecting to the terms of the settlement.  He had some complaints about the class -- the claims administration process, but it sounded as though many of those were worked out.

Is that a fair understanding?

MR. HORNE:  That's correct, Your Honor.  He -- you know, unfortunately, for about a morning, it was very difficult to reach the claims administrator, meaning that most of the calls went through to voice mail because of volume and other calls, but, you know, the problem was fixed by that afternoon.

THE COURT:  Right.

All right.  Then the next topic is the request for fees at 25 percent request.  And I would be interested in having you submit the underlying billing records.  Obviously, there are lots of lawyers working on the case, and I don't have any reason to question any of the representations, but I think from a due diligence perspective, it would be helpful for me to have the underlying records so I can, essentially, spot-check or more the lodestar cross-check figure.

How long would it take you to provide those?

MR. HORNE:  Of course, Your Honor.  We can definitely

do it by next Thursday.  If we can get it together earlier, we'll file it earlier.

THE COURT:  Okay.  Why don't you do that.

And then, at the same time, maybe you can provide the answer to the question I was discussing with the claims administrator a minute ago with regard to those undeliverables, and just give me the final tally as to how many folks shook out of that in the second mailing.

MR. HORNE:  Absolutely, Your Honor.  And can we file the records under seal?

I'm sorry.  Not under seal, ex parte?

THE COURT:  Yes.  Yes.  I think -- I think you should lodge those.  We'll figure out the mechanics of how to do it, but I think that's the right approach.  I'll issue an order letting you know what -- formally, how you ought to do that.

MR. HORNE:  Thank you, Your Honor.

THE COURT:  Ask then, just curiously, there are, obviously, a number of firms working together and I -- how did you allocate the work so that you were comfortable that there was not duplication of efforts and that things were being done efficiently?

What was the -- what was the method for assigning tasks to the various firms that were involved?

MR. HORNE:  The first thing we did was to ensure that there were not too many attorneys on the case.  I think two

attorneys, myself, and Mr. Ludwig, accounted for about two-thirds of the lodestar, and that went a long way towards avoiding duplication.

In terms of, you know, the between-firm aspect of this, we divided assignments, gave primary responsibility to -- for the assignment.  One firm for -- excuse me.  We divided assignments so that each firm had primary responsibility for certain tasks, and the other firm would assist -- assist with the task.

**THE COURT:**  All right.  I see.

And then within the firms what was the -- what was the plan for ensuring efficiency?

**MR. HORNE:**  We had two attorneys who were responsible -- one attorney in each firm responsible for the lion's share of the work.

And, you know, we had specialists in the firms who were responsible for certain tasks, like settlement negotiations and case strategy, you know, things like that, who, you know, worked on the case as needed.  And, you know, that way -- you know, this is a very complicated case, and we didn't have to train up, you know, a large number of people, just really two attorneys.

**THE COURT:**  I see.

Then we have the question of the fees motion.  And I notice that there was a request for what was referred to in shorthand as "QuickPay" on the fees and an immediate fee

payment.

I don't think -- I hadn't seen that sort of request before in our district, and it looked like the authorities that were cited were out of district.  And there was an unpublished case, I think, from the Sixth Circuit that -- is there any -- A, is there any authority that you know of from this circuit or this district on that point?

And to the -- given the reality that it will take three or four months to validate the claims and actually know what's being paid out and to whom, why isn't it more sensible to wait and see what happens there, rather than issue an order that immediately pays out the fees before class members get their payments?

**MR. HORNE:**  That's fair enough.

The QuickPay key is the payment -- I'm sorry.  Let me take your questions in turn.  I apologize, Your Honor.

I'm not aware of any authority from this district.  It is my understanding that these claims are relatively common.  And when we submit the hours, I can also submit, you know, any authority in terms of an opinion from judges in this -- you want something from this district or something from this circuit?

**THE COURT:**  In order of priority, best would be Ninth Circuit; next would be something from this district; third would be from a district court in this circuit.

**MR. HORNE:** Okay. I will -- I will look for such authorities. And, in addition, cases in which judges have approved QuickPay provisions in this district.

And can we submit those authorities next Thursday as well?

**THE COURT:** Yes, please.

**MR. HORNE:** And, you know, in terms of the idea of the QuickPay provisions, they're actually keyed to the effective date. And the effective date is the date when the approval of the settlement becomes final and non-appealable.

And the idea behind them is, there is a practice, although less so these days, of, you know, objectors filing meritless objections in order to, you know, secure a payment to, essentially, go away.

And the point of the QuickPay provisions is to disincentivize that conduct by paying attorneys' fees, you know, before any -- any -- the conclusion of an appeal, which could take, you know, a very long time. And the purpose of it is more in the threat -- not in the threat, in the adjustment of the incentives as seen by the objectors than it is in any actual -- in any actual results.

Because, you know, as the Court sees, there has been no objection in this case. There do not appear to be anyone who would appeal the final approval of the settlement. But those provisions do have an impact in deterring meritless objections and ensuring that the objections the Court does receive are

merited, I guess.

THE COURT:  Right.  But in this case, the deadline for objecting has passed, so we know who the universe of potential objectors are and it's, arguably, Mr. Jesse and no one else.

MR. HORNE:  That's correct, Your Honor.

THE COURT:  All right.  Then with respect to the incentive award, I think I've now got the day.

So the request is for $5,000 and, essentially, the back-of-the-napkin calculation, if all the claims turn out to be valid -- and we'll have to go through that process over the next three or four months -- but it's a 4,000 average recovery and a $51 median.  So it's 100 times the median if it plays out the way we're anticipating, and it might or might not.  So I'll take that into consideration in deciding the incentive award question.

MR. HORNE:  And if I may, Your Honor, you know, the plaintiffs all spent -- you know, they spent a fair amount of time on the case.  I think, with Mr. Allustiarti, he spent well in excess of a hundred hours on the case.  You know, that's time that other settlement class members didn't have to spend.

And, you know, again, in the case of Mr. Allustiarti, he is -- he was a PG&E employee until his retirement, as was his father.  So, you know, this had some reputational risks for him as well.

THE COURT:  Right.  Although, as I read it -- as I

read the declaration, a hundred hours was for reading news articles.  Why was that necessary?

**MR. HORNE:**  That's correct, Your Honor.

And, you know, the reason it's necessary and helpful is that it's helpful for the lead plaintiffs to independently stay abreast of news about the company just so that they can, you know, independently, you know, come to an understanding of what's going on in the company; whether they will be able to pay any judgment; anything like that; anything that comes up.

In terms of the rest of his hours, I believe the rest of it summed to 20 hours, which is still a very significant amount of time, particularly with the reputational concerns that he faced.

**THE COURT:**  All right.  Understood.

Okay.  Those are the questions that I had.

Are there any other updates that either side has that is significant information since the motions were filed?

**MR. SCHOLES:**  This is Mr. Scholes, Your Honor.

Not from the perspective of the individual defendants.  Thank you.

**MR. LUDWIG:**  This is Lewis Ludwig for the plaintiffs.

I just wanted to point out that we had filed an updated version of the preliminary approval order that did include the names of the parties requesting exclusion, so that that order was entered.  And there was also an inadvertent error in which

the release language wasn't properly set out in the previous order submitted with the motion.

And so this final order, this order that was submitted today, should be the one that was entered by the Court in the event that it's granted.

THE COURT:  You mean your proposed order?

MR. LUDWIG:  Correct, Your Honor.

THE COURT:  All right.  I usually don't use those, but I am glad to know that it is there.

Mr. Horne, anything else from your perspective?

MR. HORNE:  Yes, Your Honor.

The Court ordered us to include some certain language about class members being able to object to the attorneys' fees and other matters beyond the settlement on page 2 of the notice, the Internet notice.  And, unfortunately, that language was inadvertently omitted.

And that being said, though, the language did appear on the postcard notice which was mailed to every single settlement class member that we could find.  And it also appeared on the press release that was issued, and was keyed to the stock.

So the information was communicated to -- to settlement class members, that they could object to any part of the settlement, including attorneys' fees, plan of allocation, anything like that, anything they thought was objectionable.

THE COURT:  I see so --

**MR. HORNE:**  We do apologize for the mistake.

**THE COURT:**  Where was it left out?

**MR. HORNE:**  It was left out on page 2 of the long-form notice.  It was on page 9 of the long-form notice, though.

**THE COURT:**  Oh, I see.  So you're saying -- oh, it was -- let me just be sure I understand.

So you're saying it was supposed to appear in two places in the long-form notice, but only appeared in one.

**MR. HORNE:**  That's correct, Your Honor.

**THE COURT:**  All right.  I see.

Okay.  Anything further from your side?

**MR. HORNE:**  No, Your Honor.

**THE COURT:**  And, Mr. Masuda, anything further on behalf of the PG&E defendant?

**MR. MASUDA:**  Nothing further, Your Honor.

**THE COURT:**  All right.  So I'll look for those materials that we talked about by a week from today.  And then, once those are submitted, the parties can treat the motion as submitted and I won't need any further filings unless I reach out to you and ask for them.

I appreciate the discussion today, and the information, and I think that, overall, this is a good settlement.

**MR. HORNE:**  Thank you, Your Honor.

**MR. MASUDA:**  Thank you, your Honor.

**MR. LUDWIG:**  Thank you, Your Honor.

PROCEEDINGS

MR. SCHOLES:  Thank you, Your Honor.

THE COURT:  You're welcome.

(Proceedings adjourned at 2:48 p.m.)

---oOo---


**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.


DATE:   Sunday, October 2, 2021

_____
Ruth Levine Ekhaus, RMR, RDR, FCRR, CSR No. 12219
Official Reporter, U.S. District Court